## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNNOVA ENERGY INTERNATIONAL INC., *et al.*,[1] | ) | Case No. 25-90160 (ARP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO SETTLE CERTAIN DEALER CLAIMS; (II) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF (A) CRITICAL VENDORS, (B) 503(B)(9) CLAIMANTS, AND (C) LIEN CLAIMANTS; (III) AUTHORIZING THE DEBTORS TO REQUIRE FAVORABLE TRADE TERMS; (IV) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF OUTSTANDING ORDERS; AND (V) GRANTING RELATED RELIEF

**Emergency relief has been requested. Relief is requested not later than 3:00 p.m. (prevailing Central Time) on June 9, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on June 9, 2025, at 3:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "judgeperez." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance"**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova. The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046. "Sunnova" or the "Company" means, collectively, Sunnova Energy International Inc. and its Debtor and non-Debtor subsidiaries and affiliates.

**link on Judge Pérez's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

## Relief Requested

1.      The Debtors seek entry of interim and final orders, substantially in the forms attached hereto (respectively, the "Interim Order" and "Final Order"):  (a)  authorizing the Debtors to settle claims arising under certain Dealer Contracts (as defined below); (b) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, all prepetition amounts owing on account of (i) Critical Vendor Claims, (ii) 503(b)(9) Claims, and (iii) Lien Claims (each as defined below, and collectively, the "Trade Claims"); (c) authorizing the Debtors to require the Trade Claimants (as defined below) to provide favorable trade terms for the postpetition procurement of goods and services; (d) confirming the administrative expense priority status of Outstanding Orders (as defined below) and authorizing, but not directing, the payment of such obligations in the ordinary course of business; and (e) granting related relief.  The Debtors request that the Court schedule a final hearing within approximately twenty-one days after the commencement of these chapter 11 cases to consider entry of the Final Order.

---

[2]     A description of the Debtors, their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Paul Mathews, President and Chief Executive Officer of Sunnova Energy International Inc., In Support of Debtors' Chapter 11 Petitions* (the "Mathews First Day Declaration") and the *Declaration of Ryan Omohundro, Chief Restructuring Officer of Sunnova Energy International Inc., In Support of Debtors' First Day Motions* (the "Omohundro First Day Declaration," and together with the Mathews First Day Declaration, the "First Day Declarations"), filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declarations.

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 363, 503(b), 1107(a), 1108, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532  (the "Bankruptcy Code"), rules 6003, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1 and 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

**Background**

5.      On June 1, 2025, Debtor Sunnova TEP Developer, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On June 8, 2025 (the "Petition Date"), Debtors Sunnova Energy Corporation, Sunnova Energy International Inc., and Sunnova Intermediate Holdings, LLC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have filed a motion contemporaneously herewith requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**The Dealers and Settlement of Dealer Claims**

6.     Sunnova is a leader in the third-party ownership residential solar industry, offering customers end-to-end services, including system design, financing, installation, monitoring, and ongoing maintenance.  In the ordinary course of business, the Debtors rely on a network of third-party dealers (collectively, the "Dealers") to originate customer relationships and facilitate the sale, design, and installation of Sunnova's solar systems, energy storage systems, and related products and services.  Each of Sunnova's Dealer relationships is governed by a separate dealer contract, commonly referred to as a "Channel Partner Agreement," that sets out the respective parties' rights and obligations, including the terms of payment and the standards of project completion (collectively, the "Dealer Contracts").

7.     As of the Petition Date, Sunnova is party to nearly 175 Dealer Contracts.  Dealers are typically paid under the Dealer Contracts in two installments upon completion of certain milestones—either upon the issuance of the "Notice to Proceed" and at "Substantial Completion," or at "Substantial Completion" and at "Final Completion."  Typically, once a solar project achieves "Substantial Completion" or "Final Completion," title to the solar system transfers to Sunnova (in connection with Lease Agreements or Power Purchase Agreements), and Sunnova then sells the system to a Tax Equity Partnership ("TEP") through a series of intercompany transactions.  The Debtors then earn management and servicing fees ("MSA Fees") on the Solar Systems that comprise the Debtors' primary source of revenue.  Due to prepetition liquidity constraints, however, the Debtors were unable to pay certain amounts owed under the Dealer Contracts for many solar systems.  Many Dealers stopped building Solar Systems and the systems are not complete (the "Works in Process" or "WIPs"), which prevented the Debtors from monetizing the

4

Solar Systems by selling them to the TEPs.  There are approximately 22,000 WIPs stalled as of the Petition Date.  As of the Petition Date, the Debtors estimate that they owe approximately $367 million on account of prepetition claims for unpaid services and materials held by the Dealers (the "Dealer Claims").

8.      In a separate sale motion, the Debtors have sold their non-Debtor subsidiary TEP Holdings the right to settle Dealer Claims.  TEP Holdings and its lenders will negotiate a settlement with the Debtors.  If that settlement includes the compromise of Debtor Claims, it will have to be approved by the Debtors.  Through this Motion, the Debtors request authority to enter into settlements with the Dealers to resolve Dealer Claims under Bankruptcy Rule 9019.  Granting the requested relief will enable the Dealers to complete the WIPs and thereby unlock significant value for the Debtors' estates.  Failure to obtain such relief will deprive the Debtors of cash flows and jeopardize the survival of the many Dealers who rely mostly or entirely on Sunnova's business for their continued operations.  Authorizing the Debtors to settle the Dealer Claims is essential to ensuring the largest amount of WIPs reach completion so that the Debtors can access the revenue streams currently trapped in those stalled projects.

9.      Moreover, until the point of completion, many Dealers retain the statutory right to assert liens against the systems or the underlying customers' homes and properties until payment is received.[3]  The Dealers are generally contractually prohibited from asserting such liens. However, many Dealers have breached their contracts and attempted to record mechanics' liens on customers' homes and properties due to Sunnova's nonpayment.  The mounting unresolved liens are causing severe project delays, discontent among customers and Dealers, and cash

---

[3]      For the avoidance of doubt, such liens, when levied, are levied against the homes and properties of Sunnova's customers and not against Sunnova property.

flow disruptions.  Without immediate relief to settle Dealer Claims, the risk of widespread lien filings will escalate further, with cascading effects on project timelines, liquidity, and brand integrity.

10.     For the avoidance of doubt, the Debtors will not be funding the settlements and do not seek authority to pay any Dealer Claims (whether related to WIPs or otherwise) using funds within the Debtors' estates.  All Dealer Claims will be paid out of a fund established under a settlement agreement (the "ASPA Settlement Agreement") between certain non-Debtors under the TEPH Facility, Atlas Securitized Products Administration ("ASPA"), and the TEPH Lenders, as described further in the First Day Declarations.  Pursuant to the ASPA Settlement Agreement, ASPA will provide incremental loan advances for purposes of settling certain Dealer Claims (such settlement process, the "Dealer Settlement Program").

### Any Postpetition Dealer Work Must Be Authorized and Documented

11.     For the avoidance of doubt, the Debtors are not seeking authority to, and shall not, assume, perform under, or otherwise honor any obligations arising under any agreements or engagements with any Dealer unless such Dealer has been expressly authorized in writing by the Debtors to perform such services postpetition.  As of the date hereof, no such authorization has been granted, and the Debtors have not yet requested that Dealers resume work on the WIPs—though the Debtors may make such requests in the near term subject to the relief requested herein.  Accordingly, at this juncture, no Dealer should be providing postpetition services to the Debtors.  For these reasons, no Dealer shall be entitled to assert an administrative expense claim under section 503(b) of the Bankruptcy Code for any goods delivered or services rendered to the Debtors after the Petition Date unless such Dealer has been expressly authorized in writing by the Debtors to perform services postpetition.

## The Debtors' Vendors and Related Trade Claims

12.     In the ordinary course of business, the Debtors rely on vendors that support the Debtors' operations by providing the Debtors with various critical equipment, components, software, and services.  The Debtors' go-forward viability depends on their continued access to, and relationships with, these third-party providers of essential goods and services, including the Critical Vendors, 503(b)(9) Claimants, and Lien Claimants (each as defined below, and collectively,  the "Trade Claimants," and  the  claims  that  the  Trade  Claimants  hold, the "Trade Claims").[4]

13.     The Debtors have identified a limited set of vendors whose goods and services are critical to maintaining the value of their business throughout these chapter 11 cases.  These Trade Claimants provide highly specialized goods and services that are critical to the Debtors' ongoing operations.  In many cases, the Trade Claimants are effectively irreplaceable due to their technical expertise, regulatory familiarity, longstanding integration into the Debtors' systems and processes, and the specialized nature of the products and services they provide.  Even where alternatives may exist, the time and costs associated with transitioning to a new provider would cause significant operational disruption and strain on the Debtors' estates.  Further, many Trade Claimants hold liens, or the ability to place liens, on the Debtors' property that provides those Trade Claimants with security on account of their prepetition Trade Claims.  Accordingly, any delays or material changes in the delivery of such goods and services as a result of the Debtors' nonpayment of the Trade Claims would materially harm the Debtors and their key stakeholders and impede a smooth transition into these chapter 11 cases.

---

[4]     For the avoidance of doubt, (i) the Debtors do not seek authority to pay prepetition claims to any non-Debtor affiliates, any insiders (as such term is defined in section 101(31) of the Bankruptcy Code), or any affiliate of any insiders, and (ii) the term "Trade Claims" does not include any Dealer Claims.

14.     As of the Petition Date, the Debtors estimate that they owe approximately $15 million on account of the Trade Claims.  Accordingly, the Debtors request authority, but not direction, to pay certain outstanding prepetition Trade Claims to the extent the Debtors determine, in their business judgment, that such payment is beneficial to the Debtors' estates.

15.     The following table summarizes the categories and estimated amounts of accrued and unpaid prepetition Trade Claims that the Debtors request authority to pay pursuant to this Motion:

| Trade Claim Category | Interim Relief Requested | Final Relief Requested |
|---|---|---|
| Critical Vendor Claims | $8.5 million | $14 million |
| § 503(b)(9) Claimants | $350,000 | $350,000 |
| Lien Claimants | $130,000 | $640,000 |
| **Total Trade Claims:** | **$9 million** | **$15 million** |

## I.     Identifying Critical Vendors and Critical Vendor Claims.

16.     In the weeks leading up to the Petition Date, the Debtors, with the assistance of their advisors, spent significant time reviewing and analyzing the Debtors' books and records, accounts payable, key contracts, purchase orders, and vendor lists, consulted with key Company employees, and analyzed applicable laws, regulations, and historical practice to identify the vendors most critical to maximizing the value of the Debtors' estates (the "Critical Vendors"). Specifically, in determining which vendors the Debtors consider to be Critical Vendors, the Debtors examined each of their vendor relationships with the following criteria in mind:

> (i)     whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

(ii)    whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to transition business thereto;

(iii)   the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost revenue) exceed the amount of a vendor's prepetition claim;

(iv)   whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

(v)    whether the business relationship between the Debtors and the supplier is governed by a contract that will remain enforceable during these chapter 11 cases;

(vi)   whether a loss of services or goods provided by the vendor would present an unacceptable risk to the Debtors' operations given the volume of essential services and products that the vendor provides; and

(vii)  whether a vendor meeting the foregoing criteria is currently refusing or is likely to refuse to ship product to, or perform services for, the Debtors on a postpetition basis if the Debtors fail to pay their prepetition claims.

17.    In addition to these factors, the Debtors and their advisors examined the health of each vendor relationship and the extent to which each vendor's prepetition claim could be satisfied elsewhere in the chapter 11 process.

18.    When analyzing whether a particular vendor should be considered a Critical Vendor, the Debtors balanced the need to ensure business continuity during these chapter 11 cases with the need to thoughtfully conserve estate resources.  To that end, the Debtors undertook a lengthy evaluative process to ensure that the Critical Vendors truly represent those vendors whose goods and services are vital to the Debtors' operations.  Attempting to procure products or services from providers other than the Critical Vendors would impose a severe strain on the Debtors' operations—particularly at this crucial juncture as the Debtors enter chapter 11.  Even a temporary

interruption of the provision of those products and services would impede the Debtors' operations, and the cumulative effects could have a severe adverse effect on the Debtors' business, and in turn, these chapter 11 cases. That harm greatly outweighs the cost of the timely satisfaction of the prepetition claims of the Critical Vendors (such claims, collectively, the "Critical Vendor Claims"). The Debtors will evaluate each Critical Vendor Claim on a claim-by-claim basis and pay only those Trade Claims, or portions thereof, that (a) are absolutely critical to the Debtors' operations and (b) provide the Debtors with favorable postpetition terms. In the Debtors' business judgment, failing to pay this limited pool of Critical Vendor Claims will cause immediate and irreparable harm to the Debtors' business and reorganization efforts, while paying such Critical Vendor Claims will benefit the Debtors' estates both financially and operationally by preserving liquidity and enabling the Debtors to operate smoothly during these chapter 11 cases.

## II.     The Critical Vendors.

19.     In the ordinary course of business, the Critical Vendors provide the Debtors with: (a) certain materials, including modules, inverters, meters, modems, batteries, and other related solar and energy system components that are critical to the Debtors' ability to service Sunnova products and monitor their performance (the "O&M Suppliers"); (b) technology and IT infrastructure products and services, which support the Debtors' customer platforms, internal systems, and data processing capabilities (the "IT Service and Equipment Providers"); and (c) servicing and billing support, including support related to loan servicing and other administrative services, that is essential to the Debtors' payment flows, customer account management, and portfolio monitoring (the "Servicing Providers").

20.     Certain Critical Vendors are deeply embedded in the Debtors' operations, making it difficult for new vendors to step in on short notice without significant delay and cost. Others are difficult to replace due to the specialized materials, services, or industry relationships they

bring—often gained through years of working with the Debtors' unique solar products and asset portfolios. Preserving these key vendor relationships by paying Critical Vendor Claims is therefore essential to maintaining the going concern value of the Debtors' business and minimizing operational disruption at this critical juncture. Because the ultimate goal of these chapter 11 cases is to preserve the value of the Debtors' estates for the benefit of all stakeholders, it is vital that the Debtors maintain uninterrupted access to the goods and services that the Critical Vendors provide.

21.     As of the Petition Date, the Debtors estimate that they owe approximately $14 million on account of Critical Vendor Claims, $8.5 million of which is due or will become due within the first twenty-one days of these chapter 11 cases. The Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Critical Vendor Claims and to continue to make all payments on a postpetition basis in the ordinary course of business, in each case to the extent that the Debtors determine, in their business judgment, that such payment is beneficial to the Debtors' estates. The Debtors further request the authority to allocate the foregoing amounts in their sole discretion, without prejudice to seek additional relief, and subject to agreements (within the Debtors' discretion) to receive terms consistent with Customary Trade Terms (as defined herein) from the Critical Vendors.

**A. The O&M Suppliers.**

22.     In the ordinary course of business, the Debtors rely on the O&M Suppliers to maintain and service Sunnova products. The O&M Suppliers provide specialized and customized nature products, as well as engineering expertise related to the design, manufacturing, installation, and maintenance of complex solar equipment. Further, the Debtors have many long-standing relationships with the O&M Suppliers, and it would be difficult, if not impossible, to replace many

of them.   It is therefore critical that the Debtors avoid any disruption with respect to the O&M Suppliers.

**B.   The IT Service and Equipment Providers.**

17.   The Debtors partner with the IT Service and Equipment Providers to facilitate solar and energy storage system production, installation, and monitoring, as well as general business operations.   Specifically, the IT Service and Equipment Providers provide:  (a)  software and cloud computing services related to the Debtors' servicing and system monitoring business; (b) engineers, technicians, and other support personnel who develop and maintain the Debtors' IT infrastructure; and (c) consulting services related to the Debtors' enterprise resource planning systems, HR management systems, and reporting systems.   If the Debtors' relationships with the existing IT Service and Equipment Providers were to be disrupted, finding and integrating substitutes would be administratively burdensome, time-consuming, and expensive.   The IT Service and Equipment Providers are an integral part of the Debtors' hardware, software, and related services such that replacing them on short notice amid an in-court reorganization process would be impractical, if not entirely impossible.   For these reasons, it is critical that the Debtors have uninterrupted access to the IT Service and Equipment Providers.

**C.   The Servicing Providers.**

23.   The Debtors rely on a range of Servicing Providers for essential loan servicing and billing support.   These Servicing Providers are integral to maintaining uninterrupted cash flows, managing customer accounts, and monitoring the performance of the Debtors' securitized and tax equity portfolios.   Any disruption in these services could compromise the Debtors' ability to collect receivables and comply with regulations and obligations under their various securitization facilities.

### III.    The 503(b)(9) Claimants.

24.    In the ordinary course of business, the Debtors may have received certain goods or materials from various vendors (collectively, the "503(b)(9) Claimants") within the twenty-day period immediately preceding the Petition Date, thereby giving rise to claims entitled to administrative expensive status under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").

25.    Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors obtain much of their goods and other materials from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders if their 503(b)(9) Claims remain unpaid.  Any such refusal or interference could negatively affect the Debtors' estates, as the Debtors' business requires the steady flow of the goods and supplies that the 503(b)(9) Claimants provide.

26.    Certain of the 503(b)(9) Claimants supply goods or materials that are critical to the Debtors' ongoing operations.  For example, certain 503(b)(9) Claimants provide the Debtors with supplies and equipment necessary to construct and maintain solar power systems and energy storage systems.  Because many of the 503(b)(9) Claimants are highly specialized, the Debtors have few alternative suppliers in the short run should the existing 503(b)(9) Claimants stop providing goods or materials to the Debtors.  Thus, any interruption in the flow of these goods would upend the Debtors' operations and destroy value for the Debtors' business.

27.    In light of the immense importance of the 503(b)(9) Claimants to the Debtors' operations, the payment of the 503(b)(9) Claimants is essential to avoid disruption to the Debtors' operations.  Moreover, because the 503(b)(9) Claims are accorded administrative expense priority, such claims will need to be paid pursuant to a chapter 11 plan, and payment in the ordinary course

is only a matter of payment timing in order to maintain crucial vendor relationships.  Accordingly, it is essential that the Debtors are authorized, but not directed, to pay the 503(b)(9) Claims.

28.     As of the Petition Date, the Debtors estimate that they owe approximately $350,000 to the 503(b)(9) Claimants on account of their 503(b)(9) Claims on an interim and final basis.[5] For the foregoing reasons, the Debtors seek entry of interim and final orders authorizing the Debtors, in their sole discretion and business judgement, to pay undisputed 503(b)(9) Claims.

## IV.    The Lien Claimants.

29.     In the ordinary course of business, the Debtors regularly incur obligations to certain third-party suppliers (the "Lien Claimants") whose claims are potentially secured by liens against assets owned or operated by the Debtors (the "Lien Claims")[6] pursuant to applicable law.  The Lien Claimants primarily consist of companies providing logistics services and supplies that are used in the construction and maintenance of solar power systems.  To maintain efficient operations, the Debtors also employ a network of vendors to warehouse and transport raw materials and other necessary goods and equipment to the Debtors' various locations.  The goods and services that the Lien Claimants provide are fundamental to the Debtors' operations.  At any given time, the Lien Claimants may be in physical possession of parts and materials used in the Debtors' day-to-day operations.  Obtaining the authority to satisfy the Lien Claims will facilitate the timely release of assets that are critical to the Debtors' business.

---

[5]    For the avoidance of doubt, such amounts exclude 503(b)(9) Claims that are classified as Critical Vendor Claims or Lien Claims for purposes of this Motion.

[6]    For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  *See* U.C.C. § 7-307(a) (2005).

30.     Under certain applicable non-bankruptcy laws, to the extent the Debtors have not paid for the goods or services provided by a Lien Claimant, such Lien Claimant may have a lien on the goods in its possession that secures the charges or expenses incurred in connection with the transportation or storage of the goods.  Lien Claimants who have "furnish and install" contracts under which they purchase, install, or maintain certain equipment may file liens on the equipment. Lien Claimants who provided construction may file a lien against the Debtors' property.  If the Debtors fail to satisfy their obligations to the Lien Claimants, the Lien Claimants may retain possession of the Debtors' materials, products, and supplies, which would disrupt the Debtors' operations and affect their ability to efficiently administer these chapter 11 cases.  Generally, the value of the retained materials and the cost of such disruption to the Debtors' estates exceed the applicable Lien Claims.  It is therefore crucial that the Debtors are authorized, but not directed, to pay Lien Claimants in the ordinary course to avoid potential disruption to their operations.

31.     As of the Petition Date, the Debtors estimate that they owe approximately $640,000 to the Lien Claimants on account of their associated Lien Claims, $130,000 of which is due or will become due within the first twenty-one days of these chapter 11 cases.  To continue benefiting from the Lien Claimants' services, the Debtors request authority, but not direction, to pay all outstanding prepetition Lien Claims as they become due and payable and to continue paying the Lien Claims on a postpetition basis in the ordinary course of business.  For the avoidance of doubt, the Debtors seek authority to pay only those amounts of Lien Claims that the Debtors determine, in their sole discretion, to be necessary or appropriate to (a) obtain release of critical or valuable goods, (b) maintain reliable, efficient, and smooth distribution systems, and (c) induce the Lien Claimants to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.

**V.      Customary Trade Terms**.

32.      Subject to the Court's approval, the Debtors intend to pay the Trade Claims only to the extent necessary to preserve the value of their estates.  To that end, in return for paying such Trade Claims, either in full or in part, the Debtors propose that they be authorized, within their sole discretion, to require the Trade Claimants to provide favorable trade terms for the postpetition procurement of goods and services.

33.      Specifically, the Debtors seek authority, but not direction, to condition payment of the Trade Claims upon such Trade Claimant's (a) agreement to continue (or resume) supplying such products and services to the Debtors in accordance with trade terms—including credit limits, discounts, pricing, timing of payments, availability, and other terms—consistent with the parties' ordinary course prepetition practice or as otherwise agreed to in the Debtors' discretion and business judgment (collectively, the "Customary Trade Terms"), and (b) agreement that they shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such goods and/or services to the Debtors during the course of these chapter 11 cases.  The Debtors also seek authority to require, at their discretion, certain Trade Claimants to enter into a contractual agreement evidencing such Customary Trade Terms.  The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms be commemorated in writing, either by email or use of a trade agreement, as a condition to payment, the form of which is attached to the Orders as Exhibit A (the "Form Trade Agreement").

34.      In addition, the Debtors request that if any party accepts payment pursuant to the relief requested herein and thereafter does not continue to provide goods or services on Customary Trade Terms or as otherwise agreed to by the Debtors, then:  (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable by the Debtors in cash upon

written request by the Debtors; (b) upon such recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested through this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay the Debtors such postpetition payments to the extent they exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise; and (d) the Debtors may pursue any other remedy available to them under the applicable law or any executed writing with such party.

**VI.    Payment of Outstanding Orders**.

35.    Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  In order to avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.   Receiving delivery of Outstanding Orders is critical to preventing any disruption to the Debtors' business operations.  To prevent any disruption to the Debtors' business operations, and given that any goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors request that the Court confirm the administrative expense priority status of the Outstanding Orders under section 503(b) of the Bankruptcy Code and authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

## Basis for Relief

**I.   Bankruptcy Rule 9019 and Sections 105(a), 363(b), and 1107(b) of the Bankruptcy Code Authorize the Debtors to Enter into the Dealer Settlements.**

36.     Section 105 of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under Bankruptcy Code section 363, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds, with court approval, outside the ordinary course of business.  *See* 11 U.S.C. § 363.  In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  In addition, Bankruptcy Rule 9019 provides that the Court "may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Compromises are tools for expediting the administration of the case and reducing administrative costs and are favored in bankruptcy. *See In re Cantu*, No. 08-70260, 2011 WL 160563, at *3 (Bankr. S.D. Tex. Jan. 18, 2011), *aff'd sub nom. Cantu v. Int'l Bank of Commerce*, No. CIV.A. M-11-28, 2011 WL 10620314 (S.D. Tex. Aug. 5, 2011), *aff'd sub nom. In re Cantu*, 464 F. App'x 385 (5th Cir. 2012) ("In the bankruptcy context, settlement agreements are particularly important.  '[S]tipulations settling competing claims and compromises are strongly favored and should not easily be set aside.'") (citation omitted); *Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000); *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).  Indeed, courts have recognized that, particularly in the bankruptcy context, "[settlement] is intended to conserve [scarce] resources, and is therefore encouraged."  *Magill v. Springfield Marine Bank (In re Hessinger Res. Ltd.)*, 67 B.R. 378, 382 (C.D. Ill. 1986); *see Thomas v. Fallon (In re Chicago Rapid Transit Co.)*, 196 F.2d 484, 490 (7th Cir. 1952) ("We fully realize

the desirability of settling claims without resort to litigation in bankruptcy matters . . . where any reasonable basis for compromise settlements appears they should be encouraged[.]").

37.     The standards by which a debtor should guide its decision to enter into a settlement, and by which the Court should evaluate a settlement, are well established.   In addition to considering the proposed terms of the settlement, key relevant factors include:

> (i)     the probability of success in litigation;
>
> (ii)    the difficulty in collecting any judgment that may be obtained;
>
> (iii)   the complexity of the litigation involved, and the expense inconvenience and delay necessarily attendant to it;
>
> (iv)    the interest of creditors and stockholders and a proper deference to their reasonable views of the settlement; and
>
> (v)     the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion.

*See Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997)*; Matter of Foster Mortg. Corp.*, 68 F.3d 914, 918 (5th Cir. 1995); *In re Jackson Brewing Co.*, 624 F.2d 599, 602–603 (5th Cir. 1980); *In re Wright*, 545 B.R. 541, 561 (Bankr. S.D. Tex. 2016); *In re Roqumore*, 393 B.R. 474, 479 (Bankr. S.D. Tex. 2008).

38.     The decision to approve a settlement or compromise is within the discretion of the Court and is warranted where the settlement is found to be reasonable and fair in light of the particular circumstances of the case.   *See Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968).   The settlement need not be the best that the debtor could have achieved, but need only fall "within the reasonable range of litigation possibilities."   *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994).   In making its determination, a court should not substitute its own judgment for that of the debtor and

should defer to the debtor so long as there is a business justification. *See In re Martin*, 91 F.3d at 395; *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.N.J. 2000).

39.     Moreover, the Court does not need to require that the Debtors seek Court approval of all settlements.  Rather, pursuant to Bankruptcy Rule 9019(b), the Court is empowered to approve settlement procedures for entire classes of controversies by a debtor without requiring separate notice and hearing with respect to each individual controversy.  *See* Fed. R. Bankr. P. 9019(b).    The rule merely requires that the proposed procedures be reasonable. *In re Check Reporting Service, Inc.*, 137 B.R. 653, 658 (Bankr. W.D. Mich. 1992).  Finally, section 105 of the Bankruptcy Code incorporates the Court's equitable powers and provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

40.     Here, the Dealer Settlement Program is firmly rooted in the spirit of Bankruptcy Rule 9019 and the Bankruptcy Code's strong preference for consensually resolving claims through compromise and should therefore be approved.  Authorizing the Debtors to settle Dealer Claims through the Dealer Settlement Program will reduce administrative burdens, conserve estate resources, and is ultimately value-maximizing.  Requiring the Debtors to return to court to settle each individual claim, regardless of size, would impose undue costs, create unnecessary and untenable delays, and discourage the very compromises that Rule 9019 was enacted to facilitate, particularly because the Dealer Settlement Program will be funded pursuant to the ASPA Settlement Agreement and will not involve the use of any funds of the Debtors' estates.  By resolving Dealer Claims outside of the estates, the Dealer Settlement Program preserves estate funds and, in turn, preserves potential recoveries for general unsecured creditors, including those whose claims are not resolved through the program.  The more Dealer Claims the

Debtors can settle outside of a traditional chapter 11 distribution process, the larger the residual pool for distribution to the remaining general unsecured creditors.

41.     The Dealer Settlement Program strikes the appropriate balance between flexibility and oversight.  Specifically, the Dealer Settlement Program would (i) spare the Debtors and the Court from the costs and administrative burden of preparing, filing, and litigating hundreds of individual Rule 9019 motions; (ii) reduce strain on the Court's docket and protect the interests of all creditors through the notice and objection procedures incorporated therein; and (iii) afford the Debtors the flexibility needed to resolve routine yet commercially sensitive disputes in a streamlined manner.  The inclusion of the Notice Parties (particularly the U.S. Trustee) in the settlement process ensures that all agreements reached under the Dealer Settlement Program will satisfy the applicable legal standard articulated in *Martin*.[7]

42.     The Debtors also intend to take seriously their role to appropriately analyze any settlement before entering into a settlement agreement with a Dealer.  Under the Dealer Settlement Program, the Debtors will evaluate any settlements only after giving due consideration to the factors set forth in *TMT Trailer Ferry* and other relevant cases.  Specifically, the Debtors will consider:  (a) the reasonableness of the settlement as a whole; (b) the probability of success if the Dealer Claim(s) were to be litigated, mediated or resolved through other means; (c) the

---

[7]     The Debtors also request that, pursuant to Bankruptcy Rule 2002(a)(3), the Court find that cause exists to limit notice as described above for any settlements entered into pursuant to the Dealer Settlement Program.  Bankruptcy Rule 2002(a)(3) requires 21-day notices to parties in interest of "a hearing to approve a compromise or settlement . . . unless the court for cause, orders that notice not be given."  Fed. R. Bankr. P. 2002(a)(3).  Courts have found that cause exists for purposes of limiting notice under Bankruptcy Rule 2002(a)(3) where there are so many creditors that sending notice to each creditor would constitute an undue burden and expense on the debtors' estates.  *See Cory v. Leasure*, 491 B.R. 476, 487 n.8 (Bankr. W.D. Ky. 2013) ("Other courts similarly have read Rule 2002(a)(3)'s notice requirement as neither absolute nor mandatory."); *In re Szabo Contracting, Inc.*, 283 B.R. 242, 253 (Bankr. N.D. Ill. 2002) (finding cause existed to dispense with notice to all creditors where there were more than 500 creditors and "to require notice to go to every creditor listed in the estate for every claim objection settlement would constitute an undue and unnecessary burden upon the Trustee and expense to the Debtor's estate, thereby further reducing the net asset pool available to pay allowed claims").

complexity, expense, and likely duration of any litigation, mediation, or dispute resolution process; (d) the likelihood of collecting any judgment if the Debtors proceeded with litigation; (e) the fairness of the Settlement with regard to the Debtors' estates, creditors, and other parties in interest; (f) the extent to which the settlement is truly the product of arms-length bargaining, and not fraud or collusion; and (g) other factors relevant in assessing the utility of a proposed settlement.  Only after giving due consideration to the foregoing will the Debtors enter into a dealer settlement agreement.  In light of the foregoing, the Debtors believe that each of the Dealer Settlement Program and the settlements reached thereunder should be approved under Bankruptcy Code section 105 and Bankruptcy Rule 9019 and constitutes a reasonable use of estate property in satisfaction of Bankruptcy Code section 363(b).

43.    For these reasons, the Court should authorize the Debtors to enter into settlements using non-estate funds to resolve the Dealer Claims.

**II. The Court Should Authorize the Payment of the Trade Claims**.

44.    Courts have repeatedly recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.    *See, e.g.*, *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("Cases cited by Debtors that refer to necessity of payment to preserve going concern value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); *see also Czyzewksi v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (noting that courts "have approved… 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices"); *In re Scotia Dev., LLC*, No. 07-20027, 2007 WL 2788840, at *2 (Bankr. S.D. Tex. Sep. 21, 2007) (outlining the factors for when payment to a critical vendor is necessary); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of

pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

45.     Section 105(a) of the Bankruptcy Code codifies the inherent equitable powers of the bankruptcy court, empowering the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), courts may "authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor."  *See In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999).  Under the "doctrine of necessity" or "necessity of payment" rule, courts have the flexibility under Rule 105(a) to allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization.  *See CoServ*, 273 B.R. at 497 ("These are simply examples of claims that may require satisfaction for the debtor in possession to perform its fiduciary obligations.  In such instances it is only logical that the bankruptcy court be able to use section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization."); *Ionosphere*, 98 B.R. at 175 ("The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("[A] bankruptcy court may exercise its equity powers under section 105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where

such payment is necessary to 'permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately.'") (quoting *Michigan Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987)); *Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Chateaugay, Corp.*, 80 B.R. at 287 (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately").

46.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that debtors, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." This section permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to allow contractor to pay prepetition claims); *In re Windstream Holdings Inc.*, 614 B.R. 441, 456–57 (S.D.N.Y. 2020) (same). "The business judgment standard applies to transactions governed by 11 U.S.C. § 363," *In re Bouchard Trans. Co., Inc.*, 639 B.R. 697, 708 (S.D. Tex. 2022), *aff'd sub nom. Matter of Bouchard Trans. Co., Inc.*, 74 F.4th 743 (5th Cir. 2023), and "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct,"

*Johns-Manville*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

47.     Under section 1107(a) of the Bankruptcy Code, a debtor in possession is given the same rights and powers as a trustee appointed in a bankruptcy case, including the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value." *In re CEI Roofing, Inc.*, 315 B.R. 50, 56, 59 (Bankr. N.D. Tex. 2004) (quoting *CoServ*, 273 B.R. at 497).

48.     There are instances in which a debtor in possession can fulfill its fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.  The court in *CoServ* specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id*. at 497–98.  Courts in the Fifth Circuit, including the Southern District of Texas, have followed *CoServ's* three-part test to determine whether a prepetition claim of a "critical vendor" may be paid outside of the plan process on a postpetition basis:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

49.     Each of these three requirements is met in this case, and the Debtors have a sound business purpose for the relief requested herein.  The Debtors require a steady provision of goods and services provided by the Critical Vendors and the services provided by the O&M Suppliers,

IT Service and Equipment Providers, Servicing Providers, and Other Service Providers in order to continue operating their businesses and maintain operational stability.  Without such products and services, the Debtors could be forced to unexpectedly halt operations while they search for substitute vendors and service providers and may have to forego existing favorable trade terms in their haste to find new vendors, thereby hindering the Debtors' ability to generate revenue. Importantly, any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency, decreasing the value of the Debtors' business, which could impair stakeholder value at the outset of these chapter 11 cases.  The authority to honor unpaid, prepetition Trade Claims in the initial days of these chapter 11 cases will maintain the integrity of the Debtors' business, allow the Debtors to efficiently administer these chapter 11 cases, and maximize the value of their estates.  If the Debtors are denied the relief requested herein, the resulting harm to the Debtors' estates far outweighs any costs associated with paying the Trade Claims.  Thus, the Debtors' other creditors will be no worse off, and likely fare better, if the Debtors are empowered to negotiate such payments to achieve a smooth transition into chapter 11 with minimal disruptions.  Accordingly, the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

50.     Reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's ability to preserve going-concerns and maximize creditor recovery, courts regularly grant relief consistent with that which the Debtors are seeking in this Motion.  *See CoServ*, 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate").

51.     Bankruptcy courts in this circuit have found authority to authorize critical vendor payments under sections 105(a) and 1107 of the Bankruptcy Code.  *See CoServ*, 273 B.R. at 496--97 (holding that a debtor in possession's duty to protect and preserve an operating business's going-concern value may require the preplan satisfaction of prepetition claims pursuant to section 105(a)); 11 U.S.C. § 1107 (codifying the duties of a debtor in possession); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (noting that the continuance of even insignificant customer business transactions can be "critical to the survival of the business," and failure to continue such transactions risks eroding the business's customer base and going concern value); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 467–68 (2017) (noting that bankruptcy courts frequently approve critical vendor payments in furtherance of Code-related objectives); *see also In re Northvolt AB*, No. 24-90577 (ARP) (Bankr. S.D. Tex. Dec. 20, 2024) (authorizing the debtors to pay certain prepetition critical vendor claims on a final basis); *In re Vertex Energy, Inc.*, No. 24-90507 (CML) (Bankr. S.D. Tex. Oct. 29, 2024) (same); *In re Digit. Media Sols., Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Oct. 15, 2024) (same); *In re SmileDirectClub, Inc.*, No. 23-90786 (CML) (Bankr. S.D. Tex. Oct. 2, 2023) (same); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. June 1, 2023) (same).[8]

52.     In sum, should any of the Critical Vendors delay or cease providing services to the Debtors, even on a temporary basis, the Debtors' business could face severe consequences.  Aside from allowing payment to the Critical Vendors, no practical alternative exists by which Debtors can protect the value of their estates.  Accordingly, the Debtors seek authorization, but not

---

[8]     Due to the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.  Copies of these orders are available upon request to the Debtors' proposed counsel.

direction, to pay Critical Vendor Claims in the ordinary course of business during these chapter 11 cases.

**III. The Court Should Authorize Payment of the 503(b)(9) Claims.**

53.    Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within [twenty] days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9).  Generally, these claims must be paid in full for the Debtors to be able to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan unless they consented otherwise.  Additionally, all creditors will benefit from the Debtors' ongoing business relationship with the 503(b)(9) Claimants and the resulting smooth transition into these chapter 11 cases.

54.    Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation.  As these claims are administrative claims incurred in the ordinary course of business, the Debtors may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code.  *See, e.g.*, *In re Dura Auto. Sys., Inc.*, No 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49 21–23 ("THE COURT:  I think arguably the debtor could pay its 503(b)(9) claimants without court approval.").  The timing of such payments also lies squarely within the Court's discretion.  *See In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that

"the timing of the payment of that administrative expense claim is left to the discretion of the Court").

55.     The Debtors' ongoing ability to obtain inventory and other goods and supplies as provided herein is key to their survival and necessary to preserve the value of their estates. Absent payment of the 503(b)(9) Claims in the ordinary course during these chapter 11 cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the equipment and goods necessary to maintain the Debtors' business operations. Failure to honor these claims in the ordinary course of business may also cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process. Such vendors could accelerate or eliminate favorable trade terms. The cost of that disruption and the resulting administrative burden would far exceed the cost of paying 503(b)(9) Claims as they come due. Accordingly, the Debtors seek authorization, but not direction, to pay 503(b)(9) Claims in the ordinary course of business during these chapter 11 cases.

**IV. The Court Should Authorize Payment of the Lien Claims.**

56.     Certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claims. Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay. *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection"). The Debtors anticipate that certain of the Lien Claimants

29

may assert or perfect liens, refuse to turn over goods in their possession, or stop performing their ongoing obligations. Even absent a valid lien, to the extent that certain Lien Claimants have possession of the Debtors' inventory, equipment, or materials, mere possession or retention would disrupt the Debtors' operations.

57. Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of a valid possessory lien to the extent that the Debtors use or sell the estate property against which a Lien Claim is asserted. *See* 11 U.S.C. § 363(e). Given that the value of such property will generally far exceed the value of the related Lien Claim, creditors will not be harmed—and, in fact, will be benefited—by satisfying certain amounts owed to the Lien Claimants. Those payments will facilitate the use or sale of estate property against which liens may otherwise be asserted, helping to preserve the going-concern value of the Debtors' business, and enabling the Debtors to smoothly transition into chapter 11.

58. Moreover, paying the Lien Claims should not impair unsecured creditor recoveries in these chapter 11 cases. In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claimant's claim, such party may be a fully-secured creditor of the Debtors' estates. In such instances, payment now only provides the Lien Claimants with what they might be entitled to receive under a chapter 11 plan, without any interest costs that might otherwise accrue during these chapter 11 cases. Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

**V.    The Court Should Confirm that Claims Arising from Outstanding Orders Are Entitled to Administrative Expense Priority and that Payment of Such Claims Is Authorized.**

59. Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered

prepetition, are administrative expense priority claims because they benefit the Debtors' estates postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority). Thus, granting the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than what they would otherwise be entitled to if the relief requested herein were not granted and will not prejudice any other party in interest.

60.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to assure certain suppliers of such administrative priority status. The disruption to the continuous and timely flow of critical raw materials and other goods to the Debtors would potentially force the Debtors to halt operations and production, damage the Debtors' business and reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors' estates and their creditors. Accordingly, the Court should confirm that claims arising from the Outstanding Orders are entitled to administrative expense priority status and should authorize the Debtors to pay such claims as they come due in the ordinary course of business.

**Emergency Consideration**

61.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant certain relief within the first twenty-one days after the commencement of a chapter 11 case if such relief "is needed to avoid immediate and irreparable harm." For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief in this Motion during the first twenty-one days

of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief "is needed to avoid immediate and irreparable harm" as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

62. The Debtors will have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of the expected cash flows from ongoing business operations and the proceeds of certain asset sales. Under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests that are unrelated to authorized payments will be honored inadvertently. Therefore, the Debtors request that the Court authorize all applicable financial institutions, when the Debtors request, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

63. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

### Modification of Bankruptcy Rule 2002(a)(2) and 9019(a)

64. The Debtors request that the Court, for cause, modify the services requirements set forth in Bankruptcy Rules 2002(a)(2) and 9019(a) such that they are permitted to limit service of this Motion only to affected creditors. In light of the breadth and complexity of the Debtors'

business, serving the Motion on all creditors, even those that are unaffected by the relief sought herein, would cause unnecessary confusion and expense to the detriment of all stakeholders. Furthermore, the Dealer Claims contemplated to be settled do not impact the recovery of other creditors because the funding mechanism by which such Dealer Claims will be settled are not part of the Debtors' estates.  Accordingly, sufficient cause exists under Bankruptcy Rule 2002(a)(2) and section 105(a) of the Bankruptcy Code to modify the service requirements set forth in Bankruptcy Rules 2002(a)(2) and 9019(a).

**<u>Reservation of Rights</u>**

65.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended as or should be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; (h) a concession that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (i) a waiver of the

obligation of any party in interest to file a proof of claim; or (j) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## <u>Notice</u>

66.    The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to the Ad Hoc Group of Certain Noteholders; (d) Norton Rose Fulbright US LLP, counsel to GoodFinch Management, LLC; (e) White & Case LLP, counsel to Atlas, as SLA Lender and TEPH Lender; (f) Milbank LLP, counsel to the KKR Term Loan Lenders; (g) Davis Polk & Wardwell LLP, counsel to the Ad Hoc Group of ABS Lenders; (h) Schulte Roth & Zabel LLP, counsel to the Special Committee of the Board of Directors of Sunnova TEP Holdings, LLC, and co-counsel to Sunnova TEP Holdings, LLC and its subsidiaries; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the state attorneys general for states in which the Debtors conduct business; (m) the Trade Claimants; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

The Debtors request that the Court enter the Interim Order and the Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
June 9, 2025

/s/ *Jason G. Cohen*

**BRACEWELL LLP**
Jason G. Cohen (TX Bar No. 24050435)
Jonathan L. Lozano (TX Bar No. 24121570)
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:     (713) 223-2300
Facsimile:      (800) 404-3970
Email:           jason.cohen@bracewell.com
                      jonathan.lozano@bracewell.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           anup.sathy@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
Ciara Foster (*pro hac vice* pending)
Margaret Reiney (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           brian.schartz@kirkland.com
                      ciara.foster@kirkland.com
                      margaret.reiney@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/  Jason G. Cohen*
Jason G. Cohen

**<u>Certificate of Service</u>**

I certify that on June 9, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/  Jason G. Cohen*
Jason G. Cohen