**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNNOVA ENERGY INTERNATIONAL INC., *et al.*,[1] | ) ) | Case No. 25-90160 (ARP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF
PAUL MATHEWS, PRESIDENT AND
CHIEF EXECUTIVE OFFICER OF SUNNOVA ENERGY
INTERNATIONAL INC., IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS**

I, Paul Mathews, hereby declare under penalty of perjury:

**Introduction[2]**

1.      Sunnova was founded in a downtown Houston apartment in 2012 with a bold and straightforward mission:  to power energy independence with clean, reliable, and affordable electricity.  Since then, the Company has worked tirelessly toward this goal, ultimately placing itself at the top of the residential solar industry and the forefront of the clean energy sector.  When residential solar energy emerged as an alternative and supplement to traditional utilities, Sunnova was there to meet the new demand.  Today, Sunnova's full-service approach to residential solar

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova.  The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046.  "Sunnova" or the "Company" means, collectively, Sunnova Energy International Inc. and its Debtor and non-Debtor subsidiaries and affiliates.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in *Declaration of Ryan Omohundro, Chief Restructuring Officer of Sunnova Energy International Inc., In Support of the Debtors' First Day Motions* (the "Omohundro Declaration").

energy and energy storage systems allows it to serve hundreds of thousands of customers in more than fifty U.S. states and territories.

2.      Through these chapter 11 cases, the Debtors seek a long-term solution for their stakeholders, including their Dealers, customers, employees, and lenders, via a value-maximizing sale and wind-down process that contemplates:  (a) the sale of substantially all of the Debtors' assets; (b) settlement of claims held by the Debtors' Dealers with incremental financing to a non-Debtor and the non-Debtor's purchase of certain dormant Debtor assets; and (c) a wind-down of the remaining estates.

3.      Sunnova's prodigious growth dovetailed with the adoption of residential solar energy as an alternative and supplement to traditional utilities.  Sunnova's historical success reflects its unique ability to leverage the opportunities created by the growing demand for residential solar and the technological advancements necessary to fulfill that demand.  Unlike many of its competitors, which maintain large direct sales forces and installers across their footprints, Sunnova has utilized a network of approximately 450 local, independent dealers and contractors (collectively, the "Dealers") to market, sell, and install products and services, including solar energy systems and energy storage systems (collectively, "Solar Systems"), on Sunnova's behalf.

4.      Historically, Sunnova has provided services to its customers in four ways:

- *Solar Leases*—Customers enter long-term lease agreements with fixed monthly payment terms for the use of Solar Systems owned by Sunnova.

- *Power Purchase Agreements (PPAs)*—Customers enter long-term agreements with Sunnova to purchase the power generated each month by Solar Systems owned by Sunnova.

- ***Solar Loans***—Customers purchase Solar Systems from Sunnova for little or no money down, financed by Sunnova.[3]

- ***New Home Products***—Customers purchase Solar Systems—in cash or subject to Solar Leases/PPAs—through Sunnova's homebuilder-Dealers, in connection with purchases of new homes.

- ***Service and Warranty Agreements***—Customers with Sunnova-originated Solar Systems are provided warranties for monitoring, maintenance, and repair/replacement services; customers with third-party installations enter into long-term service contracts for similar monitoring, maintenance, and warranty services and, in some cases, production guarantees.

5.      These business segments generate cash flows spread across extended (multi-decade) time frames, often paired with significant up-front cash investments.  To support its business operations, grow its customer count, and leverage the solar-related tax credits and other governmental incentives its business generates, Sunnova has employed a number of sophisticated financing structures, primarily consisting of:  (a) unsecured notes at the Company's corporate level; (b) tax equity partnerships ("TEPs"), in which third-party investors commit capital for the purchase of Solar Systems subject to solar leases and PPAs in exchange for the assets' residual cash flows and tax attributes; (c) non-recourse revolving credit facilities that finance Sunnova's purchase of Solar Systems, Solar Loans, and interests in the TEPs (the "Warehouse Facilities"); and (d) securitization facilities that issue notes secured by Sunnova's Solar Loans and interests in TEPs.

6.      Sunnova's business segments have allowed it to provide a broad, complementary suite of product and service offerings to its customers.  Through the 2010s and early 2020s, Sunnova capitalized on the exceptional growth of the residential solar ecosystem, more than

---

[3]     As described in greater detail below, in addition to Solar Loans that finance customers' purchases of Solar Systems, Sunnova historically offered Accessory Loans, which allowed customers to renovate their roofs or obtain other sustainable home products, through standalone loans, as part of Solar Loans, or in addition to Solar Leases or PPAs.

quadrupling its customer count between 2020 and 2024, while increasing its gross revenues from $161 million to nearly $840 million during the same period. Sunnova now commands the second-highest market share in the growing third-party ownership ("TPO") residential solar segment, with billions of dollars in active customer contracts:[4]



7.     Over the last couple years, however, a combination of industry-specific pressures and macroeconomic headwinds resulted in reduced investment in, and diminished profitability for, residential solar generally. These forces include economic volatility, above-target inflation, prolonged high interest rates, and more recently, tariffs and uncertainty over the nation's commitment to incentivizing solar power generation. This downturn has already affected Sunnova's competitors, including SunPower Corporation, which filed for chapter 11 and underwent a sale process in the summer of 2024.

8.     As the residential solar industry navigates this new environment, Sunnova's growth-first mindset has given way to a more measured strategy with an emphasis on profitability

---

[4]    Wood Mackenzie, US Residential Solar Finance Update H2 2024; Company's filings with the Securities and Exchange Commission.

and sustainability.  Sunnova has reoriented its focus on originating only those projects that are most sound economically and better aligning its revenues with the costs of its ongoing debt service. Heading into 2025, Sunnova had shrunk its year-over-year net losses by more than 10 percent, even while it grew its revenue and customer count.  But its headline financials belied deeper challenges.  The high-growth strategy that allowed the Company to cement its place as a market leader made it difficult to preserve cash.  As the Company's cash position continued to deteriorate, it accumulated unpaid balances to its Dealers, leading them to ground in-process construction projects and dam critical revenue streams.

9.      The Company recognized an imperative to pursue a comprehensive operational and financial restructuring to rebalance its cash flows, rationalize its balance sheet, and position itself for future success.  In December 2024, it began exploring liability management options and soon thereafter, it engaged J.P. Morgan & Co. to market potential recapitalization transactions.  But the Company's eroding cash position soon prompted it to prioritize raising additional capital.

10.     Specifically, the Company identified a need for approximately $200 million to bridge its operations while it pursued long-term capital solutions.  The Company explored potential financing vehicles, including (a) the sale of its interests in entities holding Solar Assets, (b) refinancing/re-levering its Securitizations, and (c) raising a facility secured by its residual interests in its Securitizations.  The Company determined a sale of discrete equity interests/Solar Assets would foreclose on critical recurring cash flows, and refinancing/re-levering its Securitizations would be a cumbersome process, unlikely to deliver material cash proceeds. Accordingly, the Company elected to pursue an incremental facility and began a marketing process, receiving three indicative offers.  The Company ultimately pursued an offer from KKR

for a $185 million term loan facility (the "KKR Facility"), which closed on March 2, 2025, pursuant to the KKR Credit Agreement.

11.     In addition, the Company installed new senior leadership, including appointing me as President and Chief Executive Officer ("CEO") and Robyn Liska as Interim Chief Financial Officer ("CFO").  The Company also retained legal and financial restructuring advisors, including Ryan Omohundro of Alvarez & Marsal North America, LLC as Chief Restructuring Officer.  New leadership immediately commenced discussions with the Debtors' key lenders, including the lenders under its Warehouse Facilities, an ad hoc group consisting of holders of the Senior Unsecured Notes and Convertible Notes (the "Ad Hoc Group"),[5] KKR, and third parties around the Company's short-term liquidity need and turnaround business plan.  Further, the Company began to streamline its operations to both preserve cash and position itself for potential restructuring transactions.  As part of that process, the Company made extraordinarily difficult decisions to furlough, and then part ways with, more than 50 percent of its employees.

12.     Despite the current volatility in the solar market and the challenges imposed by its balance sheet, the Company, its advisors, and its stakeholders believe in the value of the Company's business and assets.  The fundamental forces that drove the residential solar industry's rapid growth over the last decade-plus have only grown stronger.  Traditional utility costs have

---

[5]     As of March 2025, the Ad Hoc Group accounted for more than 90 percent of the holders of each series of Senior Unsecured Notes and Convertible Notes.  The Ad Hoc Group has since separated, and the remaining group is referred to in the Debtors' pleadings as the "Ad Hoc Group of Certain Noteholders."

continued to rise due to load growth and transmission constraints and are forecast to continue rising in the future, particularly in key markets:[6]



Conversely, the cost savings offered by solar energy production and storage have only improved due to declining capital expenditure costs and improved battery storage technology. Residential solar also offers customers reliability in an era of grid instability. The Company believes its businesses and assets are well-positioned to capitalize on these continuing secular shifts.

13.     In the weeks and months leading to the Petition Date, the Debtors, their major constituents, and third parties engaged in negotiations regarding potential (a) out-of-court capital solutions, (b) bridge financing, (c) postpetition financing, and (d) a postpetition marketing process. The Debtors commence these chapter 11 cases to pursue the sale of all or substantially all of their assets and an orderly wind-down of their estates to realize maximum value for the benefit of their stakeholders.[7]

---

[6]    S&P Global Cost per kWh Databook 1978-2023.

[7]    *See* the Omohundro Declaration for details regarding the Debtors' (a) prepetition negotiations with its stakeholders and third parties and (b) proposed actions in these chapter 11 cases, including consummation of the Sale Process and TEPH Transactions (each, as defined in the Omohundro Declaration).

## Background and Qualifications

14.     I am the CEO of Sunnova.

15.     I began working at Sunnova in January 2023 as its Executive Vice President of Service and Supply Chain.  I was appointed Chief Operating Officer in 2024 and CEO in March 2025.  Prior to my time at Sunnova, I spent nearly two decades serving in a variety of leadership roles at UPS, most recently as President of U.S. Industrial Engineering and President of Engineering—Strategy and Planning.  I hold a bachelor's degree from the University of Pittsburgh and an MBA from the Kenan-Flagler Business School at the University of North Carolina.

16.     As CEO of Sunnova, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated, the statements set forth in this Declaration are based upon my personal knowledge, information provided by other members of the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

17.     To familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the Debtors' prepetition restructuring initiatives, this declaration (this "Declaration") is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history, structure, and business operations;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases;

- **Part IV** describes certain of the Debtors' prepetition restructuring initiatives.

**Discussion**

I.    **The Debtors' Corporate History, Structure, and Business Operations**

A.  **Corporate History**

18.    Sunnova was founded in 2012 with little more than a vision well-suited to its home in the Energy Capital of the World:  to bring a clean, reliable, affordable energy alternative to homeowners across the country.  Over the next thirteen years, Sunnova took advantage of a confluence of market developments and used its unique business model to make that vision a reality.  To start, advancements in solar and energy storage technologies in the years after Sunnova's founding improved the efficiency and output of residential solar systems and significantly reduced their costs.  These production capabilities were met by untapped demand for cleaner alternatives to traditional home electricity production—in 2019, at the time of Sunnova's initial public offering, just 3 percent of the 84 million single-family homes in the United States were equipped with rooftop solar.  Moreover, both (a) the rising (and unpredictable) costs of utility-based electricity and (b) the demand for independent energy production resilient to natural disasters—which continue to disrupt centralized power grids—bolstered Sunnova's value proposition beyond just eco-friendly production of home electricity.

19.    Sunnova grew quickly.  It commenced operations in January 2013 and began providing solar energy services through its first solar energy system in April 2013.  In July 2019, Sunnova completed an initial public offering ("IPO") and began trading on the New York Stock Exchange (the "NYSE").  At that point, less than seven years after its founding, the Company was serving 63,000 customers and operating one of the largest fleets of residential solar systems in the United States.  After its IPO, Sunnova continued its upward trajectory, and its solar systems now hold more than 2,892 megawatts of generation capacity—enough to power the city of Chicago.

The following chart illustrates the growth in Sunnova's customers from December 31, 2020, through December 31, 2024.



### B.  The Debtors' Business Operations

20.     As set forth further herein, the Debtors' business model has undergone a strategic transition from its initial growth-oriented focus.  Macroeconomic and financial factors led the Company to pause its origination of new customer business and divest from certain unprofitable and non-core segments, including the origination of solar energy loans and accessory loans. Accordingly, the following description of the Debtors' businesses details Sunnova's historical operations through the end of 2024 and then describes changes made in the subsequent period, up to the Petition Date.

21.     Until recently, Sunnova has taken a wide-ranging approach to solar energy and has offered products and services that span the solar energy ecosystem.  Sunnova has primarily worked with its expansive network of Dealers to market, sell/lease, and install Solar Systems.  To access the benefits of Solar Systems, customers have entered into one of three different agreements:  (a) a lease of a Solar System (a "Solar Lease"); (b) a power purchase agreement for

the use of a Solar System's output (a "PPA"); or (c) a loan agreement to finance the purchase of a Solar System (a "Solar Loan").  Upon installation of a Solar System, the Company owned (a) the Solar System, subject to a Solar Lease or PPA (such Solar Systems, collectively, the "Solar Assets") or (b) a Solar Loan.  The Company then (a) transferred portfolios of Solar Assets and Solar Loans to TEPs and/or other special purpose entities ("SPEs"), (b) securitized the cash flows generated by its interests in the portfolios of Solar Assets and Solar Loans by issuing asset-backed or loan-backed notes through the SPEs (collectively, the "Securitizations"), (c) used the proceeds of the notes to finance additional Solar Assets and Solar Loans, and (d) earned various servicing and management fees from providing operational and maintenance, billing, collection, and other general administration services related to the Securitizations.

### 1.  The Debtors' Core Product and Service Offerings.

22.    Through its Dealers, Sunnova offers its customers the following categories of renewable energy products—each of which provides reduced energy costs, energy resilience, and applicable federal, state, and local incentives:

- *Solar Energy System*:  a system that converts solar radiation into electrical energies usable by standard electrical appliances (including, with applicable hardware, electric vehicle chargers) and includes the following components: (a) solar photovoltaic panels that turn sunlight into direct current electricity, (b) inverters that convert solar-generated direct current electricity into alternating current electricity used by most standard household appliances, (c) racking systems that attach the solar photovoltaic panels to the roof or ground, and (d) a remote monitoring system that measures and monitors all energy generated by the solar energy system and provides alerts about system performance.

- *Combined System:* a system that combines the solar energy system with a battery storage system produced by leading energy storage manufacturers, and provides the household with additional energy efficiency.  While the energy produced by a standalone solar energy system must be used or sent back to the grid in real time, an energy storage system allows energy produced at one time (*e.g.*, the peak sun hours from late morning to mid-afternoon) to be used at another time (*e.g.*, the peak demand hours from later-afternoon to mid-evening), which is particularly beneficial if a household is subject to time-based utility rates, rolling blackouts, or power outages.

- *Standalone Energy Storage System:*  a standalone battery storage system wired into a household's electrical system that charges and stores energy from a third-party solar system or the electric grid.  Even the battery storage systems that are not connected to any solar system provide homeowners protection from time-based utility rates, rolling blackouts, and power-outages.

23.    In support of its Solar Systems, Sunnova offers sophisticated and proprietary energy management software, as well as an online portal and mobile app where customers can manage devices, pay bills, view energy recommendations, and place service requests.

24.    A demonstrative summary of Sunnova's various products can be seen in the illustration below:



25.    Prior to the operational changes described further below, Sunnova generally provided access to its products and services through long-term agreements in one of the following formats:

- **Solar Leases.**  Customers lease Solar Systems from Sunnova for existing or new homes in exchange for fixed monthly rates, with or without upfront partial prepayments or annual escalations.  Sunnova retains title to the underlying Solar Systems, which Sunnova also operates and maintains.  In most cases, Solar Leases include performance guarantees under which Sunnova will refund payments or credit customers if the Solar Systems fail to meet a guaranteed minimum level of power production for a specified time period.

12

- ***PPAs.***  Through its Dealers, Sunnova installs Solar Systems it owns at customers' homes, typically without any upfront costs to the customers.  Customers then purchase from Sunnova the energy produced by the Solar Systems at an agreed-upon price per kilowatt-hour, typically lower than the corresponding local utility rates.  Customers choose varied monthly payments based on actual energy usage or flat monthly payments that are levelized according to each customer's expected annual energy usage.  PPAs typically carry initial terms of twenty or twenty-five years, with customer options to renew for up to ten years via five-year renewal elections.

- ***Solar Loans.***  Customers purchase Solar Systems using financing provided or facilitated by Sunnova.  Customers then repay the amount financed, plus a financing charge, through monthly payments on terms of ten, fifteen, or twenty-five years.  Sunnova provides monitoring and warranty services.  Like the Solar Leases, Solar Loans usually include performance guarantees under which Sunnova refunds payments or credits customers if the Solar Systems fail to meet a guaranteed minimum level of power production for specified time periods.  As described further below, in January 2025, Sunnova indefinitely paused the origination of new loan agreements.

- ***New Home Products***. Sunnova (a) originates (i) fixed and prepaid solar leases and (ii) fixed and variable PPAs, and (b) sells Solar Systems for cash to purchasers of new homes constructed by Sunnova's homebuilder partners, including Lennar Corporation, for which Sunnova has been the exclusive residential solar and storage provider since 2021.[8]

- ***Service and Other Agreements.***  Sunnova provides a variety of ancillary services in addition to Solar Systems.  While some of these services are provided pursuant to and as part of Solar Leases, PPAs, and Solar Loans, in some instances, Sunnova enters into independent agreements with customers, including agreements to service non-Sunnova originated solar systems, loan and/or warranty agreements for ancillary energy-related products, demand response agreements, and managed SREC agreements (such independent agreements, collectively, the "Service and Accessory Loan Agreements").  Ancillary services include:

  - Financing energy-related products and services and other sustainable home products sold by Dealers, independent of or as an add-on to Solar Systems (the "Accessory Loans"), including home automation, energy management and other smart home devices, upgraded roofing, modern HVAC, generators, water systems, water heaters, main panel upgrades, and electric vehicle charges;[9]

---

[8]   As of the Petition Date, Sunnova has indefinitely paused new sales and originations through its New Home business line.

[9]   Sunnova has undertaken efforts to sell its Accessory Loans portfolio, and as of the Petition Date, Sunnova has indefinitely paused the origination of new Accessory Loan agreements.

- Monetizing excess energy production on behalf of customers during peak demand periods by discharging electricity stored in customer Solar Systems, aggregating the electricity, and selling it in exchange for a percentage of the resulting revenues;

- Providing the warranties included with Solar Loans, Solar Leases, and PPAs, which cover monitoring, performance assurance, and repair services with respect to Solar Energy Systems and Energy Storage Systems, as well as roof penetration warranties (to the extent of any damage from Solar System installations);

- Providing monitoring and/or repair services for Solar Systems that are neither owned nor sold by Sunnova for a term of one, five, ten, or twenty years. Customers choose among:  (a) a basic service, which is limited to monitoring a Solar System for issues; (b) a premium service, which includes facilitating repairs and/or replacement of equipment under a manufacturer's warranty; or, (c) in some markets a platinum service, which includes a full warranty and production guarantee;[10] and

- Providing *a la carte* repair and maintenance services for out-of-warranty Solar Systems, either sold by Sunnova or a competitor, including assessment and troubleshooting, warranty administration, warranty fulfillment, preventative maintenance, and repair and replacement of equipment.

26.      As of December 31, 2024, approximately 31 percent of Sunnova's customers had Solar Leases, approximately 28 percent had PPAs, approximately 24 percent had Solar Loans, and approximately 12 percent had Service and Accessory Loan Agreements.  The remaining 5 percent purchased Sunnova products in cash.

27.      In addition to its indirect business-to-consumer sales of solar energy products and services, Sunnova's historical business has included leasing third parties' interests in pools of energy systems, including related customer PPA and lease obligations, entitling Sunnova to future cash flows, as well as certain credits, rebates, and incentives.

---

[10]    Sunnova has discontinued its platinum service offering.

## 2.   The Debtors' Dealer Network

28.     Through Debtor Sunnova Energy Corporation ("SEC"), Sunnova partners with approximately 175 Dealers through certain channel partner agreements (the "Channel Partner Agreements"), under which the Dealers are generally responsible for:  (a) in compliance with Sunnova's underwriting standards, marketing, sourcing, verifying, and originating customers for both Solar Systems and Sunnova's ancillary product lines, such as sustainable home solutions, smart home devices, modern heating, ventilation, and air conditioning systems, generators, upgraded roofing, water systems, water heaters, main panel upgrades, and electric vehicle chargers; (b) designing, engineering, and procuring Solar Systems and other products from a list of manufacturers pre-approved by Sunnova; and (c) installing, commissioning, and connecting the Solar Systems to the electrical grid pursuant to Sunnova's procedures and applicable regulatory requirements.

29.     Solar System projects typically progress in accordance with certain milestones: (a) submission of a "contract package," whereby a Dealer delivers to Sunnova a signed customer lease agreement, PPA, or loan agreement, as applicable; (b) submission of a "notice to proceed package," whereby the Dealer submits a final design proposal and Sunnova issues an affirmative notice to proceed (a "Notice to Proceed"); (c) physical installation of the Solar System ("Mechanical Completion"); (d) the Dealer's completion and submission of all documentation required to commission the Solar System ("Substantial Completion"); and (e) Sunnova's final inspection of the Solar System, the Solar System's connection to the power grid, and the Solar Systems' placement in service ("Final Completion").   Under the Channel Partner Agreements, Dealers are typically paid in two installments:  either first, upon the Notice to Proceed, and second, at Substantial Completion; or first, at Substantial Completion, and second, at Final Completion.

30.     Dealers are the Debtors' public-facing presence in every market Sunnova serves. Many Dealers are leaders in the solar installation, electrical services, or roofing industries in their respective local markets, and they are often the first points of contact for customers actively searching for solar power, backup power, or complementary home services.  Over the course of Sunnova's twelve-year operating history, the vast majority of its customers were acquired through the Debtors' Dealer network.  In particular, the top twelve Dealers, led by Trinity Solar, Inc. and Windmar P.V. Energy, Inc., account for more than 80 percent of Sunnova's originations.

31.     The Dealer model has provided Sunnova with operational flexibility, allowing it to enter and exit markets quickly, without the fixed costs that burden more vertically-integrated models.  The Dealer model has also reduced Sunnova's exposure to labor shortages and enabled Sunnova to leverage Dealers' specialized knowledge, connections, and experience in local markets, while providing the Dealers with access to high-quality products at competitive prices, as well as technical oversight and expertise.  The Dealers have been an essential part of Sunnova's business model since its inception.

## C.  Securitizations

32.     As noted above, the installation of Solar Systems generally requires significant up-front cash investment, while cash flows are generated across extended (multi-decade) time frames.  Historically, Sunnova has pulled forward the future cash flows derived from customer payments—and used that cash to drive customer growth and purchase additional Solar Loans and Solar Assets—by engaging in extensive securitization activities.  Sunnova has effected such securitizations primarily by issuing asset- and loan-backed notes through non-Debtor SPEs.  The structure of these securitizations differs substantially depending on whether the notes are ultimately secured by Solar Assets (*i.e.*, Solar Leases and PPAs) or Solar Loans.

1.      **Asset-Backed Securitizations / TEPs**

33.      In the ordinary course of business, after the Dealers have originated qualifying Solar Leases and PPAs, but before the underlying Solar Systems are "placed in service," *i.e.*, ready for use, Sunnova uses proceeds from one of its Warehouse Facilities—the TEPH Facility—to purchase title to the inactive Solar Systems.  These Solar Systems become assets on the balance sheet of Debtor Sunnova TEP Developer, LLC ("TEP Developer") and secure Sunnova's outstanding obligations under the TEPH Facility, as described further below.

34.      Relatedly, Sunnova partners with various third-party institutional investors, including global, blue-chip financial institutions, to form TEPs.  TEP investors provide up-front capital contributions used by the TEPs to purchase Solar Systems, in exchange for entitlements to cash flows, solar Investment Tax Credits ("ITCs"), and other tax attributes (*e.g.*, depreciation deductions and net operating losses) such Solar Systems generate.  The ITCs provide a unique opportunity to offset federal tax obligations and are in high demand.  Because the Debtors do not produce sufficient income to utilize all the ITCs the Solar Systems generate, Sunnova establishes TEPs to attract capital contributions from institutional investors able to derive additional value from the ITCs.

35.      A TEP is an LLC jointly owned by the third-party TEP investor, which is vested with class A membership interests on account of its capital contribution (the "Class A Member"), and Sunnova, which retains class B membership interests through a special purpose "TEP Manager" entity (the "Class B Member").  The Class B Members are generally responsible for operating the TEPs, subject to broad consent rights by the Class A Members under the applicable TEP LLC agreements.  Generally, the Class A Member contributes a certain percentage (*e.g.*, 20 percent) of its committed capital to the TEP contemporaneous with the TEP's formation.  The TEP then uses the initial capital contribution to purchase from TEP Developer a group of

Solar Systems that are at or near Substantial Completion, pursuant to an arm's-length development and purchase agreement (a "TEP Purchase Agreement").  While Sunnova Dealers continue to progress the Solar Systems (now owned by the TEP) toward Final Completion, the TEP remains "open."  Each TEP's LLC agreement imposes an outside date by which all Solar Systems must be completed.  Failure to meet the outside date will cause title to the unfinished Solar Systems to revert from the TEP to TEP Developer[11] and either (a) vests the TEP with a credit against future capital contributions or (b) requires the Company to contribute to the TEP commensurate conforming Solar Systems.  While the TEP is open, the applicable Class B Member is a wholly owned subsidiary of non-Debtor Sunnova TEP Holdings, LLC ("TEPH")—the borrower under the TEPH Facility—and Sunnova's outstanding balance under the TEPH Facility is secured by all Class B Members' interests in the TEPs.  When a TEP has acquired title to a predetermined number and mix of Solar Systems, and all such Solar Systems have reached Final Completion (*i.e.* completed, commissioned, connected with the electric grid, generating meterable electricity), the TEP is considered "closed," and the remaining percentage of the Class A Member's committed capital is due.  Sunnova uses this capital contribution—brought within Sunnova's corporate structure through the TEP Purchase Agreement—to settle Dealer account payables and fund working capital.

36.     Once the Solar Systems are in service, they generate cash flows (pursuant to the Solar Leases and PPAs), as well as SRECs, ITCs, and other tax attributes, for the TEPs that hold them.  The distribution of these cash flows and tax attributes is governed by the TEP LLC

---

[11]   If a Solar System is completed after title has reverted from TEP to TEP Developer, TEP Developer transfers such Solar System to SAP IV.  SAP IV also holds title to certain completed Solar Systems that are never placed in a TEP and instead transferred from TEP Developer directly.  SAP IV monetizes the ITCs and SRECs it earns from the Solar Systems on its balance sheet.

agreements, which utilize a "partnership flip" structure.  This structure generally provides that, until the earlier of (a) five or six years from the date the last Solar System in the TEP is placed in service or (b) the TEP generates profits in excess of an agreed amount (such date, the "Flip Date"), the Class A Members receive substantially all (99 percent) of the ITCs and a portion (10–30 percent) of the equity residuals distributed by the TEPs, and the Class B Members receive the remainder.  After the Flip Date, the Class B Members receive substantially all equity residual distributions, while the Class A Members receive minority distributions.  In contrast, SRECs are typically distributed to the Class B Members, regardless of the Flip Date.  As of the Petition Date, substantially all TEPs are pre-Flip Date.



| Time | Pre-Flip Period | | Post-Flip Period | |
|------|------|------|------|------|
| **Party** | **Investor** | **Sponsor** | **Investor** | **Sponsor** |
| **Cash** | 10-30% | 90-70% | 5% | 95% |
| **ITCs** | 99% | 1% | N/A | N/A |
| **SRECs** | 0% | 100% | 0% | 100% |
| **Tax Income/Loss** | 99% | 1% | 5% | 95% |

37.      After the TEPs are closed, Sunnova establishes a series of SPEs, each denoted as "Holdings," "Depositor," or "Issuer," and transfers its equity in one or more Class B Members from TEPH to the issuer SPE (each such issuer SPE, an "Issuer") through a chain of intercompany transactions.  The Issuer then issues a series of notes (the "Asset-Backed Notes"), often in multiple tranches, that are secured by the applicable Class B Members' interests and are serviced by the cash flows distributed to the Class B Members from the TEPs on account of such interests.  Proceeds from the issuance of the Asset-Backed Notes are transferred, through a chain of

intercompany transactions, from the Issuer back to TEPH as consideration for the intercompany sale of the Class B Members from TEPH to the Issuer and to pay down the TEPH Facility.

38.     Every month, customer payments on the Solar Leases and PPAs are collected at the TEP level and distributed first to non-Debtors Sunnova TE Management, LLC, Sunnova TE Management II, LLC, Sunnova TE Management III, LLC, and/or Sunnova RAYS I Management, LLC (collectively, "TE Management") on account of O&M Services and Asset Administration Services (described below), and second to the Class A Member and the Class B Member, in accordance with the split set forth in the applicable TEP LLC agreement.  The Class B Member then transfers the distribution it receives from the TEP to the Issuer, where the distribution is further allocated by the applicable Asset-Backed Notes indenture trustee pursuant to a priority waterfall to cover (a) Notes Administration Fees to TE Management (as further described below) and (b) the interest and amortized principal to the holders of the Asset-Backed Notes, among other distributions.  Residual amounts, if any, are distributed upstream as equity distributions from the Issuer through the corporate chain to SEC, in order to fund Sunnova' working capital.

39.     As of the Petition Date, Sunnova, through the SPEs, has issued twelve active series of Asset-Backed Notes that collectively securitize Sunnova's membership interests in twenty-six TEPs.

| Notes Series | Amount Outstanding[12] | Maturity Date |
|---|---|---|
| Helios II Notes | $191.00 million | Jul. 2048 |
| RAYS Notes | $102.90 million | Apr. 2034 |
| Sol I Notes | $327.99 million | Jan. 2055 |
| Sol II Notes | $215.40 million | Nov. 2055 |
| Sol III Notes | $247.09 million | Apr. 2056 |
| Sol IV Notes | $317.30 million | Apr. 2057 |
| Sol V Notes | $308.30 million | Apr. 2058 |
| Sol VI Notes | $219.89 million | Jan. 2059 |
| Sol VII Notes | $315.74 million | Jul. 2059 |
| Sol VIII Notes | $301.60 million | Jul. 2059 |
| Sol IX Notes | $294.10 million | Jan. 2060 |
| Aurora Notes (incl. AP8 Notes) | $220.38 million | Oct. 2059 |

### 2.  Loan-Backed Securitizations

40.     Historically, Sunnova provided Solar Loans through originating Dealers using proceeds from the warehouse SLA Facility.  Once originated, the Solar Loans became assets on the balance sheet of non-Debtor Sunnova EZ-Own Portfolio, LLC ("EZOP") and secured Sunnova's outstanding balance under the SLA Facility.  When EZOP accumulated a critical mass of Solar Loans, Sunnova established a series of SPEs, each denoted as "Holdings," "Depositor," and "Issuer," and transferred the warehoused Solar Loan portfolio from EZOP to the Issuer through a series of intercompany transactions.  The Issuer then issued a series of notes (the "Loan-Backed Notes"), often in multiple tranches, secured by the Solar Loans and serviced by the cash flows generated therefrom.  Proceeds from the Loan-Backed Notes were distributed, through a series of intercompany transfers, from the Issuer back to EZOP (a) as consideration for the intercompany sale of the Solar Loan portfolio from EZOP to the Issuer and (b) to pay down the SLA Facility.

41.     While the Loan-Backed Notes are outstanding, the indenture trustee of the Loan-Backed Notes distributes the monthly cash flows received from customers on account of the

---

12   Balances as of March 31, 2025.

underlying Solar Loans pursuant to a priority waterfall to cover (a) O&M Fees and Loan Administration Fees (described below) to non-Debtor Sunnova ABS Management, LLC (the "ABS Manager") and (b) the interest and amortized principal to the holders of the Loan-Backed Notes, among other distributions.  Residual amounts, if any, are distributed upstream as equity distributions from the Issuer, through the corporate chain, to SEC, in order to fund Sunnova's working capital.

42.     As of the Petition Date, Sunnova, through the SPEs, has issued fourteen active series of Loan-Backed Notes, including two series—the Hestia I Notes and the Hestia II Notes— that are partially guaranteed by the U.S. Department of Energy (the "DOE") pursuant to the DOE Guarantee described below.

| Notes Series | Amount Outstanding[13] | Maturity Date |
|---|---|---|
| Helios III Notes | $85.39 million | Jun. 2046 |
| Helios IV Notes | $96.16 million | Jun. 2047 |
| Helios V Notes | $133.38 million | Feb. 2048 |
| Helios VI Notes | $160.58 million | Jul. 2048 |
| Helios VII Notes | $124.04 million | Oct. 2048 |
| Helios VIII Notes | $244.89 million | Feb. 2049 |
| Helios IX Notes | $198.23 million | Aug. 2049 |
| Helios X Notes | $206.40 million | Nov. 2049 |
| Helios XI Notes | $255.51 million | May 2050 |
| Helios XII Notes | $212.07 million | Aug. 2050 |
| Helios XIII Notes | $201.25 million | Feb. 2051 |
| Helios XIV Notes | $220.56 million | May 2051 |
| Hestia I Notes | $219.10 million | Dec. 2050 |
| Hestia II Notes | $158.33 million | Jul. 2051 |

**D.  O&M and Administrative Fees**

43.     In connection with the TEPs, the Warehouse Facilities, and the Securitizations, Sunnova services Solar Assets and Solar Loans in exchange for fees pursuant to the terms of

---

13    Balances as of March 31, 2025.

various asset management agreements (collectively, the "Management Agreements") and administrative service agreements (collectively the "Service Agreements").

- **TEP Services**—Pursuant to various Management Agreements and Service Agreements, respectively, TE Management provides (i) operational, maintenance, collection, and other management services to keep the Solar Assets owned by the TEPs productive and in good condition to satisfy both the performance guarantees to customers and the production requirements under the TEP LLC agreements ("O&M Services," and the related fees, "O&M Fees") and (ii) services related to the administration of the Solar Assets, including billing, collections, and reporting ("Asset Administration Services," and the related fees, "Asset Administration Fees"). O&M Fees and Asset Administration Fees are paid prior to distributions to Class A Members and Class B Members of each TEP.

- **Asset-Backed Notes Administration Services**—Pursuant to various Management Agreements, TE Management provides services with respect to Asset-Backed Notes, including communicating with applicable TEPs and Class A Members on behalf of each Class B Member, monitoring compliance with applicable TEP agreements, and reporting on the performance of underlying Solar Assets (the "Notes Administration Services," and the related fees, the "Notes Administration Fees"). In addition, TE Management provides O&M Services and Asset Administration Services to Issuers with non-TEP subsidiaries. Notes Administration Fees, O&M Fees, and Asset Administration Fees, as applicable, are paid prior to distributions to holders of Asset-Backed Notes.

- **Loan-Backed Notes Services**—Pursuant to various Management Agreements and Service Agreements, respectively, ABS Manager provides (i) O&M Services related to Solar Systems subject to Solar Loans and (ii) services related to the administration of the Solar Loans, including billing, collections, UCC filings, and reporting ("Loan Administration Services," and such fees, "Loan Administration Fees" and together with the Asset Administration Fees and the Notes Administration Fees, the "Management Fees"). O&M Fees and Loan Administration Fees are paid prior to distributions to holders of Loan-Backed Notes.

- **Warehouse Services**—Pursuant to various Management Agreements and Service Agreements, respectively, TE Management provides O&M Services and Asset Administration Services with respect to Solar Assets securing the TEPH Facility. Likewise, non-Debtor SLA Management LLC ("SLA Management") provides O&M Services and Loan Administration Services with respect to Solar Loans securing the SLA Facility. O&M Fees and Management Fees, as applicable, are paid prior to mandatory repayments of the TEPH Facility and the SLA Facility.

44. Because they have priority under the distribution waterfalls for the Debtors' Securitizations, TEPs, and Warehouse Facilities, the O&M Fees and Management Fees are critical

sources of revenue.  This is particularly true since few TEPs have reached their Flip Dates, and the Company receives only limited equity distributions on account of its class B membership interests. The diagram below illustrates the Debtors' organizational structure, including the positions of its TEPs, Securitization SPEs, servicer entities, and Warehouse Facilities.



### E.  Government Incentives

45.     U.S. federal, state, territorial, and local governments have established various incentives and financial mechanisms to reduce the cost and accelerate the adoption of solar energy. These include rebates, tax credits, and other financial incentives, such as payments for renewable energy credits associated with renewable energy generation, exclusion of solar energy systems and

energy storage systems from property tax assessments, and net metering programs.[14]  Incentives make Solar Systems more attractive to some homeowners and business, enable Sunnova to charge lower prices for Solar Leases or PPAs, and attract sophisticated institutional investors to invest in the TEPs.

### 1.    SRECs and ITCs

46.    Among the government incentives, the SRECs and ITCs are particularly relevant to Sunnova's businesses.  The majority of U.S. states, the District of Columbia, and Puerto Rico have implemented a renewable portfolio standard ("RPS"), which requires regulated electric utilities to generate or procure a specified percentage of total electricity delivered to customers in the state or territory from eligible renewable energy sources—such as solar energy systems—by specified dates.  Roughly one-third of states with RPS policies require a minimum portion of the RPS to be met by electricity generation from solar energy systems, with substantial penalties for non-compliance.  Electric utilities can meet their solar RPS requirements by purchasing solar renewable energy certificates ("SRECs"), which are minted through the production of each megawatt-hour of electricity generated by an eligible solar system.  SRECs are untethered to the Solar Systems that generate them, and in certain jurisdictions, SRECs may be sold through established markets.

47.    Sunnova's TEPs mint SRECs monthly based on the energy generated by the TEPs' Solar Assets.  In addition, Sunnova receives SRECs from Solar Assets it owns and through assignment of SRECs generated by customer-owned Solar Systems.  The sale of SRECs represents

---

[14]   Net metering programs vary by utility and jurisdiction.  Some utilities charge a customer for only the power used net of all electricity produced by the customer's Solar System, including the electricity the customer does not itself consume, while other utilities purchase excess power at lower rates than what they charge customers for the same electricity.

an important source of revenue for the Company.  Sunnova hedges a portion of its expected SREC production under fixed-price forward contracts.

48.     Separately, the federal government provides ITCs for owners of solar energy projects.  The Inflation Reduction Act of 2022 (the "IRA") extended the ITCs for eligible solar energy projects through at least 2032 and, depending on certain project specifications, the ITC percentage can range between 6 and 70 percent of eligible project costs.  In addition, the IRA also allows qualifying homeowners who purchase a residential solar energy system and/or energy storage system to apply up to 30 percent of the cost of installing the system as a credit against their U.S. federal income taxes, thereby returning a material portion of the purchase price of the residential solar energy system and/or energy storage system to homeowners.  As described above, the ITCs allow Sunnova to establish TEPs with sophisticated third-party institutional investors and use investors' capital contributions to fund the costs of installing and commissioning Solar Systems.

### 2.     The DOE Guarantee and Grant

49.     Sunnova also works with the DOE to utilize various solar energy-related incentives. In September 2023, Sunnova entered into a loan guarantee arrangement with the DOE under Title XVII of the Energy Policy Act of 2005, pursuant to which the DOE agreed, subject to certain conditions, to guarantee up to $3.0 billion of aggregate obligations in a series of intercompany loans between Sunnova SPEs made in connection with the issuance of certain Loan-Backed Notes (the "DOE Guarantee").  On May 22, 2025, Sunnova and the DOE amended the loan guarantee arrangement, reducing the amount of the DOE Guarantee to approximately $370 million.  As of the Petition Date, Sunnova has not drawn on the DOE Guarantee and does not expect to do so, given the degree to which the Hestia Notes—the only Securitizations backed by the DOE Guarantee—are over-collateralized.

50.     In December 2022, following natural disasters that left many homes in Puerto Rico without power for weeks and months, Congress appropriated funds to improve Puerto Rico's electrical grid.  The DOE awarded Sunnova a $281.1 million grant from the Puerto Rico Energy Resilience Fund (the "DOE Fund") to procure, design, and install Solar Systems for low- and moderate-income households in Puerto Rico.  Under this program, Sunnova takes conditional title to the installed Solar Systems and retains the ITCs generated by such Solar Systems, which it monetizes.  As of the Petition Date, Sunnova estimates it has installed—through its Dealers—more the 1,500 active Solar Systems in Puerto Rico on account of its grant from the DOE Fund.

**F.   Changes to the Debtors' Business Model Leading Up to the Petition Date**

51.     As referenced above, and described in further detail below, Sunnova's businesses have faced increasing macroeconomic and other headwinds in recent quarters.  These headwinds have constrained Sunnova's available cash and led to large balances owed to Sunnova's Dealer partners.  As a result of these balances, Sunnova's Dealers have ceased new customer originations, and as of the Petition Date, Sunnova is not currently originating new Solar Leases, PPAs, or Solar Loans.

52.     Prior to the Petition Date, Sunnova commenced an operational restructuring to reshape its business model, with a focus on profitability and cash flow.  The Company reduced its workforce and divested from underperforming and non-core segments, including the origination of Solar Loans, the Company's commercial-grade business, and the Company's partnerships with homebuilders to install Solar Systems in newly constructed homes.  Collectively, these initiatives improved the Company's position both with respect to its prepetition restructuring efforts and proposed sale process.

## II.    The Company's Prepetition Capital Structure

53.    As of the Petition Date, the Company has approximately $8.9 billion in funded debt obligations, comprising $2.0 billion of Debtor funded debt obligations and $6.9 billion of non-Debtor funded debt obligations.  The Debtors have approximately $13.5 million in available cash.

| Funded Debt | Approximate Principal Amount Outstanding |
|---|---|
| 5.875% Senior Unsecured Notes | $400 million |
| 11.75% Senior Unsecured Notes | $400 million |
| 0.25% Convertible Senior Unsecured Notes | $575 million |
| 2.625% Convertible Senior Unsecured Notes | $600 million |
| *Total Debtor Funded Debt* | *$1,975 million* |
| SLA Facility | $172 million |
| TEPH Facility | $950 million |
| BMB Facility | $0.8 million |
| KKR Facility | $185 million |
| Asset-Backed Notes | $2,994 million |
| Loan-Backed Notes | $2,516 million |
| AP8 Notes Payable | $68 million |
| *Total Company Funded Debt* | *$8,861 million* |

### A.    Senior Unsecured Notes

54.    Pursuant to that certain Indenture, dated August 17, 2021 (the "5.875% Senior Notes Indenture"), by among SEC, as issuer, SEI and Debtor Sunnova Intermediate Holdings, LLC ("Intermediate Holdings"), as guarantors, and Wilmington Trust, National Association ("Wilmington Trust"), as trustee, the Company issued 5.875% senior notes due October 1, 2026 (the "5.875% Senior Notes") with an aggregate principal amount of $400 million.  Pursuant to that certain Indenture, dated September 26, 2023 (the "11.75% Senior Notes Indenture") by and among

SEC, as issuer, SEI and Intermediate Holdings, as guarantors, and Wilmington Trust, as trustee, the Company issued 11.75% senior notes due October 1, 2028 (the "11.75% Senior Notes," and together with the 5.875% Senior Notes, the "Senior Unsecured Notes") with an aggregate principal amount of $400 million.  As of the Petition Date, the full principal amounts of the Senior Unsecured Notes remain outstanding.

### B. Convertible Senior Unsecured Notes

55.     Pursuant to that certain Indenture, dated May 20, 2021 (the "0.25% Convertible Notes Indenture"), by and between SEI, as issuer, and Wilmington Trust, as trustee, the Company issued 0.25% convertible senior notes due December 1, 2026 (the "0.25% Convertible Notes") with an initial aggregate principal amount of $500 million and an option for the initial purchasers to acquire up to $75 million of additional notes.  Subject to certain conditions, the 0.25% Convertible Notes may be converted to Common Stock, at each holder's election, at an initial rate of 28.9184 shares of Common Stock per $1,000 of notes (subject to certain adjustments).  As of the Petition Date, $575 million of the principal amount of the 0.25% Convertible Notes remains outstanding.

56.     Pursuant to that certain Indenture, dated August 19, 2022 (the "2.625% Convertible Notes Indenture"), by and between SEI, as issuer, and Wilmington Trust, as trustee, the Company issued 2.625% convertible senior notes due February 15, 2028 (the "2.625% Convertible Notes," and together with the 0.25% Convertible Notes, the "Convertible Notes") with an aggregate principal amount of $600 million.  Subject to certain conditions, the 2.625% Convertible Notes may be converted to Common Stock, at each holder's election, at an initial rate of 29.2039 shares of Common Stock per $1,000 of notes (subject to certain adjustments).  As of the Petition Date, $600 million of the principal amount of the 2.625% Convertible Notes remains outstanding.

### C.     Warehouse Facilities

57.     Certain non-Debtors are capitalized by the Warehouse Facilities—non-recourse revolving credit facilities secured by Solar Assets and Solar Loans.  Proceeds from the Warehouse Facilities are used to purchase Solar Assets and Solar Loans, fund working capital, and fund reserve amounts.[15]

58.     First, pursuant to that certain Third Amended and Restated Credit Agreement, dated March, 20, 2025 (as amended and restated from time to time, the "SLA Credit Agreement"), by and among EZOP, as borrower, SLA Management, as manager and servicer, non-Debtor Sunnova Asset Portfolio 7 Holdings, LLC ("SAP 7"), as seller, Atlas Securitized Products Administration, L.P. ("Atlas"), as administrative agent, the lenders and other financial institutions from time to time party thereto, as lenders (in such capacity, the "SLA Lenders"), the funding agents from time to time party thereto, Computershare Trust Company, National Association ("Computershare"), as paying agent, and U.S. Bank, National Association ("U.S. Bank"), as custodian, the Company has access to a $550 million revolving credit facility (the "SLA Facility").  The SLA Facility provides for an interest rate of 6.95% and matures on February 20, 2026.

59.     Proceeds from the SLA Facility are used primarily to originate Solar Loans via SAP 7.  EZOP contributes the acquired Solar Loans to Intermediate Holdings, which then sells the Solar Loans to SPEs that issue Loan-Backed Notes.  The SLA Facility is secured by substantially all EZOP's assets, including any Solar Loans purchased from Dealers that have not yet been

---

[15]   In addition to the three Warehouse Facilities described below, the Company was party to a $50 million revolving credit facility (the "IS Facility") that funded the Company's purchase of energy storage systems and was secured by assets at non-Debtors Sunnova Inventory Supply, LLC and Sunnova Inventory Supply Holdings, LLC.  The Debtors' obligations under the IS Facility were fully satisfied on May 8, 2025, and the facility was retired.

securitized, and EZOP's performance under the SLA Facility is partially guaranteed, on an unsecured basis, by SEC.[16]

60.     Second, pursuant to that certain Second Amended and Restated Credit Agreement, dated November 3, 2023 (as amended and restated from time to time, the "TEPH Credit Agreement"), by and among TEPH, as borrower, non-Debtor Sunnova TE Management, LLC, as facility administrator, Atlas, as administrative agent, the lenders from time to time party thereto, as lenders, the funding agents from time to time party thereto, as funding agents, Computershare, as paying agent, and U.S. Bank as verification agent, the Company has access to a $1.675 billion back leverage revolving credit facility (the "TEPH Facility").  The TEPH Facility provides for an interest rate of 8.08% and matures on August 20, 2026.

61.     Proceeds from the TEPH Facility are used primarily to purchase Solar Assets from Dealers via TEP Developer.  As further described above, TEP Developer primarily sells Solar Assets—specifically, inactive Solar Systems—to TEPs, and when a TEP is closed, Sunnova sells its interest in the TEP's Class B Member to an SPE that issues Asset-Backed Notes.  The TEPH Facility is secured by the Company's class B membership interests in seven open, non-securitized TEPs and certain Solar Assets held by non-Debtor Sunnova SAP IV, LLC ("SAP IV").  TEPH's performance under the TEPH Facility is partially guaranteed, on an unsecured basis, by SEC.

62.     Finally, pursuant to that certain Master Revolving Loan Agreement, dated December 27, 2023 (the "Sunnova BMB Credit Agreement"), by and among non-Debtor Sunnova

---

[16]  On March 20, 2025, EZOP and other parties to the SLA Credit Agreement entered into that certain Third Amended and Restated Credit Agreement which, among other things, (a) reduced the funding commitments under the SLA Facility to $0, (b) removed any obligation of any SLA Lender to make any advance, other than advances in such SLA Lender's sole discretion, (c) removed the ability of EZOP to request any increases to the aggregate commitments under the SLA Facility, and (d) required EZOP to acquire additional Solar Loans, make certain payments to the Dealers, and complete certain take-out transactions involving a substantial majority of the aggregate eligible Solar Loans.

Business Markets Borrower, LLC, ("Sunnova BMB"), as borrower, the "Project Companies" from time to time party thereto, as guarantors, the lenders from time to time party thereto, as lenders, Mitsubishi HC Capital America, Inc., as administrative agent, and Three Keys Capital Advisors, LLC, as arranger, the Company has access to a $25 million revolving credit facility (the "BMB Facility").  The BMB Facility provides for an interest rate of 8.22%, and it matures on December 27, 2025.  The BMB Facility is secured by substantially all Sunnova BMB's assets and non-Debtor Sunnova Business Markets Holdings' equity interests in Sunnova BMB.  The BMB Facility is guaranteed by non-Debtor Sunnova Commercial Solar Asset Owner, LLC, Sunnova BMB's wholly owned subsidiary, and Sunnova BMB's performance under the BMB Facility is partially guaranteed by SEC.  Historically, proceeds from the BMB Facility were used to finance the construction of commercial-grade Solar Systems, but as noted above, Sunnova has begun to divest from its commercial business.

### D.   Term Loan

63.     Pursuant to that certain Term Loan Agreement, dated March 2, 2025 (the "KKR Credit Agreement"), by and among non-Debtor Sunnova Solstice Borrower, LLC ("Sunnova Borrower"), as borrower, the lenders from time to time party thereto—currently, KKR Credit Advisers (US) LLC, on behalf of certain funds and accounts managed or advised by it and its affiliates ("KKR")—as lenders, and Wilmington Trust, as agent, the Company borrowed the full amount under the $185 million KKR Facility.  The KKR Facility provides for an interest rate of 15.00% (subject to a 1.3x minimum multiple on invested capital) and matures on March 6, 2028. As of the Petition Date, the full principal amount remains outstanding.  The KKR Facility is secured by (a) 100% of non-Debtor Sunnova Solstice Pledgor, LLC's equity interests in Sunnova Borrower, (b) substantially all assets of Sunnova Borrower, including 100% of its equity interests

in non-Debtor Sunnova Solstice Holdings, LLC ("Solstice Holdings"), (c) substantially all assets of Solstice Holdings, including its class A equity interests in non-Debtor Sunnova Solstice ABS Holdco, LLC ("ABS Holdco I") and 100% of its equity interests in non-Debtor Sunnova Solstice ABS Holdco II, LLC ("ABS Holdco II"), (d) substantially all assets of ABS Holdco I, including its class A interests in eleven non-Debtor "Holdings" SPEs that are the indirect parents of eleven Issuers of Asset-Backed Notes and Loan-Backed Notes,[17] (e) substantially all assets of ABS Holdco II, including its equity interests in a separate group of non-Debtor "Holdings" SPEs (the "ABS II Holdings SPEs") that are the indirect parents of twelve Issuers of Asset-Backed Notes and Loan-Backed Notes (the "ABS II Issuers"), and (f) substantially all assets of the ABS II Holdings SPEs, including their equity interests in certain "Depositor" and "Investor" SPEs that are the indirect, and in some cases the direct, parents of the ABS II Issuers.  In short, the KKR Facility is secured by all or most of the residual distributions to which the Issuers entitled under twenty-three Securitizations had been entitled to receive prior to the incurrence of the KKR Facility and by pledges of equity interests in certain non-Debtor holdings companies for such Securitizations and in certain other non-Debtor subsidiaries of Sunnova Borrower.

> **E.      Asset-Backed Notes and Loan-Backed Notes**

64.     Sunnova has issued five groups of Securitizations: two groups of Loan-Backed Notes (the Helios Notes and Hestia Notes) and three groups of Asset-Backed Notes (the Sol Notes, the RAYS Notes, and the Aurora Notes).

---

[17]   While ABS Holdco I also owns the class B interests in the same eleven Holdings LLCs, such class B interests are not collateral under the KKR Facility and are pledged to non-Debtor Sunnova Solstice RR Holdco, LLC instead. These class B interests are subject to a negative pledge under the KKR Facility and are therefore unencumbered.

### 1.   Helios Notes

65.     Pursuant to various indentures, dated from 2018 to 2024, by and between each of Sunnova Helios II–XIV Issuer, LLC, as applicable, as issuers, and Computershare (as successor to Wells Fargo, National Association ("Wells Fargo")) or Wilmington Trust, as applicable indenture trustee, Sunnova has thirteen outstanding series of Helios notes (collectively, the "Helios Notes").[18]  Approximate amounts outstanding under each series of Helios Notes range from $85 million to $255 million and interest rates range from 1.6% to 8.0%.  The Helios Notes have terms between 27 and 29 years and mature between 2046 and 2051.  The notes issued by Sunnova Helios II Issuer, LLC are secured by Solar Assets.  The remaining series of Helios Notes are secured by Solar Loans held by the respective Issuer SPEs.

### 2.   Hestia Notes

66.     Pursuant to that certain Indenture, dated November 8, 2023, by and between Sunnova Hestia I Issuer, LLC (the "Hestia I Issuer"), as issuer, and Wilmington Trust, as indenture trustee, Sunnova issued a series of Hestia notes (the "Hestia I Notes").  Pursuant to that certain Indenture, dated June 5, 2024, by and between Sunnova Hestia II Issuer, LLC (the "Hestia II Issuer," and together with the Hestia I Issuer, the "Hestia Issuers"), as issuer, and Wilmington Trust, as indenture trustee, Sunnova issued a second series of Hestia notes (the "Hestia II Notes," and together with the Hestia I Notes, the "Hestia Notes").  The Hestia Notes are partially and indirectly guaranteed by the DOE Guarantee.  Approximately $220 million is outstanding under the Hestia I Notes, which mature in 2050, with interest rates ranging from 5.75% to 8.25.[19] Approximately $160 million is outstanding under the Hestia II Notes, which mature in 2051, with

---

[18]   Sunnova previously issued a fourteenth series of Helios Notes (the "Helios I Notes") that are no longer outstanding.

[19]   5.75% for Class 1-A Notes and 8.25% for Class 2-A Notes.

interest rates ranging from 5.63% to 9.5%.[20]  Each Hestia Note is secured by an intercompany loan between a "Lender" SPE that is a subsidiary of a Hestia Issuer, and a "Borrower" SPE that is a subsidiary of the Lender SPE and the owner of the Solar Loans.  The intercompany loan is partially guaranteed by the DOE Guarantee such that to the extent customer payments on the Solar Loans are not sufficient to cover certain principal and interest obligations in the Hestia Notes priority waterfall, the DOE will cover the shortfall.

### 3.  Sol Notes

67.     Pursuant to various indentures, dated 2020 to 2025, by and between each of Sunnova Sol I–IX Issuer, LLC, as issuers, and Computershare (as successor to Wells Fargo) or Wilmington Trust, as applicable indenture trustee, Sunnova has issued nine series of Sol notes (collectively, the "Sol Notes").  Approximate amounts outstanding under each series of Sol Notes range from $215 million to $330 million, and interest rates range from 2.6% to 9.0%.  The Sol Notes have terms between 29 and 30 years and mature between 2055 and 2060.  The Sol Notes are secured by the respective Sol Issuers' interests in certain TEP Class B Members.

### 4.  RAYS Notes

68.     Pursuant to that certain Indenture, dated March 28, 2019 (as supplemented by that certain Indenture Supplement No. 1, dated March 28, 2019 and by that certain Indenture Supplement No. 2, dated June 7, 2019), by and between Sunnova RAYS I Issuer, LLC (the "RAYS Issuer"), as issuer, and Wilmington Trust, as indenture trustee, Sunnova has issued one series of RAYS notes (the "RAYS Notes").  Approximately $105 million is outstanding under the RAYS

---

20   5.63% for the Class 1-A Notes and 9.50% for the Class 2-A Notes.

Notes, and interest rates range from 4.95% to 6.35%.[21]  The RAYS Notes mature in 2034 and are secured by the RAYS Issuer's membership interests in Sunnova TEP I Manager, LLC.

### 5.  Aurora Notes

69.     Pursuant to that certain Indenture, dated December 19, 2024, by and between Sunnova Aurora I Issuer, LLC (the "Aurora Issuer"), as issuer, and Wilmington Trust, as indenture trustee, Sunnova has issued one series of Aurora notes (the "Aurora Notes").  Approximately $150 million is outstanding under the Aurora Notes, and interest rates range from 6.50% to 11.00%.[22]  The Aurora Notes mature in 2059 and are secured by Aurora Issuer's membership interests in certain TEP Class B Members.

70.     In connection with the Aurora Notes, non-Debtor Sunnova Asset Portfolio 8, LLC ("SAP 8") entered into that certain Loan Agreement, dated December 19, 2024, with Banco Popular De Puerto Rico ("BP PR") as initial lender and administrative agent, pursuant to which SAP 8 is the borrower of a $75 million term loan (the "AP8 Notes").  The AP8 Notes carry the same interest rates, mature at the same time, and are secured by the same Solar Assets in the same TEPs as the Aurora Notes, so as to enable BP PR to obtain the benefits of holding $75 million of Aurora Notes without actually holding them.  In connection with the AP8 Notes, the Aurora Issuer withheld $75 million of Aurora Notes in the offering, and the proceeds of the AP8 Notes were distributed upstream to SEC to fund general working capital.

### G.  Equity

71.     SEI's second amended and restated certificate of incorporation authorizes its board of directors (the "Board") to issue 1 billion shares of common stock, par value $0.0001 per share

---

[21]   4.95% for Class A Notes and 6.35% for Class B Notes.

[22]   6.50% for Class A Notes, 6.70% for Class B Notes, and 11.00% for Class C Notes.

(the "<u>Common Stock</u>"), and 10 million shares of preferred stock, par value $0.0001 per share (the "<u>Preferred Stock</u>").  Approximately 126 million shares of Common Stock and 200,000 shares of Series D Preferred Stock are outstanding as of the Petition Date.[23]  The Common Stock trades on the NYSE under the ticker symbol "NOVA."[24]

## III.   Events Leading to the Commencement of the Chapter 11 Cases

72.    By 2018, Sunnova was one of the largest participants in the TPO residential solar market.  But despite the Company's success driving customer growth, in 2024, a diminished appetite for new tax equity financing and limited opportunities for profitable originations forced the Company to moderate its growth targets.  This downturn placed further pressure on the Company's already stressed cost structure, which had weathered stubbornly high interest rates.  Further, the Company's years-long growth spurt had strained its ability to effectively manage operating costs and debt service, resulting in higher-than-expected cash outflows, an erosion of its remaining liquidity, and ultimately, the filing of these chapter 11 cases.

73.    Due to the factors discussed below, the Company experienced a swift decline in financial performance and was unable to raise the financing it relied on to support its operations.  This put significant strain on its businesses.  On March 3, 2025, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2024, which included a warning that

---

[23]   On March 28, the Company announced it had taken actions to preserve its net operating losses and other tax attributes.  Specifically, the Company declared a dividend of one preferred share purchase right (a "<u>Right</u>") for each share of Common Stock, which allows the applicable registered holder to purchase from the Company one one-thousandth of a share of Preferred Stock at a price of $3.00.  The Rights trade with the Company's Common Stock and will generally become exercisable only if a person (or any persons acting as a group) acquires 4.9 percent or more of the Company's outstanding Common Stock.  If the Rights become exercisable, all holders of Rights (other than any triggering person) will be entitled to acquire shares of Common Stock at a 50 percent discount, or the Company may exchange each Right held by such holders for one share of Common Stock.  No Rights have been exercised as of the Petition Date.

[24]   Since April 2025, the Company has received notifications from the NYSE that subject to certain conditions, the Company's stock may be delisted due to (a) its trading price dropping below $1.00 per share for thirty consecutive days and (b) the postponed filing of its Quarterly Report on Form 10-Q for the quarter ended March 31, 2025.

"substantial doubt exist[ed] regarding [its] ability to continue as a going concern for a period of at least one year from the date [it] issue[d] consolidated financial statements" (the "Going Concern Warning").  The Going Concern Warning prompted certain third-party TEP investors to withdraw their capital commitments to open TEPs, demonstrating the challenges the Company faced raising any additional TEP financing outside a broader restructuring scenario.

### A.     Demand Downturn and Rising Costs

74.     In late 2021, in response to inflation rising to levels not seen since 1981, central banks around the world began raising interest rates.  Since then, the United States Federal Reserve has raised its benchmark short-term rate eleven times since March 2022, reaching a target federal funds rate of 5.25 to 5.5% in July 2023, its highest level since 2001.  While the Federal Reserve has since lowered the benchmark short-term rate to between 4.25% and 4.5%, the rate is almost double any corresponding short-term rate over the last ten years.

75.     Demand for residential solar projects is strongly affected by increases in interest rates.  As further described above, given the high up-front costs of installing rooftop solar panels at personal residences, such investments are almost always financed (a) on the front-end by customers, through consumer loans for the purchase of Solar Systems or (b) on the back-end by the Company, through the payment of upfront costs to purchase and install Solar Systems and the subsequent collection of payments from leases and/or PPAs.  Rising interest rates therefore result in higher costs to customers, either borne directly through borrowing costs, or indirectly through higher lease/PPA payments, which the Company requires to sustain its cost structure.  Accordingly, higher interest rates directly reduce customer demand for Sunnova's products and services.

76.     Rising interest rates also affect the Company's costs.  Sunnova's business model is capital-intensive, and an increase in the cost of capital affects both the cost of the Company's existing debt and the Company's ability to raise future capital.  As benchmark interest rates have increased, the rates at which the Company has financed new originations have risen dramatically.  In June 2021, the Company raised the Sol III Asset-Backed Notes at a 2.8% interest rate.  That rate more than *doubled* to 6.8% three years later, when the Company raised the Sol VI Asset-Backed Notes.  These skyrocketing interest rates both limited the Company's access to new capital—crucial to the origination of new Solar Systems—and resulted in a significant and continuing diminution of its available working capital.

## B.  Misaligned Cost Structure

77.     The macroeconomic factors described above revealed weak spots in Sunnova's business model.  From its inception, the Company prioritized growth first.  This approach allowed the Company to navigate the competitive, fragmented residential solar industry and become a leader in the space.  However, a cost structure that was suited to such a strategy was not suited to a recessionary environment characterized by high interest rates and regulatory uncertainty.  Specifically, the mismatch between the Company's overhead and servicing costs on one hand and its operating environment on the other is a primary driver of the Company's liquidity contraction over the last few years.  Despite the Company's meaningful efforts to reduce net operating expenses, its cost structure has continued to constrain its ability to manage working capital effectively.

## C.  Regulatory Uncertainty

78.     The Company's existing business model, like that of many participants in the solar industry, is reliant on rebates, tax credits, and other incentives from federal, state, and local

governments.  Substantial regulatory changes and uncertainty have put further pressure on both demand for the Company's products and the Company's ability to effectively raise capital.

79.     Tax equity financing has provided the Company with billions in capital since its inception and is a crucial source of funding for the purchase of Solar Assets.  Such financing is highly reliant on investor counterparties utilizing ITCs to offset their profits.  TEP financing was further boosted by the IRA, which permitted the sale of ITCs.

80.     The current presidential administration has indicated that continued subsidization of the solar industry, and the industry's overall success, are not federal government priorities, as compared with the President's stated goals of reducing the price of fossil-fuel-based electricity. Accordingly, the President has issued an executive order freezing further spending approved as part of the IRA.  Exec. Order No. 14154 ("Unleashing American Energy").  While this executive order was subsequently enjoined by a court order, *see Woonasquatucket et al. v. Department of Agriculture et al.*, Case No. 1:25-CV-0097, ECF 45 (D. R.I. Apr. 15, 2025), the administration's actions have created uncertainty concerning the future availability and effectiveness of federal tax credits relating to renewable energy production.  In light of this uncertainty, the tax equity market has tightened, reducing the availability of a crucial source of the Company's funding.

81.     State-level regulatory changes have put additional pressure on demand for the Company's product and service offerings.  In particular, California—one of the Company's largest markets—has implemented new regulations which limit "net metering," a practice whereby consumers sell excess electricity generated by solar panels back into the grid.  Consequently, Californians who purchased—and continue to purchase—solar panels after April 2023 need to install energy storage technology to avoid wasting excess electricity generated by their solar

systems.  While high utility costs continue to drive demand in California, such regulations have nonetheless deterred potential customers.

### D.  Amendment of the SLA Facility and Interest Grace Period

82.     On March 20, 2025, the Company and the lenders under the SLA Facility amended the SLA Credit Agreement (such amendment, the "<u>SLA Amendment</u>") to (a) reduce lender commitments under the SLA Facility, (b) remove lender obligations to advance additional funds under the SLA Facility, and (c) modify other key terms under the SLA Credit Agreement.  On March 26, 2025, the Company filed a Current Report on Form 8-K announcing the SLA Amendment and its intention to further amend the SLA Facility, including restructuring or replacing the SLA Facility through a "take-out" transaction.

83.     On April 1, 2025, the Company filed a Current Report on Form 8-K announcing its election to defer its approximately $23.5 million interest payment due April 1, 2025, under the 11.75% Senior Notes.  The 11.75% Senior Notes Indenture provides for a 30-day grace period (which expired May 1, 2025) to make the scheduled interest payment before such non-payment constituted an "Event of Default," entitling the indenture's trustee or the holders of at least 30% the outstanding 11.75% Senior Notes to accelerate the maturity thereof.  On May 2, 2025, the Company entered a forbearance agreement (the "<u>Forbearance Agreement</u>") with the holders of its Senior Unsecured Notes, pursuant to which holders of the 11.75% Senior Notes agreed to forbear from exercising any remedies under the 11.75% Senior Notes Indenture triggered by the missed interest payment and holders of the 5.875% Senior Notes agreed to forbear from exercising any remedies under the 5.875% Senior Notes Indenture triggered a cross-default with the 11.75% Senior Notes.  On May 8, May 16, May 22, and May 29, 2025, respectively, the Company announced extensions of the Forbearance Agreement.

### E.  Default Under SLA Facility and TEPH Facility

84.     On April 21, 2025, Atlas, as administrative agent under the TEPH Facility, sent the Company a notice of default under the TEPH Facility (the "TEPH Default Notice"), claiming (a) the Company did not (i) take steps to protect Company entities providing O&M Services and Asset Administration Services under the TEPH Facility from the bankruptcy of certain Company affiliates or (ii) engage backup providers of O&M Services and Asset Administration Services, in each case by March 31, 2025, as required by the TEPH Credit Agreement, and (b) there existed a continued borrowing base deficiency under the TEPH Facility due to the presence of purportedly ineligible Solar Assets in the TEPH Facility borrowing base.  Accordingly, Atlas exercised its proxy to replace Ms. Liska and me with Messrs. John Dubel and Gilbert Nathan as members of the TEPH's board of directors and amended TEPH's LLC agreement to provide that the newly appointed directors must consider only the interests of TEPH and its creditors in discharging their fiduciary duties.  The TEPH Default Notice further stated that, as a result of the alleged defaults, the TEPH Facility lender commitments were terminated, the Company would be charged a higher interest rate, and Atlas may exercise certain remedies, including exercising control over certain Company bank accounts and replacing TE Management as manager and servicer.

85.     On April 22, 2025, Atlas, as administrative agent under the SLA Facility, sent the Company a notice of default under the SLA Facility (the "SLA Default Notice"), claiming the Company did not remit (a) $5.6 million in payments to Dealers by April 3, 2025 or (b) $0.6 million in payments to Dealers and $163 million in take-out payments to the SLA Facility lenders by April 21, 2025, as required by the SLA Credit Agreement and the SLA Amendment.  The SLA Default Notice further stated that, as a result of the alleged defaults, the SLA Facility lender commitments were terminated, the Company would be charged a higher interest rate, and Atlas

may pursue additional remedies, including applying all distributions from the Solar Loans collateralizing the SLA Facility to obligations outstanding under the SLA Facility.

## IV.    Prepetition Restructuring Initiatives

86.    To help navigate these macroeconomic challenges, the Company undertook a series of efforts to support its liquidity and maximize the value of its businesses for the benefit of all stakeholders.  The Company explored various in- and out-of-court restructuring alternatives, which culminated with the filing of these chapter 11 cases and the decisions to execute the TEPH Transactions and proceed with the Sale Process.

87.    On March 5, 2025, I was elevated from Chief Operating Officer to the role of CEO, replacing the Company's founder, John Berger.  On April 1, 2025, the Company announced the appointment of Robyn Liska to the role of CFO.  Ms. Liska and I have prioritized reforming the Company's approach to its operational footprint with a focus on profitability and cash flow.  The Company has suspended originations of Solar Assets and Solar Loans in an effort to focus on servicing its existing Solar Assets and Solar Loans.  In addition to reducing primary overhead costs, the Company made the extraordinarily difficult decision to reduce its workforce by more than 50 percent.  These changes led to significant expense savings, including a more than 30 percent reduction in service overhead costs per customer, even while the Company improved customer satisfaction scores and reduced its volume of outstanding service inquiries.

88.    On April 11, 2025, the Board appointed two experienced and disinterested directors—Jeffrey Stein and Anthony Horton—and appointed them to a newly-formed special committee (the "Special Committee").  The Board delegated to the Special Committee, among other things:  (a) non-exclusive authority to review, discuss, consider, negotiate, and make one or more recommendations to the Board regarding the Company's entry into or consummation of any

restructuring, reorganization and/or other recapitalization transaction; (b) authority to investigate and determine whether any matter related to such a transaction constitutes a matter in which a conflict of interest exists or is reasonably likely to exist between the Company, on one hand, and any of its related parties, including current and former directors, managers, officers, equity holders, employees, advisors, and certain other parties, on the other hand (each, a "Conflicts Matter"), and to bind the Company in connection therewith; (c) exclusive authority to take certain actions with respect to any Conflicts Matter; and (d)  authority to conduct all investigations and analyses related to any Conflicts Matter and to bind the Company in connection therewith.[25]

---

[25] *See* the Omohundro Declaration for further details regarding the activities of the Special Committee.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 9, 2025

*/s/ Paul Mathews*

Name:  Paul Mathews

Title:   President and Chief Executive Officer
Sunnova Energy International Inc.