**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SUNNOVA ENERGY INTERNATIONAL INC., *et al.*,[1] | ) | Case No. 25-90160 (ARP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR**
**ENTRY OF AN ORDER (I) AUTHORIZING AND**
**APPROVING THE PRIVATE SALE OF THE ELIGIBLE SYSTEMS**
**ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,**
**AND OTHER INTERESTS, (II) APPROVING THE ASSUMPTION AND**
**ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (III)**
**APPROVING THE ASPA SETTLEMENT AND (IV) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than 3:00 p.m. (prevailing Central Time) on June 9, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on June 9, 2025, at 3:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "judgeperez." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance"**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova. The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046. "<u>Sunnova</u>" or the "<u>Company</u>" means, collectively, Sunnova Energy International Inc. and its Debtor and non-Debtor subsidiaries and affiliates.

> **link on Judge Pérez's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state the following in support of this motion (this "<u>Motion</u>"):[2]

## **<u>Relief Requested</u>**

1.     For the past several weeks and months, the Debtors have worked diligently to obtain debtor-in-possession financing to fund these chapter 11 cases, on both an interim and final basis.  Although the Debtors anticipate that they will be able to secure DIP financing from an ad hoc group of its noteholders, interim financing has continued to prove elusive, and the Debtors need additional cash to fund these cases after their cash-on-hand runs out, which they anticipate will happen by as early as the end of this week.

2.     To address this need, the Debtors are seeking emergency relief to permit them to sell certain solar systems (the "<u>Eligible Systems</u>") to non-Debtor Sunnova TEP Holdings, LLC ("<u>TEP Holdings</u>"), the borrower under one of Sunnova's revolving warehouse facilities (the "<u>TEPH Facility</u>"), for a purchase price of $15 million, funded by an incremental loan under the TEPH Facility.  As described below, this relief is appropriate and in the best interests of the Debtors and their estates.  First, it will enable the Debtors to continue funding these cases until the Court hears the Debtors' request for approval of the DIP Facility, avoiding administrative insolvency and a potential conversion to chapter 7 days after these cases were commenced.

---

[2]     A description of the Debtors, their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, is set forth in greater detail in the *Declaration of Paul Mathews, President and Chief Executive Officer of Sunnova Energy International Inc., in Support of Debtors' Chapter 11 Petitions* (the "<u>Mathews First Day Declaration</u>") and the *Declaration of Ryan Omohundro, Chief Restructuring Officer of Sunnova Energy International Inc., in Support of Debtors' First Day Motions* (the "<u>Omohundro First Day Declaration</u>," and together with the Mathews First Day Declaration, the "<u>First Day Declarations</u>"), filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declarations, the Omohundro Sale Declaration, or the APA.

Second, it will enable the Debtors to realize the highest and best value for the Eligible Systems, which are not marketable to any other parties given the fact that the key revenue-generating contracts associated with the systems are already in the possession of TEP Holdings (and serve as collateral for the TEPH Facility).  Third, it will help ease the impasse between the Debtors and their Dealers by providing for the immediate start of negotiations with Dealers.  And finally, the sale and settlement will not prejudice any other party in interest, given that any other parties with any interest relating to the Eligible Systems are either parties to the sale (TEP Holdings and the lenders under the TEPH Facility) or will benefit from the transactions enabled thereby (the Dealers).

3.      Accordingly, the Debtors seek entry of an order, substantially in the form attached hereto, (a) authorizing and approving the sale (the "Sale") of certain assets of the Selling Entities free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code  (including all actions taken or required to be taken in connection with the implementation and consummation of the APA, the "Sale"), including:

    (i)      all rights of the Selling Entities or any of their Affiliates to receive any portion of any Uncompleted Systems or Completed Systems (including all related Solar Service Agreements), in any such case in respect of which the Buyer or a Project Company has directly or indirectly made any payment to any Selling Entity or any of their Affiliates (or, in the case of SAP IV is entitled, under the Acquisition Agreement, to receive a contribution of capital), that have not been transferred to the Buyer or a Project Company;

    (ii)      all right, title and interest in Host Customer Solar Assets (and any portion thereof) owned by the Selling Entities or any of their Affiliates in respect of which the Buyer or a Project Company has directly or indirectly made any payment to any Selling Entity or any of their Affiliates (or, in the case of SAP IV is entitled, under the Acquisition Agreement, to receive as a contribution of capital), except to the extent such Host Customer Solar Assets (or portions thereof) have previously been sold or assigned and has been conveyed, transferred and delivered to the Buyer or a Project Company; and

    (iii)      the right to settle all Claims between any Selling Entity or any Affiliate of any Selling Entity and any counterparty to a Channel Partner Agreement (a "Dealer") regarding or relating to the payment of outstanding amounts owed by any Selling Entity or any of

their Affiliates to such Dealer under such Channel Partner Agreement (collectively, the "Assets"),

(b) approving the assumption and assignment of the Assigned Contracts; and (c) approving a settlement (the "ASPA Settlement") by and among (i) Debtors Sunnova Energy Corporation ("SEC"), Sunnova TEP Developer, LLC ("TEP Developer"), Sunnova Energy International Inc., and Sunnova Intermediate Holdings, LLC, and non-Debtor Sunnova TEP Holdings, LLC ("TEP Holdings") (the "Company Settlement Parties"), and (ii) ASPA and the TEPH Lenders (collectively, the "Settling Lenders," and, together with ASPA, the "Lender Settlement Parties;" the Company Settlement Parties and the Lender Settlement Parties, together, the "Settlement Parties"), and (d) granting related relief.[3]

### Jurisdiction and Venue

4.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]      In support of this Motion, the Debtors have filed the *Declaration of Ryan Omohundro, Chief Restructuring Officer of Sunnova Energy International Inc., in Support of the Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Private Sale of the Eligible Systems Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Approving the ASPA Settlement, and (IV) Granting Related Relief* (the "Omohundro Sale Declaration").

6.      The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6004, 6006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4002-1(e) and 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

7.      On June 1, 2025 (the "Petition Date"), Debtor Sunnova TEP Developer, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On the date hereof, Debtors Sunnova Energy Corporation, Sunnova Energy International Inc., and Sunnova Intermediate Holdings, LLC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have filed a motion contemporaneously herewith requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

## Eligible Systems and Solar Service Agreements

8.      Sunnova's operations involve purchasing and monetizing solar energy systems and batteries (the "Solar Systems") that are subject to lease agreements or power purchase agreements (collectively, the "TPO Agreements").  Most of these systems (and the TPO Agreements) were marketed, designed and installed (the "Work") by local, independent dealers and contractors (collectively, the "Dealers"), under prepetition channel partner agreements between the Dealers and the Debtors (the "Channel Partner Agreements").

9.      Work on Solar Systems typically progresses through five phases:  (a) submission of a "contract package," whereby a Dealer delivers to Sunnova a signed customer lease agreement, PPA, or loan agreement, as applicable; (b) submission of a "notice to proceed package," whereby the Dealer submits a final design proposal and Sunnova issues an affirmative notice to proceed (a "Notice to Proceed"); (c) physical installation of the Solar System ("Mechanical Completion"); (d) the Dealer's completion and submission of all documentation required to commission the Solar System ("Substantial Completion"); and (e) Sunnova's final inspection of the Solar System, the Solar System's connection to the power grid, and the Solar Systems' placement in service ("Final Completion").

10.     Sunnova finances a portion of its acquisition of Solar Systems from Dealers by drawing under the warehouse asset-based loan facility at non-Debtor TEP Holdings (the "TEPH Facility").  Additionally, Sunnova funds the progression of Solar Systems to Final Completion with contributions from the Class A Members of the Tax Equity Partnerships ("TEPs") to which the Solar Systems are ultimately transferred.  When the required number of Solar Systems are purchased and transferred to a TEP, the TEP "closes" and the future distributions to Sunnova of cash flows from TPO Agreements on account of Sunnova's Class B Interests in the TEPs are securitized into asset-backed notes.  A portion of the proceeds of the securitizations are then distributed to the indirect owner of the Class B Interests, TEP Holdings, which then repays the TEPH Facility replenishing the borrowing base capacity for the TEPH Facility so Sunnova can start the process all over again, financing the purchase of new Solar Systems that can be transferred to new TEPs.

11.     As the Solar Systems proceed through the various stages of Work, ownership of the Solar Systems and the TPO Agreements is transferred from the Dealers to the Debtors and throughout the financing structure depending on the stage of the Work:

    a.  Initially, each Dealer is appointed as Sunnova's non-exclusive representative for purposes of, among other things, leasing Solar Systems and entering into TPO Agreements with customers on Sunnova's behalf.

    b.  When a customer signs a TPO Agreement, title to the TPO Agreement vests in Sunnova, where it is automatically transferred first to Sunnova TEP Developer, LLC ("TEP Developer"), one of the Debtors in these cases, and then to the TEPs the residual interests in which are part of the collateral package securing TEP Holdings' obligations under the TEPH Facility.

    c.  Title to and risk of loss on the Solar System itself—the actual physical panels—remain with the Dealer until the Substantial Completion phase, and then automatically passes to SEC, one of the Debtors in these cases.  At this point in time, SEC holds free-and-clear title to the Solar Systems.

    d.  SEC contributes the Solar System to TEP Developer.  The Solar Systems are then transferred to applicable TEPs according to certain criteria set by the TEPs and pursuant to development and purchase agreements among TEP Developer and the TEPs in exchange for payment of a purchase price funded by contributions by the TEPs' Class A Members.  Only when this process has been completed for a sufficient number of Solar Systems can the TEP be "closed" and Sunnova's Class B Interests be securitized.

    e.  Solar Systems are generally progressed to Final Completion only after being transferred to a TEP to ensure that the TEP owns the ITC minted upon such Solar Systems reaching Final Completion.

    f.  Certain Solar Systems are not "tranched" to a TEP, generally, because of timing or eligibility issues under the tax equity financing documents, and are instead transferred to a separate, wholly-owned subsidiary of the Borrower under the TEPH Facility.  The wholly-owned Solar Systems are typically securitized along with the Solar Systems owned by TEPs.

12.     Following the securitization, Solar Systems generate cash flows that ultimately flow to the Debtors, providing the Debtors with critical cash flows.  First, the Debtors are entitled to certain residual cash flows from the TEPs' and the securitizations' payment waterfalls after certain payments to the TEPs' tax equity partners and to principal, interest, fees and other items in

connection with the securitizations (the "Residuals").  Second, Sunnova is paid a fee to manage and service the Solar Systems (the "MSA Fees").  Together, the Residuals and the MSA Fees comprise Sunnova's primary ongoing revenue from the TPO Agreements.

13.     By 2025, the Debtors had accumulated significant payables to Dealers on account of Work performed by the Dealers on Solar Systems subject to TPO Agreements.  The amounts owed to Dealers generally fall into two categories:  (a) amounts related to certain Solar Systems that have achieved Final Completion (and accordingly have been "placed in service" for US federal income tax purposes, thereby minting a solar investment tax credit ("ITC")) (collectively, the "Completed Systems") and (b) amounts related to certain Solar Systems that have not yet achieved Final Completion (collectively, the "Uncompleted Systems," and, together with the Completed Systems, the "Eligible Systems").

14.     In the months leading to the Petition Date, all Dealers ceased Work on Solar Systems.  Thousands of work-in-process Solar Systems—and, in particular, the Eligible Systems—remain stalled at various stages of development because the Debtors have not paid the Dealers and cannot pay for prepetition Work.  Additionally, although the vast majority of the Channel Partner Agreements do not permit the Dealers to impose liens on Eligible Systems if the Company does not pay for the Work (subject to limited exceptions), Dealers and their subcontractors have attempted to place mechanic's liens on Sunnova's customers' homes.  As a result, the Debtors cannot benefit from the Eligible Systems on a postpetition basis without resolutions with the Dealers.

15.     The Debtors' inability to pay their Dealers and advance stalled works-in-process led to a cascade of liquidity pressures.  On April 21, 2025, Atlas Securitized Products Administration, L.P. ("ASPA"), as administrative agent for the lenders under the TEPH Credit

Agreement (the "<u>TEPH Lenders</u>"), sent the Debtors a notice of default (the "<u>TEPH Default Notice</u>") stating that, as a result of the alleged defaults, among other things, the TEPH Facility lender commitments were terminated and the borrower (non-Debtor Sunnova TEP Holdings, LLC) would be charged default interest.  The following day, ASPA, as administrative agent under Sunnova's loan backleverage facility (the "<u>SLA Facility</u>"), sent the Company a notice of default under the SLA Facility, stating that the SLA Facility lender commitments were terminated as a result of alleged defaults and the borrower (non-Debtor Sunnova EZ-Own Portfolio, LLC ("<u>SLA</u>")) would be charged default interest.  As a result of the defaults, no cash may be distributed from TEP Holdings or SLA to the Debtors.  The Debtors were also unable to satisfy the conditions precedent to receive funding from the TEPs.  In addition, on April 21, 2025, ASPA exercised its proxy with respect to the equity of TEP Holdings and replaced certain of the existing directors with outside directors Gilbert Nathan and John S. Dubel (together, the "<u>Outside Directors</u>").

## **The Proposed Sale**

16.    In the period leading up to the Petition Date, the Debtors' liquidity pressures, and the Dealers' refusal to continue the Work until they are paid, left the parties at an impasse.  The Debtors lack the cash to fund payments to the Dealers to incentivize them to complete their Work on the Eligible Systems.  The Debtors attempted to negotiate with certain of the Dealers prior to the Petition Date, but without the funds to assure the Dealers that they would be paid for Work performed on Completed Systems and Work to-be-performed on Uncompleted Systems, the Dealers had no incentive or, in some instances, ability to complete the Uncompleted Systems.

17.    The status of the uncompleted Work is a critical input to maximizing the value of the Debtors' business.  Until the Work is finished and the Eligible Systems reach Final Completion, the Debtors will not begin receiving any MSA Fees or Residuals in connection with those systems. Without MSA Fees and Residuals flowing to the Debtors and their affiliates from the Eligible

Systems, the value of the Debtors' business will be hamstrung, and the marketing and sale process for the Debtors' business may suffer. And yet the Debtors lack the ability to monetize the Eligible Systems—even though, as noted above, they hold free-and-clear title to the underlying Solar Systems themselves—because the TPO Agreements associated with the Solar Systems are owned by non-Debtor TEP Holdings (or its subsidiaries), which has already provided the Debtors funds to pay, in part, for the Eligible Systems. Accordingly, until Work resumes, the Debtors will be unable to realize the full value of their business.

18.     In an effort to overcome the obstacle posed by the uncompleted Work and unlock value in the Eligible Systems, the Debtors (through their advisors, and under the direction of the Special Committee of the board of directors of Debtor Sunnova Energy International, Inc.), TEP Holdings (under the supervision of its Special Committee and through its advisors), and ASPA, in its capacity as administrative agent and Class A Lender under the TEPH Facility, engaged in extensive good-faith, arm's length negotiations around the terms of a settlement of certain claims and causes of action between the parties. The parties ultimately were able to reach a resolution that includes a settlement and the sale of the Eligible Systems to TEP Holdings for $15 million (the "Purchase Price").

19.     The Sale (documented in that certain Asset Purchase Agreement, dated as of June 8, 2025, attached as Exhibit 1 to the Sale Order (together with all schedules, exhibits, and ancillary documents related thereto, and as amended, modified, or supplemented from time to time, the "APA")) and the ASPA Settlement (documented in that certain Settlement Agreement, dated as of June 8, 2025, attached as Exhibit 2 to the Sale Order (the "ASPA Settlement Agreement")), work hand in hand.

20.     First, as part of the Sale, TEP Holdings will pay SEC the Purchase Price in exchange, among other things, for (1) the right to receive the Eligible Systems where it is able to reach resolution with a Dealer, (2) any Eligible Solar Systems and the associated TPO Agreements that are currently owned by Debtors and were funded with proceeds of the TEPH Facility and not transferred to TEP Holdings, and (3) the right to negotiate and consent to any settlement with the Dealers.

21.     Second, as part of the ASPA Settlement, the Settling Lenders will provide incremental loans to TEP Holdings, the proceeds of which will be used to pay the Purchase Price and may be used to fund settlements with the Dealers.  TEP Holdings anticipates that those settlements will include a payment to the Dealers in exchange for the completion of Work on the Eligible Solar Systems and a release of claims.  As part of the ASPA Settlement, the Debtors have also agreed to appoint the TEPH Lenders' preferred back-up servicer and manager and ensure those entities are provided with all of the information so that they are in a position to step in and take over servicing and management of the Solar Systems owned by TEP Holdings and its subsidiaries if the Debtors are removed under the applicable agreements between the parties.

22.     Although the Debtors anticipate seeking approval of debtor-in-possession financing (the "DIP Facility") by separate motion, the contemplated DIP Facility provides only limited funding prior to entry of a final order.  As of the Petition Date, the Debtors have approximately $13.5 million cash on hand.  Given the Debtors' postpetition working capital needs, if they do not receive the Purchase Price on the first day of these cases, the Debtors will not have sufficient available cash to operate their business, pay obligations as they come due, administer these chapter 11 cases, and run the postpetition marketing process for the sale of their assets beyond the near term.

23.     The Debtors will use the Purchase Price to fund the administrative costs of these chapter 11 cases, including facilitating the negotiations with Dealers.  The Purchase Price will support the Debtors' payment of their wages and benefits obligations and the administrative costs of the chapter 11 cases.  Accordingly, the Debtors require immediate access to the proceeds of the Sale, and approving and authorizing the Sale is in the best interests of the Debtors and their estates.

24.     If the Sale is not approved now, much of its benefit will be lost.  Without the Sale proceeds, the Debtors will likely not have enough cash to pay the expected administrative expenses incurred prior to the approval of the DIP Facility and the second day hearing.  The Debtors' relationships with their Dealers and customers will also further deteriorate.  Many customers have been waiting months for solar panels to be installed or completed and, in some cases, have cancelled contracts for solar panels.  If more time passes without progress, more customers may cancel their contracts and the estate's value will decrease.  The Dealers also need funds to finish the Work.  The ASPA Settlement and the Incremental Warehouse Financing provide the opportunity to get money in the Dealers' hands quickly so that they can pay their employees and recommence Work.  Completing work-in-process Solar Systems will both enhance the Debtors' cash flows through collection of MSA Fees and maximize the value of the Debtors' business and assets for purposes of the broader sale process.  Further, without the Sale and ASPA Settlement, the Warehouse Lenders would likely proceed with enforcement actions and the Debtors would likely lose their entire equity interest in TEP Holdings and its subsidiaries.  Finally, without the immediate receipt of the additional funds provided by the Purchase Price, the Debtors will likely have to terminate additional employees that otherwise will be retained if the Sale is approved. Receipt of the Purchase Price at the earliest stage of these chapter 11 cases will provide the Debtors

with the funding needed to keep key employees and to cover certain costs during the chapter 11 cases without the accompanying administrative claim or liens of additional DIP financing.

25.     The Debtors, in consultation with their advisors, do not believe that the cost and delay of running an auction process for the Assets would be outweighed by any marginal increase to the Sale proceeds (if any), particularly in light of the benefits to the Debtors, their estates, and their stakeholders if the Sale is approved.  TEP Holdings has already advanced hundreds of millions of dollars to the Debtors on account of the Eligible Systems, and the Solar Service Agreements associated with them have been transferred to TEP Holdings but legal title to the Eligible Solar System may still be owned by the Dealer.  Thus, in their current state, the Assets are not reasonably marketable to third parties that lack the associated Solar Service Agreement, the Debtors' existing relationships with Dealers, TEPs, and tax credit purchasers necessary to complete and monetize the Uncompleted Systems.

26.     The Debtors intend to run an expedited sale process for their remaining business and assets.  That process will suffer if settlements with Dealers are not negotiated so that the Dealers can receive funds from the Incremental Warehouse Financing and complete in-process Solar Systems.  Successful settlements therefore provide the best opportunity to reduce claims against the Debtors' estates, increase the value of the Debtors' estates and, potentially, the proceeds received through the sale of their business.  Notably, the Debtors' DIP lenders and stalking horse bidder support the Sale and the ASPA Settlement.  Accordingly, given the Debtors' urgent need for additional liquidity to facilitate Dealer settlements and fund these chapter 11 cases, and the potential value accretion from those settlements, the Debtors believe that proceeding to closing on an expedited basis is in the best interests of the Debtors and all parties in interest.

## Summary of Key Transaction Terms

27.     The following is a summary of the material terms of the APA:[4]

| Summary Description of the APA | |
|---|---|
| **Parties** | **Selling Entities**:<br><br>• Sunnova Energy Corporation<br><br>• Sunnova TEP Developer, LLC<br><br>**Buyer**:<br><br>• Sunnova TEP Holdings, LLC<br><br>**TEPH Sub**:<br><br>• Sunnova TEP Holdings Subsidiary, LLC ("TEPH Sub")<br><br>*See generally* APA. |
| **Description** | Purchase of all rights and title, including the right to receive title, and interests, in Eligible Systems and the leases and contracts associated therewith free of debts and liens through an asset purchase agreement.<br><br>*See* APA § 2.1. |
| **Assets** | • All rights of the Selling Entities or any of their Affiliates to receive any portion of any Uncompleted Systems or Completed Systems (including all related Solar Service Agreements), in any such case in respect of which the Buyer or a Project Company has directly or indirectly made any payment to any Selling Entity or any of their Affiliates (or, in the case of SAP IV is entitled, under the Acquisition Agreement, to receive a contribution of capital), that have not been transferred to the Buyer or a Project Company (such Solar Service Agreements, collectively, the "Assigned Contracts");<br><br>• All right, title and interest in Host Customer Solar Assets (and any portion thereof) owned by the Selling Entities or any of their Affiliates in respect of which the Buyer or a Project Company has directly or indirectly made any payment to any Selling Entity or any of their Affiliates (or, in the case of SAP IV is entitled, under the Acquisition Agreement, to receive as a contribution of capital), except to the extent such Host Customer Solar Assets (or portions thereof) have previously been sold or assigned and has been conveyed, transferred and delivered to the Buyer or a Project Company;<br><br>• The right to settle all Claims between any Selling Entity or any Affiliate of any Selling Entity and any counterparty to a Channel Partner Agreement (a "Dealer") regarding or relating to the payment of outstanding amounts owed by any Selling Entity or any of their Affiliates to such Dealer under such Channel Partner Agreement, which settlement agreement may include (i) the Dealer agreeing to transfer the applicable Completed System and/or Uncompleted System to TEPH Sub, (ii) the Dealer agreeing to complete the applicable Uncompleted Systems for an agreed payment amount funded by the proceeds of loans issued to the Buyer pursuant to the Credit Agreement, (iii) the Dealer releasing all parties from any |

---

[4]    This summary is provided for the convenience of the Court and parties in interest and describes, generally, the terms contained in the APA.  To the extent there is any conflict between this summary and the APA, the APA shall govern in all respects.

|  | Claims, Encumbrances or other interests such parties may have in respect of such Uncompleted Systems or Completed Systems, and/or (iv) the Selling Entities or any of their Affiliates and their estates releasing the Dealer from all Claims and causes of action they have against the Dealer; |
|  | • Copies of all books, records, information, files, data and plans (whether written, electronic or in any other medium), and similar items of the Selling Entities, in each case, to the extent relating to the Purchased Assets; |
|  | • (i) all rights, Claims and causes of action of the Selling Entities, against Persons (including, suppliers, vendors, merchants and manufacturers) and (ii) all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by the Selling Entities, in each case of clauses (i) and (ii), solely to the extent related to the other Purchased Assets and the Acquired Liabilities; and |
|  | • the valid, non-exclusive right to use all intellectual property necessary to install and operate any Uncompleted Systems or Completed Systems that otherwise constitute Purchased Assets under the APA. |
|  | *See* APA § 2.1. |
| **Proposed Purchase Price** | The aggregate consideration to be paid by Purchaser for the purchase of the Purchased Assets shall be cash consideration of $15 million. *See* APA § 3.1(a). |
| **Source of Funds** | Funds to be lent by the Settling Lenders to TEP Holdings pursuant to the Incremental Warehouse Financing. |
| **Private Sale** | The Assets will be sold via private sale. There will not be an auction; the Sale is not subject to overbid. |
| **Sale Free and Clear** | Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Assets shall be free and clear of liens and all interests, liabilities, obligations, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code), except for Assumed Liabilities. |

28.     The following is a summary of the material terms of the ASPA Settlement Agreement:[5]

| **Summary Description of the ASPA Settlement Agreement** | |
|---|---|
| **Parties** | **The Company Settlement Parties** <br> • Sunnova Energy International, Inc.; |

---

[5]    This summary is provided for the convenience of the Court and parties in interest and describes, generally, the terms contained in the ASPA Settlement Agreement. To the extent there is any conflict between this summary and the ASPA Settlement Agreement, the ASPA Settlement Agreement shall govern in all respects. Capitalized terms used but not defined in this summary have the meanings ascribed to them in the ASPA Settlement Agreement.

| | |
|---|---|
| **Summary Description of the ASPA Settlement Agreement** | |
| | • Sunnova Energy Corporation; |
| | • Sunnova Intermediate Holdings, LLC; |
| | • Sunnova TEP Developer, LLC; |
| | • Sunnova TEP Holdings, LLC; |
| | • Sunnova TEP Holdings Subsidiary, LLC; and |
| | • Sunnova TE Management, LLC |
| | **Atlas and the Settling Lenders** |
| | • ASPA, in its capacity as administrative agent under the TEPH Facility, and for itself and on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by ASPA and its affiliates (collectively, "Atlas"); and |
| | • certain participating Class A Lenders (the "Settling Class A Lenders") and Class B Lenders (the "Settling Class B Lenders" and, together with the Settling Class A Lenders, the "Settling Lenders") under the TEPH Facility. |
| | *See generally* ASPA Settlement Agreement. |

| | |
|---|---|
| **Summary Description of the ASPA Settlement Agreement** | |

| | |
|---|---|
| **Settlement** | **Forbearance Regarding Events of Default**<br><br>• Atlas and the Settling Lenders shall forbear from exercising rights and remedies and accruing interest at the default rate under the TEPH Facility Credit Agreement with respect to the Existing Subject Events of Default.<br><br>*See* ASPA Settlement Agreement §§ 9, 10(b).<br><br>**Warehouse Loans**<br><br>• The Settling Lenders shall fund the New Warehouse Loans to TEP Holdings pursuant to and on the terms set forth in the Warehouse Credit Agreement.<br><br>*See* ASPA Settlement Agreement § 3.<br><br>**Dealer Settlements**<br><br>• *Dealer Settlement Reporting.* The Administrative Agent shall provide weekly reporting to SEC regarding the execution of settlement agreements with Dealers, which reporting shall include the material terms of such settlement agreements including, at a minimum: (a) the Dealer party to such settlement agreement; (b) any and all settlement payments to be made to such Dealer pursuant to such settlement agreement; (c) a schedule of the Eligible Systems subject to such settlement agreement; and (d) whether the Administrative Agent seeks consent from SEC or TEP Developer to settle an Avoidance Claim (as defined in the ASPA Settlement Agreement) in accordance with Section 4(b) of the ASPA Settlement Agreement.<br><br>• *Completion Costs.* No Party shall instruct any Dealer to resume work on any Eligible System unless and until such Dealer enters into a settlement agreement. All costs incurred by Eligible Dealers under any such settlement agreement after the Petition Date shall be the sole obligation of TEPH Sub and shall not give rise to any claim for administrative expenses pursuant to section 503(b) of the Bankruptcy Code against the Debtors' estates without the written consent of Ryan Omohundro, the Debtors' Chief Restructuring Officer (the "CRO"), or such other authorized officer as the Debtors may identify in writing delivered to the Administrative Agent. For the avoidance of doubt, TEPH Sub shall not have any payment obligations to any Eligible Dealer until a settlement agreement is entered into with such Dealer and unless TEPH Sub has sufficient funding under the Warehouse Facility for such payment obligations.<br><br>• *No Settlement of Avoidance Claims.* Neither the Administrative Agent nor any Settling Lender shall, in connection with any settlement with any Dealer, settle, resolve, release, or otherwise dispose of, or commit SEC or TEP Developer to settle, resolve, release, or otherwise dispose of, any claim or cause of action for avoidance of a preferential or fraudulent transfer under state law or the Bankruptcy Code (collectively, "Avoidance Claims") that SEC or TEP Developer may hold against any Dealer without the written consent of the CRO, not to be unreasonably withheld, or such other authorized officer as the Debtors may identify in writing delivered to the Administrative Agent. SEC and TEP Developer reserve all rights with regard to such Avoidance Claims.<br><br>*See* ASPA Settlement Agreement § 4.<br><br>**Manager/Servicer Replacement**<br><br>The Company Settlement Parties will use best efforts to appoint a "hot" back-up manager and servicer with regard to each Eligible Systems. |

| Summary Description of the ASPA Settlement Agreement | |
|---|---|
| | *See* ASPA Settlement Agreement § 5.<br><br>**Amendment to Tax Equity Partnerships**<br><br>The Company Settlement Parties shall take all actions necessary and use best efforts to amend the governing and operating documents of certain tax equity partnerships whose equity is indirectly owned in part by the Borrower, in each case, satisfactory to the Administrative Agent (on behalf of the Incremental Class A Lenders).<br><br>*See* ASPA Settlement Agreement § 6.<br><br>**Mutual Release**<br><br>The ASPA Settlement Agreement contains ordinary and customary mutual release provisions for settlements of this type, subject to certain carve outs regarding intercompany claims held by the Borrower, the Borrower's Subsidiaries, and the Project Companies.<br><br>*See* ASPA Settlement Agreement § 11. |
| **Board Replacement Ratification** | The Company Parties shall acknowledge that, as of the date of the ASPA Settlement Agreement, the Company Parties have taken all actions necessary to approve and ratify the compositions of the Boards of Directors of the Borrower and the Borrower's Subsidiaries.<br><br>*See* ASPA Settlement Agreement § 7. |
| **Access** | The Company Parties (i) shall grant the Administrative Agent, the Borrower, TEPH Sub, and their respective advisors access to (1) the Company Parties' systems, books, records, documents, and other data regarding (without limitation or duplication) (a) the Host Customer Solar Assets (as defined in the Warehouse Credit Agreement) relating to the Warehouse Facility and the associated customer information and tax reporting, (b) the Dealers (including outstanding payment obligations due and owing by the Company Parties in connection with Host Customer Solar Assets), and (c) the Purchased Assets (as defined in that certain Asset Purchase Agreement, dated as of June 8, 2025, by and among SEC, TEP Developer, Borrower and TEPH Sub (the "Asset Purchase Agreement")) and (2) the Seller's Representatives (as defined in the Asset Purchase Agreement) and (ii) shall require, as a condition precedent to consummation of the intended sale of all or substantially all of the Debtors' assets, that the buyer in such sale grant the Administrative Agent and its advisors the same access.<br><br>*See* ASPA Settlement Agreement § 8. |
| **Waiver of Employment Restrictions** | The Company Parties shall waive certain non-competition, non-solicitation, or similar provisions in employment agreements or other similar agreements and permit the Settling Lenders to solicit for employment, hire, or otherwise contract for services of certain employees that interface with Dealers or are contemplated to participate in the Dealer settlement process.<br><br>*See* ASPA Settlement § 9. |

**Basis for Relief**

I.     **The Sale Is a Sound Exercise of the Debtors' Business Judgment, Is Appropriate Pursuant to Bankruptcy Rule 6004(f), and Should Be Approved.**

29.     Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A debtor may sell estate property outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).  "Great judicial deference is given to the [debtor in possession's] exercise of business judgment" regarding the sale of estate property.  *GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).  Once a debtor articulates a valid business justification, then the burden of rebutting the "strong presumption . . . that the agreement at issue was negotiated in good faith and in the best interests of the estate" falls to parties opposing the transaction.  *In re Filene's Basement*, No. 11-13511, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014); *see In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  Thus, if a debtor satisfies the business judgment rule, the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

30.     Bankruptcy Rule 6004(f)(1) authorizes a debtor to sell estate property outside of the ordinary course of its business by private sale or public auction.  *See* Fed. R. Bankr. P. 6004(f)(1).  Private sales are appropriate where the debtor demonstrates that the proposed sale is permissible pursuant to section 363 of the Bankruptcy Code.  *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) ("[T]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction." (quoting *Penn. Mut. Life Ins. Co. v. Woodscape Ltd. P'ship* (*In re Woodscape Ltd. P'Ship*), 134 B.R. 165, 174 (Bankr. D.

Md. 1991))); *In re Dura Auto. Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *88 (Bankr. D. Del. Aug. 15, 2007) ("[S]ales of property rights outside the ordinary course of business may be by private sale or public auction.").  Additionally, a debtor has broad discretion to determine the manner in which its assets are sold.  *See Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) (finding that section 363 of the Bankruptcy Code "clearly indicates that the manner of sale is within the discretion of the trustee"); *see also In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through a private or public sale).

31.     Consummating the Sale of the Assets on the terms set forth in the Sale Documents is a sound exercise of the Debtors' business judgment for several reasons.  ***First***, the Debtors believe the Purchase Price will allow them to realize the highest and best value for the Assets.  The Purchase Price exceeds the expected proceeds from the Assets, including the Uncompleted Systems prior to their completion.  ***Second***, the Sale will enable negotiations with Dealers to begin with the value-maximizing aims of (a) resuming Work on Uncompleted Systems and (b) reducing the magnitude of claims held by Dealers against the Debtors' estates.  Each of these aims will enhance the value of the Debtors' business as a whole, which will inure to the benefit of the Debtors' creditors by ensuring the Debtors may obtain the highest and best sale price for their assets as part of their broader marketing and sale process.

32.     ***Finally***, the Debtors and their advisors have evaluated the terms of the Sale and believe that selling the Assets by private sale is in the best interests of the Debtors' estates and should be approved.  After engaging in good-faith, arm's-length negotiations, the Debtors and ASPA agreed on the Purchase Price in cash for the Assets, which totals approximately $15 million.  As described in the Omohundro Sale Declaration, the Assets are likely not reasonably marketable

in their current condition and the value generated by the Sale outweighs any benefits of maintaining the Assets.  The Sale provides necessary near-term liquidity to the Debtors in the first days of these chapter 11 cases, and ensures that Dealer negotiations can commence now.  The Sale and ASPA Settlement will also preserve the Debtors' equity interest in TEP Holdings and provide the best path toward maximizing the value of that equity interest.

33.     The Debtors and their advisors believe that a public auction for the Assets would require the Debtors' estates to incur substantial additional costs and create undue delay.  Given the unique nature of the Assets and the necessary relationships and resources required to monetize them, the Debtors do not believe an auction would result in any incremental value that could justify expense and delay, particularly in light of Debtors' limited liquidity.  Indeed, the Debtors believe that the Purchaser, with the support of ASPA and the Settling Lenders, is likely the only entity that can purchase and effectively use the Assets.  For these reasons, the private Sale is a sound exercise of the Debtors' business judgment and should be approved.  Courts in this and other jurisdictions have authorized private sales pursuant to section 363 of the Bankruptcy Code.  *See, e.g.*, *In re Kal Freight Inc.*, No. 24-90614 (CML) (Bankr. S.D. Tex. Mar. 31, 2025); (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction); *In re Envision Healthcare Corp.*, No. 23-90342 (CML) (Bankr. S.D. Tex. Aug. 1, 2023) (same); *In re Katerra Inc.*, No. 21-31861 (DRJ) (Bankr. S.D. Tex. July 8, 2021) (same); *In re Wheel Pros LLC*, No. 24-11939 (Bankr. D. Del. Oct. 15, 2024) (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Mar. 11, 2024) (same).

**II.     The Sale Free and Clear of Liens and Other Interests Is Authorized by Section 363(f) of the Bankruptcy Code.**

34.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such

a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale

price of the property exceeds the value of all liens on the property; (d) the interest is the subject of

a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable

proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

35.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.   Thus,

satisfaction of *any* of the requirements enumerated therein will suffice to warrant the sale of the

applicable property free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges,

or encumbrances), except with respect to any interests that may be assumed under the applicable

agreement.  *See In re C-Power Prods., Inc.*, 230 B.R. 800, 803 (Bankr. N.D. Tex. 1998); *In re

Nature Leisure Times, LLC*, No. 06-41357, 2007 Bankr. LEXIS 4333, at *7 (Bankr. E.D. Tex.

Dec. 19, 2007).  Here, by statute, any liens will attach to the proceeds of the sale.  Moreover, any

such statutory liens fall squarely within section 363(f)(5), under which it is well-established that

assets may be sold free and clear of statutory liens.  *See, e.g.*, *In re AG Van Metre, Jr. Inc.*, 155

B.R. 118 (Bankr. E.D. Va. 1993), *aff'd without opinion*, 16 F.3d 414 (4th Cir. 1994) ("It would be

illogical to require full satisfaction statutory tax liens as a condition to the approval of sale pursuant

to § 363(f)(3) (sic) when § 724(b) explicitly provides otherwise").

36.     Thus, section 363(f)(3) of the Bankruptcy Code is satisfied with respect to the Sale.

The Debtors accordingly request authority to sell the Assets to the Purchaser free and clear of all

liens, claims, rights, interests, charges, and encumbrances.

**III.    The Purchaser Is a Good-Faith Purchaser and Is Entitled to the Full Protection of
Section 363(m) of the Bankruptcy Code.**

37.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or

modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or

lease of property does not affect the validity of a sale or lease under such authorization to an entity

that purchased or leased such property in good faith[.]"  11 U.S.C. § 363(m).  Although "[t]he Bankruptcy Code does not explicitly define 'good faith,'" the Fifth Circuit has stated that a good faith purchaser is one who (a) "purchases the assets for value, in good faith, and without notice of adverse claims" and (b) "one who does not engage in 'misconduct' including," among other things, "fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders."  *SR Construction, Inc. v. Hall Palm Springs, L.L.C. (In re Palm Springs II, L.L.C.)*, 65 F.4th 752, 759 (5th Cir. 2023) (quoting *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014)).  "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

38.     Here, although the Purchaser is an affiliate of the Debtors, it is acting as a *bona fide* purchaser with respect to the APA.  The Debtors have disclosed the terms of the Sale and the APA, as well as the Purchaser's affiliation with the Debtors.  The Sale and the APA are the product of good-faith, arm's-length negotiations among sophisticated commercial counterparties, each represented by competent counsel of their choosing.  Importantly, the Sale was approved by the Debtors' Special Committee, all of which are independent fiduciaries, and a special committee of the board of TEP Holdings (the "TEPH Special Committee"), comprising only the Outside Directors.  Each of the Debtors' Special Committee and the TEPH Special Committee has been delegated sole authority with regard to certain "conflicts matters," including sole authority to review, evaluate, and negotiate the Sale transaction on behalf of the Debtors and TEP Holdings, respectively.  Each of the Debtors' Special Committee and the TEPH Special Committee was also advised by its own counsel separate from the Debtors' counsel.  There is no indication of fraud or

any improper insider dealing, no special treatment was afforded to ASPA or the Purchaser, and any affiliations with the Debtors have not impacted the material terms of the Sale.  Further, the consideration to be received by the Debtors for the Assets is fair and reasonable.  The Debtors submit that the Purchaser is a "good faith purchaser[s]" within the meaning of section 363(m) of the Bankruptcy Code and that the APA is a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  The consideration to be received by the Debtors pursuant to the APA is fair and reasonable.  Accordingly, the Debtors request that the Court enter an order entitling each of the parties to the Sale to the full protections of section 363(m) of the Bankruptcy Code.

## IV.  Relief Under Bankruptcy Rules 6004(h) is Appropriate.

39.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stay under Bankruptcy Rule 6004(h)is waived.

40.    Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankruptcy ¶ 6004.11, ¶ 6004.04 (16th rev. ed. 2014).

41.    The Debtors simply do not have the financial wherewithal to assist with the Dealer negotiations absent closing of the Sale immediately.  Without the liquidity the Sale provides, the Debtors anticipate that they will not have the liquidity needed to pay their ordinary course expenses, including employee wages prior to the entry of the final order with respect to the anticipated DIP Facility.  Moreover, any delay in commencing negotiations with the Dealers will

likely lead to a destruction of value.  The Debtors seek to close the Sale as soon as possible to mitigate the significant risk of these negative outcomes in the immediate near term.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**V.    The Assumption and Assignment of Assumed Contacts Is Appropriate and Should Be Approved.**

   **A.    The Assumption and Assignment of the Assigned Contracts Reflects the Debtors' Reasonable Business Judgment.**

42.    To facilitate and effectuate the Sale, the Debtors seek authority to assign or transfer the Assigned Contracts to the Purchaser.  Section 365 of the Bankruptcy Code authorizes a debtor to assume or assume and assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  *See generally* 11 U.S.C. § 365. "A bankruptcy court reviews a debtor's decision to assume or reject an executory contract under the deferential 'business judgment' standard."  *In re J. C. Penney Direct Mktg. Servs., L.L.C.*, 50 F.4th 532, 534 (5th Cir. 2022) (citation omitted).  Indeed, "a bankruptcy court should only withhold approval [of a debtor's assumption request] when 'the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.'"  *Id. (quoting Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)); *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (noting that the business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage").

43.    The Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code

on the terms set forth in the Sale Order.  *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the sale motion, the creditor was deemed to consent).

44.     As an initial matter, the Debtors do not believe that any Solar Service Agreements will be assumed and assigned under the APA.  Unlike the Solar Systems associated with them, the Solar Service Agreements are assigned to TEP Holdings nearly immediately upon their execution. Accordingly, the Debtors only request relief pursuant to section 365 of the Bankruptcy Code out of an abundance of caution.

45.     To the extent any Solar Service Agreements are assigned pursuant to the APA, such agreements are necessarily linked to the Eligible Systems being sold.  The Solar Service Agreements are the leases and power purchase agreements that generate cash flows on account of the Eligible Systems.  Without the Solar Service Agreements, the cash flows from the Eligible Systems would be limited to the ITCs minted when they are placed in service.  Accordingly, it is unlikely that any purchaser would want to acquire the Eligible Systems without the Assigned Contracts.  Moreover, the transfer of the Assigned Contracts is consistent with the Debtors' ordinary course operations—the Solar Service Agreements are assigned to TEP Holdings upon their execution by SEC and the customer.  The Assigned Contracts are essential to the value of the Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Assets. Accordingly, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment.

   **B.     Defaults Under the Assigned Contracts Will Be Cured.**

46.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code,

specifically that the debtor (a) cures, or provides adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensates parties for pecuniary losses arising therefrom, and (c) provides adequate assurance of future performances thereunder.  Section 365(b) of the Bankruptcy Code "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980) *rev'd on other grounds* 14 B.R. 529.

47.      Here, the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied.  As an initial matter, the Debtors are unaware of any defaults under the Assigned Contracts and believe that no cures are necessary.  To the extent that any defaults have occurred, the Sale Documents provide which party will cure the default that is associated with a given Assigned Contract and is required to be cured under section 365(b) of the Bankruptcy Code. Thus, to the extent that defaults exist that must be cured, those defaults will be cured as part of the Sale.  Accordingly, the Court should approve the Sale and the assumption and assignment of the Assigned Contracts.

### C.      Non-Debtor Parties Will Be Adequately Assured of Future Performance.

48.      The third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

49.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (noting that adequate assurance of future performance is present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).  The Purchaser intends to close quickly here to provide the estates with essential liquidity.  The Debtors will continue to service the assets, and the ASPA Settlement will provide for back-up servicers to be moved to "hot" back-up status to ensure management and servicing may continue seamlessly in any scenario.

## VI.     The ASPA Settlement Is Fair, Reasonable, and in the Best Interest of the Debtors' Estates, Is a Sound Exercise of the Debtors' Business Judgment, and Should Be Approved.

50.     Under Bankruptcy Rule 9019(a), "[o]n the [debtor in possession's] motion and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  "To minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)).  Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly."  *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted).

51.     Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement.  *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).  Instead, the court should

determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Ultimately, "the decision to approve a compromise lies within the sound discretion of the bankruptcy court." *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984); *see also Jackson Brewing Co.*, 624 F.2d at 602–03 (same).

52.     Courts in this circuit use a three-factor balancing test to analyze whether a proposed settlement is fair, reasonable, and in the best interests of the estate "with a focus on comparing the terms of the compromise with the likely rewards of litigation." *DeepRock Venture Partners, L.P. v. Beach (In re Beach)*, 731 Fed. Appx. 322, 325 (5th Cir. 2018) (citing *Age Ref. Inc.*, 801 F.3d at 540). The three-part test considers "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise." *Age Ref. Inc.*, 801 F.3d at 540; *see In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355–56 (5th Cir. 1997). In connection with the third factor, courts should also consider "(i) the best interests of the creditors, with proper deference to their reasonable views; and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not fraud or collusion." *In re Beach* 731 Fed. Appx. at 325 (quoting *Age Ref. Inc.*, 801 F.3d at 540); *see Foster Mortg. Corp.*, 68 F.3d at 918.

53.     The ASPA Settlement Agreement easily satisfies these standards. ***First***, the ASPA Settlement works in conjunction with the Sale as part of a broader financing package that will fund certain administrative costs incurred in negotiations with Dealers. ***Second***, an open and prolonged dispute with ASPA and the Settling Lenders would not only divert the Debtors' directors', officers', and employees' attention and resources from more critical tasks, but may also cause

concerns among potential investors, creditors, vendors, and other parties in interest regarding the prospects of the Debtors' sale and restructuring efforts. The forbearance of ASPA's and the TEPH Lenders' exercise of rights and remedies under the TEPH Facility provided under the ASPA Settlement Agreement eliminates the need for the Debtors to incur significant costs and time commitments defending or otherwise seeking to resolve those disputes that far outweigh any benefit. *Third*, the ASPA Settlement Agreement provides for a forbearance from ASPA and the settling lenders with respect to certain events of default, preserving the Debtors' indirect equity interest in TEP Holdings. *Finally*, the ASPA Settlement Agreement is a product of good-faith, arm's-length negotiation between the Debtors and ASPA, each of which is a sophisticated commercial party represented by separate counsel. Accordingly, the ASPA Settlement Agreement is fair, reasonable, in the best interest of the Debtors' estates, and should be approved.

54.     In connection with Bankruptcy Rule 9019(a), courts also look to sections 105(a) and 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Lilis Energy, Inc.*, No. 20-33274 (Bankr. S.D. Tex. Oct. 22, 2020) [Docket No. 529] (authorizing and approving settlement amongst debtors and equity holder under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019); *In re Weatherly Oil & Gas, LLC*, No. 19-31087 (Bankr. D. Del. Aug. 15, 2019) [Docket No. 584] (authorizing and approving settlement between debtor and its equity sponsor under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019).

55.     Section 363(b)(1) authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. 11 U.S.C. §363(b)(1). It is well established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so. *See*, *e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601

(5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)).   In the context of Bankruptcy Rule 9019, "although approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored."   *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009) (citations omitted).

56.     Further, under section 105(a) of the Bankruptcy Code, bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the [Bankruptcy Code]." 11 U.S.C. §105(a)

57.     Entering into the ASPA Settlement Agreement is a sound exercise of the Debtors' business judgment.  As discussed above, the ASPA Settlement Agreement conserves significant resources for the Debtors' estates and facilitates the Debtors' ongoing marketing and sale process by avoiding potentially expensive and time-consuming litigation.  The Debtors request that the Court finds that entry into the ASPA Settlement Agreement is a proper exercise of the Debtors' business judgment and rightly authorized.

## Emergency Consideration

58.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant certain relief within the first twenty-one days after the commencement of a chapter 11 case if such relief "is needed to avoid immediate and irreparable harm."  For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief in this Motion during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture

and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief "is needed to avoid immediate and irreparable harm" as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

## Modification of Bankruptcy Rules 2002(a)(2) and 9019(a)

59.     The Debtors request that the Court, for cause, modify the services requirements set forth in Bankruptcy Rule 2002(a)(2) and 9019(a) to limit service of this Motion only to the core service list and affected creditors. In light of the breadth and complexity of the Debtors' business, serving the Motion on all creditors, even those that are unaffected by the relief sought herein, would cause unnecessary confusion and expense to the detriment of all stakeholders. Accordingly, sufficient cause exists under Bankruptcy Rule 2002(a)(2) and 9019(a) to modify the service requirements for this Motion.

## Reservation of Rights

60.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended as or should be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as

to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; (h) a concession that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (i) a waiver of the obligation of any party in interest to file a proof of claim; or (j) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

### Notice

61.    The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to the Ad Hoc Group of DIP Lenders; (d) Norton Rose Fulbright US LLP, counsel to GoodFinch Management, LLC; (e) Arnold & Porter Kaye Scholer LLP, counsel to the DIP Agent; (f) White & Case LLP, counsel to Atlas, as SLA Lender and TEPH Lender; (g) Morgan, Lewis, Bockius, LLP, counsel to Blue Owl Capital Inc. and LibreMax Capital, LLC, as TEPH Lenders; (h) Milbank LLP, counsel to the KKR Term Loan Lenders; (i) Davis Polk & Wardwell LLP, counsel to the Ad Hoc Group of ABS Lenders; (j) Schulte Roth & Zabel LLP, counsel to the Special Committee of the Board of Directors of Sunnova TEP Holdings, LLC, and co-counsel to Sunnova TEP Holdings, LLC and its subsidiaries; (k) the United States Attorney's Office for the Southern District of Texas; (l) the Internal Revenue Service; (m) the United States Securities and Exchange Commission; (n) the state attorneys general for states in which the Debtors conduct business; and (o) any party that has requested

notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

The Debtors request entry of the Sale Order, substantially in the form attached hereto, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
June 9, 2025

*/s/ Jason G. Cohen*

**BRACEWELL LLP**
Jason G. Cohen (TX Bar No. 24050435)
Jonathan L. Lozano (TX Bar No. 24121570)
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:    (713) 223-2300
Facsimile:    (800) 404-3970
Email:          jason.cohen@bracewell.com
                    jonathan.lozano@bracewell.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          anup.sathy@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
Ciara Foster (*pro hac vice* pending)
Margaret Reiney (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:          brian.schartz@kirkland.com
                    ciara.foster@kirkland.com
                    margaret.reiney@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Jason G. Cohen*
Jason G. Cohen

## **Certificate of Service**

I certify that on June 9, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Jason G. Cohen*
Jason G. Cohen