**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNNOVA ENERGY INTERNATIONAL INC., *et al.*,[1] | ) ) | Case No. 25-90160 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF RYAN OMOHUNDRO,**
**CHIEF RESTRUCTURING OFFICER OF SUNNOVA ENERGY**
**INTERNATIONAL INC., IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS**

I, Ryan Omohundro, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") of Sunnova Energy International Inc. ("SEI," and together with the other above-captioned debtors and debtors in possession, the "Debtors," and collectively with their non-debtor affiliates, "Sunnova" or the "Company") and its subsidiaries.  On June 1, 2025, Debtor Sunnova TEP Developer, LLC filed a voluntary petition for relief under chapter 11, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  On June 8, 2025 (the "Petition Date"), Debtors SEI, Sunnova Energy Corporation, and Sunnova Intermediate Holdings, LLC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Paul Mathews, President and Chief Executive Officer of Sunnova Energy International Inc., In*

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova.  The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046.

*Support of Debtors' Chapter 11 Petitions* [Docket No. 17] (the "<u>Mathews First Day Declaration</u>").[2]

2.      I was appointed as the CRO of the Debtors on April 27, 2025.  In addition to my role as CRO of the Debtors, I am also a Managing Director of Alvarez & Marsal North America, LLC ("<u>A&M</u>").  A&M is the proposed financial advisor to the Debtors in the above-captioned chapter 11 cases.  The Debtors engaged A&M in March 2025 to help manage the Company's liquidity, identify strategic alternatives to enhance liquidity and profitability, assist with the development of a business plan, and manage the Debtors' contingency planning efforts.  Since being engaged, A&M has worked closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other financial information.  I am the senior leader of the A&M team advising the Debtors.

3.      A&M is a preeminent restructuring consulting firm with extensive experience and an excellent reputation for providing high-quality, specialized management and restructuring advisory services to debtors and distressed companies.  A&M provides a wide range of turnaround advisory services targeted at stabilizing and improving a company's financial position, including: (a) developing or validating forecasts, business plans, and related assessments of strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring packages.  A&M is known for its ability to work alongside

---

[2]    Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Mathews First Day Declaration or the corresponding First Day Motion, as applicable.

company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

4.      I have over twenty years of experience advising distressed companies and creditors in complex transactions and a deep expertise in the energy, industrial, and services industries. I also have substantial experience helping to stabilize financially distressed companies and developing business plans to accomplish the necessary restructuring of their operations and finances.  I have served as lead financial advisor to several complex restructuring transactions totaling more than $30 billion in debt in aggregate, including:  *In re Strategic Materials, Inc.*, No. 23-90907 (CML) (Bankr. S.D. Tex. Jan. 18, 2024); *In re MLCRJ LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. Jul. 10, 2023); *In re Talen Energy Corp.*, No. 22-90054 (MI) (Bankr. S.D. Tex. June 13, 2022); *FTS Int'l, Inc.*, No. 20-34622 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2021); *In re Superior Energy Servs.*, No. 20-35812 (DRJ) (Bankr. S.D. Tex. Jan. 14, 2021); *In re Hi-Crush Inc.*, No. 20-33495 (DRJ) (Bankr. S.D. Tex. Dec. 30, 2020); *In re Arena Energy, LP*, No. 20-34215 (MI) (Bankr. Sept. 25, 2020); *In re Ne. Gas Generation*, No. 20-11597 (MFW) (Bankr. S.D. Tex. July 17, 2020); *In re Weatherford Int'l plc*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Aug. 22, 2019); *In re Jones Energy*, No. 19-32112 (DRJ) (Bankr. S.D. Tex. May 6, 2019); *New MACH Gen, LLC*, No. 18-11368 (MFW) (Bankr. S.D. Tex. July 2, 2018); and *In re Forbes Energy Servs. Ltd*, No. 17-20023 (DRJ) (Bankr. S.D. Tex. Feb. 15, 2017).

5.      I earned a bachelor's degree in business administration and a master's degree in professional accounting from the University of Texas at Austin.  I am a Certified Public Accountant, a Chartered Financial Analyst, a Certified Insolvency & Restructuring Advisor, and a Certified Fraud Examiner.  I have been employed at A&M since 2006.

6.    As CRO, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, as well as their books and records.   I submit this declaration (this "Declaration") in support of the relief requested in the motions filed along with the Debtors' chapter 11 petitions (collectively, the "First Day Motions").   I am familiar with the contents of each First Day Motion and believe that the relief requested therein is necessary for the Debtors to smoothly transition into chapter 11 and to continue their ordinary course operations on a postpetition basis.

7.    The statements in this Declaration are, except where otherwise noted, based on (a) my personal knowledge, (b) information I have obtained from other members of the Debtors' management team, employees, advisors, and/or employees of A&M, (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and (d) my experience and knowledge advising distressed companies.   I am over the age of eighteen, and I am authorized to submit this Declaration on behalf of the Debtors.   If called upon to testify, I could and would testify competently to the facts set forth herein.

**Prepetition Negotiations**

8.    The Company has faced significant ongoing operational, financial, and liquidity headwinds, which resulted in substantial liquidity erosion over time.   By mid-March 2025, the Company was facing critically tight liquidity that threatened its ability to fulfill upcoming near-term cash obligations, including an approximately $24 million interest payment due under the 11.75% Senior Notes and various payments totaling approximately $170 million under the SLA Facility.   Accordingly, the Company engaged A&M, Kirkland & Ellis LLP ("Kirkland"), and Moelis & Company LLC ("Moelis," together with A&M and Kirkland, the "Advisors") to (a) review and analyze the Debtors' businesses, operations, financial projections, and liquidity,

(b) explore raising prepetition bridge financing to allow the Company sufficient time to negotiate the terms of an out-of-court or in-court restructuring of its balance sheet liabilities, and (c) develop the strategy for, and negotiate the terms of, a restructuring of the Debtors' liabilities. In consultation with their Advisors, the Debtors determined that their liquidity was inadequate to meet these upcoming obligations without a near-term cash infusion, and absent such an infusion, the Company was projected to run out of cash in late April 2025 to early May 2025.

9.       As a result of this determination, beginning in the latter half of March 2025, the Debtors, with the assistance of their Advisors, began the critical work of: (a) rationalizing costs; (b) developing a restructuring plan to present to their various stakeholders; and (c) engaging in preliminary discussions with their various stakeholders, including (i) the Ad Hoc Group, which at the time represented 90% of each series of the SEC Unsecured Notes and SEI Convertible Notes; (ii) Atlas Securitized Products Administration, L.P. and certain of its affiliates ("Atlas"), in their respective capacities as administrative agent and lenders under the TEPH Facility and SLA Facility; and (iii) KKR in its capacity as the lender under the KKR Facility.

10.     On April 1, 2025, the Company elected to forgo the interest payment due under the 11.75% Senior Notes and entered a 30-day grace period. Beginning on or about April 9, 2025, once the Company had completed the initial development of its long-term business plan and preliminary restructuring proposal, the Company presented to and began detailed diligence and restructuring discussions with the Ad Hoc Group, Atlas, and KKR, as well as prospective third-party lenders.

11.     Given the complexity of the Company's operations and balance sheet, and the breadth of the operational streamlining that needed to occur, the financing and restructuring discussions with the Debtors' stakeholders and prospective third-party lenders evolved

substantially over time in their scope as the Debtors and their Advisors learned more about various parties' appetite, or lack thereof, to participate in potential financing and restructuring structures.

12.     Beginning in April 2025, the Debtors initially determined that they would need approximately $60 million of prepetition bridge financing to fund an out-of-court bridge period through the end of May 2025 and an additional approximately $340 million to fund a comprehensive restructuring of the Debtors' obligations, including resolution of Dealer obligations, pursuant to a pre-arranged chapter 11 process.  After engaging with their existing stakeholders and prospective third-party DIP lenders, the Debtors developed an alternative DIP financing proposal to fund a process in chapter 11 to execute a sale of all or substantially all of their assets (the "Sale Process").  At the time, the Debtors initially determined that approximately $70 million would be required to fund this Sale Process, although after further analysis by the Debtors with the assistance of its Advisors, this number was subsequently modified to $100 million to fund an approximately 90-day chapter 11 process, including a 45-day Sale Process.

13.     Contemporaneous with their efforts to obtain financing from third parties, the Debtors and their Advisors engaged in extensive discussions and negotiations with the Ad Hoc Group, Atlas, and KKR.  The Company (i) provided the Ad Hoc Group and Atlas with extensive diligence materials and (ii) had near-daily discussions with the Ad Hoc Group, Atlas, and KKR in the weeks leading up to these chapter 11 cases in an effort to raise (a) an out-of-court bridge financing to give the Company additional time to negotiate a comprehensive restructuring solution, (b) a comprehensive financing solution to fund an out-of-court restructuring of the business, if possible, and (c) in the absence of any such financing to fund an out-of-court restructuring, a DIP financing to fund an in-court pre-arranged plan of reorganization.

14.     During the Debtors' extensive engagement with KKR, Atlas, and the Ad Hoc Group, and after extensive diligence of multiple iterations of the Debtors' business plan, (a) KKR ultimately informed the Debtors that it was not willing to extend additional financing to Sunnova; (b) Atlas informed the Debtors that it was going to focus exclusively on resolving and funding certain Dealer-related obligations of the Debtors, and was otherwise not in a position to provide financing to fund either an out-of-court or in-court restructuring; and (c) the Ad Hoc Group informed the Debtors that they were pivoting away from exploring a DIP financing focused on a prearranged plan of reorganization, and would instead focus on a DIP financing to fund a credit bid in a chapter 11 Sale Process.  The Debtors and their Advisors were also contacted by, and engaged with, counsel to an ad hoc group of Asset-Backed Noteholders, which subsequently informed the Debtors that they likely would not be a source of financing.

15.     Importantly, under the KKR Facility, the Debtors cannot sell certain assets or pledge certain of their interests for the benefit of a third party without the consent of KKR.  The Debtors, the Ad Hoc Group, and KKR engaged in extensive negotiations regarding the conditions for KKR to provide such consent, which includes a comprehensive release by the Debtors of their potential claims against KKR arising under the KKR Facility (the "KKR Release").  However, the Special Committee is conducting an independent investigation and will determine whether the KKR Release is appropriate under the circumstances.[3]  Without obtaining KKR's consent for the transaction, the Ad Hoc Group is reluctant to provide DIP financing and commit to purchasing certain of the Debtors' assets.

---

[3]   The Special Committee, with assistance from its advisors, has been conducting, and continues to conduct, an independent investigation into, among other things, potential estate causes of action.  The releases, if any, in the final DIP order remain subject to the Special Committee's ongoing investigation.

16.     After weeks of arm's-length, hard-fought negotiations, the Company reached an agreement with Atlas and the TEPH Lenders regarding incremental financing to certain non-Debtors through an amendment of the TEPH Facility (the "Incremental Warehouse Financing").

17.     The Incremental Warehouse Financing includes two components. **_First_**, non-Debtor Sunnova TEP Holdings, LLC ("TEP Holdings"), the borrower under the TEPH Facility, will purchase, for $15 million, certain Solar Systems from the Debtors for which TEP Holdings or its tax equity affiliates previously advanced funds, but which were unable to be placed to the relevant tax equity affiliates due to outstanding Dealer accounts payable (the "TEPH Sale"). Proceeds from the TEPH Sale will provide the Debtors incremental liquidity to fund these chapter 11 cases, including liquidity necessary to pay ordinary course postpetition operating expenses, such as wages and benefits to the Debtors' employees.

18.     **_Second_**, Atlas and the other TEPH Lenders will make certain incremental loans available under the TEPH Facility (the "Incremental Warehouse Facility" and, together with the TEPH Sale, the "TEPH Transactions"). In addition to funding TEP Holdings' payment in connection with the TEPH Sale, Atlas will use the Incremental Warehouse Facility to effectuate settlements with Dealers, thus both enhancing the value of TEP Holdings and its subsidiaries as part of the broader Sale and reducing the amount of Dealers' claims against the Debtors.[4]

---

[4]   *See* the *Declaration of Ryan Omohundro in Support of the Debtors'* Emergency *Motion for Entry of an Order (I) Authorizing and Approving the Private Sale of the Eligible Systems Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, (III) Approving the ASPA Settlement, and (IV) Granting Related Relief*, filed contemporaneously herewith, for a more detailed discussion of the TEPH Transaction.

19.     The Debtors commence these chapter 11 cases relying on approximately $13.5 million[5] of available cash on hand, the proceeds of the TEPH Sale, and the sale of certain Solar Systems installed on new homes (the "New Home Installed Inventory") constructed by the Company's homebuilder partners, such as Lennar Homes, LLC.  Based on the budget attached hereto as **Exhibit A**, which includes the proceeds from negotiated agreements with certain homebuilder partners, the Debtors expect that they will have sufficient liquidity to fund the initial three weeks of these chapter 11 cases.  During this period, the Debtors will launch a marketing process for the sale of all or substantially all of their assets and will continue to negotiate the terms of potential DIP financing and a stalking horse purchase agreement with the Ad Hoc Group.

### Disinterested Directors and Special Committee

20.     To facilitate a fair and thorough process with respect to the Debtors' review of strategic alternatives, historical transactions, possible sources of recovery, and potential conflict matters, on April 11, 2025, the Board appointed two experienced and disinterested directors—Jeffrey Stein and Anthony Horton—and appointed them to a newly-formed special committee (the "Special Committee").   The Board delegated to the Special Committee, among other things:  (a) non-exclusive authority to review, discuss, consider, evaluate, negotiate, and make one or more recommendations to the Board regarding the Company's entry into or consummation of any restructuring, reorganization and/or other recapitalization transaction; (b) authority to investigate and determine whether any matter related to such a transaction constitutes a matter in which a conflict of interest exists or is reasonably likely to exist between the Company, on one

---

[5]     This figure represents cash that is actually available in the Debtor Bank Accounts.  The budget attached hereto as **Exhibit A** reflects a figure of approximately $11.5 million, which represents the unrestricted bank cash balance *less* outstanding checks.

hand, and any of its related parties, including current and former directors, managers, officers, equity holders, employees, advisors, and certain other parties on the other hand (each, a "Related Party," and such matter, a "Conflict Matter"); (c) exclusive authority to take certain actions with respect to any Conflicts Matters; and (d) authority to conduct all investigations and analyses related to any Conflicts Matter.  The Special Committee has retained Kobre & Kim LLP ("Kobre") as independent counsel and Province LLC ("Province") as independent financial advisor to assist the Special Committee in carrying out its responsibilities.  I understand that Kobre & Kim and Province (together, the "Special Committee Advisors") will seek orders of the Court granting their respective retentions pursuant to section 327 of the Bankruptcy Code.

21.     Since its appointment, the Special Committee has been in regular communication with other members of the Board, the management team, and the advisors regarding the new business plan, engagement with various stakeholders, and solicitation, negotiation, and evaluation of various proposals in connection with potential transactions.  In addition, the Special Committee, with assistance from the Special Committee Advisors, has been conducting, and continues to conduct, an independent investigation into, among other things, the circumstances under which the Company incurred certain obligations, past uses of Company funds, and potential estate causes of action.  In furtherance of this investigation, the Special Committee Advisors are performing diligence into the Debtors' relationship with and transactions involving Related Parties, conducting interviews (with additional interviews anticipated to occur in the coming weeks), and engaging in an in-depth review of the Company's prior material transactions.  I understand that the Special Committee's investigation is ongoing.

**First Day Motions**

22.     The Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the

efficient administration of these chapter 11 cases.  I am familiar with the content and substance of

the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge,

information, and belief, and such facts shall be deemed incorporated herein by reference as if fully

stated herein.  The First Day Motions include the following:

### A.  Administrative Motions.

- *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix, (B) Redact or Withhold Certain Confidential Information of Customers, (C) Redact Certain Personally Identifiable Information of Natural Persons, (II) Waiving the Requirement to File a List of Equity Security Holders, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (IV) Granting Related Relief* (the "Creditor Matrix Motion");

- *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Bankruptcy Rule 2015.3 Financial Reports, (II) Modifying the Requirements of Bankruptcy Local Rule 2015-3, and (III) Granting Related Relief* (the "SOFAs / Schedules Extension Motion");

- *Debtors' Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (the "Claims Agent Retention Application"); and

- *Debtors' Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and* Ipso Facto *Protections of the Bankruptcy Code, (II) Approving the Related Form and Manner of Notice, and (III) Granting Related Relief* (the "Worldwide Stay Motion").

### B.  Operational Motions Requesting Immediate Relief.

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Settle Certain Dealer Claims; (II) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) 503(b)(9) Claimants, and (C) Lien Claimants; (III) Authorizing the Debtors to Require Favorable Trade Terms; (IV) Confirming Administrative Expense Priority of Outstanding Orders; and (V) Granting Related Relief* (the "Critical Vendors Motion");

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using their Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany*

*Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief* (the "<u>Cash Management Motion</u>");

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs; and (III) Granting Related Relief* (the "<u>Wages Motion</u>");

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "<u>Taxes Motion</u>");

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "<u>Utilities Motion</u>");

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock, (II) Directing that any Such Transfer or Declaration of Worthlessness in Violation of Such Procedures Be Null and Void Ab Initio, and (III) Granting Related Relief* (the "<u>NOL Motion</u>");

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, Purchase, Cancel, and Enter into New Insurance Policies, (C) Honor Prepetition Payment Arrangements, (D) Continue to Pay Brokerage Fees and Commissions, and (E) Maintain the Surety Bond Program; and (II) Granting Related Relief* (the "<u>Insurance Motion</u>"); and

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Customer Programs and Honor Certain Prepetition Business Practices Related Thereto and (II) Granting Related Relief* (the "<u>Customer Programs Motion</u>").

23.     The First Day Motions seek authority to, among other things, honor employee-related wage and benefits obligations, pay certain prepetition accounts payable claims, and ensure the continuation of the Debtors' cash management systems and other business operations.  With respect to relief requested on an emergency basis, I believe that the Debtors have tailored their requests to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  An orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  I therefore believe that the relief

sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption and is in the best interest of the Debtors' estates.

## I.      Administrative Motions.

### A.      Joint Administration Motion.

24.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing the procedural consolidation and joint administration of these chapter 11 cases, and request that the Court maintain one file and one docket for all of the jointly administered cases. Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity. I believe that the entry of an order directing joint administration of these chapter 11 cases (a) will reduce fees and costs by avoiding duplicative filings and objections, and (b) will allow the Office of the United States Trustee for the Southern District of Texas and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

### B.      Creditor Matrix Motion.

25.      Pursuant to the Creditor Matrix Motion, Debtors seek entry of an order (a) authorizing the Debtors to (i) file a consolidated creditor matrix, (ii) redact or withhold certain confidential information of customers and (iii) redact certain personally identifiable information of natural persons, (b) waiving the requirement to file a list of, and provide notice directly to, certain equity security holders of SEI, (c) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases and other information, and (d) granting related relief.

26.      ***Filing a Consolidated Matrix***.  I believe allowing the Debtors to prepare and maintain a consolidated creditor matrix in lieu of filing a separate creditor matrix for each Debtor is warranted under the circumstances given there are thousands of creditors and parties in interest. The preparation of separate lists of creditors for each Debtor would be expensive, time consuming,

and administratively burdensome.  I understand that such relief to maintain a consolidated creditor matrix is permitted pursuant to the Complex Case Procedures, and I believe that filing a Consolidated Creditor Matrix is in the best interest of the Debtors' estates.

27.     ***Redaction of Certain Confidential Information of Customers***.   One of the Debtors' most critical assets is their customer database—including customers' names, email addresses, physical addresses, and telephone numbers (collectively, the "Customer List")—and it is vital that the Debtors maintain the Customer List in strict confidence.  Not only would the disclosure of the Customer List give unfair advantages to Debtors' competitors by providing them information as to the commercial operations of the Debtors, but also the deluge of customer solicitation that would inevitably follow from such a disclosure would significantly increase the risk of customer attrition, diminish the value of the Debtors' estates, distract the Debtors from their restructuring efforts, and undermine the business prospects of a reorganized Sunnova.  Therefore, I believe that the Debtors should be permitted to redact the Customer List from any paper filed or to be filed with the Court or otherwise made public in these chapter 11 cases, including the Consolidated Creditor Matrix, the Top 30 List, and the Schedules and Statements.

28.     ***Redaction of Certain Personally Identifiable Information***.   I believe that the Debtors should be permitted to redact from any paper filed or to be filed with the Court in these chapter 11 cases—including, but not limited to, the Consolidated Creditor Matrix, the Schedules and Statements, proofs of claim, and any related affidavits of service—the names, home and email addresses, and other personally identifiable information of all natural persons, including the Debtors' current and former employees and individual equity holders.  Absent such relief, the Debtors (a) may be in violation of applicable privacy or data protection laws, (b) would unnecessarily render individuals more susceptible to identity theft and phishing scams,

and (c) could jeopardize the safety of individuals who, unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking, by publishing their home and email addresses without any advance notice or opportunity to opt out or take protective measures.

29.     ***Waiving the Requirement to File a List of Equity Holders***.  The requirements to file a list of, and to provide notice directly to, equity security holders should be waived as to SEI. SEI's common stock is publicly traded on the New York Stock Exchange, under the ticker symbol "NOVA."  There are approximately 125 million shares of common stock outstanding as of the Petition Date, a significant amount of which cannot be readily traced to specific individual holders.  Absent the relief requested in the Creditor matrix Motion, SEI must therefore obtain the names and addresses of its widely dispersed equity security holders from a securities agent. Preparing and submitting such a list with last known addresses for each equity security holder and sending notices to all such parties would incur significant expense and an administrative burden with limited corresponding benefit to the estates or parties in interest.

C.     **SOFAs / Schedule Extension Motion.**

30.     Pursuant to the SOFAs and Schedules Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their (i) Schedules and Statements by forty-five days to and including August 6, 2025, for a total of fifty-nine days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown, and (ii) 2015.3 Reports to fifty-nine days from the Petition Date (*i.e.*, August 6, 2025), without prejudice to the Debtors' ability to request additional extensions for cause shown or to file a motion with the Court seeking a modification of such reporting requirements for cause, (b) modifying the requirements of rule 2015-3 of the Bankruptcy Local Rules, and (c) granting related relief.

31.     The ordinary operation of the Debtors' businesses requires the Debtors to maintain voluminous books, records, and complex accounting systems.  To prepare the Schedules and

Statements, the Debtors must compile information from (a) those books and records, (b) documents relating to the claims of their thousands of creditors, and (c) the Debtors' many assets, contracts, and leases. Collecting such information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term—when these resources would be best used to stabilize the Debtors' business operations.

32. The Debtors, with the assistance of their professional advisors, are mobilizing their limited amount of employees to diligently and expeditiously prepare the Schedules and Statements, but resources are strained. Given the amount of work required to complete the Schedules and Statements and the competing demands on the Debtors' employees and professionals, the Debtors are unlikely to be able to properly and accurately complete the Schedules and Statements without extra time.

**D.     Claims Agent Retention Application.**

33. The Debtors seek an order appointing Kroll Restructuring Administration LLC ("Kroll") as the claims, noticing, and solicitation agent for these cases. Based on my discussions with the Debtors and their other advisors, I believe that the Debtors' selection of Kroll is appropriate under the circumstances and is in the best interest of the Debtors' estates. Moreover, it is my understanding that, based on all engagement proposals that the Debtors obtained and reviewed, Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.

**E.     Worldwide Stay Motion.**

34. Pursuant to the Worldwide Stay Motion, the Debtors seek entry of an order (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code; and (b) approving the form and manner of notice related thereto. Given the scope of the Debtors' business, it is possible that the Debtors' suppliers and

trade creditors may be unfamiliar with the chapter 11 process, the scope of a debtor in possession's authority to operate its business, or the importance and implications of the worldwide automatic stay. Certain of the Debtors' creditors may also take actions that violate the automatic stay to the detriment of the Debtors, their estates, and their other creditors. The relief requested will also protect the Debtors against improper actions that foreign parties in interest may take and assuage such parties in interest of any concerns during the pendency of these chapter 11 cases.

## II.     Operational Motions.

### A.     Critical Vendors Motion.

35.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to settle certain prepetition claims for unpaid services and materials of their third-party dealers (the "Dealer Claims"); (b) authorizing the Debtors to pay prepetition amounts in the ordinary course of business owing on account of (i) Critical Vendor Claims in an aggregate amount of up to $8.5 million on an interim basis and $14 million on a final basis, (ii) 503(b)(9) Claims in an aggregate amount of up to $350,000 on an interim basis and final basis, and (iii) Lien Claims in an aggregate amount of up to $130,000 on an interim basis and $640,000 on a final basis; (c) authorizing the Debtors to require the Trade Claimants to provide favorable trade terms for the postpetition procurement of goods and services; (d) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the payment of such obligations in the ordinary course of business; and (e) granting related relief.

36.     As described in the Mathews First Day Declaration, in the ordinary course of business, the Debtors rely on a network of Dealers to originate customer relationships and facilitate the sale, design, and installation of Sunnova's solar systems, energy storage systems, and related products and services. I understand that there are approximately 22,000 solar projects stalled at various stages short of Completion (the "Works in Process" or "WIPs") as of the Petition Date,

and that the majority of those WIPs involve Dealers that hold Dealer Claims against the Debtors. Therefore, I believe that the Debtors need authority to enter into settlements with the Dealers to resolve Dealer Claims because granting such relief will allow the Dealers to complete the WIPs and thereby unlock significant value for their estates in the form of MSA Fees. Failure to obtain the requested relief will deprive the Debtors of cash flows they are the verge of realizing, fracture their key Dealer relationships (in most cases, irreparably), and jeopardize the survival of the many Dealers who rely mostly or entirely on Sunnova's business for their continued operations.

37.     I understand that the Debtors do not seek authority to pay any Dealer Claims (whether related to WIPs or otherwise) using funds of the Debtors' estates. Instead, as I understand it, all Dealer Claims will be paid out of a fund established under a settlement agreement (the "ASPA Settlement Agreement") between certain non-Debtors under the TEPH Facility, Atlas Securitized Products Administration ("ASPA"), and the TEPH Lenders, as described further in the First Day Declarations. Pursuant to the ASPA Settlement Agreement, ASPA will provide incremental loan advances for purposes of settling certain Dealer Claims (such settlement process, the "Dealer Settlement Program").

38.     The Debtors conduct business with the Critical Vendors, the 503(b)(9) Claimants, and the Lien Claimants (collectively, the "Trade Claimants" and such claims, collectively, the "Trade Claims") for the design, financing, installation, repair, and ongoing monitoring of solar-related products and services. The goods and services supplied by the Trade Claimants are often highly specialized and, in some cases, might give rise, either directly or indirectly, to mechanic's, possessory, or other liens. Due to the highly technical nature of the supplies and services that the Debtors use, I understand that there are a limited number of qualified vendors available. In many cases, the Trade Claimants are effectively irreplaceable due to their technical expertise, regulatory

familiarity, longstanding integration into the Debtors' systems and processes, and the specialized nature of the products and services they provide.  Even where alternatives may exist, the time and costs associated with transitioning to a new provider would cause significant operational disruption and strain on the Debtors' estates.

39.     Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  In order to avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or might recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  Thus, to prevent any disruption to the Debtors' business operations, and given that any goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, I believe that all undisputed Outstanding Orders should be granted administrative expense priority under section 503(b).

**B.     Cash Management Motion.**

40.     The Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; (b) authorizing, but not directing, the Debtors to continue to perform Intercompany Transactions; (c) granting administrative expense status to the Intercompany Transactions among the Debtors and between the Debtors and their Non-Debtor Affiliates; and (d) granting the Debtors (i) an interim extension to comply with the deposit and investment requirements set forth in section 345(b) of the Bankruptcy Code pursuant to the interim order and (ii) a subsequent waiver thereof pursuant to the final order.

41.     In the ordinary course of business, the Debtors maintain an integrated and complex Cash Management System, which they use to collect, transfer, and disburse funds generated from operations and facilitate cash monitoring, forecasting, and reporting.   The Cash Management System also facilitates Intercompany Transactions among different Sunnova entities to ensure that sufficient cash is available for each entity within the group.   Sunnova's treasury department maintains daily oversight over the Cash Management System by implementing cash management controls for accepting, processing, and releasing funds, including in connection with any Intercompany Transaction.   The Debtors also reconcile their Books and Records on a quarterly basis to account for all Intercompany Transactions.

42.     As of the Petition Date, the Cash Management System is comprised of a total of 525 Bank Accounts, twenty-four of which the Debtors own and control (the "Debtor Bank Accounts").   The Debtors hold twelve Debtor Bank Accounts at their primary Cash Management Bank, JPMorgan Chase Bank, N.A. ("JPM"), five Debtor Bank Accounts at Texas Capital Bank, N.A. ("TCB"), two Debtor Bank Accounts at Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), two Debtor Bank Accounts at The Goldman Sachs Group, Inc. ("Goldman Sachs"), one Debtor Bank Accounts at Wilmington Trust, National Association , one Debtor Bank Account at Amegy Bank, N.A. ("Amegy"); and one Debtor Bank Account at Blackrock, Inc. ("Blackrock").

43.     The Debtor Bank Accounts consist of (a) the Main Operating Account, (b) the Payroll Account, (c) the Main Dealer Payment Account, (d) the Government Incentives Collection Account, (e) two Intermediate Holdings Accounts, (f) the Customer Security Deposit Account, (g) the Corporate Credit Card Account, (h) two Miscellaneous Customer Activity Accounts, (i) two LC Collateral Accounts, (k) four Investment Accounts, (l) seven Inactive/De Minimis

Accounts, and (m) the Adequate Assurance Account.  The remaining 501 Bank Accounts are held by Non-Debtor Affiliates.

44.     Substantially all of Sunnova's cash on hand comprises revenue from the Sunnova's ongoing operations, proceeds from funded-debt borrowings, capital contributions from Sunnova's tax equity partners, and proceeds from securitizations.  As a result of the various financing transactions, such as securitizations and TEPs, most solar assets generating revenue from customer payments are routed through Non-Debtor Affiliates within the Non-Debtor Subsidiary Silos prior to the Debtors receiving such funds.  The Debtors generate material cash flows through (a) MSA Fees earned by the Managers and Servicers for managing and servicing the solar assets and/or loans, (b) residual distributions on account of the Debtors' equity interests in the TEPs and securitization SPEs, and (c) the sale of SRECs and other environmental incentives.  Once the current in-process systems are complete, Sunnova will need to monetize them by transferring them into TEPs, from which it will receive (among other consideration) ongoing MSA Fees.  These MSA Fees comprise Sunnova's primary revenue stream, from which the Company funds its general corporate obligations, including administrative costs and maintenance obligations. Without the authority to continue that practice, the Debtors will lose access to this critical revenue stream and potentially face liquidation.

45.     Sunnova uses various Bank Accounts to fund operations and make disbursements to third parties.  ***First***, the Debtors use the Main Operating Account and the Main Dealer Payment Account as the main sources of disbursements.  ***Second***, the Main Dealer Payment Account generally funds payments to Dealers on account of solar projects at the Project Level Non-Debtor Affiliates.  ***Third***, Sunnova maintains several Bank Accounts to disburse funds to certain lenders as required by the applicable credit agreements, including (a) the TEPH Trustee Accounts and the

21

SLA Trustee Accounts, which the Non-Debtor Affiliates use to pay debt service and fees in connection with the Warehouse Facilities, and (b) the Solstice Accounts which the Non-Debtor Affiliates use to distribute certain residuals to the lenders under the KKR Facility.  In addition, the Securitization Trustee Collection Accounts in the Non-Debtor Subsidiary Silos generally disburse principal and interest payments to the holders of the loan-backed and asset-backed notes.

46.     The majority of the Cash Management System is made up of six Non-Debtor Subsidiary Silos corresponding with discrete securitization transactions and TEPs, each of which maintains its own segregated cash management system that is integral to Sunnova's ordinary course operations.  Generally, each Non-Debtor Subsidiary Silo receives customer payments on account of the loans, leases, and PPAs associated with the solar projects within the applicable silo and uses such funds to satisfy its own obligations to the applicable lenders and/or noteholders through disbursements from various trustee-controlled Bank Accounts.  In addition, certain fees, such as MSA Fees, and residuals that Non-Debtor Affiliates earn within these Non-Debtor Subsidiary Silos flow to the Debtor Bank Accounts and are used to fund employee payroll, payments to third-party vendors, and service the Debtors' funded debt obligations at the corporate level.  Thus, even though most of Sunnova's banking activity happens outside of the Debtor entities, most of the revenue that Sunnova realizes flows from the Non-Debtor Affiliates to the Debtors in the ordinary course of business.

47.     ***Intercompany Transactions***.  In the ordinary course of business, the Debtors and their Non-Debtor Affiliates engage in Intercompany Transactions, which result in Intercompany Claims.  Generally, Intercompany Claims arise in the ordinary course of business as Debtors and Non-Debtor Affiliates periodically transfer cash and other assets to one another.

22

48.     Intercompany Transactions arise mainly from transfers of (a) solar assets and the related customer agreements from Debtor SEC to Non-Debtor Affiliates pursuant to TEPs or securitization transactions; (b) MSA Fees and residuals from Non-Debtor Affiliates to the Debtors, and (c) SREC proceed, other environmental credits, and performance guarantees from Debtor SEC to Non-Debtor Affiliates.  Additionally, the Debtors historically received and disbursed funds to and from other Debtors.

49.     The vast majority of cash activity involves Intercompany Transactions flowing from the Non-Debtor Affiliates to the Debtors; however, funds sometimes flow from the Debtors to their Non-Debtor Affiliates.  For example, in the ordinary course of business, Debtor SEC provides administrative services on behalf of certain Project Level Non-Debtor Affiliates by selling the SRECs and other environmental credits produced by the solar assets held by such Project Level Non-Debtor Affiliates.  The proceeds from the SREC sales are received in the Main Operating Account and a portion are transferred through the Intermediate Holdings Accounts to the applicable Open Tax Equity Accounts or Closed Tax Equity Accounts maintained by the Non-Debtor Affiliates where the solar assets are held.  In accordance with the securitization indentures, certain SRECs may be distributed from the Issuer SPE to the Depositor SPE, and ultimately to Debtor SEC on account of their ownership interest in the SPEs.  In addition, the Debtors transfer funds from the Main Operating Account to the Main Dealer Payment Account to make payments to Dealers as needed.  Debtor SEC also pays for certain reimbursable items, such as tax preparation and insurance premiums, on behalf of certain Non-Debtor Affiliates, but the Non-Debtor Affiliates reimburse Debtor SEC for such payments.

50.     Intercompany Transactions are an essential component of the Debtors' operations. The Debtors' accounting and treasury departments closely monitor, record, and reconcile all

Intercompany Transactions on a quarterly basis.  Accordingly, I believe the Debtors can ascertain, trace, and account for all Intercompany Claims and will continue to do so postpetition.

51.     ***Corporate Card Program***.  In the ordinary course of business, the Debtors maintain a Corporate Card Program to cover business expenses incurred by certain employees while performing their duties.  Under the Corporate Card Program, the Debtors maintain approximately 267 Corporate Credit Cards issued by Amegy, which are used for certain authorized business and travel expenses, including miscellaneous operational expenses, certain utility connection fees, hotel stays and meals, and other necessary and approved company expenditures.  The Debtors pay outstanding Corporate Credit Card balances directly on an as needed basis by wire from the Corporate Credit Card Account.  Expenses incurred on account of the Corporate Card Program are billed directly to the Debtors and do not pass through the employees' personal financial accounts.  The Debtors estimate that  $1 million each month over the next few months on account of the Corporate Card Program.  As of the Petition Date, the Debtors estimate that approximately $307,000 is owed on account of the Corporate Card Program.  The Continuation of the Corporate Card Program is necessary because it is an integral part of the Debtors' Cash Management System and employees need to have the ability to pay expenses for operational and travel purposes.

52.     ***Business Forms and Books and Records***.  As part of the Cash Management System, the Debtors use a variety of preprinted Business Forms.  The Debtors also maintain Books and Records to document their financial results and a wide array of operating information.  I believe that continued use of all Business Forms and Books and Records in the ordinary course of business, without reference to the Debtors' status as debtors in possession, will avoid a material disruption to their business operations and minimize administrative expense to their estates.

53.     ***Bank and Processor Fees***.  In the ordinary course of business, the Debtors incur periodic Bank Fees in connection with the maintenance of the Cash Management System.  The due dates of such Bank Fees vary and are generally paid automatically daily, monthly, or quarterly.  As of the Petition Date, the Debtors estimate that they owe approximately $30,000 on account of accrued but unpaid Bank Fees.

54.     In addition, in the ordinary course of business, the Debtors utilize Usio, Inc. solely for purposes of processing payments to customers participating in the Managed SREC Program.  Debtor SEC pays the Processor Fees on an as-needed basis using funds from the Main Operating Account.  As of the Petition Date, the Debtors estimate that they owe approximately $5,000 on account of accrued but unpaid Processor Fees.  I believe that payment of the Bank Fees and Processor Fees will minimize disruption to the Debtors' operations and is therefore in the best interests of their estates.

55.     ***Compliance with the Bankruptcy Code and Guidelines***.  The Debtors hold seventeen of the Debtor Bank Accounts at JPM and TCB, each of which I understand to be an Approved Depository under the U.S. Trustee Guidelines, and seven Bank Accounts at Cash Management Banks—Wilmington Trust, Merrill Lynch, Goldman Sachs, Blackrock, and Amegy—that are not.  Nevertheless, I believe that all of the Cash Management Banks are highly-rated, global financial institutions that are widely recognized as being some of the most well-capitalized and financially stable financial institutions in the world with excellent credit ratings.

56.     Moreover, out of the Debtors' approximately $13.5 million of available cash on hand, only approximately $75,000 is held at non-Approved Depositories, and nearly all of the Debtor Bank Accounts are insured by the FDIC.  The only Debtor Bank Account that is not insured

by the FDIC is an Inactive/De Minimis Account held at Blackrock that holds no funds as of the Petition Date.  Blackrock as well as the other Cash Management Banks are trustworthy, well capitalized, and financially stable institutions.  Of the Debtors' twenty-four Bank Accounts, only seven hold deposits in excess of FDIC limits, including five Debtor Bank Accounts held at JPM and two at TCB.  I am not aware of any cognizable risk known to the Debtors that suggests that funds in excess of the FDIC insurance limit held in those Debtor Bank Accounts will be in jeopardy during the pendency of these chapter 11 cases.

**C.     Wages Motion.**

57.     Pursuant to the Wages Motion, the Debtors seek entry of an order:  (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue the Compensation and Benefits[6] in the ordinary course, including payment of certain prepetition obligations related thereto; and (b) granting related relief.

58.     Sunnova made the difficult decision in the Spring of 2025 to terminate approximately 300 Employees and furlough approximately one-third of the Workforce.  In the weeks after the initial reduction in force and furlough, the Debtors' liquidity position continued to contract.  In the days preceding the Petition Date—after exhausting all available options—Sunnova was forced to terminate approximately 720 Employees, including previously furloughed employees.

59.     As of the Petition Date, the Debtors have approximately 570 Employees.  Of the Debtors' 570 Employees, approximately 530 are located in twenty-seven states throughout the

---

[6]     The Compensation and Benefits include, among other things, the Wage Obligations, Withholding Obligations, Reimbursable Expenses and Fees, Health and Welfare Coverage and Benefits, Non-Insider Bonus Programs, Workers' Compensation Program, Retirement Programs, Long-Term Incentive Plan, Paid Leave Benefits, Non-Insider Severance Program, WARN Act Obligations, Additional Benefit Programs, and Non-Employee Director Compensation.

mainland United States, and forty are located in Puerto Rico. Approximately 295 Employees earn a salary, and 275 Employees are paid on an hourly basis. In addition to the Employees, the Debtors have historically supplemented their workforce through the use of approximately 680 Independent Contractors, many of whom are sourced via third-party staffing agencies.

60. As discussed in greater detail in the Wages Motion, the Debtors provide the Workforce with Compensation and Benefits. The Debtors estimate that they owe prepetition amounts on account of the Compensation and Benefits in approximately the following amounts:

| Relief Sought | Prepetition Amount |
|---|---|
| Wage Obligations, Withholding Obligations, and Reimbursable Expenses and Fees | $7,320,000 |
| Health and Welfare Coverage and Benefits | $3,730,000 |
| Non-Insider Bonus Programs | $4,600,000 |
| Workers' Compensation Program | $1,400,000 |
| Retirement Programs | $550,000 |
| Long-Term Incentive Plan | $260,000 |
| Paid Leave Benefits | $2,600,000 |
| Non-Insider Severance Program | $7,760,000 |
| WARN Act Obligations | Undetermined |
| Additional Benefit Programs | $340,000 |
| Non-Employee Director Compensation | $0 |
| **Total** | **$28,560,000** |

61. The vast majority of the Workforce relies exclusively on the Compensation and Benefits that the Debtors provide to pay their daily living expenses and support their families. The Debtors' Workforce will be exposed to significant financial hardship if the Debtors are not permitted to continue paying their compensation and providing them with health and other benefits during these chapter 11 cases in the ordinary course of business. Moreover, the Debtors cannot easily replace the Workforce because the Employees and Independent Contractors possess specialized skills and expertise that are difficult to replace in the midst of a comprehensive reorganization effort. Simply put, the Debtors cannot operate their business without the Workforce, and the Debtors' ability to administer their estates in these chapter 11 cases will be

materially impaired to the detriment of all stakeholders without the Workforce's continued, uninterrupted services.

**D.     Taxes Motion.**

62.     Pursuant to the Taxes Motion, the Debtors seek entry of an order:  (i) authorizing the Debtors to negotiate, remit, and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are payable or become payable during these chapter 11 cases, including any obligations arising on account of an Audit or Assessment, without regard to whether such obligations accrued or arose before, on, or after the Petition Date; and (ii) granting related relief.

63.     In the ordinary course of business, the Debtors collect, withhold, and incur income taxes, franchise taxes, property taxes, sales and use taxes, regulatory taxes and fees, as well as other governmental taxes, fees, assessments, interest, penalties, and additions to tax, and fees owed to various tax service providers on account of tax consulting services provided to the Debtors (collectively, the "Taxes and Fees").  The Debtors pay or remit, as applicable, Taxes and Fees to various taxing authorities, including the Internal Revenue Service on a periodic basis.  The Debtors generally pay and remit Taxes and Fees through checks, credit card, and electronic transfers that are processed through their banks and other financial institutions or service providers.  The Debtors also, from time to time, receive tax credits for overpayments or refunds with respect to Taxes and Fees.  The Debtors generally use such credits in the ordinary course of business to offset against future Taxes and Fees or cause the dollar amount of such credits to be refunded to the Debtors.  The Debtors estimate that approximately $15.3 million in Taxes and Fees are outstanding as of the Petition Date.

64.     The Debtors are not subject to any current audit investigations that I am aware of, but they may become subject to routine audit investigations on account of tax returns and/or tax obligations ("Audits") during these chapter 11 cases, including as a result of any voluntary

disclosures or similar procedural mechanisms.  I understand that Audits could result in additional prepetition Taxes and Fees being assessed against the Debtors ("Assessments").

65.     Finally, the Debtors use various third-party Tax Services Providers in the ordinary course of business to facilitate the calculation and payment of the Taxes and Fees.  Specifically, the Tax Service Providers assist the Debtors with (a) tax compliance and tax return preparation, (b) the calculation of the Sales and Use Taxes and Property Taxes, and (c) the remittance of taxes to taxing authorities on the Debtors' behalf.  As further described in the Mathews First Day Declaration, the Debtors' business is highly complex.  This complexity requires precise tax compliance in order to operate effectively.  For instance, I understand that the Company has historically generated approximately 18,000 tax returns of various types per year on account of both its Debtor entities and the Non-Debtor Affiliates and Subsidiaries.  Such a monumental task simply would not be possible without the Tax Service Providers, on whom the Debtors rely for tax monitoring compliance, timely tax payment, and accurate calculations of tax exposure.

**E.     Utilities Motion.**

66.     Pursuant to the Utilities Motion, the Debtors seek entry of an order:  (a) approving the Debtors' proposed adequate assurance of payment for future utility services, (b) prohibiting utility providers from altering, refusing, or discontinuing services, (c) approving procedures for resolving any dispute concerning adequate assurance in the event that a utility provider is not satisfied with the proposed adequate assurance, and (d) granting related relief.

67.     In connection with the operation of their businesses and management of their properties, the Debtors obtain, either directly or indirectly, electricity, telecommunications, gas (heating and cooling), telephone, internet, waste, and other similar services from a number of Utility Providers.  In the aggregate, the Debtors pay approximately $27,000 each month for Utility Services, calculated as the historical average payment for the twelve-month period ending in

29

February 2025.  To the best of my and the Debtors' knowledge, none of the Utility Providers hold deposits from the Debtors, and the Debtors are not in possession of any funds allocated for any prepayments for the Utility Services.

68.     To provide additional assurance of payment, the Debtors propose to deposit approximately $13,516 into a newly-created, segregated, interest-bearing account (the "Adequate Assurance Deposit") within twenty days following entry of the Utilities Order or an order approving the Debtors' use of cash collateral and/or debtor in possession financing, whichever is later.  The amount of the Adequate Assurance Deposit attributable to a given Utility Provider is equal to approximately fifty percent of the Debtors' average monthly cost of such Utility Provider's Utility Services, generally calculated as the historical average payment of Utility Services from the Utility Providers.

69.     I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these chapter 11 cases.  The Utility Services are essential for the Debtors to maintain their businesses and to operate their facilities and corporate offices, which provide functions essential for daily, ordinary course operations.  These facilities and offices require electricity, internet, gas, and other Utility Services in order to operate.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to successfully operate and manage their reorganization efforts.  Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

   **F.     NOL Motion.**

70.     Pursuant to the NOL Motion, the Debtors seek entry of an order:  (a) approving certain notification and hearing procedures (the "Procedures"), related to certain transfers of, or declarations of worthlessness with respect to, Debtor Sunnova Energy International Inc.'s existing

class of common stock or any Beneficial Ownership therein, (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to, Common Stock in violation of the Procedures shall be null and void *ab initio*, and (c) granting related relief.

71.     The Debtors generate tax attributes, such as net operating losses ("<u>NOLs</u>"), general business credits ("<u>General Business Credits</u>"), and 163(j) carryforwards ("<u>163(j) Carryforwards</u>") in the ordinary course of business.  The Debtors estimate that, as of December 31, 2024, they and their non-Debtor affiliates had approximately $1.4 billion of federal NOLs, approximately $302 million of 163(j) Carryforwards, approximately $375 million of general business tax credits, and certain other tax attributes, and may generate substantial additional tax attributes in the current tax year, including during the pendency of these chapter 11 cases (all such tax attributes, collectively, the "<u>Tax Attributes</u>").

72.     The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to utilize the Tax Attributes to offset taxable income, including any taxable income generated by transactions consummated during these chapter 11 cases (including with respect to any taxable disposition of some or all of the Debtors' assets, such as pursuant to one or more sale transactions under section 363 of the Bankruptcy Code). In addition, depending on the chapter 11 plan's structure, in the event any of the Debtors' Tax Attributes were to survive, I understand that the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal tax liability in future years. Accordingly, I believe that the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

73.     Under sections 382 and 383 of the Internal Revenue Code of 1986, as amended, certain transfers of or declarations of worthlessness for U.S. federal income tax purposes with

respect to Beneficial Ownership of Common Stock prior to the consummation of a chapter 11 plan could cause the termination of, or limit the use of, the Tax Attributes.  Further, these Tax Attributes could be necessary to address tax consequences resulting from the implementation of the transactions contemplated by the chapter 11 plan.  Depending on the structure the chapter 11 plan may take during these chapter 11 cases, the Tax Attributes could provide the potential for material future tax savings, including in the post-emergence years.  The termination or limitation of the Tax Attributes could therefore be materially detrimental to all parties in interest, including by potentially limiting the Debtors' ability to utilize certain chapter 11 plan structures.  Accordingly, I believe that the implementation of the Procedures is necessary and appropriate to enforce the automatic stay under section 362 of the Bankruptcy Code and to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.

### G.     Insurance Motion.

74.     Pursuant to the Insurance Motion, the Debtors seek entry of an order: (a) authorizing, but not directing, the Debtors to (i) maintain insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business, (ii) renew, amend, supplement, extend, purchase, cancel, and enter into new insurance policies in the ordinary course of business, (iii) honor and renew the terms of the Payment Arrangements entered into prepetition and satisfy obligations related thereto, and enter into new Payment Arrangements in the ordinary course of business, (iv) pay prepetition obligations on account of, and continue to pay, Brokerage Fees and Commissions in the ordinary course, and (v) maintain the Surety Bond Program; and (b) granting related relief.

75.     The Debtors maintain approximately forty Insurance Policies administered by approximately thirty Insurance Carriers.  The Insurance Policies provide coverage for losses related to the Debtors' real and personal property, general liability, automobile liability, and

director and officer liability, among other things.  Historically, the Debtors spend approximately $26 million per year on account of aggregate premiums for all of the Insurance Policies, not including applicable taxes and surcharges, deductibles, self-insured retentions, broker fees, and commissions.  As of the Petition Date, the Debtors estimate that they owe approximately $7.6 million on account of the Insurance Policies.

76.     The Debtors also maintain approximately 120 Surety Bonds, which broadly fall into three buckets: (a) Consumer Financing Bonds; (b) Operational Licensing Bonds; and (c) Performance and Payment Bonds.  The Surety Bonds are required by various state and local regulations and allow the Debtors to conduct core aspects of their business, guarantee their ability to perform certain work, and secure their performance obligation.  Historically, the Debtors spend approximately $130,000 per year on account of the Surety Premiums.  As of the Petition Date, the Debtors estimate that they owe approximately $80,000 on account of the Surety Premiums.

77.     I believe that the Insurance Policies, Surety Bonds Program, and related agreements are critical to preserving the value of the Debtors' estates in these chapter 11 cases. Prohibiting the Debtors from maintaining their Insurance Policies, Surety Bond Program, and related agreements would expose the Debtors to a number of risks, including (a) potential direct liability for the payment of claims that otherwise would have been covered under the Insurance Policies or Surety Bonds, (b) material costs and other losses that otherwise would have been reimbursed, (c) the inability to obtain similar insurance coverage or surety bonds on terms as equally favorable as the present coverage, and (d) higher costs for reestablishing lapsed Insurance Policies or obtaining new insurance coverage or surety bonds.  Without the Insurance Policies,

Surety Bond Program, and related agreements, I believe that the Debtors' estates will be significantly harmed to the detriment of all stakeholders.

### H.    Customer Programs Motion.

78.    Pursuant to the Customer Programs Motion, the Debtors seek entry of an order: (a) authorizing, but not directing, the Debtors to maintain and administer their Customer Programs and honor certain prepetition business practices related thereto and (b) granting related relief.  The Debtors have designed and implemented various Customer Programs, including the Lead Gen Program, Promotional Offers, and Ancillary Customer Programs to build and maintain strong Customer relationships in the ordinary course of business.  In 2024, the Debtors paid approximately $2.7 million on account of the Lead Gen Program.  Similarly, the Debtors historically have spent approximately $165,000 per month on average on account of the Promotional Offers.  And collectively, the Ancillary Customer Programs generated approximately $31.4 million in aggregate revenue in 2024.

79.    I believe that the Debtors' ability to continue the Customer Programs and to honor any prepetition business practices thereunder in the ordinary course of business is necessary to maintain their reputation, meet competitive market pressures, ensure customer satisfaction, and ultimately maximize value.  Continuing these Customer Programs will allow the Debtors to maintain goodwill and enhance revenue and profitability for the benefit of all the Debtors' stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  June 9, 2025

/s/ Ryan Omohundro
_____

Ryan Omohundro
Chief Restructuring Officer
Sunnova Energy International Inc.

**Exhibit A**

**Budget**

**Sunnova**
Exhibit A - Budget
*($ thousands)*

| | Fcst Wk-1 13-Jun | Fcst Wk-2 20-Jun | Fcst Wk-3 27-Jun | Total |
|---|---|---|---|---|
| *Fcst vs Act -->* | | | | |
| *Week Number -->* | | | | |
| *Week Ending -->* | | | | |
| MSA Fees | - | 1,982 | - | 1,982 |
| 3rd Party SRECs / PPAs | 393 | 4,028 | - | 4,421 |
| SEC SREC Proceeds | - | - | - | - |
| New Home Sales | 300 | 300 | - | 600 |
| Residuals | - | 210 | - | 210 |
| Other Receipts | 96 | 96 | 96 | 288 |
| **Operating Receipts** | **790** | **6,617** | **96** | **7,502** |
| Asset Sales | - | 750 | - | 750 |
| **Total Receipts** | **790** | **7,367** | **96** | **8,252** |
| Dealers | - | - | - | - |
| Non-Dealer Trade | (8,828) | (5,275) | (6,038) | (20,140) |
| Payroll & Benefits | (75) | (6,065) | (70) | (6,210) |
| Insurance / Sureties | (1,937) | (10) | (809) | (2,756) |
| SREC / PPA Remittance to Waterfall | - | - | (14,612) | (14,612) |
| Other | (1,115) | (150) | (150) | (1,415) |
| **Total Operating Disbursements** | **(11,955)** | **(11,500)** | **(21,679)** | **(45,134)** |
| **Operating Cash Flow** | **$ (11,165)** | **$ (4,133)** | **$ (21,583)** | **$ (36,881)** |
| Debtor Professionals | - | - | - | - |
| Other Creditor / UCC Professionals | - | - | - | - |
| Other Case Costs | (14) | - | - | (14) |
| **Total Process Costs** | **(14)** | **-** | **-** | **(14)** |
| New Home Inventory Sale | - | 15,500 | - | 15,500 |
| Warehouse Asset Sale | 15,000 | - | - | 15,000 |
| **Total Financing** | **15,000** | **15,500** | **-** | **30,500** |
| **Total Disbursements** | **(11,969)** | **(11,500)** | **(21,679)** | **(45,148)** |
| **Beginning Unencumbered Cash Book Cash** | **$ 11,584** | **$ 15,405** | **$ 26,772** | **$ 11,584** |
| **Net Cash Flow** | **$ 3,821** | **$ 11,367** | **$ (21,583)** | **$ (6,395)** |
| **Ending Unencumbered Book Cash** | **$ 15,405** | **$ 26,772** | **$ 5,189** | **$ 5,189** |