**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNNOVA ENERGY INTERNATIONAL INC., *et al.*,[1] | ) ) ) | Case No. 25-90160 (ARP) |
| | ) | |
| Debtors. | ) ) | (Joint Administration Requested) |

**DECLARATION OF RYAN OMOHUNDRO
IN SUPPORT OF THE DEBTORS' <u>EMERGENCY</u>
MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING THE PRIVATE SALE OF THE ELIGIBLE SYSTEMS
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS, (II) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (III)
APPROVING THE ASPA SETTLEMENT, AND (IV) GRANTING RELATED RELIEF**

I, Ryan Omohundro, hereby declare under penalty of perjury as follows:[2]

1. I was appointed Chief Restructuring Officer ("<u>CRO</u>") of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") on April 27, 2025. Prior to being appointed CRO, I advised the Debtors in my capacity as Managing Director of Alvarez & Marsal North America, LLC ("<u>A&M</u>"), the proposed financial advisor to the Debtors in the above-captioned chapter 11 cases. The Debtors engaged A&M in March 2025 to help manage the

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova. The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046.

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Motion, the Order, the *Declaration of Paul Mathews, President and Chief Executive Officer of Sunnova Energy International Inc., in Support of Debtors' Chapter 11 Petitions* (the "<u>Mathews First Day Declaration</u>") and the *Declaration of Ryan Omohundro, Chief Restructuring Officer of Sunnova Energy International Inc., in Support of Debtors' First Day Motions* (the "<u>Omohundro First Day Declaration</u>," and together with the Mathews First Day Declaration, the "<u>First Day Declarations</u>"), filed contemporaneously herewith, as applicable. The "<u>Company</u>" means, collectively, Sunnova Energy International Inc. and its Debtor and non-Debtor subsidiaries and affiliates.

Company's liquidity, identify strategic alternatives to enhance liquidity and profitability, assist with the development of a business plan, and manage the Debtors' contingency planning efforts. In that capacity, and in my capacity as CRO, I have been directly involved in and obtained firsthand knowledge of the events and circumstances leading to these chapter 11 cases.

2. I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Private Sale of the Eligible Systems Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, (III) Approving the ASPA Settlement, and (IV) Granting Related Relief* (the "Motion"),[3] filed contemporaneously herewith.

3. The statements in this Declaration are, except where otherwise noted, based on (a) my personal knowledge, (b) information I have obtained from other members of the Debtors' management team, employees, advisors, and/or employees of A&M, (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and (d) my experience and knowledge as the Debtors' CRO and as a principal of A&M advising distressed companies for over twenty years. I am over the age of eighteen, and I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

**Professional Qualifications**

4. I have over twenty years of experience advising distressed companies and creditors in complex transactions and a deep expertise in the energy, industrial, and services industries. I

---

[3] The significant terms of the Sale are set forth in greater detail in the Motion. For the avoidance of doubt, any description of the Sale herein or in the Motion is qualified in its entirety by reference to the APA or the Order, as applicable.

also have substantial experience helping to stabilize financially distressed companies and developing business plans to accomplish the necessary restructuring of their operations and finances. I have served as lead financial advisor to several complex restructuring transactions totaling more than $30 billion in debt in aggregate, including: *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. May 14, 2023); *FTS Int'l, Inc.*, No. 20-34622 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2021); *In re Superior Energy Servs.*, No. 20-35812 (DRJ) (Bankr. S.D. Tex. Jan. 14, 2021); *In re Hi-Crush Inc.*, No. 20-33495 (DRJ) (Bankr. S.D. Tex. Dec. 30, 2020); *In re Arena Energy, LP*, No. 20-34215 (MI) (Bankr. Sept. 25, 2020); *In re Ne. Gas Generation*, No. 20-11597 (MFW) (Bankr. S.D. Tex. July 17, 2020); *In re Weatherford Int'l plc*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Aug. 22, 2019); *In re Jones Energy*, No. 19-32112 (DRJ) (Bankr. S.D. Tex. May 6, 2019); *New MACH Gen, LLC*, No. 18-11368 (MFW) (Bankr. S.D. Tex. July 2, 2018); and *In re Forbes Energy Servs. Ltd*, No. 17-20023 (DRJ) (Bankr. S.D. Tex. Feb. 15, 2017).

5. I earned a bachelor's degree in business administration and a master's degree in professional accounting from the University of Texas at Austin. I am a Certified Public Accountant, a Chartered Financial Analyst, a Certified Insolvency & Restructuring Advisor, and a Certified Fraud Examiner. I have been employed at A&M since 2006.

### The Eligible Systems

6. Sunnova's operations involve purchasing and monetizing solar energy systems and batteries (the "Solar Systems") that are subject to lease agreements or power purchase agreements (collectively, the "TPO Agreements"). Most of these systems (and the TPO Agreements) were marketed, designed and installed (the "Work") by local, independent dealers and contractors (collectively, the "Dealers"), under prepetition channel partner agreements between the Dealers and the Debtors (the "Channel Partner Agreements").

7. Work on Solar Systems typically progresses through five phases: (a) submission of a "contract package," whereby a Dealer delivers to Sunnova a signed customer lease agreement, PPA, or loan agreement, as applicable; (b) submission of a "notice to proceed package," whereby the Dealer submits a final design proposal and Sunnova issues an affirmative notice to proceed (a "Notice to Proceed"); (c) physical installation of the Solar System ("Mechanical Completion"); (d) the Dealer's completion and submission of all documentation required to commission the Solar System ("Substantial Completion"); and (e) Sunnova's final inspection of the Solar System, the Solar System's connection to the power grid, and the Solar Systems' placement in service ("Final Completion").

8. Sunnova finances a portion of its acquisition of Solar Systems from Dealers by drawing under the warehouse asset-based loan facility at non-Debtor TEP Holdings (the "TEPH Facility"). Additionally, Sunnova funds the progression of Solar Systems to Final Completion with contributions from the Class A Members of the Tax Equity Partnerships ("TEPs") to which the Solar Systems are ultimately transferred. When the required number of Solar Systems are purchased and transferred to a TEP, the TEP "closes" and the future distributions to Sunnova of cash flows from TPO Agreements on account of Sunnova's Class B Interests in the TEPs are securitized into asset-backed notes. A portion of the proceeds of the securitizations are then distributed to the indirect owner of the Class B Interests, TEP Holdings, which then repays the TEPH Facility, replenishing the borrowing base capacity for the TEPH Facility so Sunnova can start the process all over again, financing the purchase of new Solar Systems that can be transferred to new TEPs.

9. As the Solar Systems proceed through the various stages of Work, ownership of the Solar Systems and the TPO Agreements is transferred from the Dealers to the Debtors and throughout the financing structure depends on the stage of the Work:

   a. Initially, each Dealer is appointed as Sunnova's non-exclusive representative for purposes of, among other things, leasing Solar Systems and entering into TPO Agreements with customers on Sunnova's behalf.

   b. When a customer signs a TPO Agreement, title to the TPO Agreement vests in Sunnova, where it is automatically transferred first to Sunnova TEP Developer, LLC ("TEP Developer"), one of the Debtors in these cases, and then to the TEPs the residual interests in which are part of the collateral package securing TEP Holdings' obligations under the TEPH Facility.

   c. Title to and risk of loss on the Solar System itself—the actual physical panels—remain with the Dealer until the Substantial Completion phase, and then automatically passes to SEC, one of the Debtors in these cases. At this point in time, SEC holds free-and-clear title to the Solar Systems.

   d. SEC contributes the Solar System to TEP Developer. The Solar Systems are then transferred to applicable TEPs according to certain criteria set by the TEPs and pursuant to development and purchase agreements among TEP Developer and the TEPs in exchange for payment of a purchase price funded by contributions by the TEPs' Class A Members. Only when this process has been completed for a sufficient number of Solar Systems can the TEP be "closed" and Sunnova's Class B Interests be securitized.

   e. Solar Systems are generally progressed to Final Completion only after being transferred to a TEP to ensure that the TEP owns the ITC minted upon such Solar Systems reaching Final Completion.

   f. Certain Solar Systems are not "tranched" to a TEP, generally, because of timing or eligibility issues under the tax equity financing documents, and are instead transferred to a separate, wholly-owned subsidiary of the Borrower under the TEPH Facility. The wholly-owned Solar Systems are typically securitized along with the Solar Systems owned by TEPs.

10. Following the securitization, Solar Systems generate cash flows that ultimately flow to the Debtors, providing the Debtors with critical cash flows. First, the Debtors are entitled to certain residual cash flows from the TEPs' and the securitizations' payment waterfalls after certain payments to the TEPs' tax equity partners and to principal, interest, fees and other items in

5

connection with the securitizations (the "Residuals"). Second, Sunnova is paid a fee to manage and service the Solar Systems (the "MSA Fees"). Together, the Residuals and the MSA Fees comprise Sunnova's primary ongoing revenue from the TPO Agreements.

11. By 2025, the Debtors had accumulated significant payables to Dealers on account of Work performed by the Dealers on Solar Systems subject to TPO Agreements. The amounts owed to Dealers generally fall into two categories: (a) amounts related to certain Solar Systems that have achieved Final Completion (and accordingly have been "placed in service" for U.S. federal income tax purposes, thereby minting a solar investment tax credit ("ITC") (collectively, the "Completed Systems") and (b) amounts related to certain Solar Systems that have not yet achieved Final Completion (collectively, the "Uncompleted Systems," and, together with the Completed Systems, the "Eligible Systems").

12. In the months leading to the Petition Date, all Dealers ceased Work on Solar Systems. Thousands of work-in-process Solar Systems—and, in particular, the Eligible Systems—remain stalled at various stages of development because the Debtors have not paid the Dealers and cannot pay for prepetition Work. Additionally, although the vast majority of the Channel Partner Agreements do not permit the Dealers to impose liens on Eligible Systems if the Company does not pay for the Work (subject to limited exceptions), Dealers and their subcontractors have attempted to place mechanic's liens on Sunnova's customers' homes. As a result, the Debtors cannot benefit from the Eligible Systems on a postpetition basis without resolutions with the Dealers.

13. The Debtors' inability to pay their Dealers and advance stalled works-in-process led to a cascade of liquidity pressures. On April 21, 2025, Atlas Securitized Products Administration, L.P. ("ASPA"), as administrative agent for the lenders under the TEPH Credit

Agreement (the "TEPH Lenders"), sent the Debtors a notice of default (the "TEPH Default Notice") stating that, as a result of the alleged defaults, among other things, the TEPH Facility lender commitments were terminated and the borrower (non-Debtor Sunnova TEP Holdings, LLC) would be charged default interest. The following day, ASPA, as administrative agent under Sunnova's loan backleverage facility (the "SLA Facility"), sent the Company a notice of default under the SLA Facility, stating that the SLA Facility lender commitments were terminated as a result of alleged defaults and the borrower (non-Debtor Sunnova EZ-Own Portfolio, LLC ("SLA")) would be charged default interest. I understand that, as a result of the defaults, no cash may be distributed from TEP Holdings or SLA to the Debtors. The Debtors were also unable to satisfy the conditions precedent to receive funding from the TEPs. In addition, on April 21, 2025, ASPA exercised its proxy with respect to the equity of TEP Holdings and replaced certain of the existing directors with outside directors Gilbert Nathan and John S. Dubel (together, the "Outside Directors").

### The Proposed Sale

14. In the period leading up to the Petition Date, the Debtors' liquidity pressures, and the Dealers' refusal to continue the Work until they are paid, left the parties at an impasse. The Debtors lack the cash to fund payments to the Dealers to incentivize them to complete their Work on the Eligible Systems. The Debtors attempted to negotiate with certain of the Dealers prior to the Petition Date, but without the funds to assure the Dealers that they would be paid for Work performed on Completed Systems and Work to-be-performed on Uncompleted Systems, the Dealers had no incentive or, in some instances, ability to complete the Uncompleted Systems.

15. The advancement of the uncompleted Work is a critical input to maximizing the value of the Debtors' business. Until the Work is finished and the Eligible Systems reach Final

Completion, the Debtors will not begin receiving any MSA Fees or Residuals in connection with those systems. Without MSA Fees and Residuals flowing to the Debtors and their affiliates from the Eligible Systems, the value of the Debtors' business will be hamstrung, and the marketing and sale process for the Debtors' business may suffer. And yet the Debtors lack the ability to monetize the Eligible Systems—even though, as noted above, they hold free-and-clear title to the underlying Solar Systems themselves—because the TPO Agreements associated with the Solar Systems are owned by non-Debtor TEP Holdings (or its subsidiaries), which has already provided the Debtors funds to pay, in part, for the Eligible Systems. Accordingly, until Work resumes, the Debtors will be unable to realize the full value of their business.

16. In an effort to overcome the obstacle posed by the uncompleted Work and unlock value in the Eligible Systems, the Debtors (through their advisors, and under the direction of the Special Committee of the board of directors of Debtor Sunnova Energy International, Inc.), TEP Holdings (under the supervision of its Special Committee and through its advisors), and ASPA, in its capacity as administrative agent and Class A Lender under the TEPH Facility, engaged in extensive good-faith, arm's length negotiations around the terms of a settlement of certain claims and causes of action between the parties. The parties ultimately were able to reach a resolution that includes a settlement and the sale of the Eligible Systems to TEP Holdings for $15 million (the "Purchase Price").

17. The Sale (documented in that certain Asset Purchase Agreement, dated as of June 8, 2025, attached as Exhibit 1 to the Sale Order (together with all schedules, exhibits, and ancillary documents related thereto, and as amended, modified, or supplemented from time to time, the "APA")) and the ASPA Settlement (documented in that certain Settlement Agreement, dated

as of June 8, 2025, attached as <u>Exhibit 2</u> to the Sale Order (the "ASPA Settlement Agreement")), work hand in hand.

18. First, as part of the Sale, TEP Holdings will pay SEC the Purchase Price in exchange, among other things, for (1) the right to receive the Eligible Systems where it is able to reach resolution with a Dealer, (2) any Eligible Solar Systems and the associated TPO Agreements that are currently owned by Debtors and were funded with proceeds of the TEPH Facility and not transferred to TEP Holdings, and (3) the right to negotiate and consent to any settlement with the Dealers.

19. Second, as part of the ASPA Settlement, the Settling Lenders will provide incremental loans to TEP Holdings, the proceeds of which will be used to pay the Purchase Price and may be used to fund settlements with the Dealers. TEP Holdings anticipates that those settlements will include a payment to the Dealers in exchange for the completion of Work on the Eligible Solar Systems and a release of claims. As part of the ASPA Settlement, the Debtors have also agreed to appoint the TEPH Lenders' preferred back-up servicer and manager and ensure those entities are provided with all of the information so that they are in a position to step in and take over servicing and management of the Solar Systems owned by TEP Holdings and its subsidiaries if the Debtors are removed under the applicable agreements between the parties.

20. Although the Debtors anticipate seeking approval of debtor-in-possession financing (the "DIP Facility") by separate motion, the contemplated DIP Facility provides limited interim funding prior to entry of a final order. As of the Petition Date, the Debtors have approximately $13.5 million cash on hand. Given the Debtors' postpetition working capital needs, if they do not receive the Purchase Price on the first day of these cases, the Debtors will not have sufficient available cash to operate their business, pay obligations as they come due, administer these chapter

11 cases, and run a value-maximizing postpetition marketing process for the sale of their assets beyond the near term.

21.     The Debtors will use the Purchase Price to fund the administrative costs of these chapter 11 cases, including facilitating the negotiations and payment of their wages and benefits obligations. Accordingly, I believe the Debtors require immediate access to the proceeds of the Sale, and approving and authorizing the Sale is in the best interests of the Debtors and their estates.

22.     I also believe that the Sale is the best opportunity to maximize the value of the Debtors' estates and avoid the value-destructive proposition of keeping the Dealers in limbo for any longer. I believe the Sale, on the terms set forth in the APA, constitutes the highest or otherwise best offer for the Assets and will provide a greater recovery on account of the Assets for the Debtors' estates than would any other available alternative. The value generated by the private Sale far outweighs any benefits of retaining the Assets or seeking a third-party purchaser. TEP Holdings has already advanced funds to the Debtors on account of the Eligible Systems, and the Solar Service Agreements associated with those systems have been transferred to TEP Holdings' subsidiaries. In their current state, the Assets are not marketable to third parties without existing relationships with Dealers, TEPs, and ITC purchasers necessary to complete and monetize the Uncompleted Systems. Completing work-in-process Solar Systems will both enhance the Debtors' cash flows through collection of MSA Fees and maximize the value of the Debtors' business and assets for purposes of the broader sale process. Further, without the Sale and ASPA Settlement, the Warehouse Lenders, would likely proceed with enforcement actions and the Debtors would likely lose their entire equity interest in TEP Holdings and its subsidiaries.

23.     Finally, to the best of my knowledge, the Debtors and Purchaser have negotiated and acted at all times in a good-faith, non-collusive, and fair manner, and I am not aware of any

facts indicating that either the Debtors or Purchaser is fraudulently entering into the transaction contemplated by the APA. No special treatment was afforded ASPA or the Purchaser and any affiliations with the Debtors have not impacted the material terms of the Sale. The Sale and the APA are the products of arm's-length negotiations among the parties, and each has been represented by separate counsel (and, in the case of the Debtors and TEP Holdings, Special Committees consisting of disinterested directors). To the best of my knowledge, the Purchaser is purchasing the Assets for fair value.

24. Given the details described above and based on my experience as a restructuring professional and involvement in other sales transactions, I believe that the Court should enter the Sale Order and approve the sale to the Purchaser on the terms and conditions set forth in the APA.[4]

### Entry into the ASPA Settlement Agreement Is a Sound Exercise of the Debtors' Business Judgment

25. In my view, execution of the ASPA Settlement Agreement is also a sound exercise of the Debtors' business judgment. By resolving the various legal issues and claims among the ASPA, the Debtors, and the Debtors' non-Debtor affiliates party thereto, the ASPA Settlement Agreement sets important guardrails around the Dealer settlement process, provides a forbearance on ASPA's and the TEPH Lenders' exercise of remedies with regard to outstanding events of default under the TEPH Facility, and provides a broad mutual release of claims for the benefit of

---

[4] I do not believe that any TPO Agreements will be assumed and assigned under the APA. Unlike the Solar Systems associated with them, the TPO Agreements are assigned to TEP Holdings nearly immediately upon their execution. However, to the extent any TPO Agreements are to be assigned pursuant to the APA, such agreements are inextricably linked to the Eligible Systems being sold. The TPO Agreements are the leases and power purchase agreements that generate cash flows on account of the Eligible Systems. Without the TPO Agreements, the cash flows from the Eligible Systems would be limited to the ITCs minted when they are placed in service. Accordingly, I believe, based on my experience as a restructuring professional and involvement in other sales transactions, that it is unlikely that any purchaser would want to acquire the Eligible Systems without the Assigned Contracts. Moreover, the transfer of the Assigned Contracts is consistent with the Debtors' ordinary course operations—as noted above, the TPO Agreements are assigned to TEP Holdings upon their execution among SEC and the customer. The Assigned Contracts are essential to the value of the Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Assets.

all parties thereto.  The ASPA Settlement Agreement is a reasonable resolution among the parties to it that will allow them to move forward and focus their efforts on the important work of settling with Dealers and administering the chapter 11 cases.

## Conclusion

26.     The proceeds of the Sale and entry into the ASPA Settlement Agreement are necessary to facilitate negotiations with Dealers and to ensure that the Debtors' employees assisting in those efforts receive ordinary course compensation.  The Dealer negotiations will resolve or reduce claims and unlock value currently frozen by the cessation of advancement of works-in-process toward completion.  The Sale and ASPA Settlement are the first steps toward accomplishing these crucial goals.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 9, 2025             /s/ Ryan Omohundro
                                 Ryan Omohundro
                                 Managing Director
                                 Alvarez & Marsal North America LLC