## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| SUNNOVA ENERGY INTERNATIONAL INC., *et al.*,[1] | ) ) ) ) | Case No. 25-90160 (ARP) |
| Debtors. | ) ) ) | (Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF RYAN OMOHUNDRO IN FURTHER SUPPORT OF (A) THE DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE PRIVATE SALE OF THE ELIGIBLE SYSTEMS ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (III) APPROVING THE ASPA SETTLEMENT AND (IV) GRANTING RELATED RELIEF, AND (B) THE DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE PRIVATE SALE OF THE NEW HOMES SOLAR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

I, Ryan Omohundro, hereby declare under penalty of perjury as follows:[2]

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova. The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046.

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Motion, the Order, the *Declaration of Paul Mathews, President and Chief Executive Officer of Sunnova Energy International Inc., in Support of Debtors' Chapter 11 Petitions* (the "Mathews First Day Declaration"), the *Declaration of Ryan Omohundro, Chief Restructuring Officer of Sunnova Energy International Inc., in Support of Debtors' First Day Motions* (the "Omohundro First Day Declaration"), the *Declaration of Ryan Omohundro, Chief Restructuring Officer of Sunnova Energy International Inc., in Support of the Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Private Sale of the Eligible Systems Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Approving the ASPA Settlement, and (IV) Granting Related Relief* (the "Omohundro TEPH Sale Declaration"), and the *Declaration of Ryan Omohundro, Chief Restructuring Officer of Sunnova Energy International Inc., in Support of the Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Private Sale of the New Homes Systems Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "New Homes Asset Sale

1. I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). Prior to being appointed CRO on April 27, 2025, I advised the Debtors in my capacity as Managing Director of Alvarez & Marsal North America, LLC ("A&M"), the proposed financial advisor to the Debtors in the above-captioned chapter 11 cases. I have been directly involved in and obtained firsthand knowledge of the events and circumstances leading to these chapter 11 cases.

2. I submit this declaration (this "Declaration") in further support of the following motions:

    (a) the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Private Sale of the Eligible Systems Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, (III) Approving the ASPA Settlement, and (IV) Granting Related Relief* (the "Warehouse Asset Sale Motion"); and

    (b) the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Private Sale of the New Homes Solar Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "New Home Inventory Sale Motion," and together with the Warehouse Asset Sale Motion, the "Sale Motions").

3. The statements in this Declaration are, except where otherwise noted, based on (a) my personal knowledge, (b) information I have obtained from other members of the Debtors' management team, employees, advisors, and/or employees of A&M, (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and (d) my experience and knowledge as the Debtors' CRO and as a principal of A&M advising distressed companies for over twenty years. I am over the age of eighteen, and I am

---

Declaration," and together with the TEPH Sale Declaration, the "Prior Sale Declarations"), as applicable. The "Company" means, collectively, Sunnova Energy International Inc. and its Debtor and non-Debtor subsidiaries and affiliates.

2

authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

### The Debtors' Need for Cash to Fund Operations and the Administration of These Chapter 11 Cases

4. During the hearing held on June 9, 2025, the Court posed questions regarding the timeframe for the Debtors' ability to operate based on the Budget attached to my first declaration. The answer to those questions is that, without additional cash, the Debtors will run out of funds necessary to operate their businesses and administer these cases by, at the latest, early next week.

5. Since they were first engaged by the Debtors in March 2025, A&M has helped to manage the Company's liquidity, identify strategic alternatives to enhance liquidity and profitability, assist with the development of a business plan, and manage the Debtors' contingency planning efforts. In connection with the Sale Motions, with the assistance of A&M and their other advisors, the Debtors reviewed and analyzed their projected cash receipts and disbursements and prepared a forecast outlining the Debtors' projected postpetition receipts, disbursements, and cash flow through the business day prior to the contemplated second day hearing scheduled for June 30, 2025, a copy of which is attached as **Exhibit A** (the "Forecast"). I believe the Forecast is true and correct, and that it reflects the Debtors' best estimate of the receipts and disbursements the Debtors will realize over the first three weeks of these cases.

6. As set forth in the Forecast, the Debtors commenced these chapter 11 cases with approximately $13.5 million in cash on hand (or $11.5 million after accounting for the Debtors' "float" relating to outstanding checks written against their bank accounts). When combined with the cash flow generated by the Debtors in the ordinary course of business, that amount is insufficient to cover the Debtors' working capital needs and the projected administrative costs of these chapter 11 cases. In fact, without additional cash or significant disruption to the Debtors'

business operations and administration of the estates, the Debtors will run out of funds by as early as the end of this week or, at the latest, the beginning of next week.  For the avoidance of doubt, I do not mean that the Debtors will fall below a minimum liquidity threshold.  Rather, to be very clear, **_without the relief sought through the Motions, the Debtors will have zero cash in their bank accounts by this time next week._**

7. To demonstrate this, I have included in the Forecast a separate scenario that reflects the cash shortfalls that would result if the Debtors do not receive the relief they seek in the Sale Motions.  As set forth therein, the Debtors expect to incur a total of approximately $12 million in operating and administrative expenses (including employee payroll) between the Petition Date and this Friday, June 13, with approximately $800,000 in receipts, for a net cash outflow of approximately $11 million—leaving the Debtors with less than $500,000 in their bank accounts as of the end of this week.  By the end of next week, the Debtors would have a cash _shortfall_ of approximately $4 million.  Without additional cash, that shortfall would grow to more than $25 million by the end of the Debtors' third week in bankruptcy:

Sunnova Energy International Inc. 25-90160
The Forecast
($ millions)

| | Forecast Inclusive of Sale Proceeds | | | | Forecast Excluding Sale Proceeds | | | |
|---|---|---|---|---|---|---|---|---|
| Fcst vs Act --> | Fcst | Fcst | Fcst | | Fcst | Fcst | Fcst | |
| Week Number --> | Wk-1 | Wk-2 | Wk-3 | | Wk-1 | Wk-2 | Wk-3 | |
| Week Ending --> | 13-Jun | 20-Jun | 27-Jun | Total | 13-Jun | 20-Jun | 27-Jun | Total |
| Total Receipts | $ 0.8 | $ 7.4 | $ 0.1 | $ 8.3 | $ 0.8 | $ 7.4 | $ 0.1 | $ 8.3 |
| Total Operating Disbursements | (12.0) | (11.5) | (21.7) | (45.1) | (12.0) | (11.5) | (21.7) | (45.1) |
| Operating Cash Flow | $ (11.2) | $ (4.1) | $ (21.6) | $ (36.9) | $ (11.2) | $ (4.1) | $ (21.6) | $ (36.9) |
| Total Process Costs | (0.0) | - | - | (0.0) | (0.0) | - | - | (0.0) |
| New Homes Solar Assets Sale | - | 15.5 | - | 15.5 | - | - | - | - |
| TEPH Sale | 15.0 | - | - | 15.0 | - | - | - | - |
| Total Financing | 15.0 | 15.5 | - | 30.5 | - | - | - | - |
| Beginning Unencumbered Book Cash* | $ 11.6 | $ 15.4 | $ 26.8 | $ 11.6 | $ 11.6 | $ 0.4 | $ (3.7) | $ 11.6 |
| Net Cash Flow | 3.8 | 11.4 | (21.6) | (6.4) | (11.2) | (4.1) | (21.6) | (36.9) |
| Ending Unencumbered Book Cash | $ 15.4 | $ 26.8 | $ 5.2 | $ 5.2 | $ 0.4 | $ (3.7) | $ (25.3) | $ (25.3) |

* Excludes approximately $8.5MM received from the DOE in relation to the PR-ERF program

8. The Debtors believe they can meet their immediate cash needs through two interrelated proposed transactions that are the subject of the Sale Motions pending with the Court:

4

(i) the sale of certain eligible solar systems (the "Eligible Systems") to Sunnova TEP Holdings, LLC ("TEP Holdings"), the borrower under one of the Debtors' warehouse facilities (the "TEPH Facility"; and such sale, the "TEPH Sale"); and (ii) the sale of certain solar systems and related contracts associated with the Debtors' New Homes business (the "New Homes Solar Assets Sale," and together with the TEPH Sale, the "Asset Sales"). As discussed below, without access to the proceeds from these transactions, the Debtors will face an immediate value-destructive interruption to their businesses, including their ability to service the Solar Assets and Solar Loans supporting the Debtors' Asset-Backed Notes and Loan-Backed Notes, which would in turn jeopardize the Debtors' primary revenue stream; trigger events of default, acceleration and other drastic remedies; and likely lead to the conversion of these cases within weeks of their filing.

### The Asset Sales Are Reasonable and Provide the Debtors With Cash Needed to Fund These Cases

9. As of the filing of this Declaration, the Debtors do not have a DIP Facility up for this Court's approval or even approved by their boards of directors at this time. Further, by itself, the interim draw contemplated under the currently proposed potential DIP Facility would not provide sufficient liquidity to fund the cash needs of these estates through to the second day hearing without the additional cash proceeds contemplated by the Sale Motions. This is because the Debtors were unable to find a lender (including the parties that may fund the DIP Facility) willing to fund additional debtor-in-possession financing collateralized by certain unencumbered assets within the Debtors' estates. This is primarily due to the fact that the value of these assets can practically (if at all) be realized only by certain parties who already have an interest in, or related to, those assets. To be clear, the Debtors will require additional funding to make it beyond the currently scheduled second day hearing in these cases—either in the form of a DIP or through further sales of the Debtors' remaining unencumbered collateral.

10. Accordingly, in the weeks prior to the Petition Date, the Debtors pivoted from seeking to collateralize these and other assets in connection with DIP financing to monetizing them through an asset sale to the only parties for whom they hold any reasonably realizable value. As set forth in my Prior Sale Declarations, the Debtors' efforts were ultimately successful, and through the Sale Motions, the Debtors seek approval of two sale transactions that will provide the cash that the Debtors need to move these cases forward through the coming weeks.

11. *The TEPH Sale.* Through the TEPH Sale, the Debtors seek to sell the Eligible Systems to TEP Holdings for $15 million in cash. The sale is the result of approximately five weeks of negotiation between the Debtors (through the Special Committee of the Debtors' board, with the assistance of their advisors), TEP Holdings (through a special committee of TEP Holdings' board, consisting of disinterested directors), Atlas, in its capacities as administrative agent and Class A Lender under the TEPH Facility, and the other Class A and Class B lenders thereunder (together with Atlas in its capacity as Class A Lender, the "TEPH Lenders").

12. The TEPH Sale provides numerous concrete benefits to the Debtors and their estates, starting with the $15 million in cash that the Debtors will receive as a result of the transaction—allowing the Debtors to recover the approximately $15 million they invested in these Eligible Systems, which are in various degrees of completion, ranging from early-stage construction to near-complete and still require approximately many multiples of this amount to complete. In addition, the Eligible Systems are subject to leases and power purchase agreements ("TPO Agreements"), which dictate customers' payment obligations to Sunnova and are the sole source of cash flows on account of the Eligible Systems, and customers' payment obligations under those TPO Agreements are generally triggered only upon completion of the applicable Eligible System.

13. Critically, the Eligible Systems have no marketable value to anyone other than TEP Holdings and the TEPH Lenders. The TPO Agreements, and therefore the cash flows (if any) from the Eligible Systems, are already held by TEP Holdings' subsidiaries and serve as collateral for the TEPH Lenders' loans. In the ordinary course, the physical systems also would have been transferred to TEP Holdings' subsidiaries and become part of the TEPH Lenders' collateral package—without any additional consideration from TEP Holdings or the TEPH Lenders—and the only reason that has not happened is due to the interruption in the flow of tax equity contributions in the lead up to the filing of these cases.

14. I understand that certain Dealers have argued that they have various interests in the Eligible Systems. However, the relief sought will not impair any rights or interests any Dealer may hold, or any claims any Dealer may hold against the Estate, in connection with the Eligible Systems. In any event, I understand that the Debtors have agreed to language to provide comfort to dealers that approval of this sale in no way affects any dealers' rights or claims against the estate or any other party.

15. ***New Homes Solar Assets Sale.*** Through the New Homes Solar Assets Sale, the Debtors seek to sell solar systems installed on new homes that are held by a homebuilder, Lennar Corporation ("Lennar"), for which homes sales have not yet closed. In exchange, Lennar will pay the Debtors approximately $16 million in cash (representing a small discount to the cash retail price paid by the home buyers) and fund the costs of completing the remaining items necessary to place the systems online.

16. As stated in my earlier declaration, Lennar is the natural purchaser for these assets, since Lennar will face difficulty closing sales on homes without the ability to include in the sale the solar systems that are installed on the roofs of those homes. Further, absent this sale, the

Debtors would in the ordinary course sell these same solar systems on an individual basis to new homeowners as they purchased homes in Lennar's developments.  By selling these solar systems in bulk to Lennar the Debtors have found a way to increase its upfront liquidity by collapsing hundreds of transactions into one, reducing the Debtors' administrative burden.  In addition, the homeowners will benefit from this transaction, which will streamline their closing process.

17.     As a result, by selling them to Lennar, the Debtors are maximizing the value of assets whose only natural purchaser is Lennar or homeowners on an individual basis.

### The Debtors Will Suffer Immediate and Irreparable Harm if the Asset Sales Are Not Approved

18.     Immediate approval of the Asset Sales is critical for the Debtors and their stakeholders—and the Debtors will suffer irreparable harm absent such approval—for at least two reasons.

19.     *First*, the Debtors have a very critical need for the cash without any alternative source for the cash other than the Asset Sales.  The Debtors will face significant disruption to their businesses and the administration of these estates, or else have zero balances in their bank accounts within days, if the Asset Sales are not approved.

20.     *Second*, the Asset Sales offer the Debtors the highest and best price they can hope to receive for these unique assets.  The Eligible Systems have no associated cash flows that are not already owned by TEP Holdings and/or its subsidiaries, and thus have little to no value to anyone other than TEP Holdings, its subsidiaries, and the TEPH Lenders.  Similarly, as the homebuilder that owns the unsold new homes on which the New Homes Solar Assets sit, Lennar naturally has the keenest interest in, and will pay the highest value for, those assets.  However, while the Debtors have no expectation of receiving a higher price for these assets, there is a risk that the Debtors will realize *less value* and incur *more costs* if the Assets Sales are not approved immediately.

For example, I have been informed by Atlas that the Warehouse Asset Sale must be approved as a condition to the broader transaction and settlement that will provide, among other things, a framework for Atlas to negotiate with the dealers.

## **Conclusion**

21.     Given the details described above and based on my experience as a restructuring professional and involvement in other sales transactions, I believe that the Asset Sales are each value-maximizing transactions and reasonable exercises of the Debtors' business judgment. Moreover, I believe that each of these transactions is vital to the Estates' ability to remain in chapter 11, and that, if these transactions are not approved, the Debtors will suffer immediate and irreparable harm. Accordingly, I respectfully submit that the Court should approve the Court should approve the DIP Facility and each of the Asset Sales on the terms and conditions set forth in the documents governing those transactions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 11, 2025 　　　　　　　　　　　　 */s/ Ryan Omohundro*
　　　　　　　　　　　　　　　　　　　　　　　　 Ryan Omohundro
　　　　　　　　　　　　　　　　　　　　　　　　 Managing Director
　　　　　　　　　　　　　　　　　　　　　　　　 Alvarez & Marsal North America LLC

**Exhibit A**

**Forecast**

**Sunnova Energy International Inc. 25-90160**
The Forecast
*($ thousands)*

|  | Forecast Inclusive of Sale Proceeds | | | | Forecast Excluding Sale Proceeds | | | |
|---|---|---|---|---|---|---|---|---|
| *Fcst vs Act --><br>Week Number --><br>Week Ending -->* | **Fcst<br>Wk-1<br>13-Jun** | **Fcst<br>Wk-2<br>20-Jun** | **Fcst<br>Wk-3<br>27-Jun** | **Total** | **Fcst<br>Wk-1<br>13-Jun** | **Fcst<br>Wk-2<br>20-Jun** | **Fcst<br>Wk-3<br>27-Jun** | **Total** |
| MSA Fees | $ - | $ 1,982 | $ - | $ 1,982 | $ - | $ 1,982 | $ - | $ 1,982 |
| 3rd Party SRECs / PPAs | 393 | 4,028 | - | 4,421 | 393 | 4,028 | - | 4,421 |
| SEC SREC Proceeds | - | - | - | - | - | - | - | - |
| New Home Sales | 300 | 300 | - | 600 | 300 | 300 | - | 600 |
| Residuals | - | 210 | - | 210 | - | 210 | - | 210 |
| Other Receipts | 96 | 96 | 96 | 288 | 96 | 96 | 96 | 288 |
| **Operating Receipts** | **790** | **6,617** | **96** | **7,502** | **790** | **6,617** | **96** | **7,502** |
| Asset Sales | - | 750 | - | 750 | - | 750 | - | 750 |
| **Total Receipts** | **790** | **7,367** | **96** | **8,252** | **790** | **7,367** | **96** | **8,252** |
| Non-Dealer Trade | (8,828) | (5,275) | (6,038) | (20,140) | (8,828) | (5,275) | (6,038) | (20,140) |
| Payroll & Benefits | (75) | (6,065) | (70) | (6,210) | (75) | (6,065) | (70) | (6,210) |
| Insurance / Sureties | (1,937) | (10) | (809) | (2,756) | (1,937) | (10) | (809) | (2,756) |
| SREC / PPA Remittance to Waterfall | - | - | (14,612) | (14,612) | - | - | (14,612) | (14,612) |
| Other | (1,115) | (150) | (150) | (1,415) | (1,115) | (150) | (150) | (1,415) |
| **Total Operating Disbursements** | **(11,954)** | **(11,500)** | **(21,679)** | **(45,133)** | **(11,954)** | **(11,500)** | **(21,679)** | **(45,133)** |
| **Operating Cash Flow** | **$ (11,165)** | **$ (4,133)** | **$ (21,583)** | **$ (36,881)** | **$ (11,165)** | **$ (4,133)** | **$ (21,583)** | **$ (36,881)** |
| Debtor Professionals | - | - | - | - | - | - | - | - |
| Other Creditor / UCC Professionals | - | - | - | - | - | - | - | - |
| Other Case Costs | (14) | - | - | (14) | (14) | - | - | (14) |
| **Total Process Costs** | **(14)** | **-** | **-** | **(14)** | **(14)** | **-** | **-** | **(14)** |
| New Homes Solar Assets Sale | - | 15,500 | - | 15,500 | - | - | - | - |
| TEPH Sale | 15,000 | - | - | 15,000 | - | - | - | - |
| **Total Financing** | **15,000** | **15,500** | **-** | **30,500** | **-** | **-** | **-** | **-** |
| **Beginning Unencumbered Book Cash*** | $ 11,584 | $ 15,405 | $ 26,772 | $ 11,584 | $ 11,584 | $ 405 | $ (3,728) | $ 11,584 |
| **Net Cash Flow** | $ 3,821 | $ 11,367 | $ (21,583) | $ (6,395) | $ (11,179) | $ (4,133) | $ (21,583) | $ (36,895) |
| **Ending Unencumbered Book Cash** | $ 15,405 | $ 26,772 | $ 5,189 | $ 5,189 | $ 405 | $ (3,728) | $ (25,311) | $ (25,311) |

*\* Excludes approximately $8.5MM received from the DOE in relation to the PR-ERF program*