**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNNOVA ENERGY INTERNATIONAL INC., *et al.*,[1] | ) ) | Case No. 25-90160 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' EMERGENCY MOTION**
**FOR ENTRY OF AN ORDER (I) APPROVING**
**THE BIDDING PROCEDURES, (II) SCHEDULING**
**CERTAIN DATES WITH RESPECT THERETO, (III) APPROVING**
**THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING**
**THE WHOLECO STALKING HORSE AGREEMENT AND EXPENSE**
**REIMBURSEMENT, (V) ESTABLISHING NOTICE AND PROCEDURES**
**FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES, (VI) AUTHORIZING THE ASSUMPTION AND**
**ASSIGNMENT OF ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES,**
**(VII) AUTHORIZING THE SALE OF ASSETS, AND (VIII) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on June 30, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on June 30, 2025, at 1:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "judgeperez." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova. The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state the following in support of this motion (this "<u>Motion</u>"):[2]

## **Relief Requested**

1.    The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Bidding Procedures Order</u>"):

    (a)    authorizing and approving the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order (the "<u>Bidding Procedures</u>"),[3] pursuant to which the Debtors will solicit and may select the highest or otherwise best offer for the sale of some or substantially all of the Debtors' assets (the "<u>Assets</u>") pursuant to one or more sale transactions (each, a "<u>Sale Transaction</u>");

    (b)    scheduling and approving certain dates and deadlines in connection with the Bidding Procedures;

    (c)    approving the form and manner of the notice of the Sale Transaction and Auction, if any (the "<u>Sale and Auction Notice</u>"), attached to the Bidding Procedures Order as <u>Exhibit 2</u>;

    (d)    approving the form and notice of successful bidder (the "<u>Successful Bidder Notice</u>"), attached as <u>Exhibit 4</u> to the Bidding Procedures Order;

---

[2]   A description of the Debtors, their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, is set forth in greater detail in the *Declaration of Paul Mathews, President and Chief Executive Officer of Sunnova Energy International Inc., In Support of the Debtors' Chapter 11 Petitions* (the "<u>Mathews First Day Declaration</u>") and the *Declaration of Ryan Omohundro, Chief Restructuring Officer of Sunnova Energy International Inc., In Support of the Debtors' First Day Motions* (the "<u>Omohundro First Day Declaration</u>," and together with the Mathews First Day Declaration, the "<u>First Day Declarations</u>"), filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declarations, the Bidding Procedures Order, or the Bidding Procedures, filed contemporaneously herewith, as applicable.

[3]   All references to the Bidding Procedures herein are qualified in their entirety by the Bidding Procedures themselves.

(e)     authorizing the Debtors to (i) designate Solaris Assets, LLC, Solaris ABS, LLC, and Solaris Borrower, LLC as the stalking horse bidder for WholeCo (the "WholeCo Stalking Horse Bidder"), (ii) enter into an asset purchase agreement with such WholeCo Stalking Horse Bidder (such agreement, the "WholeCo Stalking Horse Agreement"), on the terms substantially set forth therein, and (iii) in connection with the WholeCo Stalking Horse Agreement, reimburse the WholeCo Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) actually incurred in connection with the negotiation, execution, performance, and enforcement of the WholeCo Stalking Horse Agreement (the "Expense Reimbursement");

(f)     authorizing the terms of the WholeCo Stalking Horse Agreement, attached as Exhibit 1 to the Bidding Procedures;

(g)     approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts," and the counterparties thereto, the "Contract Counterparties") in connection with the Sale Transactions (the "Assumption and Assignment Procedures"), and approving the form and notice thereof (the "Assumption and Cure Notice"), attached as Exhibit 3 to the Bidding Procedures Order; and

(h)     granting related relief.

2.     Additionally, the Debtors will seek entry of an order (the "Sale Order") authorizing either the sale of some or substantially all of the Debtors' Assets to the WholeCo Stalking Horse Bidder on the terms set forth in the WholeCo Stalking Horse Agreement or the sale of some or substantially all of the Debtors' Assets to another successful bidder (each successful bidder for the sale of some or all of the Debtors' Assets, a "Successful Bidder").

**Jurisdiction and Venue**

3.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern

District of Texas, entered May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), rules 2002(a), 6004, 6006(a), 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "<u>Complex Case Procedures</u>").

### Background

6.      On June 1, 2025, Debtor TEP Developer, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On June 8, 2025 (the "<u>Petition Date</u>"), Debtors Sunnova Energy Corporation, Sunnova Energy International Inc., and Sunnova Intermediate Holdings, LLC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have filed a motion contemporaneously herewith requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**Proposed Sale Process, the WholeCo
Stalking Horse Bid, and Expense Reimbursement**

**I.      The Bidding Procedures.**

7.      Through this Motion, the Debtors seek approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of any proposals, solicitations, or offers to consummate a Sale Transaction ("Bids") in a fair, accessible, and efficient manner. The Bidding Procedures set forth, among other things, the procedures by which interested parties may access due diligence, the manner in which bidders and Bids become "qualified," the rules and conduct governing any auction, the procedures for selecting and approving one or more successful bidders and back-up bidders, and the applicable deadlines for each stage of the sale process.

8.      The Bidding Procedures offer numerous protections and benefits to the Debtors and their stakeholders to ensure an efficient and value maximizing process, designed to generate the highest or otherwise best available recoveries for the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing Bids.  First, the Bidding Procedures are designed to provide flexibility and accommodate a range of transaction structures, including offers to acquire either or both of (i) the Debtors' securitization line of business ("AssetCo"), and/or (ii) the Debtors' management and servicing line of business ("ServiceCo," and together with AssetCo, "WholeCo").  Second, the Bidding Procedures provide each Potential Bidder with ample notice and a meaningful opportunity to conduct due diligence and submit binding Bids in advance of the Auction, if one is held.  Third, by entering into the WholeCo Stalking Horse Agreement, the Debtors are setting the bidding floor for a value-maximizing sale process. For these reasons, among others, the Debtors believe that the Bidding Procedures and the dates and deadlines set forth therein are in the best interests of the Debtors and their estates.

9.      Because the Bidding Procedures are attached to the proposed Bidding Procedures Order, they are not restated fully herein.  In sum, however, the Bidding Procedures establish, among other things:[4]

- the process by which the Debtors will provide the Bidding Procedures Order, the Bidding Procedures, the Sale and Auction Notice, and the Assumption and Cure Notice to interested parties as soon as reasonably practicable after entry of the Bidding Procedures Order;

- the requirements that Potential Bidders must satisfy to participate in the sale process and become Qualified Bidders;

- the availability of and access to due diligence by the Potential Bidders;

- the deadlines and requirements for submitting Bids and the method and criteria by which such Bids will be evaluated to determine if such Bids are deemed to be Qualified Bids sufficient to require the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the Starting Bid;

- the conditions for having an Auction and procedures for conducting the Auction, if any;

- the criteria by which the Successful Bidder will be selected by the Debtors; and

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid, return of any Good Faith Deposits, and certain reservations of rights.

10.     The Bidding Procedures are designed to maximize stakeholder recoveries by encouraging prospective bidders to submit competitive, value-maximizing Bids for the Assets. As such, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to

---

[4]   This summary is provided for the convenience of the Court and parties in interest, and is qualified in its entirety by the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.  To the extent there is any conflict or inconsistencies between this summary and the Bidding Procedures, the Bidding Procedures control in all respects.

maximize sale value, do not impair the Debtors' ability to consider any Qualified Bids, and preserve the Debtors' rights to modify the Bidding Procedures as necessary, pursuant to the terms thereof, or appropriate to maximize value for the Debtors' estates.

## II. The Proposed Schedule.

11.     The Debtors seek approval of the Bidding Procedures and sale schedule set forth below in order to establish a transparent and orderly process for the solicitation, receipt, and evaluation of Bids on an efficient timeline that allows the Debtors to consummate one or more Sale Transactions.  The Debtors request that the Court approve the proposed schedule, subject to the Court's availability.

| Deadline or Event | Date |
|---|---|
| Bid Deadline | July 21, 2025 at 4:00 p.m., prevailing Central Time |
| Auction (if necessary) | July 23, 2025 |
| Sale Objection Deadline | July 24, 2025 at 4:00 p.m., prevailing Central Time |
| Hearing Approving Sale Transaction and Deadline to File Assumption and Cure Notice | July 25, 2025 |
| Cure Objection Deadline | 4:00 p.m. (prevailing Central Time) on the date that is seven days following the expiration of the Resolution Period (as defined herein). |

12.     The proposed schedule is calculated to balance the need to provide adequate notice to parties in interest and potential bidders with the need to run an efficient, expedited sale process. The proposed timeline also affords the Debtors an opportunity to conduct a robust postpetition market test of the WholeCo Stalking Horse Bid, pursue the highest or otherwise best Bids, and ultimately maximize the value of the Debtors' Assets.  Following entry of the Bidding Procedures

Order, the Debtors will continue actively marketing the Assets in an effort to solicit higher or otherwise better Bids in advance of the Bid Deadline.  To the extent any bidder has not previously conducted diligence on the Debtors' business prior to the Petition Date, such bidder will be granted immediate access to the Debtors' virtual data room (the "<u>Data Room</u>") upon execution of a confidentiality agreement.  Consistent with the Bidding Procedures, all parties who execute a confidentiality agreement will retain access to the Data Room throughout the sale process.

13.     Accordingly, the Debtors believe that the proposed schedule is in the best interests of the Debtors' creditors, other stakeholders, and all other parties in interest, provides interested parties with sufficient opportunity to participate in the sale process, and will result in the highest or otherwise best Bid for the Assets under the circumstances.

**III.    The WholeCo Stalking Horse Bid, the Material Terms of the WholeCo Stalking Horse Agreement, and the Expense Reimbursement.**

14.     The Debtors also request approval of the terms of the WholeCo Stalking Horse Agreement, pursuant to which the WholeCo Stalking Horse Bidder proposes to acquire substantially all of the Debtors' Assets for aggregate consideration comprised of: (i) the assumption of Assumed Liabilities; *plus* (ii) all principal amount of the Loans (under and as defined in the DIP Financing Agreement) including any interest or Funding Fee (under and as defined in the DIP Financing Agreement) paid-in-kind, then outstanding at Closing under the DIP Financing Agreement (subject to adjustments under the DIP Financing Agreement), and any accrued and unpaid fees (other than Agent Obligations and the DIP Lender Professional Fees and Expenses) (each, as defined in the DIP Financing Agreement) and interest at the time of Closing (the "<u>Credit Bid Amount</u>"); *plus* (iii) an amount equal to $10,000,000 *plus or minus*, as applicable, the Aggregate Early Closing Adjustment Amount (collectively, the "<u>Purchase Price</u>" and such Bid, the "<u>WholeCo Stalking Horse Bid</u>"), subject to higher or otherwise better Bids.  In recognition of

the WholeCo Stalking Horse Bidder's expenditure of time, energy, resources, and value to the sale process, the Debtors also seek authority to offer the WholeCo Stalking Horse Bidder the Expense Reimbursement.

15.     The following chart summarizes the terms and conditions of the WholeCo Stalking Horse Agreement attached to the Bidding Procedures as <u>Exhibit 2</u>.[5]

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| **Stalking Horse Agreement Parties**<br><br>*See* **Preamble** | <u>Sellers</u>:  The Persons set forth on <u>Annex I</u> of the WholeCo Stalking Horse Agreement.<br><br><u>Purchaser</u>:  Solaris Assets, LLC, Solaris ABS, LLC, and Solaris Borrower, LLC. |
| **Purchase Price**<br><br>*See* § 2.1 | The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchasers for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities; *plus* (ii) all principal amount of the Loans (under and as defined in the DIP Financing Agreement) including any interest or Funding Fee (under and as defined in the DIP Financing Agreement) paid-in-kind, then outstanding at Closing under the DIP Financing Agreement (subject to adjustments under the DIP Financing Agreement), and any accrued and unpaid fees (other than Agent Obligations and the DIP Lender Professional Fees and Expenses) (each, as defined in the DIP Financing Agreement) and interest at the time of Closing (the "<u>Credit Bid Amount</u>"); *plus* (iii) an amount equal to $10,000,000 *plus or minus*, as applicable, the Aggregate Early Closing Adjustment Amount (the "<u>Cash Purchase Price</u>"). |
| **Acquired Assets**<br><br>*See* § 1.1 | "<u>Acquired Assets</u>" means (i) all of the Equity Interests that any Seller owns in Sunnova Solstice Holdings, LLC and Sunnova Solstice RR Holdco, LLC (the "<u>Transferred AssetCo Subsidiaries</u>") (and the Subsidiaries of such Transferred AssetCo Subsidiaries, together with the Transferred AssetCo Subsidiaries, collectively, the "<u>Acquired AssetCo Entities</u>") and (ii) all of the properties, rights, interests, and other assets held by Sellers as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by Sellers after the date hereof and prior to the Closing, and including any Seller's right, title, and interest in and to, as of the Closing, the following assets of Sellers, but excluding in all cases the Excluded Assets and subject to <u>Section 1.5</u> of the WholeCo Stalking Horse Agreement:<br><br>     (a)     all of the Equity Interests that any Seller owns in Sunnova TE Management I, LLC, Sunnova Management, LLC, Sunnova SSA Management, LLC, Sunnova Protect Management, LLC, Sunnova SLA Management, LLC, Sunnova TE Management, LLC, Sunnova ABS Management, LLC, Sunnova TE |

---

[5]   This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the WholeCo Stalking Horse Agreement, the WholeCo Stalking Horse Agreement shall govern in all respects.  All references to schedules or sections in the following summary shall refer to schedules or sections of the WholeCo Stalking Horse Agreement.  Terms used but not defined in this summary description have the meaning ascribed to such term as in the WholeCo Stalking Horse Agreement.

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | Management II, LLC, Sunnova TE Management III, LLC and Sunnova RAYS I Management, LLC, in each case to the extent active (the "Transferred ServiceCo Subsidiaries") and the Subsidiaries of the Transferred ServiceCo Subsidiaries, together with such Transferred ServiceCo Subsidiaries, collectively, the "Acquired ServiceCo Entities");<br><br>(b) all of the Equity Interests that any Seller owns in (i) Sunnova TEP Holdings, LLC ("TEP Holdings"), (ii) Sunnova Asset Portfolio 8, LLC ("Portfolio 8"), (iii) Sunnova RAYS I Issuer, LLC ("RAYS I"), (iv) Sunnova Hestia I Issuer, LLC ("Hestia I"), (v) Sunnova Hestia II Issuer, LLC ("Hestia II"), and (vi) Sunnova EZ-Own Portfolio, LLC ("EZ-Own") (and the direct or indirect owned Equity Interests owned in Subsidiaries of TEP Holdings, Portfolio 8, RAYS I, Hestia I, Hestia II and EZ-Own, together with TEP Holdings, Portfolio 8, RAYS I, Hestia I, Hestia II and EZ-Own, the "Acquired Additional Entities", including any Equity Interest in any other Person held directly or indirectly by the Acquired Additional Entities, and together with the Acquired AssetCo Entities and the Acquired ServiceCo Entities, the "Acquired Entities");<br><br>(c) the Contracts listed on Section 1.1(c) of the Schedules to which any Seller is a party and that supports, facilitates, is involved in or relates to the Business in any way, including (i) Contracts constituting a guarantee, indemnity, or similar arrangement pursuant to which any Seller provides a Sellers Support Obligation in respect of any Assigned Contract or Assumed Liability and (ii) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof (collectively, the "Assigned Contracts");<br><br>(d) all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons (other than (x) the Acquired Entities or (y) a Seller (if the payee is a Seller)), together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;<br><br>(e) all Documents (excluding any credit card numbers or related customer payment sources, social security numbers, or other information to the extent prohibited by any Law);<br><br>(f) the Leased Real Property listed on Section 1.1(f) of the Schedules, which Leased Real Property shall include, without limitation, all Leased Real Property leased pursuant to any Lease (i) identified as an "Assigned Contract" listed on Section 1.1(c) of the Schedules or (ii) held by any Acquired Entity (the "Acquired Leased Real Property" and each Lease related to such Acquired Leased Real Property, an "Acquired Lease");<br><br>(g) all tangible assets (including Equipment), including the tangible assets of a Seller located at any Acquired Leased Real Property and any tangible assets on order to be delivered to any Seller or any of its Subsidiaries;<br><br>(h) all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to any Assigned Contract) other than Excluded Assets or Excluded Liabilities, including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds of Sellers (unless the corresponding tax is an Assumed Liability), Tax refunds attributable to a Pre-Closing Tax Period (unless the corresponding tax is an Assumed Liability), or Tax Refunds attributable to an Excluded Liability), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, and other similar rights, in each case, whether direct or |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | derivative, unknown, liquidated or unliquidated, contingent or otherwise, in each case, with respect to any of the Acquired Assets or Assumed Liabilities; |
| | (i)    all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor; |
| | (j)    all Intellectual Property owned or purported to be owned by one or more Sellers or any of its Affiliates (other than the Acquired Entities) used or held for use in the Business, (A) all rights to collect royalties and proceeds in connection with any such Intellectual Property, (B) all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, any such Intellectual Property (regardless of whether or not such claims and causes of action have been asserted by Sellers or any of its Affiliates), and (C) any and all corresponding rights that, now or hereafter, may be secured throughout the world, including the Intellectual Property set forth on Section 1.1(j) of the Schedules (collectively, the "Seller Intellectual Property") (for avoidance of doubt, with respect to the intent-to-use applications filed with the United States Patent and Trademark Office pursuant to 15 USC Section 1051(b) included in the Seller Intellectual Property (an "Intent-To-Use Trademark"), the Parties acknowledge and agree that the applicable Purchaser is the successor-in-interest to the business of Sellers and their Affiliates or portion thereof to which such Intent-To-Use Trademarks pertain and that such business is ongoing and existing); (ii) a copy of all embodiments of the Seller Intellectual Property in the possession of Sellers and their Affiliates; and (iii) all rights to any Intellectual Property pursuant to any Assigned Contract; |
| | (k)    all IT Assets of Sellers and its Affiliates; |
| | (l)    all Inventory and supplies of Sellers; |
| | (m)    all Renewable Energy Incentives |
| | (n)    all ITCs of Sellers that are eligible to be sold or transferred to Purchaser as determined under Section 9.3(c) of the WholeCo Asset Purchase Agreement, other than any ITCs to be generated by the New Home WIP; |
| | (o)    all net proceeds received from any sale of ITCs owned by Sellers that occurs after the Effective Date (but excluding for the avoidance of doubt, ITCs that are eligible to be sold or transferred to Purchaser as determined under Section 9.3(c) of the WholeCo Asset Purchase Agreement); |
| | (p)    all goodwill (including all goodwill associated with the Seller Intellectual Property), payment intangibles and general intangible assets and rights of Sellers; |
| | (q)    all rights of Sellers under each Sunnova ABS Transaction Document, including the right to perform the obligations of Sellers thereunder and any related agreements but excluding Excluded Liabilities under each such document and agreement; |
| | (r)    the Accessory Loans; |
| | (s)    the Critical Vendor Avoidance Claims; and |
| | (t)    all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone, or otherwise), or prepaid or deferred charges and expenses (including all lease and rental payments), that have been prepaid by Sellers and relate to the Business or the Acquired Assets. |
| **Assumed Liabilities**<br><br>*See* § 1.3 | On the terms and subject to the conditions set forth in the WholeCo Stalking Horse Agreement and subject to the entry and terms of the Sale Order, in addition to the payment of the Cash Payment in accordance with Section 2.1 of the WholeCo Stalking Horse Agreement, (a) Solaris Borrower shall irrevocably assume from |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | Sunnova Solstice Borrower, LLC and from and after the Closing, shall pay, perform, discharge, or otherwise satisfy in accordance with its terms, and Sunnova Solstice Borrower, LLC shall irrevocably transfer, assign, convey, and deliver to Solaris Borrower, the KKR Term Loan Agreement and (b) Asset Purchaser shall irrevocably assume from Sellers (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate), and from and after the Closing, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms, and Sellers (or with respect to Taxes, if applicable, a Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Asset Purchaser, only the following Liabilities (which shall exclude any such Liabilities which are Liabilities for Taxes except as set forth in clause (c)), without duplication and only to the extent not paid on or prior to the Closing (collectively, the "<u>Purchaser Assumed Liabilities</u>" and, together with the KKR Term Loan Agreement, the "<u>Assumed Liabilities</u>"), subject to <u>Section 1.5</u> of the WholeCo Stalking Horse Agreement: <br><br> (a)  all Liabilities and obligations of Sellers under the Assigned Contracts that become due from and after the Closing (excluding any Liabilities arising from or relating to any breaches under such Assigned Contract prior to the Closing); <br><br> (b)  Liabilities arising under Environmental Laws related to the Business or any of the Acquired Assets (and the ownership or use thereof) solely to the extent such Liabilities are required by Applicable Law (including Environmental Laws) and Permits to be a Liability of Purchaser as owner or operator of the Acquired Assets (the "<u>Assumed Environmental Liabilities</u>"); <br><br> (c)  all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date; <br><br> (d)  the EZ Own Warehouse Facility; and <br><br> (e)  all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchasers under this Agreement. |
| **Excluded Assets** <br> *See* § 1.2 | Notwithstanding anything to the contrary in the WholeCo Stalking Horse Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "<u>Excluded Assets</u>"), subject to <u>Section 1.5</u> of the WholeCo Stalking Horse Agreement: <br><br> (a)  all Equity Interests of Sellers or any of their respective Subsidiaries, in all cases, other than Equity Interests of the Acquired Entities (collectively, the "<u>Excluded Entities</u>"), including for the avoidance of doubt, equity interests in Sunnova TEP Developer, LLC ("<u>TEP Developer</u>"); <br><br> (b)  (i) all Cash and Cash Equivalents (except to the extent described in <u>Section 1.1(o)</u> or <u>Section 1.1(p)</u> of the WholeCo Stalking Horse Agreement), (ii) all bank accounts, (iii) all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone, or otherwise), or prepaid or deferred charges and expenses (including all lease and rental payments), that have been prepaid by Sellers and, in each case, solely to the extent such deposits, prepaid or deferred charges and expenses are not Acquired Assets, and (iv) any retainers or similar amounts paid to Advisors or other professional service providers; <br><br> (c)  all Contracts of Sellers or their Affiliates listed on <u>Section 1.2(c)</u> of the Schedules; <br><br> (d)  all Documents (including information stored on the computer systems, data networks or servers of any Seller or any Acquired Entity) (A) to the |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | extent they relate solely to any of the Excluded Assets or Excluded Liabilities, (B) that are Sellers' minute books, Organizational Documents, stock certificates or other Equity Interests instruments, stock registers and such other books and records of any Excluded Entity pertaining to the ownership, organization or existence of such Excluded Entity, Tax Returns (and any related work papers), corporate seal, checkbooks, canceled checks, employee and personnel files and records of the Business Employees who do not become Transferred Employees, or (C) that contain, and solely to the extent they contain, Personal Information and are governed under applicable data privacy Laws that prohibit the transfer or sale of Personal Information; provided that, with respect to the foregoing clause (C) only, Purchasers shall have the right to make copies of, and have access to, any relevant portions of such Documents to the extent not prohibited by Applicable Law; <br><br> (e)  (i) all bids and expressions of interest received from third parties with respect to the acquisition of any Excluded Entity's businesses or assets (including any bids and expressions of interest unrelated to the sale process undertaken by the Sellers in connection with this Agreement), (ii) all privileged materials, documents and records of any Excluded Entity, including any privileged materials, documents and records that are in the possession of any Acquired Entity, and (iii) any other files or records to the extent relating exclusively to any Excluded Assets or Excluded Liabilities; <br><br> (f)  all current and prior insurance policies of any Excluded Entity, including all director and officer insurance policies, and, subject to Section 6.8 of the WholeCo Stalking Horse Agreement, all rights and benefits of any nature of any Excluded Entity with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and the sponsorship of, and all rights, interests and assets associated with, any benefit or compensation plan, program, policy, contract, or arrangement of any Excluded Entity and the Employee Benefit Plans; <br><br> (g)  (i) Sellers' claims, causes of action or other rights of the Sellers expressly set forth under this Agreement, including the Purchase Price, or any agreement, certificate, instrument, or other document executed and delivered between Sellers or their Affiliates, on the one hand, and Purchasers or any member of the Purchaser Group, on the other hand, in connection with the Transactions, or any other agreement between Sellers or their Affiliates, on the one hand, and Purchasers or any member of the Purchaser Group, on the other hand, entered into on or after the date hereof, (ii) any and all preference claims, fraudulent conveyance claims and other Avoidance Actions, other than Critical Vendor Avoidance Claims, and (iii) claims, causes of action or other rights of any Seller against current or former directors or officers of any Seller; <br><br> (h)  all Tax refunds, Tax attributes and Tax assets of Sellers other than (i) any such Tax refunds, attributes or assets that transfer by operation of Law and (ii) any such Tax refunds, attributes or assets that are Acquired Assets; <br><br> (i)  all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to any Contract that is not an Assigned Contract, arising out of or relating to events occurring on or prior to the Closing Date, in all cases, solely with regard to Excluded Assets or Excluded Liabilities; |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | (j)　other than the ITCs of Sellers or the proceeds of a sale of ITCs described in Section 1.1(o) of the WholeCo Stalking Horse Agreement, all assets of TEP Developer now or hereafter existing in respect of preference claims, fraudulent conveyance claims and/or other Avoidance Actions (and related proceeds), Purchased Assets (as defined in the TEP Holdings APA), and any other assets or inventory and any proceeds from any sale of any such assets;<br><br>(k)　all New Home WIP (including any related ITCs) and all proceeds from any sales of the foregoing;<br><br>(l)　Excluded Dealer Claims; and<br><br>(m)　the sponsorship of, and all rights, interests and assets associated with, the Employee Benefit Plans of any Seller or its Affiliates, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers of its Affiliates with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries. |
| **Excluded Liabilities**<br><br>*See* § 1.4 | Purchasers shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers or any other Excluded Entity other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of Sellers; provided that, in the event of a conflict between the terms of clauses (a) through (m) of Section 1.4 and Section 1.3 of the WholeCo Stalking Horse Agreement, the terms of Section 1.3 shall control:<br><br>(a)　all Cure Costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and Acquired Assets;<br><br>(b)　all Liabilities of Sellers' arising under the WARN Act Employee Retirement Income Security Act of 1974 , and similar Laws relating to the termination of any current or former employee or contractor of any Seller, or any Affiliate of a Seller, (including any Transferred Employees), and including any current, threatened or potential claims for compensation or benefits, in each such case, to the extent related to employment or contracting with the Sellers (or any of their Affiliates) or termination thereof, whether arising prior to, on or after the Closing Date;<br><br>(c)　Liabilities at any time arising under, pursuant to or in connection with any Employee Benefit Plans (whether arising prior to, on or after the Closing Date) and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" (as such term is defined in 26 C.F.R. § 54.4980B-9);<br><br>(d)　all Liabilities arising under, pursuant to or in connection with Environmental Laws, including such Liabilities (x) that are dischargeable, or capable of being sold free and clear, pursuant to Section 363 of the Bankruptcy Code, (y) that are otherwise dischargeable pursuant to Section 1141 of the Bankruptcy Code, and (z) from which the Acquired Assets are otherwise released as of the Closing pursuant to an Order of the Bankruptcy Court, in each case other than the Assumed Environmental Liabilities;<br><br>(e)　in each case, unless any such amount is included in Section 1.3(c) of the WholeCo Stalking Horse Agreement, (i) all Taxes of Sellers and all Taxes of or relating to the Excluded Assets for any Tax period, (ii) all Taxes of or relating to |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | the Acquired Assets or Assumed Liabilities for a Pre-Closing Tax Period, and (iii) all Transfer Taxes;<br><br>(f)    all Liabilities relating to Transferred Employees that arise on or prior to the Closing Date;<br><br>(g)    all Liabilities in respect of customer warranties and production guarantees;<br><br>(h)    any Liability of the Sellers or of any of their predecessors associated with any and all indebtedness, including any guarantees of third party obligations and reimbursement obligations to guarantors of the Sellers' or any of their respective Affiliates' obligations, and including any guarantee obligations or imputed Liability through veil piercing incurred in connection with the Sellers' Affiliates;<br><br>(i)    all Liability of the Sellers or of any of their predecessors associated with payments for the purchase of goods for the period prior to Closing, including but not limited to customer deposits and prepaid amounts;<br><br>(j)    all Liabilities of the Sellers or of any of their predecessors to their respective equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise;<br><br>(k)    all Liabilities outstanding as of and arising after the Closing for any contract for delivery of or returns of products previously sold to customers, whether or not any customer has provided a deposit for the sale except for under any Assigned Contract or other Acquired Asset;<br><br>(l)    all Liabilities of the Sellers or of any of their predecessors arising out of any Contract, Permit, or claim that is not transferred to Purchasers hereunder;<br><br>(m)    all Liabilities of the Sellers or any of their Subsidiaries incurred in connection with or arising out of the sale of ITCs to any third party, including any indemnification obligations arising with respect to such sales, including as a result of the recapture of any such ITCs, in each case, other than Liabilities arising as a result of an action taken by or, to the extent reasonably expected to result in recapture of any ITCs, an inaction of Purchasers or the Acquired Entities after the Closing; and<br><br>(n)    all Liabilities arising with respect to any Business Employees who do not receive a Transfer Offer or who otherwise fail to become employed by Purchasers or their Affiliates immediately following the Closing Date (including due to refusing to accept a Transfer Offer). |
| **Representations and Warranties of the Sellers**<br>*See* **Art. III** | The WholeCo Stalking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of Seller regarding: (a) organization and qualification; (b) organization and qualification of the Acquired Entities; (c) authorization of agreement; (d) conflicts and consents; (e) equity interests of Acquired Entities; (f) financial statements; (g) title to properties; (h) contracts; (i) no litigation; (j) permits and compliance with law; (k) environmental matters; (l) intellectual property; (m) information systems and data privacy; (o) tax matters; (p) employee benefits plans; (q) employees; (r) insurance; (s) brokers; (t) intercompany transactions; (u) title to assets; (v) sufficiency of assets; (w) no material adverse effect; (x) renewable energy incentives; (y) no undisclosed liabilities; and (z) disclaimer of other representations and warranties. |
| **Representations and Warranties of the** | The WholeCo Stalking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of Purchaser regarding: (a) organization and qualification; (b) authorization of agreement; |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| **WholeCo Stalking Horse Bidder**<br><br>*See* **Art. IV** | (c) conflict and consents; (d) financing; (e) brokers; (f) no litigation; (g) investment representation and investigation; (h) certain arrangements; and (i) disclaimer of additional representations or warranties. |
| **Expense Reimbursement**<br><br>*See* § **8.2(b)** | In connection with the WholeCo Stalking Horse Agreement and in recognition of the WholeCo Stalking Horse Bidder's expenditure of time, energy, and resources, if this Agreement is terminated pursuant to Section 8.1(d), Section 8.1(f), Section 8.1(h), Section 8.1(i), Section 8.1(j), Section 8.1(k), Section 8.1(l) or Section 8.1(m) of the WholeCo Stalking Horse Agreement, then Sellers shall pay to the Purchasers the Expense Reimbursement; provided that the Expense Reimbursement shall be payable within two (2) Business Days of termination hereof to an account designated by Purchasers in writing to Sellers. Each of the Parties acknowledges and agrees that the agreements contained in Section 8.2(b) of the WholeCo Stalking Horse Agreement are an integral part of this Agreement and that the Expense Reimbursement is not a penalty, but rather represents liquidated damages in a reasonable amount that will reasonably compensate Purchasers in the circumstances in which such Expense Reimbursement is payable for the efforts and resources expended and opportunities foregone by Purchasers while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision. |

16.    By approving the WholeCo Stalking Horse Bid and the Expense Reimbursement set forth therein, the Court will enable the Debtors to set the bidding baseline or "floor" at the Auction (if necessary), which in turn will help maximize the value of the Assets for the benefit of creditors and other stakeholders and promote an efficient conclusion to the Debtors' sale process. Moreover, the WholeCo Stalking Horse Bid was negotiated by the Debtors and the WholeCo Stalking Horse Bidder in good faith and at arm's length.  The Debtors have demonstrated compelling and sound business justifications for approval of, and authorization to perform under the WholeCo Stalking Horse Agreement.  The WholeCo Stalking Horse Agreement represents the highest or otherwise best offer the Debtors have received to date as a result of their efforts to market the Assets for sale. The WholeCo Stalking Horse Bidder is providing a material benefit to the Debtors, their estates, and their creditors by increasing the likelihood that, given the circumstances, the best possible price for the Debtors Assets and Interests will be received.  As such, the WholeCo Stalking Horse Bidder's contributions to the process have indisputably

provided a substantial benefit to the Debtors, their estates, and their creditors in these chapter 11 cases.

17.     The Debtors believe that designating the WholeCo Stalking Horse Bidder to serve as the "stalking horse bidder" under the WholeCo Stalking Horse Agreement, and subjecting the WholeCo Stalking Horse Bid to higher or better offers in accordance with the Bidding Procedures, represents a sound exercise of the Debtors' business judgment and is in the best interests of their estates.  The WholeCo Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the WholeCo Stalking Horse Bidder and the Debtors.

18.     In connection with the WholeCo Stalking Horse Bid, the Debtors also seek approval of the Expense Reimbursement.  The Expense Reimbursement provided to the WholeCo Stalking Horse Bidder is a material inducement for the WholeCo Stalking Horse Bidder's willingness to commit to the Sale Transactions contemplated by the WholeCo Stalking Horse Agreement and to invest substantial time, effort, and resources necessary to negotiate and finalize a binding bid, and to pursue the consummation of the Sale Transactions.  The Debtors believe that the Expense Reimbursement is appropriate and justified under the circumstances.  Specifically, the Expense Reimbursement: (i) constitutes an allowed superpriority administrative expense claim under sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code, subject to and subordinated in all respects to the Carve Out and DIP Obligations (each as defined in the DIP Interim Order); (ii) is commensurate with the actual and material benefits provided to the Debtors' estates by the WholeCo Stalking Horse Bidder; and (iii) is fair and reasonable in light of the binding commitments made and the value that the WholeCo Stalking Horse Bid sets as a floor for further

bidding.    Accordingly,   approval   of   the   Expense   Reimbursement   is   warranted   under the circumstances.

19.    For these reasons, the designation of the WholeCo Stalking Horse Bidder and payment of the Expense Reimbursement is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

**IV.    Form and Manner of Sale and Auction Notice and Successful Bidder Notice.**

20.    The Auction, if any, shall take place on **July 23, 2025**, in person at Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, or such other time or other place as the Debtors determine, subject to the terms of the Bidding Procedures.

21.    As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will serve the Sale and Auction Notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order, on the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to the Ad Hoc Group of DIP Lenders; (d) White & Case LLP, counsel to the Ad Hoc Group of Warehouse Lenders; (e) Milbank LLP, counsel to the KKR Term Loan Lenders ("KKR"); (f) Davis Polk & Wardwell LLP, counsel to the Ad Hoc Group of ABS Lenders; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) the state attorneys general for states in which the Debtors conduct business; (k) each governmental agency that is an interested party with respect to the proposed Sale Transaction; (l) all parties that have expressed a written interest in the Assets; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.

22.     In addition, as soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will (i) publish the Sale and Auction Notice, with any modifications necessary for ease of publication, in the *New York Times* (national edition), the *Financial Times* (global edition), the *San Juan Daily Star*, and/or another national publication that the Debtors deem appropriate to provide notice to any potential interested parties and (ii) disclose in the Claims and Noticing Agent's affidavits of service to provide notice to any other potential interested parties.  The Debtors will also publish the Sale and Auction Notice through publication on the Debtors' case website:  https://restructuring.ra.kroll.com/Sunnova.

23.     The Sale and Auction Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Sale Transaction (including the sale of the Assets as set forth under the WholeCo Stalking Horse Agreement), including, without limitation, the date, time, and place of the Auction (if one is held), the Bidding Procedures and the dates and deadlines related thereto, and a description of the Sale Transaction as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the WholeCo Stalking Horse Agreement or applicable asset purchase agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale Transaction proceeds. Because of its adequacy, no other or further notice of the Auction or Sale Transaction will be required.  Accordingly, the Debtors request that the form and manner of the Sale and Auction Notice be approved and no other or further notice of the Sale Transaction or the Auction, if any, be required.

24.     Promptly after the conclusion of the Auction (if any), the Debtors shall file with the Court and serve on the parties that received notice of the Motion, the Successful Bidder Notice and the Assumption and Cure Notice, attached as Exhibit 4 and Exhibit 3 to the Bidding

Procedures Order, respectively.  The Debtors will also publish the Successful Bidder Notice and the Assumption and Cure Notice through publication on the case website:  https://restructuring.ra.kroll.com/Sunnova.

25.     The Successful Bidder Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Sale Transaction, including, without limitation:  (a) the Successful Bidder; (b) the Back-Up Bidder; and (c) the date, time, and place of the Sale Hearing.  Relatedly, the Assumption and Cure Notice is reasonably calculated to provide all non-Debtor counterparties to the Debtors' contracts with proper notice of the potential assumption and assignment of the contract, the proposed cure amounts relating thereto, and the related Assumption and Assignment Procedures, and thus no other or further notice need be given; *provided* that merely listing any contract on the Assumption and Cure Notice does not require or guarantee that such contract will be assumed and assigned, and all rights of the Debtors with respect to such contracts are reserved.  Accordingly, the Debtors request that the form and manner of the Successful Bidder Notice and the Assumption and Cure Notice be approved.

## V.     Summary of the Assumption and Assignment Procedures.

26.     The Debtors seek entry of the Assumption and Assignment Procedures set forth below to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Debtors' Contracts in connection with any Sale Transaction.  Pursuant to the Bidding Procedures Order, the proposed Assumption and Assignment Procedures are as follows:

(a)     **Assumption and Cure Notice.**  No later than the Sale Hearing, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, a notice of potential contracts to be assumed and assigned to any Successful Bidder (the "Assumption and Cure Notice"), attached to the Bidding Procedures as Exhibit 3, on the Contract Counterparties, and post the Assumption and Cure Notice to the Case Website:  https://restructuring.ra.kroll.com/Sunnova.

(b)    **<u>Content of Assumption and Cure Notice.</u>**   The Assumption and Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale Transaction, and contain the following information:  (i) a list of Contracts to be assumed and assigned (the "<u>Assigned Contracts</u>"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the Cure Costs; and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the Assumption and Cure Notice (such objection, a "<u>Cure Objection</u>," and such deadline, the "<u>Cure Objection Deadline</u>"); *provided* that service of an Assumption and Cure Notice does not constitute an admission that such Contract is an executory contract or unexpired lease or that such Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid. For the avoidance of doubt and notwithstanding the foregoing, nothing contained in the Bidding Procedures Order shall limit the Debtors' ability to modify the Assigned Contracts list and Cure Notice in accordance with the applicable sale documents.

(c)    **<u>Cure Objections.</u>**  Within seven calendar days following service of the Assumption and Cure Notice, parties that wish to file a Cure Objection must notify the Debtors, WholeCo Stalking Horse Bidder, or any other Successful Bidder in writing (email to counsel being sufficient) following service of the Assumption and Cure Notice stating that such party wishes to file a Cure Objection.  Thereafter, the applicable objecting party shall work in good faith with the Debtors and/or their counsel to resolve such Cure Objection for a minimum of seven days prior to filing a formal objection with the Court (such seven-day period, the "<u>Resolution Period</u>").  In the event that the relevant issue(s) remain unresolved following the expiration of the Resolution Period, the objecting party must file a Cure Objection with the Court no later than **4:00 p.m. (prevailing Central Time) on the date that is seven days following the expiration of the Resolution Period** (the "<u>Cure Objection Deadline</u>") and serve such Cure Objection on the Notice Parties.  The Debtors, in consultation with the WholeCo Stalking Horse Bidder or other Successful Bidder, as applicable, may extend the Cure Objection Deadline by filing a notice of such extension on the Court's docket.  Cure Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules,

the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; and (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof.

(d)     **Effect of Filing a Cure Objection.**  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

(e)     **Dispute Resolution.**  Any Cure Objection that remains unresolved after the Sale Hearing shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the WholeCo Stalking Horse Bidder's or other applicable Successful Bidder's discretion and subject to the terms of the WholeCo Stalking Horse Agreement or Modified APA, as applicable.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the WholeCo Stalking Horse Bidder or other applicable Successful Bidder and the terms of the WholeCo Stalking Horse Agreement or Modified APA, as applicable, pending a resolution of the Cure Objection after notice and a hearing. If a Cure Objection is not satisfactorily resolved, the WholeCo Stalking Horse Bidder or other applicable Successful Bidder may determine that such Contract should be rejected and not assigned.   Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs, the applicable Contract may be assumed by the Debtors and assigned to the WholeCo Stalking Horse Bidder or other applicable Successful Bidder; *provided* that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(f)      **Supplemental Assumption and Cure Notice.**   If the Debtors (i) discover Contracts inadvertently omitted from the Assumption and Cure Notice, (ii) identify other Contracts that they desire to assume and assign in connection with the Sale Transaction, or (iii) desire to remove any Contracts from the list attached to the Assumption and Cure Notice, the Debtors may, in consultation with the Successful Bidder and in accordance with the WholeCo Stalking Horse Agreement, at any time before the Court approves a chapter 11 plan of reorganization or liquidation (as the case may be), supplement the Assumption and Cure Notice with previously omitted Contracts or modify a previously filed Assumption and Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Assumption and Cure Notice").   The Debtors shall serve such Supplemental Assumption and Cure Notice on the Contract Counterparties to Contracts that were added or removed or to the Contract Counterparties to Contracts for which the Cure Costs were changed.

(g)      **Objection to the Supplemental Assumption and Cure Notice.**   Any Contract Counterparty listed on the Supplemental Assumption and Cure Notice may file an objection (a "Supplemental Cure Objection") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs included in the Supplemental Assumption and Cure Notice, if any.   Parties that wish to file a Supplemental Cure Objection must notify the Debtors in writing (email to counsel being sufficient) within seven calendar days following service of the Supplemental Assumption and Cure Notice stating that such party wishes to file a Supplemental Cure Objection.   Thereafter, the applicable objecting party shall work in good faith with the Debtors and/or their counsel to resolve such Supplemental Cure Objection for the duration of the Resolution Period prior to filing a formal objection with the Court.   In the event that the relevant issue(s) remain unresolved following the expiration of the Resolution Period, the objecting party must file a Supplemental Cure Objection with the Court no later than **4:00 p.m. (prevailing Central Time) on the date that is seven days following the expiration of the Resolution Period** (the "Supplemental Cure Objection Deadline") and serve such Supplemental Cure Objection on the Notice Parties.   The Debtors may extend the Supplemental Cure Objection Deadline by filing a notice of such extension on the Court's docket.   Supplemental Cure Objections

must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Supplemental Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof.

(h)     **Dispute Resolution of Supplemental Cure Objection.**  If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek a hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts.  If there is no such objection, then the Debtors shall obtain an order of the Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Assumption and Cure Notice.   Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to the Cure Costs, the applicable Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(i)     **No Cure Objections.**  If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Assumption Cure Notice (or Supplemental Assumption and Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment

of such Contract and rights thereunder, including the Cure
Costs, if any, and from asserting any other claims related to
such Contract against the Debtors or the Successful Bidder,
or the property of any of them.

## VI.     Qualified Bids From Qualified Bidders.

27.     The WholeCo Stalking Horse Bidder is a Qualified Bidder and the Bid reflected in
the WholeCo Stalking Horse Bid is a Qualified Bid.  Designating the WholeCo Stalking Horse
Bidder as a Qualified Bidder provides the Debtors with a firm and actionable bid that establishes
a meaningful floor for further bidding, which is critical to preserving and maximizing value.
Further, in the event the Debtors receive one or more competing Qualified Bids, the WholeCo
Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and, in connection
therewith, to credit bid all or a portion of its claims under the DIP Facility in accordance with
section 363(k) of the Bankruptcy Code and the terms of the DIP Financing Agreement.  This right
further incentivizes robust participation in the Auction, if one is held, while preserving the rights
of the DIP lender.

28.     The Debtors also propose, consistent with the Bidding Procedures, that if they
receive multiple Qualified Bids from different Qualified Bidders, they will conduct an Auction in
accordance with the Bidding Procedures.  Where the Debtors receive Qualified Bids for distinct
subsets of assets, the Debtors may, in their business judgment, first conduct sub-Auctions for each
applicable subset to ensure that the highest or otherwise best value is realized for each component
of the business.

29.     Conversely, if no Qualified Bids (or Bids that may be remedied into Qualified Bids
pursuant to the Bidding Procedures and are actually remedied into Qualified Bids prior to the
Auction) other than the WholeCo Stalking Horse Bid, as reflected in the WholeCo Stalking Horse
Agreement, are received by the Bid Deadline, the Debtors will not conduct an Auction for the

Assets.  In that case, the WholeCo Stalking Horse Bidder will be deemed the Successful Bidder, and the WholeCo Stalking Horse Bid will be deemed the Successful Bid.  The Debtors will promptly notify the Court in writing and file a notice of cancellation of the Auction.  This sale structure provides transparency, preserves estate resources, and ensures a timely path to Closing under a Bid that is already negotiated, value-maximizing, and binding.

**VII.    KKR's Consent to the Sale.**

30.    The Debtors' ability to execute a sale of their interests in AssetCo (or otherwise transfer or pledge such interests in connection with a broader sale transaction) requires the consent of KKR due to a change of control provision and other transfer restrictions embedded in the KKR Facility.  Moreover, to the extent any potential Bid contemplates the KKR Facility "riding through" post-closing, KKR's consent would be required to permit such treatment.  In either case, whether by virtue of a change of control or a proposed "ride-through" of the KKR Facility, no Sale Transaction involving AssetCo can be consummated absent KKR's consent, unless such transaction provides for the full payment and satisfaction of the KKR Facility in cash at closing.

31.    As detailed in the First Day Declarations and the DIP Motion, KKR has agreed to provide such consent.  Critically, however, KKR's consent is expressly conditioned on, among other things, the entry of the Final DIP Order and the approval of a release therein of KKR by the Debtors and the DIP Lenders (the "KKR Release").[6]  Accordingly, KKR's consent to the Sale Transactions contemplated in the WholeCo Stalking Horse Agreement will become effective only upon entry of the Final DIP Order and the approval of the KKR Release.

---

[6]    As set forth in the First Day Declarations, the Special Committee, with assistance from its advisors, has been conducting, and continues to conduct, an independent investigation into, among other things, potential estate causes of action.  The releases, including the KKR Release, set forth in the Final DIP Order remain subject to the Special Committee's ongoing investigation.

32.     For the avoidance of doubt, KKR's consent is a critical gating item for any Potential Bidder seeking to acquire the Debtors' interests in AssetCo.  Without it, bidders would either need to structure their bids to include a full payoff of the KKR Facility or risk a failed sale.  By securing KKR's consent in advance, the Debtors can offer an efficient, executable sale process that enhances certainty for any Potential Bidders and thereby maximizes the value of any Sale Transaction for the benefit of the Debtors' estates.

**Basis for Relief**

I.      **The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Consistent with the Debtors' Reasonable Business Judgment**.

33.     A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling the assets of a debtor's estate.  *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

34.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), 2017 WL 5484017, at *3 (Bankr. D. Del. Sept. 20, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors.");

*In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

35. Here, the Bidding Procedures will continue the Debtors' significant prepetition efforts and promote active bidding from interested parties to elicit the highest or otherwise best offers available for some or all of the Assets. The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by these estates from any eventual transactions. In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties—many of whom have been engaged with the Debtors for months—with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed Bid.

36. Moreover, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999). This is especially true here, where any Sale Transaction will have been subjected to an extensive marketing process and intensively scrutinized by the Debtors and their advisors. In addition, entry into the WholeCo Stalking Horse Agreement will further ensure that the Debtors obtain fair market

value by setting a minimum purchase price for the Debtors' Assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

37.     In addition, as described herein, the Debtors' investment banker, Moelis & Company LLC ("Moelis"), will continue to market the Debtors' Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting parties, continuing to provide acceptable bidders with Data Room access and requested information, and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the WholeCo Stalking Horse Agreement's Purchase Price will, conclusively, be fair value.

38.     The proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, consistent with courts in this District evaluating similar orders, the Court should enter the Bidding Procedures Order.  *See, e.g.*, *In re Digit. Media Sols., Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Oct. 16, 2024) (approving bidding procedures); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (same); *In re Ctr. for Autism and Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. June 16, 2023) (same); *In re Pipeline Health Sys., LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Oct. 12, 2022) (same).[7]

---

[7]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

## II.  The Form and Manner of the Sale and Auction Notice and Notice of Successful Bidder Should Be Approved.

39.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rules 2002(c) and 6004(a), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.  As required under Bankruptcy Rule 2002(c), the Debtors seek approval of the Sale and Auction Notice as proper notice of the Auction. Additionally, the Debtors seek approval of the notice of Successful Bidder as proper notice of the Sale Transaction and related objection deadline.  Notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale and Auction Notice and the notice of Successful Bidder as provided for herein, constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rules 2002 and 6004.  Accordingly, the Debtors request that the Court approve the form and manner of the Sale and Auction Notice and the notice of Successful Bidder.

## III.  The Expense Reimbursement Has a Sound Business Purpose and Should Be Approved.

40.     The Debtors also seek to approval of the WholeCo Stalking Horse Bid, including the Expense Reimbursement contemplated thereby.  The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, since the use of a stalking horse bid is in many circumstances the best way to maximize value in an auction process because it "establish[es] a framework for competitive bidding and [] facilitat[es] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum Holding, LLC*, No. 11-CV-219, 2011 WL 2671254 at *1 n.1 (E.D. Wis. July 7, 2011).  Stalking horse bidders virtually always require expense reimbursement and, in many cases, other forms of bidding protections such as breakup

fees as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (citation omitted).

41.     Accordingly, the use of bid protections, including expense reimbursements, has become an established practice in chapter 11 cases, and a normal, and in many cases necessary, component of significant sales conducted under section 363 of the Bankruptcy Code.  For example, courts have found that because a "corporation [has] a duty to encourage bidding, [bid protections] can be ***necessary*** to discharge [such] duties to maximize value. . . .  [Bid protections] may 'be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.'" *Integrated Res. Inc.*, 147 B.R. at 659-61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid") (emphasis added); *see also In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

42.     Courts routinely approve bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").  Courts in the Fifth Circuit apply the "business judgment rule" standard and consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price.  *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602-03 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible).

43.     The allowance of the Expense Reimbursement is in the best interests of the Debtors' estates and their creditors, as the WholeCo Stalking Horse Agreement establishes a floor for further bidding that may increase the consideration given in exchange for the Assets that are the subject of the WholeCo Stalking Horse Agreement, which will inure to the benefit of the Debtors' estates and all parties in interest.  The Expense Reimbursement provided to the WholeCo Stalking Horse Bidder is (a) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) commensurate to the real and material benefits conferred upon the Debtors' estates by the WholeCo Stalking Horse Bidder, and (c) fair, reasonable, and appropriate, including in light of the size and nature of the proposed transactions, the commitments that have been made, and the efforts that have been and will continue to be expended by the WholeCo Stalking Horse Bidder.

44.     The Expense Reimbursement was necessary to induce the WholeCo Stalking Horse Bidder to enter into the WholeCo Stalking Horse Agreement.  In the weeks leading up to the Petition Date, the Debtors and their advisors engaged in extensive good faith, arm's-length negotiations with a potential third-party stalking horse bidder.  After significant diligence and negotiation of deal terms, the third-party withdrew its offer shortly before the filing of these chapter 11 cases.  As a result, the Debtors pivoted to negotiating a stalking horse credit bid with the WholeCo Stalking Horse Bidder.  To adequately protect the WholeCo Stalking Horse Bidder from the time and expense related to finalizing the WholeCo Stalking Horse Agreement in an expedited timeframe, the WholeCo Stalking Horse Bidder requested a reasonable Expense Reimbursement.  In short, the proposed Expense Reimbursement is fair and reasonable under the circumstances because it constitutes a "fair and reasonable percentage of the proposed purchase

price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.

45.     The Expense Reimbursement is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, and all parties in interest.  Accordingly, the Court should approve the Expense Reimbursement, just as similar Expense Reimbursements have been approved by the Court.  *See, e.g.*, *In re Digit. Media Sols., Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Oct. 16, 2024) (authorizing stalking horse expense reimbursement up to $1 million); *In re Ctr. for Autism and Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. June 16, 2023) (authorizing stalking horse expense reimbursement up to $350,000); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (authorizing stalking horse expense reimbursement subject to a cap to be agreed upon by the debtors and the applicable stalking horse bidder); *In re Pipeline Health Sys., LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Oct. 12, 2022) (same); *In re BJ Servs., LLC*, No. 20-33627 (MI) (Bankr. S.D. Tex. July 29, 2020) (authorizing stalking horse expense reimbursement subject to a cap of three percent of the purchase price on account of all bid protections).[8]

## IV.     The Court Should Approve the Debtors' Entry into One or More Asset Purchase Agreements as a Sound Exercise of Business Judgment.

46.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy courts routinely authorize the sale of a debtor's assets if such sale is based upon "some articulated business justification for using, selling, or leasing the

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

property outside the ordinary course of business." *In re Cont'l Air Lines, Inc.*, 780 F.2d at 1226; *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

47.     The business judgment rule shields a debtor's management's decisions from judicial second-guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation). The business judgment rule protects certain debtor decisions—such as the Debtors' entry into one or more definitive purchase agreements—from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

### A.     A Sound Business Purpose Exists for the Sale Transaction.

48.     The Debtors have a sound business justification for selling the Assets. The Debtors believe the Sale Transaction will maximize the value of their Assets after exposing them to a competitive, arm's-length market test.

49.     The WholeCo Stalking Horse Bidder and WholeCo Stalking Horse Agreement will be subject to competing Bids, enhancing the Debtors' ability to receive the highest or otherwise

best value for the Assets. Consequently, in the Debtors' reasonable business judgment, the ultimate Successful Bid(s), being the product of an extensive prepetition marketing process and a further robust "market check" in the form of the sale process and Auction (if warranted), will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). Accordingly, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into the WholeCo Stalking Horse Agreement or the Modified APA, as applicable, will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court authorize the proposed Sale Transaction as a proper exercise of the Debtors' business judgment.

**B.     The Sale Transaction Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.**

50.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

51.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the

Assets free and clear of any and all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "Interests"), except with respect to any Interests that may be assumed Interests under the definitive purchase agreement of the applicable Successful Bidder.  *See In re Kellstrom Indus., Inc*., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

52.     Any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Successful Bidder(s) free and clear of all Interests including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the applicable Sale Transaction.

**C.     The Bidding Procedures Ensure that the Sale Transaction Will Be Proposed in Good Faith and Without Collusion, and the WholeCo Stalking Horse Bidder or Successful Bidder Are "Good Faith Purchasers."**

53.     The Debtors request that the Court find the WholeCo Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale Transaction for the Assets, and that the WholeCo Stalking Horse Bidder and/or any other Successful Bidder, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.[9]

---

[9]     A finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction.  Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Successful Bidder or Back-Up Bidder any entity whose good faith under section 363(m) of the Bankruptcy

Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

54.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

55.     The WholeCo Stalking Horse Bidder, or any other Successful Bidder arising from the Auction (if any), is or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the WholeCo Stalking Horse Agreement, or Modified APA, as

---

Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence at the Sale Hearing for the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

applicable, are or would be good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code. *First*, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the WholeCo Stalking Horse Agreement is substantial, fair, and reasonable. *Second*, the parties entered into the WholeCo Stalking Horse Agreement in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders," or similar conduct that would cause or permit the Sale Transaction or Stalking Horse Agreement to be avoided under section 363(n) of the Bankruptcy Code. *In re Abbotts Diaries*, 788 F.2d at 147/ Moreover, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. *Finally*, the WholeCo Stalking Horse Bid was evaluated and approved by the Debtors in consultation with their advisors, and any other Bids that the Debtors ultimately determine to be a Successful Bid will have been evaluated in a similar fashion. Accordingly, the Debtors believe that the WholeCo Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and WholeCo Stalking Horse Agreement (or Modified APA) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### D. Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.

56.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid

at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

57.     Accordingly, the WholeCo Stalking Horse Bidder should be entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code.

**V.      The Assumption and Assignment Procedures Are Appropriate and Should Be Approved**.

**A.      The Assumption and Assignment Procedures Reflect the Debtors' Reasonable Business Judgment**.

58.     To facilitate and effectuate the Sale Transaction, the Debtors seek the entry of the Assumption and Assignment Procedures, as well as authority to assign or transfer the Assigned Contracts to a Successful Bidder (including, for the avoidance of doubt, the WholeCo Stalking Horse Bidder) to the extent required by such bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court; *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such

judgment.  *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

59.     The Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Assumption and Cure Notice.  *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent).

60.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment.  ***First***, the Assigned Contracts are essential to the value of the Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Assets.  ***Second***, it is unlikely that any purchaser would want to acquire certain of the Assets unless the Assigned Contracts needed to conduct business and manage day-to-day operations of those Assets were included in the transaction.  ***Third***, the Assigned Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, the Debtors' decisions will be reviewed by the Debtors' stakeholders who will have the opportunity to object.

61.     Accordingly, the assumption and assignment of the Assigned Contracts pursuant to the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

     **B.**    **Defaults Under the Assumed Contracts Will Be Cured in Connection with any Sale Transaction and Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

62.     Upon finding that a debtor has exercised its business judgment in deciding to assume an executory contract, courts must then evaluate whether the assumption meets the

requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

63.     The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults.  The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

64.     Similarly, the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' was adopted from Uniform Commercial Code section 2-609" and is "to be given a practical, pragmatic construction" based upon the facts and circumstances of each case.  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the degree of assurance necessary falls considerably short of an absolute guaranty." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective

assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

65.     The Debtors will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied.  The Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Contracts), including as it relates to such Qualified Bidder's willingness and ability to perform under the Assigned Contracts.   Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed cure amounts.  The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Contracts as set forth in the definitive purchase agreement of the Successful Bidder.

## Emergency Consideration

66.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1.   This Motion requests relief from procedural rules and requirements that pertain to matters of immediate significance or which involve deadlines sooner than twenty-one days after the commencement of these chapter 11 cases.  The relief will save costs and avoid undue administrative burden and confusion only if granted immediately.  The Debtors therefore request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

67.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

## Modification of Bankruptcy Rule 2002(a)(2)

68.     The Debtors request that the Court, for cause, modify the services requirements set forth in Bankruptcy Rule 2002(a)(2) to limit service of this Motion only to the core service list and affected creditors.  In light of the breadth and complexity of the Debtors' business, serving the Motion on all creditors, even those that are unaffected by the relief sought herein, would cause unnecessary confusion and expense to the detriment of all stakeholders.  Accordingly, sufficient cause exists under Bankruptcy Rule 2002(a)(2) to modify the service requirements for this Motion.

## Reservation of Rights

69.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended as or should be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on,

security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) a concession that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (i) a waiver of the obligation of any party in interest to file a proof of claim; or (j) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### Notice

70.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to the Ad Hoc Group of DIP Lenders; (d)  Norton Rose Fulbright US LLP, counsel to GoodFinch Management, LLC; (e) Arnold & Porter Kaye Scholer LLP, counsel to the DIP Agent; (f) White & Case LLP, counsel to Atlas, as SLA Lender and TEPH Lender; (g) Milbank LLP, counsel to KKR; (h) Davis Polk & Wardwell LLP, counsel to the Ad Hoc Group of ABS Lenders; (i) Schulte Roth & Zabel LLP, counsel to the Special Committee of the Board of Directors of Sunnova TEP Holdings, LLC, and co-counsel to Sunnova TEP Holdings, LLC and its subsidiaries; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and

Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; (n) each governmental agency that is an interested party with respect to the proposed Sale Transaction; (o) all parties who have expressed a written interest in the Assets; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

The Debtors request that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
June 12, 2025

/s/  *Jason G. Cohen*

**BRACEWELL LLP**
Jason G. Cohen (TX Bar No. 24050435)
Jonathan L. Lozano (TX Bar No. 24121570)
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:      (713) 223-2300
Facsimile:       (800) 404-3970
Email:            jason.cohen@bracewell.com
                     jonathan.lozano@bracewell.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:            anup.sathy@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
Ciara Foster (admitted *pro hac vice*)
Margaret Reiney (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:            brian.schartz@kirkland.com
                     ciara.foster@kirkland.com
                     margaret.reiney@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Jason G. Cohen*

Jason G. Cohen

## **Certificate of Service**

I certify that on June 12, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason G. Cohen*

Jason G. Cohen