```
 1                   UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   SUNNOVA ENERGY INTERNATIONAL  )  CASE NO: 25-90160
     INC.,                         )
 4                                 )  Houston, Texas
                                   )
 5             Debtor.             )  Thursday, June 12, 2025
                                   )
 6                                 )  8:31 a.m. to 1:50 p.m.
     ------------------------------)
 7
                               HEARING
 8
                BEFORE THE HONORABLE ALFREDO R. PEREZ
 9                UNITED STATES BANKRUPTCY JUDGE

10

     APPEARANCES:
11
     For Debtor:              BRIAN SCHARTZ
12                            MARGARET REINEY
                              CIARA FOSTER
13                            Kirkland & Ellis LLP
                              601 Lexington Avenue
14                            New York, NY 10022

15                            JASON GARY COHEN
                              Bracewell LLP
16                            711 Louisiana Street, Suite 2300
                              Houston, TX 77002
17
     For U.S. Trustee:        ANDREW JIMENEZ
18                            U.S. Department of Justice
                              United States Trustee Program
19                            515 Rusk Street, Suite 3516
                              Houston, TX 77002
20
     For Ad Hoc Group of      ROBERT A. BRITTON
21   DIP Lenders:             Paul Weiss Rifkind Wharton &
                              Garrison
22                            1285 Avenue of the Americas
                              New York, NY 10019
23

24

25
```

```
 1    For Windmar P.V.        THEODORE S. HECKEL
      Energy, Inc.:           Pachulski Stang
 2                            700 Louisiana Street, Suite 4500
                              Houston, TX 77002
 3
                              HENRY C. KEVANE
 4                            Pachulski Stang
                              One Sansome Street, Suite 3430
 5                            San Francisco, CA 94104

 6                            IRA KHARASCH
                              Pachulski Stang
 7                            10100 Santa Monica Blvd., 13th Fl.
                              Los Angeles, CA 90067
 8
      For Power Solar, LLC:   JAMES P. MUENKER
 9                            DLA Piper LLP (US)
                              1900 North Pearl Street, Suite 2200
10                            Dallas, TX 75201

11    For JAJ Roofing d/b/a   XOCHITL S. STROHBEHN
      Citadel Roofing & Solar: DAVID JONES
12                            Venable LLP
                              151 W. 42nd Street, 49th Floor
13                            New York, NY 10036

14    For Lennar Homes, LLC:  ALEXANDER J. NICAS
                              Goodwin Procter LLP
15                            The New York Times Building
                              620 Eighth Avenue
16                            New York, NY 10018

17    Alter Domus (US) LLC,   SARAH GRYLL
      in its capacity as      Arnold & Porter Kay Scholer LLP
18    Administrative Agent:   70 West Madison Street, Suite 4200
                              Chicago, IL 60602
19
      Special Committee of    DANIEL J. SAVAL
20    Board of Directors of   Kobre & Kim LLP
      Sunnova Energy          800 Third Avenue
21    International Inc:       New York, NY 10022

22    Ad Hoc Group of         IRA HERMAN
      Sunnova Dealers:        Blank Rome LLP
23                            1271 Avenue of the Americas
                              New York, NY 10020
24

25
```

```
 1   Court Reporter:          AKEITA HOUSE

 2   Courtroom Deputy:        AKEITA HOUSE

 3   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
 4                            Mineola, NY 11501
                              Tel: 800-727-6396
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
         Proceedings recorded by electronic sound recording;
25       Transcript produced by transcription service.
```

1          HOUSTON, TEXAS; THURSDAY, JUNE 12, 2025; 8:31 A.M.

2                          (Call to Order)

3          THE COURT:  All right, we'll just get started in

4    one minute, I just want to make sure that they can hear us

5    on the recording.  All right, good morning.  It is Thursday,

6    June 12th, 2025.  We're here in Case Number 25-90160,

7    Sunnova Energy International.  And there are a couple of

8    motions that are set for this morning, so Mr. Cohen, why

9    don't you start us off?

10         MR. COHEN:  Yes, thank you, Your Honor.  Jason

11   Cohen with Bracewell here for the Debtors, I have my co-

12   counsel here as well, Mr. Brian Schartz and Ms. Ciara Foster

13   from Kirkland and Ellis.

14         THE COURT:  All right, why don't we get

15   appearances from everyone?

16         MR. JIMENEZ:  Good morning, Your Honor, Andrew

17   Jimenez for the United States Trustee.

18         THE COURT:  Good morning.

19         MR. NICAS:  Good morning, Your Honor --

20         MR. BRITTON:  Good morning --

21         MR. NICAS:  Sorry, I had to go over

22   (indiscernible).

23         MR. BRITTON:  Good morning, Your Honor, Bob

24   Britton, Paul Weiss, on behalf of the DIP lenders and

25   stalking horse (indiscernible).

```
1              THE COURT:  Good morning.

2              MR. NICAS:  Good morning, Your Honor, Alexander

3    Nicas, Goodwin Procter, LLP on behalf of Lennar Homes.

4              THE COURT:  Good morning.

5              MR. HECKEL:  Good morning, Your Honor, Theodore

6    Heckel, Pachulski Stang Ziehl and Jones on behalf of Windmar

7    Energy P.V. -- or Windmar P.V. Energy, excuse me, Your

8    Honor.  Thank you.

9              THE COURT:  Good morning.

10             MS. STROHBEHN:  Good morning, Your Honor, Xochitl

11   Strohbehn, Venable LLP on behalf of Citadel Roofing and

12   Solar.

13             THE COURT:  Good morning.

14             MS. GRYLL:  Good morning, Your Honor, Sarah Gryll

15   from Arnold and Porter Kaye Scholer on behalf of Alter

16   Domus, the post-DIP agent.

17             MR. MUENKER:  Good morning, Your Honor, James

18   Muenker of DLA Piper on behalf of Power Solar, LLC.

19             THE COURT:  Good morning.  Hey, have you hit five-

20   star, Mr. Jones?  Go ahead.

21             MR. JONES:  Good morning, Your Honor, David Jones

22   on behalf of Citadel Roofing as well.  Thank you.

23             THE COURT:  All right, Mr. Saval, have you -- I

24   don't see you on the -- can you hit five star?  Hold on.

25   Okay.  I just unmuted someone.
```

```
 1              MR. SAVAL:  -- Kobre and Kim on behalf of -- can
 2   you hear me, Your Honor?
 3              THE COURT:  Yes, I can, go ahead and why don't you
 4   start over again.
 5              MR. SAVAL:  Yeah.  Good morning, Daniel Saval of
 6   Kobre and Kim on behalf of the Special Committee of the
 7   Board of Sunnova Energy International.
 8              THE COURT:  All right, good morning.
 9              MR. HERMAN:  Good morning, Your Honor, Ira Herman,
10   Blank Rome from the Ad Hoc Dealers Committee.
11              THE COURT:  Good morning.
12              MR. HERMAN:  Good morning, Your Honor.
13              THE COURT:  All right.  Anyone else wish to make
14   an appearance?
15              THE COURT:  All right.  Mr. Schartz, I see you've
16   been busy overnight.
17              MR. SCHARTZ:  Yeah, yeah.  I changed -- my suit's
18   changed colors too, so that's always a good sign.  For the
19   record, Brian Schartz from Kirkland Ellis proposed counsel
20   to the Debtors.  We're in a different room today.  There's
21   another Kirkland case that has a first day hearing and they
22   told me that -- I tried twice, and I don't get the room
23   anymore.  So, we're in a different room.  If you have any
24   issues, you can't hear me, please let me know because we're
25   in a little bit of a different set up today.
```

1            Thank you again for making the time for us this

2       morning, Groundhog Day, we were just in front of you 13

3       hours ago.  Judge, we really appreciate you accommodating us

4       today and frankly throughout the week, bearing with us as we

5       take things in what I've called bite-sized pieces.

6            I'm pleased to report that with the momentum from

7       your ruling yesterday, we immediately left the hearing to

8       finalize our negotiations with the -- on the DIP and the

9       stalking horse bid and we were successful.  Mr. Britton, who

10      represents the now proposed DIP lenders and stalking horse

11      bidders was right when he said yesterday there was no

12      guarantee the deal would get done.

13           The Debtors were fully prepared to do no deal

14      before we did a bad deal.  Sometimes, candidly, that's the

15      hardest part of this job.  But we were able to get there,

16      and it was not without a fair bit of bruises on both sides.

17      But from the Debtor's perspective, we think we've reached a

18      really fantastic conclusion to those negotiations and I'm

19      going to talk a little bit about that in a bit.

20           We did file motions for the DIP motion and the

21      stalking horse bid motion and what I hope will be a breath

22      of relief where we set the bidding procedures motion for

23      June 30th.  So, it's captioned as an emergency motion

24      frankly because we don't quite comply with the rules.  We're

25      going to do better on that.  But it's not up for today, we

1    would like to have that heard for today.

2         Look, Judge, ideally -- and we did file

3    supplemental declarations.  So, Mr. Bassam Latif from

4    Moelis, who you haven't heard from yet, is the Debtor's

5    proposed banker.  You'll see him, he hasn't had a role to

6    play yet, but he does stay, hopefully.  And then we also

7    have Mr. Paul Mathews, the company's CEO, and Mr. Ryan

8    Omohundro who you've become familiar with.

9         Now, look.  Ideally, all of this would have

10   happened on or before the filing of the additional three

11   entities on June 8th.  But we just didn't have that luxury

12   as I said when we first spoke on Monday.  And our single,

13   overarching goal this week has been to take the matter from

14   what I called on Monday, odd footing, the news loved that

15   quote and they quote it all over the place so I'm going to

16   come back to it.  I said it was odd footing, and our goal

17   was to get it to firm footing which all the news outlets

18   then just ignored.

19        We believe that today, with the filing of the DIP

20   motion, the stalking horse bid, the approval of the Atlas

21   sale settlement motion last night, and the proceeds from the

22   Lennar settlement motion, when you put that all together we

23   will have access to at least $45 million of liquidity.  And

24   that, Your Honor, when you put it all together, that will

25   help to put us on the firm footing.  Actually, strike help,

1    it will put us on firm footing.  It's going to put this case

2    on what I think is the right and best path that it could be

3    on given the circumstances.

4            I want to talk a little bit about timing and

5    process.  Although this week has been a bit hectic if not

6    bumpy, we want to align on the all-in liquidity number so

7    that the company can project as much stability as possible

8    while pursuing this sale process.  Now, you said that

9    yesterday in your ruling, I thought this was the perfect

10   insight into this situation, the company is $9 billion in

11   debt almost.  And you know, $15 million isn't enough.  $30

12   million isn't enough.  $45 million is just enough.  And we

13   don't want to live, you know, from the proverbial paycheck-

14   to-paycheck.

15           So, what we've put together with those three

16   reliefs, packages of relief, one of which has already been

17   granted, is a path to get to the all-important second day

18   hearing.  And do it in a way so that the world knows that

19   Sunnova is not desperate.  We know what happens to companies

20   in Chapter 11 when they're perceived as desperate and

21   they're trying to run a sale process.  We're not desperate.

22   We have a path forward, we have a plan to get to a second

23   day hearing and frankly, be administratively solvent so we

24   can hopefully confirm a plan.

25           So, I did say on Monday, Judge, that we're going

1   to be -- we were going to need your help.  For once, I was

2   right.  And I'm going to ask you to indulge us just once

3   more today in what has been a very long week as we would

4   very much like to have the Lennar sale motion heard today,

5   as we were originally planned.  As well as the interim

6   relief we're seeking on the DIP motion we filed very early

7   this morning.

8          Without wading too much into the substance of the

9   DIP motion, because I don't want to go too far into it, but

10  I want to emphasize that the relief we're seeking on the DIP

11  is very straightforward, dare I say plain vanilla.  I've

12  been kind of joking that I'm going to use that DIP order for

13  training with our associates to talk about what's missing

14  from it.

15         It's a $15 million interim draw, very small

16  amount.  There is no priming of secure debt.  There is no

17  adequate protection.  And because the lenders providing it

18  aren't even secure creditors, there aren't stipulations of

19  the type that you're probably used to seeing as a judge and

20  when you were a practitioner.  It's a very straightforward,

21  simple DIP if I do say so.

22         If we can land that relief, again, we'll have $30

23  million approximately between the Lennar DIP and the -- the

24  Lennar sale and the DIP which would get us at least $55

25  million of liquidity.  Why do I say at least?  Well, as part

1    of our negotiations with the DIP lender, there's a bucket of

2    unencumbered assets.  Frankly, the same bucket that the

3    Lennar assets come out of, what we call the new home list,

4    that were not being covered.

5           So, we've got some flexibility in this case

6    because not everything is going to be taken up as DIP

7    collateral, nor is it going to be sold pursuant for a

8    stalking horse APA.  That's the flexibility.  So, when I say

9    at least, it's that flexibility we need to just give this

10   case a little bit of room to breathe and to be able to have

11   the flexibility that we're going to need to be successful.

12          Again, not to wade too much into it, in Mr.

13   Omohundro's new declaration at Docket Number 112, which I

14   hope you had a chance to read.  We tried to come to it from

15   the perspective of if I was Judge Perez, what would I want

16   to say?  And we didn't want you to have to take this

17   declaration from yesterday and hold it up to the one we

18   filed today.  We just tried to do the bridge, and we can

19   answer any questions you have on that.

20          But the point is that when you look at that

21   declaration and you look at the now-expanded budget that you

22   would have expected to see on day one -- because we only

23   showed three weeks when we started, now we're showing the

24   full 13-weeker.  What you see there is that we have enough

25   money to get to the end of June and get to that very, very

1    important second-day hearing.  That being said, unless we

2    sell some more assets or do something else, we're still

3    going to be pretty tight.  Right now, Mr. Omohundro's

4    projecting that the company will have less than a million

5    dollars in cash and then we'll have our final hearing, we'll

6    do our final draw on the DIP, and we're off to the races in

7    this case.

8            So, Your Honor, while it may be tempting frankly

9    for you or others on the line to say hey, the Debtor's fine,

10   they just got a win yesterday, let's pick this up tomorrow

11   or even next week, I'm going to ask respectfully that you

12   hear us out today on the relief we're seeking.  Both on

13   Lennar, and on the interim DIP.

14           Because we think it's critically important that we

15   give clarity to the market, the solar market is experiencing

16   an extreme level of disruption.  We want to give the clarity

17   that Sunnova is not only here, but it's able to do the

18   things it needs to do to pursue a value-maximizing

19   transaction.

20           Now, I'm going to do one more thing which is

21   probably dangerous.  I'm going to stick my neck out here a

22   bit, always dangerous to do before a federal judge.  If we

23   can do that, we can get the relief entered today and you're

24   satisfied with the evidence that we're going to present, my

25   promise to you is that on the Debtor's side -- and I can't

1    control what others are going to do on the case -- but on

2    the Debtor's side, we want to do our level best to make sure

3    that we will move past the frankly uncomfortable stage that

4    we've been living in this week in terms of everything being

5    emergency, we're negotiating everything real time.

6           We want to get to a steady and predictable case

7    cadence that will allow us to focus on the many, many, many

8    other things that have to be done.  Including most

9    importantly, focusing on the sale process, working to find

10   consensus with the UCC when it's appointed, and hopefully

11   filing in the near term a plan that will help us you know,

12   deal with the case once the sale is closed.

13          That is -- that's why again, we're not seeking the

14   bidding procedures relief until June 30th.  It's why we

15   filed the DOE motion yesterday on regular notice.  We want

16   to get out of this everything's an emergency.  It's not

17   going to be an emergency.  This case I said didn't have an

18   RSK when we started and I said this is not that case and I

19   said but yet, we think we are within spitting distance of

20   getting it to a very good, rational place that everyone will

21   understand and make sense of.

22          And so, at the risk of again, negotiating from the

23   podium, and anticipating what some others may say, we would

24   ask that we proceed today by moving to the Lennar motion and

25   then have the opportunity to present our case on the interim

1    relief on the DIP motion.  Now, I want to say one last thing

2    and I will be quiet.

3         To the extent anyone has an issue with the DIP

4    motion, they dispute my claim that it's plain vanilla, I

5    would like to have the opportunity, Judge, just to spend

6    some time with them.  So, if people want to raise issues on

7    the record that's fine.  I don't know what your schedule is,

8    Judge, but I -- and I think with just a small amount of time

9    spent in adjournment after we hear those issues, I do think

10   that we can resolve them.  We've tried to anticipate things

11   that we may hear.

12        So, for example, we're probably going to hear

13   about the DOE money as it relates to the Puerto Rico solar

14   plant.  We put language in the DIP order that's designed to

15   address that issue, right?  If there's something we've

16   missed, we want to talk about it.  We're not here to

17   railroad people.  We're here to do the right thing for the

18   company and we find ourselves in a circumstance that

19   unfortunately just leaves us in a position that we have to

20   move with all speed to get this done.

21        So, that's my opening statement, Your Honor.  Ms.

22   Foster who you saw yesterday is going to handle Lennar and

23   if we go forward on the interim DIP motion and I hope we do,

24   my associate, Ms. Reiney will handle the DIP.  Is there any

25   questions that you have for me, Your Honor?

1          THE COURT:  No, no, I did read Mr. Latif's

2    declaration as well as Mr. Omohundro's declaration.  And I

3    did review the proposed form of DIP order.  I can't say I

4    read the credit agreement, but I did read the DIP order, and

5    the order trumps the credit agreement.

6          MR. SCHARTZ:  Correct.

7          THE COURT:  So, why don't we get started -- why

8    don't we -- if anyone has opening statements let's do that

9    and then let's just go right into the evidence on the Lennar

10   thing.  And I do have a 10:00 docket.  It's my Galveston day

11   today.  So, to the extent that you know, we can try to get

12   this done significantly in advance of 10:00, that would be

13   great.

14         MR. SCHARTZ:  We'll do our best.

15         THE COURT:  All right.  All right, anyone else

16   wish to be heard by means of opening statement?

17         MR. MUENKER:  Good morning, Your Honor, James

18   Muenker of DLA Piper on behalf of Power Solar, LLC.  Your

19   Honor, Power Solar has no objection to the sale motion and

20   moving forward with considering the evidence on the sale

21   motion.  Before we move and I'm happy to reserve my comments

22   until after that hearing or the portion of the hearing as it

23   relates to that motion is taken up.

24         Before we move and commence a hearing on the

25   interim DIP hearing, I  -- we do have serious concerns about

1    moving forward with that today given the lack of any

2    meaningful notice to parties.  And what occurred yesterday,

3    which you know, I think we all heard the same thing last

4    night when we were before Your Honor, the purpose of

5    approving that sale on an expedited basis and getting $15

6    million in the door was we thought to bridge to a more

7    normal cadence.  And by bridge, I don't think anyone was

8    expecting that to mean about 12 hours.

9         So, we have some serious concerns about moving

10   forward with that and would like to make some additional

11   statements, but I don't want to get in the way of what I

12   think is going to be probably an uncontested sale hearing.

13   Unless the Court wants to hear more from me at this time.

14        THE COURT:  No, let's go ahead and do the sale

15   hearing first.

16        MR. HECKEL:  Your Honor, Theodore Heckel on behalf

17   of Windmar.  We echo Mr. Muenker's comments and you know,

18   we'll reserve our points about the DIP for the appropriate

19   time.  Thank you.

20        THE COURT:  Thank you.  Okay, Ms. Foster, go

21   ahead.

22        MS. FOSTER:  Thank you, Your Honor.  Good morning,

23   Ciara Foster, Kirkland and Ellis proposed counsel for the

24   Debtors.  As Mr. Schartz previewed, it's only been a few

25   hours since we were last before you and thank you again for

1    continuing to accommodate us.

2         First up is the Lennar sale motion filed at Docket

3    Number 55 which is supported by the declarations of Mr.

4    Omohundro in support of the relief filed at Dockets Number

5    27 and 93.  Both were already entered into evidence.

6    Further, we filed a revised form of order just before the

7    hearing which I believe is at Docket Number 117.

8         THE COURT:  Okay.  I have not seen that.

9         MS. FOSTER:  And I'll have someone in the room

10   flag me if I got the Docket Number wrong, but I believe it's

11   117.  So, Your Honor, prior to the petition date, the

12   Debtors installed Sunnova's systems on newly built homes in

13   Lennar's residential developments.

14        This relationship between the Debtors and Lennar

15   was governed by a master service agreement and under those

16   agreements, the Debtors retained title to the installed

17   systems.  And once the sale of a Lennar home closed, title

18   to the system transferred to the homeowner and the Debtors

19   retained the related customer contracts, which provide for a

20   production guarantee and a warranty.

21        In the days leading up to the petition date, the

22   Debtors and Lennar explored the possibility of selling the

23   systems associated with the contracts in bulk to Lennar as a

24   means of raising much-needed liquidity.  However, the

25   systems are you know, of limited value without the related

1    contracts as those include important servicing obligations

2    as well as the guarantee as previously mentioned.

3            On June 9th, the first day hearing, the Debtors

4    and Lennar entered into a purchase agreement subject to this

5    Court's approval.  Under that purchase agreement the Debtors

6    will receive approximately retail price if these systems had

7    otherwise been sold on an individual basis to homeowners.

8    Further, Lennar will cover the cost of any cures related to

9    the assumed contracts that provides for a performance

10   guarantee.  Although at this point, we do not believe any

11   cures are at issue given the sales of the individual homes

12   have yet to close.

13           Further, any administrative or financial burden

14   with respect to hooking up the systems and then servicing

15   the systems will be covered by Lennar.  Homeowners in turn

16   will be benefited by this release because they can close on

17   their homes without the delay that would otherwise have

18   occurred if the Debtors had -- as the Debtors have

19   substantially shrunk their workforce and no longer have the

20   bandwidth to timely transfer title or the funds to service

21   and guarantee these systems once in service.

22           Unlike the release after the Atlas sale motion, no

23   party has filed an objection to the relief sought today.

24   Although, I will cede the podium after I'm done making my

25   remarks as I believe the US Trustee will have the same issue

1    with today's relief as yesterday on account of notice.  In

2    part though, I believe the lack of objections is because

3    there were only really two parties affected by this

4    transaction.  Lennar and the to-be homeowners, both of whom

5    are benefited.

6            If the transaction is not approved today,

7    homeowners will be trapped in limbo as sales start to close

8    next week.  And as mentioned, the Debtors do not have

9    sufficient staffing to efficiently turn over title and

10   address immediate servicing needs.

11           With respect to the legal standard of immediate

12   and irreparable harm, the Debtors are certainly

13   incrementally better -- in a better place than they were

14   yesterday when we were before Your Honor.  However, as Your

15   Honor noted, the Debtors have an incredibly complicated

16   capital structure and a key component of this Chapter 11

17   case as well as the deal with the DIP lenders, is that

18   there's no harm done to the ABS.  In order to ensure that

19   the ABS stays in place, we need to continue servicing the

20   systems associated with the securitizations.

21           To do so, we need to both have a performance

22   guarantee approved by Your Honor which was handled in the

23   cash management motion, as well as have sufficient liquidity

24   with enough one-way to demonstrate that we have the ability

25   to service.  The company has been operating on incredibly

1    thin margins and the relief requested is part of its three-

2    legged stool that we need in place to ensure we can

3    demonstrate to the ABS note holders that it makes sense to

4    hold tight while we continue to prosecute these cases.

5            Your Honor, unless you have any questions, I just

6    wanted to flag the added language to the revised order which

7    is just to make clear that the systems at issue are only

8    with respect to Lennar's residential development.  Unless

9    Your Honor has any questions, I'm happy to cede the podium

10   to the United States Trustee or anyone else who would like

11   to be heard.

12           THE COURT:  All right, thank you.  All right, Mr.

13   Jimenez.

14           MR. JIMENEZ:  Good morning, Your Honor, Andrew

15   Jimenez for the United States Trustee.  Your Honor, I think

16   we have this same concern with this sale motion that we

17   expressed to the Court yesterday.  And I have a

18   responsibility to be consistent with the decisions that I

19   take before the Court.

20           This is again an extraordinary relief that is

21   essentially being requested on a first-day basis, Your

22   Honor.  We're talking about this petition of assets on the

23   first day.  This is prohibited by Bankruptcy Rule 6003.  The

24   situation of the Debtors today is different from yesterday

25   because the Debtors yesterday got their other sale motion

1     approved, and the Debtors also got a deal with the DIP

2     lenders and have a DIP motion before the Court.

3               So, this sale should be done on regular notice,

4     Your Honor, as is required under Rule 6003.  And that is the

5     basis of my objection.  Thank you, Your Honor.

6               THE COURT:  All right.  Thank you.  All right,

7     does anyone else wish to be heard?  All right.  Is there any

8     additional evidence other than the declaration of Mr.

9     Omohundro that we -- was admitted yesterday?

10               MR. SCHARTZ:  You should, actually, we should put

11     Number 112 into evidence, that's the budget.

12               MS. FOSTER:  And Your Honor, may I please move

13     additionally Mr. Omohundro's DIP declaration at Docket

14     Number 112 into evidence as that actually contains the DIP

15     budget?  I was going to hold off until we got to the DIP but

16     apologies for doing this in a disjointed fashion.  Just as

17     that contains the budget that I'll speak to in a second.

18               THE COURT:  All right, does anyone object to the

19     admission of Mr. Omohundro's declaration at Docket 112?  All

20     right.  Hearing no objections that will be admitted as his

21     direct testimony.

22          (Debtor's Exhibit Number 112 entered into evidence)

23               Does anyone wish to cross-examine Mr. Omohundro

24     with respect to the declaration at Exhibit Number 112?

25               MR. MUENKER:  Your Honor, James Muenker, DLA Piper

1   on behalf of Power Solar.  I have one question for Mr.

2   Allejandro in connection with this motion.  I would have

3   questions for Mr. Allejandro in connection with his

4   declaration if we're going to move forward with the DIP

5   motion, but I'd like to reserve those for the DIP motion.

6           THE COURT:  All right.  We'll do that.  All right.

7   Anyone else wish to be heard?  All right.  I've reviewed the

8   motion as well as the declarations of Mr. Omohundro.  I'm

9   very sensitive to the concerns raised by the US Trustee that

10  we're doing both of the two sale motions on such an

11  expedited basis.

12          And to meet the requirements of Bankruptcy Rule

13  6003, the Debtor has to show immediate and irreparable harm.

14  And I think based on Mr. Omohundro's declarations, even with

15  -- to the extent that the DIP is considered today and

16  approved, even with that, I think that when you're looking

17  at it's such a complex business with a complex capital

18  structure that is to some extent a service business, which -

19  - once the business goes away, you can't bring it back.

20  That I think that the Debtor has met its burden of showing

21  the irreparable harm that it would need to show in order to

22  make a -- in order for me to make a finding under 6003 that

23  this can be done on a first-day basis or on a less than 21-

24  day basis.

25          I don't think anyone has raised any question about

1    the merits of the transaction in terms of the Debtor's

2    business judgment.  I mean, these are solar systems that

3    could only go to Lennar.  The Debtor doesn't have the money

4    to finish them out.  The only way for them to monetize these

5    at this time without, you know, without significant

6    additional liquidity is to do the sale.

7             I don't think there were any concerns about the

8    exercise of the Debtor's business judgment.  I think that

9    the only concern was the timing and I think that based on

10   the facts and circumstances of the case, that they do meet -

11   - that the Debtor has met its burden under 6003.  So, I will

12   go ahead and approve the order.  So, give me a minute here.

13             MS. FOSTER:  Thank you, Your Honor.

14             THE COURT:  All right.  That order has been signed

15   and sent to docketing.

16             MS. FOSTER:  Thank you, Your Honor.  Unless you

17   have any questions or any further questions for me, I'll

18   cede the podium to my colleague, Ms. Reiney.

19             THE COURT:  Okay, thank you.

20             MS. FOSTER:  Thank you.

21             MS. REINEY:  Good morning, Your Honor, for the

22   record, Margaret Reiney from Kirkland and Ellis, proposed

23   counsel to the Debtors.

24             THE COURT:  Good morning.

25             MS. REINEY:  We indeed filed a lot of paper

1   overnight.  And we are extremely grateful of your Court's

2   time this morning.  So, I'd like to address the Debtor's DIP

3   financing with the motion filed at Docket Number 110, and

4   the declaration of Mr. Bassam Latif filed at Docket Number

5   111, and the declaration of Mr. Ryan Omohundro at Docket

6   Number 112.

7           Ms. Foster handled the admittance of Mr.

8   Omohundro's declaration, but I would like to note that Mr.

9   Latif is in the virtual courtroom available to testify and I

10  would like to move his declaration into evidence at this

11  time.

12          THE COURT:  All right.  Does anyone object to the

13  declaration of Bassam Latif found at Docket 111 as his

14  direct testimony in connection with this hearing subject to

15  cross-examination at the appropriate time?  All right.  We

16  will -- I'll admit the declaration of Mr. Latif as his

17  direct testimony found at Docket 111 and then we'll reserve

18  on cross-examination.  All right, thank you, go ahead, Ms.

19  Reiney.

20          (Debtor's Exhibit Number 111 entered into evidence)

21          MS. REINEY:  Thank you, Your Honor.  As the

22  Debtors have previewed at the many hearings this week, the

23  Debtors have been engaged in negotiations for a DIP facility

24  with the Ad Hoc Group of Unsecured Bond Holders represented

25  by Paul Weiss and Evercore.  Because this DIP is provided by

1    unsecured bond holders and due to the unique structure in

2    this case in which the only four Debtor entities actually

3    are not subject to a secured lender debt, the DIP facility

4    before Your Honor as Mr. Schartz noted, is very

5    straightforward.

6            There are no stipulations, there's no adequate

7    protection, there's no challenge period, and marshaling and

8    surcharge waivers are likely not even applicable here.

9    While this was a heavily negotiated DIP facility, we are

10   pleased to come to the Court today with a DIP that resolves

11   many of the complexities that Your Honor has likely seen in

12   other cases.

13           The DIP does have one nuance that I'd like to flag

14   for Your Honor.  Given the company's unique capital

15   structure, the KKR term loan facility essentially requires

16   that KKR bless any sale structure.  For much of this past

17   week, has been spent negotiating the terms for KKR's consent

18   to a sale structure and we believe that we have come to a

19   construct that works whereby the special committee comprised

20   of Mr. Tony Horton and Jeff Stein and advised by Kobre Kim

21   will conduct an investigation and continue their

22   investigation, including into the KKR facility, and present

23   their findings in the coming weeks.

24           The DIP letter provides a release of KKR but only

25   subject to entry of the final order.  We believe that the

1    Special Committee's process and the integrity of their

2    investigation is paramount.  And I understand that Kobre Kim

3    and Mr. Saval are on the line as well and can address any

4    questions that Your Honor may have.

5          Your Honor, to the terms of the DIP itself.  The

6    DIP will provide $90 million of liquidity for the Debtors,

7    with the first tranche only providing $15 million in this

8    interim period.  This limited interim funding emphasizes the

9    importance of not only the DIP but reinforces the order that

10   Your Honor entered last night and just now with the Lennar

11   sale as liquidity is truly extremely tight.

12         Notably in the DIP, the new home list subject to

13   sales such as the Lennar sale just heard, will not be

14   subject to DIP collateral.  So, they -- or the Debtors will

15   seek to sell any other new home list in the ordinary course

16   to increase liquidity as well.  Notably, Your Honor, we are

17   not seeking relief for that today, I just wanted to flag the

18   nuances in the collateral package.

19         The DIP facility does come with certain fees.

20   There's a 12 percent funding fee which is picked and paid on

21   the amounts as they're drawn.  A 12 percent interest rate,

22   which is also picked.  And then an exit fee, however the

23   exit fee is only payable to the extent that the DIP lenders

24   do not successfully credit their DIP loans.

25         Not only is this DIP facility crucial to the

1    company's liquidity, but it is also the means by which the

2    Debtors have secured a stalking horse bidder.  The unsecured

3    bond holders are seeking to credit bid their DIP loans in

4    service of stalking horse bidders and the sale substantially

5    all of the Debtor's assets.  As Mr. Schartz noted, we filed

6    the bidding procedures last night that include a form of

7    sale order and the stalking horse APA.  And we would seek

8    for those to be heard on June 30th.

9           The sale milestones in this case are extremely

10   tight with only 45 days to an auction.  So, going into an

11   auction without a stalking horse bidder puts the Debtors at

12   a huge disadvantage.  And we believe that this structure in

13   which the DIP lenders would serve as a stalking horse would

14   substantially increase the likelihood of a value-maximizing

15   transaction.  And while this DIP is extremely important from

16   a liquidity perspective and I don't mean to understate that

17   at all, it is equally important to be approved as the

18   mechanism by which the company can secure a stalking horse

19   bidder and facilitate a sale transaction.

20          All right, Your Honor I wanted to address some

21   points that have been made on the outset.  One is obviously

22   the issue with the notice.  As Your Honor can recognize,

23   we're moving very quickly.  We have flagged on the record

24   the last few days that we have been negotiating a DIP

25   facility.  This is not unique relief, really.  You know,

1    it's often that first-day hearings, you know, consider DIP

2    relief, usually on more egregious DIP facilities as well.

3    That's always done on very short notice, and I would draw

4    the Court's attention to the fact that there is no roll-up

5    here.

6            There are no interim releases.  There are no

7    stipulations to challenge.  This really is frankly a pretty

8    boring DIP.  So, I would note that many of the concerns that

9    the Court likely sees in other cases are simply not here.

10   And I don't know that notice really would have made a

11   difference for a very straightforward DIP facility.

12           We also have Mr. Omohundro on the line and have

13   submitted a budget attached to his declaration at Docket

14   Number 112.  Simply put, $15 million on an interim basis is

15   not enough.  You know, $45 million even, including the Atlas

16   sale and the Lennar sale, really is not enough either.

17           As Your Honor noted, I believe yesterday, this is

18   a $9 billion capital structure and you know, we're getting

19   incremental little bits of liquidity as we go, but this is a

20   really small, small facility in the scheme of things.  And

21   it's candidly pretty interesting that we are getting

22   objections to increased liquidity coming into the estate

23   given the real threat of a Chapter 7 if this release is not

24   granted.

25           Your Honor, happy to walk through the order or any

1    questions that you may have.  But we would respectfully

2    request entry of the order.

3           THE COURT:  All right.  I did have a chance to

4    review the order before the hearing.  So, my only question

5    is, and as I walk through the various provisions I didn't --

6    other than the you know, repayment of the loan the fees

7    associated with the borrowing of the money, I didn't see

8    anything that would bind a creditor's committee with respect

9    to any other item.

10          There were no -- I didn't -- you know, waivers or

11   to the extent that -- there is no challenge period, so to

12   the extent that they want to challenge.  So, in my mind, is

13   there anything that -- in the order that would bind a

14   creditor's committee other than the repayment of the debt

15   and the fees associated with it?  I couldn't find anything.

16          MS. REINEY:  No, I think you're on-point, Your

17   Honor.  And as soon as a creditor's committee is appointed,

18   we will engage with them earnestly to work through any

19   issues that they may have ahead of an entry of a final

20   order.  But given the unique nature of these cases without

21   secured debt, this is -- it's pretty unique relief in that -

22   - well, it's unique in that there's not much to see here I

23   guess is a better way to put it.  But we remain willing and

24   able to negotiate with the creditors committee once they get

25   appointed.

1          THE COURT:  All right, thank you.  All right, Mr.

2    Jimenez, let me hear from you first.

3          MR. JIMENEZ:  Thank you, Your Honor.  Your Honor,

4    let me start addressing your question from a moment ago.  I

5    believe that Section 7 includes a provision that states that

6    certain professional fees will be excluded or that proceeds

7    from the DIP facility could not be used to pay professional

8    fees in certain scenarios.

9          And one of those scenarios include challenging or

10   objecting to the legality, validity, priority, perfection,

11   extent amount, or enforceability of the DIP obligations,

12   Your Honor.  I think that's something that will affect any

13   committee appointed in these cases to make any meaningful

14   review or investigation of this DIP facility.

15         I want to also point to the Court, Your Honor,

16   that it is my belief and I expressed this to the Debtors

17   several days ago that the order that is proposed does not

18   comply with the procedures for complex cases in the Southern

19   District of Texas.  The procedures are very clear, Your

20   Honor, that if a cash collateral or financing order contains

21   a release of claims against lenders or other third parties,

22   there should be a challenge period for the committee of at

23   least 60 days.

24         That is missing in this order.  I think it is

25   necessary, and it's also required under the procedures for

1    complex cases.  So, that is my concern with the proposed

2    order that has been submitted to the Court.

3            THE COURT:  All right.  I think the first issue

4    can be addressed by having a budget for that, so I think,

5    Ms. Reiney, I'll let you talk to Mr. Britton about that.

6    With respect to the second item, my understanding is that

7    the relief being sought here is a relief in order to obtain

8    -- not from the lender, but from a third party whose release

9    of the collateral is needed in order to give the collateral

10   for the note -- for the lending.  So, I'm not quite sure

11   that we're talking about that the complex rules are

12   contemplating the same relief point.  But let me let Mr.

13   Britton address those points.

14           MR. BRITTON:  Your Honor, Bob Britton, Paul Weiss

15   on behalf of the DIP lenders.  On the first point, Your

16   Honor, I want to make sure that we're talking apples to

17   apples.  Because I think that you and Mr. Jimenez are

18   actually saying the same thing.  Which is, after the interim

19   DIP financing is approved today, the DIP liens and claims

20   will be valid and effective.  And the DIP amount that's

21   actually funded into these cases today upon rule by Your

22   Honor, will be repayable by these estates in all cases.

23           What Mr. Jimenez is saying is that no amount of

24   these DIP funds will be used to investigate that DIP funding

25   or challenge that DIP funding and that is the case, Your

1    Honor.  Just like another debt, once you improve the interim

2    financing, the DIP fees and claims will be valid and

3    personal.  It doesn't relate to any pre-petition liens, Your

4    Honor.  On the second --

5            THE COURT:  All right, Mr. Jimenez -- go --

6            MR. BRITTON:  Go ahead.

7            THE COURT:  Let me just say, Mr. Jimenez, does

8    that answer your question?

9            MR. JIMENEZ:  No, Your Honor, because at Section

10   7, specifically talks about challenging the DIP obligations.

11   So, my concern is that that's effectively forecloses the

12   ability for the committee to review what is being done today

13   and review the releases that are being granted today.  I

14   know they changed the language that it's to be upon entry of

15   a final order, but that is the point.  So, that the

16   committee would have the opportunity to participate and

17   review what is being done today.

18           And to address the concern about the -- that the

19   Court expressed regarding the complex -- the procedure for

20   complex cases.  And I'm reading from the rule right now,

21   from the procedure.  Cash collateral and financing orders

22   that contain a relief of claims against lenders or other

23   third parties by the Debtors should provide that an official

24   committee of unsecured creditors has at least 60 days from

25   the date of the committee formation to investigate claims

1    against the lenders at which the extent of the validity of

2    any liens.  That is my concern, Your Honor.  And I think

3    that's what the rules require.

4          MR. BRITTON:  And again, Bob Britton, Paul Weiss

5    on behalf of the DIP lenders, Your Honor.  Again, the DIP

6    lenders are not secured creditors.  There are no pre-

7    petition liens involved in this case to investigate or

8    challenge.  They do hold certain pre-petition unsecured

9    bonds, but the limitation on investigation that Mr. Jimenez

10   is referring to really only relates to the DIP financing

11   itself and that won't be subject to challenge.  The releases

12   that are being granted pursuant to the interim order are

13   part and parcel of the business deal and our prerequisite to

14   the DIP lender's interim funding in order to bridge to a

15   final hearing.

16         THE COURT:  All right, thank you.  All right,

17   anyone else wish to be heard?

18         MR. MUENKER:  Yes, Your Honor, James Muenker, DLA

19   Piper, on behalf of Power Solar.  Your Honor, we're

20   obviously very sensitive, like I think all the parties in

21   this case are, and I'm sure the Court is to making sure that

22   the Debtors have sufficient liquidity to manage this case

23   and move this case forward hopefully to a successful

24   conclusion.  We're not trying to get in the way of that.

25         We don't have a per se objection to the Debtors

1    obtaining DIP financing.  What we do have an objection to is

2    the setting of an interim hearing to consider that DIP

3    financing on no notice when there have been no showings that

4    there would be irreparable harm to the Debtors if this were

5    done on a day's notice or on two-days' notice.

6         You know, there's been some comments made I think

7    at the outset of the hearing by Debtors' counsel that they

8    proactively took efforts to address issues that they

9    anticipated that parties like Power Solar may have with

10   respect to the proposed DIP financing.  Candidly, given you

11   know, the lack of any meaningful notice, we have not had a

12   chance to read in full the pleadings that were filed in the

13   middle of the night.

14        The order and the attachments itself are 161 pages

15   long.  But we did do a search for references to the DOE

16   program and the only paragraph that we see in the order that

17   addresses that is Paragraph 29.  What that paragraph says is

18   nothing in this interim order, any of the DIP loan

19   documents, or any other documents related thereto, shall

20   impact the Debtors' rights or obligations with respect to

21   funds received on account of Department of Energy programs.

22        That's not enough.  That doesn't say anything

23   about rights of the dealers in those funds.  It doesn't say

24   anything about whether there are liens or claims that could

25   be asserted by the DIP lenders to those funds.  We

1   categorically oppose the granting of any liens or claims by

2   the Debtors whether the Debtors have an interest in those

3   funds or not to the DIP lenders on no notice.

4          And Your Honor, as we've done earlier in this case

5   and I think we could do with a meaningful opportunity with

6   the Debtors on this motion, we would be happy to have

7   conversations with the Debtors' counsel and the DIP lenders'

8   counsel about the relief that they're seeking here this

9   morning.  Hopefully, we can come to an agreement.

10          But if we can't come to an agreement about

11   language in the order that would address our client's

12   concerns and I'm sure our concerns are shared by you know,

13   other parties that are appearing this morning and will have

14   an opportunity to speak, if they cannot be addressed then we

15   should be provided a meaningful opportunity to have a real

16   hearing on this issue.  And that should not happen now.  It

17   should happen tomorrow or the next available date that the

18   Court has.

19          But it's -- you know, the Court has just now

20   approved the second hearing -- a second sale motion, there

21   is $30 million of additional liquidity that's coming into

22   these estates in the next few days, and there has been no

23   showing from the Debtors of irreparable harm that is

24   required to warrant the consideration of this type of relief

25   on no notice to creditors and other parties-in-interest.

1    Thank you, Your Honor.

2          THE COURT:  All right, Mr. Kevane.  Oh, wait a

3    second, I don't think you're unmuted.  Hold on.  Did you hit

4    five star?  All right, you should be good.

5          MR. KEVANE:  There we go, thank you, Your Honor.

6    Henry Kevane with Pachulski Stang Ziehl and Jones on behalf

7    of Windmar P.V. Energy and Windmar Home Florida.  We are a

8    dealer in those two jurisdictions, Your Honor.

9          I want to echo the comments about notice even

10   though Ms. Reiney has said this is a standard and typical

11   notice and on a boring DIP motion.  That is patently not the

12   case.  These papers were filed at midnight last night.  And

13   I haven't had a chance at all on the west coast to look them

14   over.  So, I do think that there ought to be a greater

15   opportunity for parties-in-interest to look at the pleadings

16   carefully, to look at the DIP loan papers, and to look at

17   the order, with a little more time than has been afforded so

18   far.

19         I too, my client also, was very concerned about

20   the funds that are received and to be received under the DOE

21   program.  And if I might, Your Honor, just take a minute to

22   describe what that program entails.  This was an award given

23   by the Department of Energy to a Sunnova Debtor to

24   facilitate the construction of solar energy systems for low-

25   income households in Puerto Rico.

1            Parties like my client Linmar and Power Solar are

2    the dealers who actually install these solar systems under

3    leases.  We submit our invoices to the Debtors who then

4    aggregate them and upload them to the Department of Energy

5    which then reviews them and submits funding downstream to

6    Sunnova to be remitted to the dealers.  As of the petition

7    date, Your Honor, my client had completed solar system

8    projects in Puerto Rico worth $32.2 million.

9            And we have not been paid for those yet.  And we

10   are waiting the submittal of those invoices to the

11   Department of Energy so they can be funded pursuant to an

12   award that has already been granted to the Debtors for

13   relief to the dealers.  Now, it's not like this is being

14   done for the sole benefit of the dealers.  The Debtors get a

15   tangible benefit from these contracts as well because they

16   have the leases.

17           Those leases entitle them to a stream of payments

18   over 25 years.  Those leases entitle them to investment tax

19   credits.  And those leases also have a little bit of

20   administrative profit embedded in them to compensate them

21   for participation in the program.  We're very concerned,

22   Your Honor, that the DOE funding, that the submittal of

23   these invoices for projects completed continue

24   uninterrupted.

25           And yet, despite the concern that was raised over

1    the past two hearings, the sentence that the Debtors put

2    into these papers that nothing here shall, "impact the DOE

3    program" is to us, rather artfully coy.  We want it to be

4    crystal clear.  No DIP liens, no claims shall attach to our

5    completed invoices, to the rights under the DOE program, to

6    the funding that was granted to the Debtor pursuant to the

7    DOE award, or to any further flow of funds pursuant to that

8    program.

9         That -- it just boggles my mind, Your Honor, to be

10   honest.  That after all the concern that's been expressed

11   about the DOE that it was addressed in kind of a throw-away

12   line of no impact.  Because that doesn't nearly meet our

13   very serious concerns about how these funds have been

14   handled today.  So, we would ask for a little more time for

15   us to look through the papers very carefully and make sure

16   that none of our rights are being affected by these DIP

17   loans.  Thank you, Your Honor.

18        MS. FOSTER:  Your Honor, may I respond?

19        THE COURT:  Let's hear -- see if anyone else

20   wishes to speak and then I'll let you respond, of course.

21        MR. BRITTON:  Your Honor, again, Bob Britton, Paul

22   Weiss on behalf of the DIP lenders and stalking horse

23   bidder.  Just briefly in support of the motion, Your Honor.

24   Your Honor, the interim DIP financing provides the runway

25   for the Debtors to conduct their value-maximizing marketing

1    process, and it sets up the (indiscernible) stalking horse

2    bid and it creates a baseline outcome of these cases that

3    preserves value, and preserves the value of the Debtors

4    estate and enterprise as a going concern.

5         But there should be no mistake among any of the

6    parties on the phone today, it is critical from our

7    perspective that this DIP financing be approved today in

8    order for that (indiscernible) stalking horse bid to also be

9    locked in by the Debtors and be there for them at the end of

10   this marketing process.  It is through the DIP credit

11   agreement, not only that the Debtors will get the liquidity

12   runway to get to the final hearing and get to that auction,

13   to complete that three-legged stool that Ms. Foster referred

14   to, but it is also to the DIP credit agreement that there

15   will be certain agreements as between the DIP lenders and

16   stalking horse bidder and the Debtors about how they're

17   going to conduct these cases.

18        What they can and cannot do with their assets

19   going forward.  What their limitations on borrowing

20   additional money.  Standard covenants, Your Honor, but the

21   covenants that are going to protect the asset perimeter that

22   is within the (indiscernible) stalking horse bid.  So,

23   approval of this DIP credit agreement today is a necessary

24   predicate to the Debtors locking in that (indiscernible)

25   bid.

1           Importantly, Your Honor, as Ms. Reiney explained

2    to you, if that stalking horse bid is successful, all

3    principal, interest, and funding fees will be credited and

4    forgiven as one component of the total purchase price of

5    this enterprise.  If -- if not bid, Your Honor, then the DIP

6    financing will serve the critical function of enabling the

7    Debtors' efforts to create value, do the marketing process,

8    and in that instance, it will be repaid in cash.

9           There's been some statements by the objectors,

10   Your Honor, that there's been no testimony regarding

11   irreparable harm in the event this financing is not provided

12   or not approved today.  But I don't think that's true, Your

13   Honor, I think that testimony exists in Mr. Omohundro's

14   declaration that's been admitted into evidence today.

15          Without all the funds that the Debtors have pulled

16   together since the petition date, including this $15 million

17   in interim DIP financing, their estate will experience

18   irreparable harm before the sale process can reach its

19   conclusion and before the Debtors can realize either of the

20   value-maximizing outcomes of a successful stalking horse bid

21   or an outbid by a third party.

22          Your Honor, it should come as no surprise to

23   anybody on the phone that we're here before you today

24   seeking interim DIP financing on an emergency basis.  Mr.

25   Schartz and I have been projecting to all parties of

1    interest including Your Honor since the first day, that

2    we've been locked in hand-to-hand combat over the terms of

3    (indiscernible) per se -- potential DIP financing and that

4    we intended and hoped that we'd be able to speak before you

5    today to seek approval of that financing.  And we are and

6    we're thankful to be.

7         But Your Honor, this financing that we're seeking

8    today on an interim basis, and interim does mean interim,

9    Your Honor, to your point earlier.  It's no different in Ms.

10   Reiney's point, than any other emergency first day DIP

11   financing motion that is approved in order to bridge the

12   Debtor through the interim period to the final hearing.

13        With that, I'll pause, Your Honor and thank you.

14        THE COURT:  All right, thank you.  Mr. Saval.

15        MR. SAVAL:  All right, thank you, Your Honor.

16   I'll just be brief.  As counsel to the Special Committee, we

17   thought it was appropriate to briefly address what's been

18   referred to as the KKR release that would be part of the KKR

19   consent.  And to be clear, that release would only go into

20   effect if that release is given upon final DIP approval.

21        I know that Your Honor already got a helpful

22   overview of the Special Committee process from Ms. Rainey

23   and Mr. Schartz on the first day, but we thought the Court

24   and the parties should hear directly from us given the

25   significance of this issue.

1          Specifically, I just wanted to make clear for the

2    record that as a matter of corporate governance, that

3    release is a matter that can only be given on the Debtors'

4    behalf by our client, or through our client, the Special

5    Committee.  And in that regard as you heard from Ms. Reiney,

6    the Special Committee has been and is conducting an

7    independent investigation on the Debtors' behalf into

8    potential claims and causes of action on behalf of the

9    Debtors' estates.  And that investigation does encompass the

10   facts and circumstances regarding KKR's $185 million loan to

11   certain Debtor affiliates.

12          So, to be clear, whether the Special Committee

13   gives and authorizes that release as part of the consent is

14   naturally going to be tied to what comes out of the

15   investigation that's underway.  And while it's very clear as

16   you've heard, these cases need to move quickly, which in

17   turn means our investigation needs to progress

18   expeditiously.

19          I just need to emphasize that the Special

20   Committee, consistent with its fiduciary obligations, needs

21   to run its process.  And by that, I mean that the Special

22   Committee has not pre-judged this matter, has no intention

23   of cutting corners, and will follow the facts.  Thank you,

24   Your Honor.

25          THE COURT:  All right, thank you.  All right, Ms.

1   Reiney.

2         MS. REINEY:  Thank you, Your Honor.  To briefly

3   respond to a few points.  As Mr. Omohundro's declaration

4   makes clear, the Debtors have very little liquidity and

5   really need these funds.  These funds will support the 45-

6   day sale process and as Mr. Britton knows, facilitate the

7   stalking horse bid.

8         Your Honor, nothing requires that all of the first

9   day releases file together.  We've been negotiating this DIP

10   order and the DIP facility generally for greater than a few

11   months now.  If we had had this available to bring before

12   Your Honor on Monday, we absolutely would have done that.

13   We are negotiating in real time, and it can't be understated

14   that we need this release to continue operations and

15   facilitate a sale process.

16         To Mr. Kevane's point, at the hearing on Monday,

17   we included language in the orders noting that we would seek

18   further order of the Court prior to our remitting any funds

19   relating to the Department of Energy.  We filed that motion

20   last night and that motion notes that these funds are in a

21   segregated account.  That motion is up on regular notice so

22   that everyone has time to review that.  And we would be

23   before Your Honor with respect to that motion in 20 days

24   from now.

25         We have included language in Paragraph 29 of the

1   order noting that rights are not impacted by the DIP

2   facility and I believe we've made statements on the record

3   in the last few hearings and also in the motion noting that

4   we will honor the obligations under that Puerto Rico

5   program.  So, Your Honor, we would respectfully request

6   entry of the order.  We believe that there will be

7   irreparable harm if this relief is not granted.

8            THE COURT:  All right.  Mr. -- Ms. Strohbehn.

9            MS. STROHBEHN:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MS. STROHBEHN:  Xochitl Strohbehn on behalf of

12   Citadel Roofing and Solar.  I just want to echo the comments

13   made by Mr. Muenker and Mr. Kevane -- I'm sorry, Mr. Kevane

14   and also join in the reservation of rights that's been filed

15   by the Ad Hoc Group.  I think it would be very beneficial to

16   have more of an opportunity to read the papers more closely.

17           I had an opportunity to read them briefly but not

18   in a way that would be meaningful and I'm not entirely clear

19   why another day or two, assuming Your Honor's schedule would

20   allow it, would cause irreparable harm when the Debtor has

21   just obtained $45 million of financing.  So, that's it for

22   me, I just wanted to keep that brief and put our reservation

23   of rights on the record.

24           THE COURT:  All right.  So --

25           MR. MUENKER:  If I could -- just one final

1    comment?

2          THE COURT:  Yes.

3          MR. MUENKER:  Again, for the record, James

4    Muenker, DLA Piper on behalf of Power Solar.  I do again

5    want to reiterate.  We're not trying to get in the way of

6    financing for the Debtors.  Again, what we're looking for is

7    an opportunity to have a conversation.  And if we can't

8    resolve issues consensually under the order, then an

9    opportunity to come back to Your Honor for a proper hearing

10   on this in very short order.

11         And I just want to refer the Court to the

12   declaration that the Debtors submitted which shows the

13   budget that the declaration -- in the declaration that the

14   Debtors are relying on.  It shows any unencumbered book cash

15   of this week of $25 million that assumes a $15 million DIP

16   draw.  But without the DIP draw, their own budget shows that

17   they're going to have at least $10 million of unencumbered

18   book cash at the end of this week.  That book cash actually

19   increases next week.  In fact, they're projecting through

20   their own budget that they're going to have ending

21   unencumbered book cash of $15 million by the end of June

22   27th.

23         So, respectfully, there's just no evidence here

24   that supports the relief on a couple of hours' notice that

25   they're seeking.  And I think the least the Court should do

1     is adjourn the hearing, require the parties or invite the

2     parties to engage in some good faith discussions, and see if

3     this can be resolved consensually.  And if not, reschedule

4     the hearing to a date when any issues can be properly

5     addressed.  Thank you, Your Honor.

6          MS. REINEY:  Your Honor, may I address Mr. Muenker

7     --

8          THE COURT:  Yes.

9          MS. REINEY:  -- shortly?

10         THE COURT:  Sure.

11         MS. REINEY:  Thanks, Your Honor.  Your Honor, I

12    just wanted to note that each of these hearings -- it is

13    costing a lot of professional fee burn.  There's a lot of

14    time and energy that goes into prepping for these, into all

15    these lawyers being on the line right now.  You know, we

16    would rather that funds are reserved for actual operations

17    and distributions to creditors rather than putting a further

18    burn on the administration of these cases on an issue that

19    we think can be resolved today.  Thank you.

20         THE COURT:  All right.  And there's always a

21    balance between a burn and due process.  So, what I'm going

22    to do is I'm going to adjourn the hearing until 1:00 Central

23    Time and then hopefully by that time -- and my biggest

24    concern is making sure that Paragraph 29 is -- appropriately

25    reserves the rights with respect to Puerto Rico.

```
 1              I think that as it relates to the issue with
 2    respect to the release, I tend to agree with Mr. Britton
 3    that that's not the situation, you don't need to investigate
 4    a release given to somebody who gives you new money for the
 5    new money.  I don't think that's what was intended by that
 6    complex rule.  So, I think my bigger concern is making sure
 7    that there's no -- that if there is impact on the money
 8    coming from Puerto Rico that people understand that and if
 9    there isn't any impact that we have a very clear statement
10    in the order that that's the case.  So, why don't we adjourn
11    until 1:00 and hopefully that'll be a five-minute hearing at
12    that time.
13              MS. REINEY:  All right, thank you so much, Your
14    Honor.
15              THE COURT:  All right, so we're in recess until
16    1:00.  Thank you.
17              MR. SCHARTZ:  Thank you, Your Honor.
18              MS. FOSTER:  Thank you, Your Honor.
19              (Recess)
20              THE COURT:  All right.  It's one o'clock.  We're
21    back on case number 25-90160.  My understanding is is that
22    the parties are requesting an additional 15 minutes.  Is
23    that correct?  Ms. Reiney?
24              MS. REINEY:  Can you hear me, Your Honor?
25              THE COURT:  Yes, I can.
```

```
1              MS. REINEY:  Okay.  Yes.  It's (Indiscernible)
2     just with 15 just to ensure that the language is acceptable
3     to all parties.  (Indiscernible).
4              THE COURT:  All right.  So, we'll be in recess
5     until 1:15.  All right?
6              MS. REINEY:  Thank you so much.
7              THE COURT:  Thank you.
8              AUTOMATED VOICE:  Conference muted.
9              (Recess)
10             AUTOMATED VOICE:  Conference unmuted.
11             THE COURT:  All right.  We're back on the record
12    in case number 25-90169, Sunnova Energy International, Inc.
13             MS. REINEY:  Hi, Your Honor.  We are using this
14    time as wisely as we can.  We are hoping to get to a
15    consensual resolution.  I was curious if Your Honor might
16    indulge us with another 10 minutes to make sure
17    (Indiscernible) out before we come back to Your Honor.
18             THE COURT:  Okay.  All right.  We'll return at
19    1:30 central time.
20             MS. REINEY:  Thank you.
21             MAN 1:  Another recess, bro.  (Indiscernible) get
22    your shit together.
23             AUTOMATED VOICE:  Conference muted.
24             (Recess)
25             AUTOMATED VOICE:  Conference unmuted.
```

1          AUTOMATED VOICE:  Conference muted.

2          MS. REINEY:  Your Honor, can you hear me?  Okay.

3    I am unable to hear you.

4          MR. BRITTON:  Yes, Your Honor.  We're unable to

5    hear you as well.

6          THE COURT:  Okay.  How about that?

7          MS. REINEY:  That's great.

8          MR. BRITTON:  Very good.

9          MS. REINEY:  Thanks.

10          THE COURT:  All right.

11          MS. REINEY:  Thank you so much, Your Honor, for

12    indulging the multitude of breaks.  And, for the record,

13    it's Margaret Reiney from Kirkland & Ellis on behalf of the

14    Debtors here.

15          I wanted to see if I might be able to share my

16    screen, and I can pull up a redline of the language that we

17    have agreed to.  If you see the name Margaret Reiney -- I

18    know this is a little --

19          THE COURT:  Oh, okay.

20          MR. BRITTON:  Your Honor, while she does that --

21    it's Bob Britton, Paul Weiss, on behalf of the potential DIP

22    lenders.  Would it be helpful to just get a high-level

23    overview of what I believe we've agreed with the dealers and

24    the Debtors and then Ms. Reiney can take you through the

25    language?

1                THE COURT:  Sure.  Go ahead.

2                MR. BRITTON:  Sure.  So, as I understand it, the

3      language that we've agreed effectively does three things,

4      Your Honor, and thank you very much for your indulgence

5      while we worked through it with the dealers and the Debtors.

6                First, Your Honor, it provides that all of the

7      cash within the Debtors' estates or their affiliates'

8      estates related to the Puerto Rico resiliency fund, we

9      understand, based on representations made to us by the

10     Debtors' (Indiscernible) is approximately $8 million today

11     and then will include additional cash on a go-forward basis

12     in the ordinary course as the Debtors continue to administer

13     these funds.  Those cash would be free of any DIP liens, any

14     DIP claims.  They would be earmarked for use to pay down

15     dealer claims.

16               Second, we, the DIP lenders, have agreed that we

17     will not object to the Debtors' DOE motion that's on file.

18     And third and finally, we've agreed, the Debtors -- dealers

19     -- have asserted that they may have certain valid properly

20     prefect pre-petition liens.  We and the Debtors aren't aware

21     of any such liens, but we've agreed that all rights to

22     assert at the final hearing that any such valid and properly

23     perfected liens exist, and if so, that they cannot be primed

24     by the DIP liens and/or our entitled adequate protection.

25               In effect, that's the agreement and I'm happy for

1    Ms. Reiney to lead you through the language if that's

2    helpful.  Thank you, Your Honor.

3             THE COURT:  All right.  Thank you.

4             MS. REINEY:  Are you able to see the screen, Your

5    Honor?

6             THE COURT:  I am.

7             MS. REINEY:  Okay.  Great.  So, I think Mr.

8    Britton did a great job of providing an overview.  If you

9    want to scroll down a little bit -- yeah.  I'll give Your

10   Honor a second to kind of read through this.  I think most

11   of this is clarifying language for the existing rights under

12   -- or pursuant to the Puerto Rico Brazilian resilience fund.

13            THE COURT:  All right.  You can scroll down.

14   Okay.  You can scroll down further.  Okay.  All right.  Go

15   ahead.

16            MS. REINEY:  And we have Mr. Kevane and Mr.

17   Muenker on the line as well.  They have also indicated that

18   their clients are signed off on this language.

19            THE COURT:  All right.  Go ahead.

20            MR. MUENKER:  James Muenker, DLA Piper, on behalf

21   of Power Solar, LLC.  I appreciate Your Honor's sensitivity

22   to the concerns that were expressed earlier this morning and

23   providing the parties with an opportunity to have a dialogue

24   and resolve those issues consensually.

25            I can confirm that we have signed off on the

1    revised language in the order, and I thank Mr. Britton and

2    the lawyers at Kirkland for working with us over the break

3    to do that.  And I also agree with Mr. Britton's, you know,

4    general characterization of the agreement that's embodied

5    therein.

6              THE COURT:  All right.  Go ahead.

7              MR. KEVANE:  Yes, Your Honor.  Henry Kevane for

8    Windmar Energy and Windmar Home Florida.  That is correct.

9    Thanks again for giving us the chance to work out this

10   language.  I think this effectuates our goal which is to

11   make sure that the (Indiscernible)  program and the Debtors'

12   rights under that and the dealers' rights under it are not

13   impaired by the DIP liens and the DIP super priority claims

14   and that the dealers can continue to expect reimbursement

15   under that federal grant as expected by the terms of it.

16             We do again thank Your Honor for giving us the

17   time to work this out.

18             THE COURT:  All right.  Does anyone else wish to

19   be heard?

20             MS. REINEY:  Your Honor, would I be able to read

21   another representation into the record as well?

22             THE COURT:  Sure.

23             MS. REINEY:  Thank you, Your Honor.  During the

24   break, I was also able to speak with Ms. Strohbehn who filed

25   an objection at docket number 136.  Ms. Strohbehn and I have

1    agreed that we will include language regarding the Debtors'

2    obligation to cure executory contracts in a future sale

3    order.  While it was styled as a DIP objection, it is more

4    appropriately going to be -- her language will more

5    appropriately be placed in the future sale order that is not

6    up for Your Honor today.  But I did want to note on the

7    record that we have come to an agreement as to her

8    objection.  I believe she's on the line too if I missed

9    anything.

10          MR. BRITTON:  Your Honor, Bob Britton, Paul Weiss,

11    on behalf of in this case the central stalking horse -- or

12    the stalking horse bidder.

13          No objection that Section 265 provides for certain

14    cure rights, but obviously, we'll reserve our rights on any

15    particular language until we see it.

16          THE COURT:  All right.  All right.  Ms.

17    (Indiscernible).  All right.  Anyone else wish to be heard?

18    All right.  All right.  Wait a second.  There's one more.

19    All right.  All right.  I just unmuted someone.

20          MR. HERMAN:  Thank you, Judge.  It's Ira Herman,

21    Blank Rome, for the ad hoc dealer group.  Your Honor,

22    earlier today, we hustled and filed a reservation of rights

23    which you hopefully have seen.  The Debtors have certainly

24    seen it.  I spoke to Ms. Foster during the break about our

25    concerns.

1              This is essentially seeking relief on an ex parte

2    basis.  I hate to say I'm old enough to remember when

3    interim DIP orders were obtained on an ex parte basis.  But

4    when they were obtained on an ex parte basis like this,

5    Judge, essentially everything is on the table at the final

6    hearing because there was no notice.  And when you file

7    papers in the middle of the night and there are thousands of

8    pages in those papers, 12 hours' notice or 10 hours' notice

9    is not notice.  It's essentially -- they're asking for

10   emergency relief on an ex parte basis.

11             I heard several explanations of why they need this

12   relief on an emergent basis.  If one looks at the budget

13   that they filed this morning, they don't need it to satisfy

14   their payment obligations.  It's very clear that they don't

15   need it because -- maybe they don't even need it next week.

16   But they seem to need it very badly now.

17             No one's explained why now is so important, and,

18   Your Honor, at the very least, there should be a reservation

19   of rights, so parties have a chance to read through the

20   papers and find out what's buried in those papers.  I'm not

21   asserting any nefarious purpose, but it's a lot to read,

22   Judge, and I'm not smart enough personally to be able to

23   digest it all on such short notice while preparing for

24   hearings and doing all those things that I have to do.

25             So, Judge, we believe that there ought to be a

1   full reservation of rights for parties to have notice and

2   have an opportunity to be heard in a meaningful way which

3   one-day notice is not.  And, Your Honor, to the extent Your

4   Honor is inclined to grant the relief requested immediately,

5   the Debtor should be required to explain to the Court and to

6   all of us who are at this hearing why they need this relief

7   now when their budget says that they don't need now.  Thank

8   you, Judge.

9          THE COURT:  All right.  Does anyone else wish to

10   be heard?  So, I'll go back to Ms. Reiney.

11          MS. REINEY:  Thank you, Your Honor.  As the Court

12   has seen, we remain willing and able to negotiate with

13   parties on reservation of rights' language.  We negotiated

14   this language with several parties and would have been happy

15   to entertain any language from the ad hoc group of dealers

16   as well.

17          But I think our statements on the record earlier

18   and the declaration of Mr. Ryan Omohundro notes that we do

19   indeed need the cash now and do face irreparable harm.  And

20   as I noted earlier, yes, this is about DIP financing, but

21   it's also about ensuring that the DIP lenders can be our

22   stalking horse bidder and put us in the best path forward as

23   we continue in this 45-day sale process.

24          So, I will just reference our statements made on

25   the record earlier as to the irreparable harm that the

1    Debtors would seek, and we remain open to engage with the ad

2    hoc group of dealers in the lead up to the final DIP

3    hearing.

4            THE COURT:  All right. Anyone else wish to be

5    heard?

6            MR. HERMAN:  Your Honor, may I respond very

7    briefly?

8            THE COURT:  Yes.

9            MR. HERMAN:  We did reach out to Kirland & Ellis

10   during the break.  We provided language yesterday that Your

11   Honor included in the Atlas sale order.  They know what we

12   need, and I'm surprised to hear Ms. Reiney say that we

13   weren't engaged.  That language needs to be in this order,

14   Judge, and that's important to us.

15           And the bald statement that they need the money --

16   they still haven't answered the question why they need the

17   money when their budget says they don't need the money.  The

18   budget is not consistent with the statement; we need the

19   money now.  Thank you.

20           THE COURT: All right.  All right.  Any further

21   response?

22           All right.  I've reviewed the two declarations.  I

23   think this is a -- not your usual DIP in that it is not

24   being done by a secured creditor who's trying buttress his -

25   - their position.  There really aren't the usual types of

1    things that we normally look for in a DIP which is the

2    rollup and the cross collateralization and all of those

3    things.

4              In reviewing the order and especially now that

5    we've clarified the language on the Puerto Rico resiliency

6    fund, it does seem to me that in essence what we're getting

7    is an incremental $15 million of liquidity and, just as

8    important, a potential stalking horse bidder so that we

9    don't have a naked auction going forward.

10             It's clear, based on the budget that was attached

11   -- the 13-week budget that was attached to Mr. Omohundro's

12   declaration, that unless that other $75 million comes in,

13   you know, this company will run out of cash.  And, of

14   course, the funding from the DIP is certain but collections

15   -- you know, the collections -- when you have a budget that

16   also includes collections, those may or may not come at the

17   appropriate time.  And for a company of this size to have,

18   you know, a several million-dollar cushion is certainly not

19   something that is an exercise of the Debtors' fiduciary

20   duty.

21             So, I truly do view this -- what I said to Mr.

22   Britton -- I truly do view this as -- the main obligation

23   pursuant to the DIP order is to repay the 15 million plus

24   the fees associated with that.  As -- from my reading of the

25   DIP order, all of the other items are in essence on the

1    table for the final hearing.

2            So, I don't think that other parties' rights are

3    prejudiced as it relates to the issue of the use of proceeds

4    from the DIP, you know, and the provision in the complex

5    rules.  That, in my mind and I've never -- and I may have,

6    you know, been involved in the drafting of those rules way

7    back then.  Those rules were not -- the purpose of that rule

8    was to prevent a boot strap of other claims.  It wasn't -- I

9    don't think anybody's going to lend money into a situation -

10   - into a distressed situation -- without knowing for certain

11   that you're going to be able to collect that money on a go-

12   forward basis.

13           So, I didn't think that in that circumstance it

14   applies.  And it relates to the relief, again, the relief in

15   this case is coming from a -- the need for a consent which,

16   you know, I don't think could be compelled -- so, that is

17   the price for the relief is the consent.  So, again, I don't

18   think that that runs afoul of the complex rules.

19           So, on the basis of the evidentiary record that is

20   before me, the fact that, again, even with 45 million of

21   liquidity or 46 million of liquidity, this company is still

22   not anywhere near to the point of having the type of

23   liquidity that would be needed to run a company of this size

24   that -- and the fact that the main issue relating to the

25   Puerto Rico resiliency fund has been at least cabined for

1   now, I'm going to go ahead and approve the interim DIP and

2   we'll set the hearing on the final DIP along with the second

3   day hearings on June 30th, and then we'll have an objection

4   deadline, you know, the week before.

5            So, when you upload the order, please let Mr. Laws

6   know and I'll take a look at it and if I -- if it's

7   appropriate, I'll sign it.

8            MS. REINEY:  Great.  Thank you so much, Your

9   Honor.  We really appreciate all of your time and this week

10  generally.  You've been incredibly accommodating.

11           THE COURT:  All right.  Anything further from

12  anyone?  All right.  We're in recess until tomorrow morning

13  at 8:30.  Thank you.

14           MR. BRITTON:  Thank you, Your Honor.

15       (Proceedings adjourned at 1:50 p.m.)

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2

3       I certify that the foregoing is a correct transcript from

4       the electronic sound recording of the proceedings in the

5       above-entitled matter.

6

7       *Sonya M. Ledanski Hyde*

8

9

10      Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  June 16, 2025