**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SUNNOVA ENERGY INTERNATIONAL INC., *et al.*,[1] | ) | Case No. 25-90160 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' OBJECTION TO THE**
**EMERGENCY MOTION TO RECONSIDER AND,**
**ALTERNATIVELY, FOR RELIEF FROM ORDER AUTHORIZING SALE OF ASSETS**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this objection (the "Objection") to the *Emergency Motion to Reconsider and, Alternatively, for Relief from Order Authorizing Sale of Assets* [Docket No. 691] (the "Motion"), filed by Enterprise Bank & Trust ("Enterprise").[2]  In support of this Objection, the Debtors state as follows:

<u>**Preliminary Statement**</u>

1.       The Court should deny Enterprise's request to reconsider the Sale Order (as defined below) or for relief therefrom for at least four reasons.  ***First***, Enterprise fails to carry its heavy burden of establishing that reconsideration of the Sale Order, an extraordinary remedy, is necessary

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Sunnova.  The location of Debtor Sunnova Energy International Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 20 East Greenway Plaza, Suite 540, Houston, Texas 77046.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the *Disclosure Statement for the Joint Chapter 11 Plan of Sunnova Energy International Inc. and Its Debtor Affiliates* [Docket No. 694] (the "Disclosure Statement") or the *Declaration of Paul Mathews, President and Chief Executive Officer of Sunnova Energy International Inc., in Support of Debtors' Chapter 11 Petitions* [Docket No. 17] (the "First Day Declaration").  References to "Ex." herein refer to the exhibits as attached to the *Debtors' Amended Witness and Exhibit List for Hearing Scheduled for August 19, 2025 at 10:30 A.M. (Prevailing Central Time)* [Docket No. 710] (the "Amended W&E List").

to "correct manifest errors of law or fact or to present newly discovered evidence." **Second**, Enterprise fails to carry its burden of proving mistake, surprise, or any other reason for relief from the Sale Order. **Third**, Enterprise has not shown, and cannot show, that the Sale Transaction—the result of a competitive auction with numerous bidders and bids—is not in the best interests of the Debtors and their estates. **Fourth**, vacatur of the Sale Order and the Sale Transaction now, as the Debtors and the Purchaser (as defined in the Sale Order) are on the verge of closing, is an existential threat to these chapter 11 cases and will likely result in an immediate liquidation— leading to the exact same consequences to Enterprise that it claims it requires relief to prevent, while materially harming the Debtors' other stakeholders in the process.

2.      In its Motion, Enterprise tells a selective story of alleged concealment and surprise. The record, however, belies Enterprise's narrative. For example, Enterprise claims the Debtors, through unidentified "assurances," "led" Enterprise to believe the Sale Transaction would not result in a recapture of investment tax credits. But until last week, the Debtors had never communicated with Enterprise *at all* about these chapter 11 cases; and they certainly never told Enterprise (or anyone else) that the Sale Transaction would not result in recapture. Not surprisingly, Enterprise provides no details of any "assurances" by the Debtors and submits no evidence to back up its claim of having been "misled."[3] Instead, the record shows that the Debtors supplied a vast amount of information about the Sale Transaction—in numerous public filings across a multi-week period leading up to the Sale Hearing, during which the material terms

---

[3]   Less than 24 hours before the hearing on the Motion, Enterprise filed the *Declaration of Abigail Kepple in Support of Enterprise Bank & Trust's Emergency Motion to Reconsider and, Alternatively, for Relief from Order Authorizing Sale of Assets* [Docket No. 706] (the "Kepple Declaration"). The Kepple Declaration includes nothing more than the same conclusory statements included in the Motion, word-for-word. Just over an hour after Enterprise filed the Kepple Declaration, the Debtors requested that Ms. Kepple be made available for a deposition regarding her testimony therein. Enterprise refused to make Ms. Kepple available for a deposition before the hearing.

of the Sale Transaction were publicly disclosed and remained materially unchanged—that was indisputably sufficient to put Enterprise on notice that the Sale Transaction could result in recapture of its ITCs (as defined below).  Indeed, the information the Debtors provided included the same details of which Enterprise now claims it was unaware, such as the fact that assets were being sold by non-Debtor affiliates, and the identity of the "Sellers" and "Acquired Entities" under the asset purchase agreement.

3.     The reality appears to be that Enterprise either failed to review the Debtors' public filings or failed to appreciate the import of the information that the Debtors filed.  But neither event would justify the extraordinary relief Enterprise now seeks.  The law requires that parties seeking reconsideration based on newly discovered facts, surprise or mistake show that they would not have discovered the allegedly new facts had they engaged in reasonable diligence prior to entry of the order that they seek to be set aside.  Enterprise falls far short of meeting this burden here.  At a very minimum, Enterprise, like many, many other parties in these cases, should have monitored the docket, raised any questions or potential issues with the Debtors, filed a reservation of rights, objected to the Sale Transaction, and appeared at the Sale Hearing.  Enterprise necessarily did *none* of these things—because had it done so, Enterprise would have learned all the facts that it now claims the Debtors failed to disclose.

4.     Even if Enterprise could meet its heavy burden of coming forward with newly discovered evidence that it could not have uncovered with reasonable diligence—and it cannot do so—the Court must still deny the Motion because Enterprise cannot show that the outcome would have been different had it raised its arguments at the Sale Hearing.  As the record at the Sale Hearing strongly demonstrated, the Sale Transaction was the culmination of a far-reaching marketing process, an extremely complex and competitive auction, and arms'-length negotiations

with all bidders, including the Purchaser.  The result of this process was a high-water mark in these otherwise difficult chapter 11 cases and the successful bid was materially higher than the original stalking horse bid, bringing substantial value into the Debtors' estates and preserving their ability to propose and confirm a chapter 11 plan that provides for recoveries to their general unsecured creditors.  Absent the Sale Transaction, the Debtors would have been, and today would be, forced into a liquidation.

5.      Under those facts, the possibility that the Sale Transaction might result in ITC recapture for Enterprise could not possibly outweigh either the benefits to the Debtors' estates from the Sale Transaction, or the costs to the Debtors' stakeholders if the Sale Transaction were to fall apart.  Thus, the conclusion that the Sale Transaction is in the best interests of the Debtors and their estates, and a reasonable exercise of the Debtors' business judgment, remains true regardless of the possibility of recapture.  If anything, that conclusion has become only more inescapable with the passage of time:  not only is there still no alternative transaction available to bring cash into these estates, such that the only result of granting Enterprise's motion will be a value-destructive chapter 7 liquidation, but the Debtors and their professionals have spent the past two weeks since the Sale Hearing working hard to close the Sale Transaction, incurring additional administrative expenses that would be wasted if Enterprise's Motion were granted.

6.      Finally, Enterprise's attempt to attack the Sale Order for its inclusion of standard, and appropriately limited, findings and conclusions regarding the Purchaser's entitlement to the benefits of section 363(m) is misplaced.  The Sale Transaction includes the sale of Debtor and non-Debtor assets.  The Sale Order is clear that the Purchaser is entitled only to the protections afforded under section 363(m), no more and no less.

7.     For these reasons, and those described in more detail below, the Debtors respectfully submit that the Motion should be denied.

**Factual Background and Procedural Posture**

8.     Enterprise's Motion is unsupported by any evidence and provides only a cursory summary of its relationship with the Debtors, the Debtors' bidding, auction, and sale processes, and the events that followed the Court's entry of the Sale Order.  In an attempt to cast false aspersions on the Debtors, Enterprise's summary of the factual background omits key facts and is incorrect on others.  When those facts are corrected, and the full record provided, it is clear that Enterprise is entitled to no relief whatsoever.

**I.     Enterprise's Prepetition Relationship with the Debtors.**

9.     Enterprise is a Missouri state-chartered trust company that operates branch offices in Arizona, California, Florida, Kansas, Missouri, Nevada, and New Mexico.  It is a subsidiary of Enterprise Financial Services Corporation, a financial services holding company that trades on the Nasdaq and has a $2.1 billion market capitalization, over $16 billion in assets, nearly a billion dollars in revenue in 2024, and over 1,200 employees.[4]

10.     The Debtors' prepetition business, including the generation of investment tax credits ("ITCs") under section 48 of the Internal Revenue Code of 1986 (the "IRC"), is described in detail in the First Day Declaration.  First Day Declaration §§ I.A.1, I.E.1.  In addition to the sales of ITCs by the Debtors' tax equity partnership ("TEP") affiliates—which are not at issue in this motion—the Debtors also arranged for sales of certain "balance sheet" ITCs, or ITCs

---

[4]     *See* "Press Release: Enterprise Financial Services Corp Announces Appointment of Lars C. Anderson to Board of Directors," available at https://investor.enterprisebank.com/news/news-details/2025/Enterprise-Financial-Services-Corp-Announces-Appointment-of-Lars-C--Anderson-to-Board-of-Directors/default.aspx; Enterprise Financial Services Corp, 2024 Annual Report, available at https://s202.q4cdn.com/418681919/files/doc_financials/2024/q4/2008481a-34c7-4ca9-a7fc-9f55d2f6c67e.pdf.

generated by Solar Systems owned by Debtor Sunnova TEP Developer, LLC ("TEP Developer") or other of the Debtors' non-TEP affiliates.

11.     Prior to the Petition Date, on September 30, 2024, Enterprise and TEP Developer entered into a Tax Credit Purchase Agreement (the "TCPA"), pursuant to which TEP Developer agreed to sell to Enterprise ITCs for 2,604 Solar Systems (the "Purchased ITCs"). Attached to the TCPA were "Transfer Election Statements" which, among other things, included schedules of the Purchased ITCs with a unique identifier for each Solar System generating each Purchased ITC (the "Relevant Systems"), allowing Enterprise to identify with specificity the Solar Systems that generated the Purchased ITCs.[5]

12.     The IRC restricts the transfer of ITCs other than through statutorily authorized sale transactions under section 6418 of the IRC. *See*, *e.g.*, 26 U.S.C. § 6418. In addition, certain dispositions of Solar Systems generating those ITCs within five years of being "placed in service" can trigger recapture of some or all of the ITC corresponding to the sold Solar System. *See* 26 U.S.C. § 50(a)(1). However, the IRC generally permits transfer of the Solar Systems among entities within a consolidated tax group of entities because the "taxpayer," for purposes of the IRC, remains the same. *See* Treasury Regulations 1.1502-3(f)(2); *see also id.* (providing for recapture of ITCs where an asset "ceases to be investment credit property with respect to the taxpayer").

13.     Each of the Relevant Systems that generated the Purchased ITCs was placed in service while it was owned by TEP Developer. Accordingly, each of the Purchased ITCs was owned, and thereafter sold, by TEP Developer in connection with the TCPA. After the Relevant Systems were placed in service, but before the closing of the TCPA, the Relevant Systems were

---

[5]   Because Each Solar System mints a single ITC for the year in which it was placed in service, ITCs and Solar Systems are traceable one-to-one.

then transferred among affiliates of the Debtors, primarily for the purpose of supporting securitization transactions in the ordinary course of the Debtors' business.  Ultimately, those transfers resulted in the following non-Debtor affiliates owning the Relevant Systems, both at the time of the closing of the TCPA and through to the present day:[6]

    1.      Sunnova AP6 Warehouse II LLC ("AP6 Warehouse") – 39 Relevant Systems;

    2.      Sunnova SAP IV LLC ("SAP IV") – 26 Relevant Systems;

    3.      Sunnova Sol VI Owner LLC ("Sol VI Owner") – 421 Relevant Systems; and

    4.      Sunnova Sol VII Owner LLC ("Sol VII Owner," and, together with AP6 Warehouse, SAP IV, and Sol VI Owner, the "Owner Affiliates") – 2,118 Relevant Systems.

14.     AP6 Warehouse is an indirect subsidiary of SEC.  SAP IV is a direct subsidiary of Sunnova TEP Holdings, LLC ("TEP Holdings").  Sol VI Owner and Sol VII Owner are indirect subsidiaries of non-Debtor Sunnova Solstice Holdings, LLC ("Solstice Holdings"), which is in turn a direct subsidiary of non-Debtor Sunnova Solstice Borrower, LLC ("Solstice Borrower").  Solstice Borrower, in turn, is a direct subsidiary of SIH, which is a direct subsidiary of SEC.  Solstice Borrower is also the borrower under the term loan facility through which the Debtors obtained a $185 million term loan (the "Solstice Facility") from KKR Credit Advisers (US) LLC and/or its affiliates.

15.     The alleged recapture of the Purchased ITCs is likely to occur as a result of the sale of assets by SEC and Solstice Borrower, each of which is, or has elected to be treated as, a taxable corporation. *See id.* § 50(a) (providing that the disposition of a solar system within five years of

---

6    Enterprise knew or should have known about the ownership of the Relevant Systems.  For example, Advantage— as described below, the party that brokered the sale of ITCs to Enterprise—later volunteered in a July 2025 email its existing knowledge that "[t]he projects are owned by Sunnova Sol VII Owner, LLC at this time, having been transferred to it by Sunnova Sap IV LLC."  Ex. 4 at 1.

being "placed in service" by a taxpayer triggers recapture).  Although neither SEC nor Solstice

Borrower directly owns the Relevant Systems, each entity's disposition of its assets for tax

purposes (i.e., including a sale of a disregarded entity that owns any of the Relevant Systems) is

deemed to be a disposition of the Relevant Systems for purposes of determining whether recapture

has occurred under Section 50(a) of the IRC.

16.     The selection of SEC and Solstice Borrower as asset sellers was not arbitrary—the

Debtors and the Purchaser analyzed numerous alternative structures to avoid the sale of assets by

Solstice Borrower, specifically.  Each alternative scenario, however, resulted in an extremely high

risk of triggering large tax liabilities payable by Solstice Borrower, which liabilities would have

been assumed by the Purchaser in any structure in which they acquired Solstice Borrower as an

Acquired Entity.  Accordingly, in the APA Schedules (as defined below), Solstice Borrower was

identified as a Seller.  APA Schedules at 61.

## II.     Enterprise Is Put on Notice of the Debtors' Bankruptcy Filing, Proposed Sale, and the Possibility of a Recapture Event.

17.     On June 1, 2025, TEP Developer filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code.  On June 8, 2025 (the "Petition Date"), Debtors Sunnova

Energy Corporation, Sunnova Energy International Inc., and Sunnova Intermediate Holdings, LLC

each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

18.     On June 9, 2025, the Court held a first day hearing regarding the Debtors'

emergency first day motions.[7]  On July 10, 2025, the Debtors served Enterprise and its counsel

---

[7]     *Notice of Telephonic and Video Conference Hearing on Emergency First Day Motions. Filed by Sunnova Energy International Inc.* [Docket No. 18].

notice of the filing of the Debtors' chapter 11 cases and their designation as complex cases.[8]  Given that TEP Developer, the entity to which Enterprise says it paid over $30 million to purchase ITCs barely nine months earlier, had now filed for bankruptcy, Enterprise (and its sophisticated employees and advisors) should have recognized that there was now a very real possibility of recapture.  Yet Enterprise appears to have done nothing in response to TEP Developer's filing.[9]

19.     On June 12, 2025, the Debtors filed the Bidding Procedures Motion,[10] by which the Debtors sought approval of the Bidding Procedures "pursuant to which the Debtors will solicit and may select the highest or otherwise best offer for the sale of some or substantially all of the Debtors' assets."  Bidding Procedures Mot. ¶ 1(a).  The Bidding Procedures Motion included a summary of the terms of the WholeCo Stalking Horse Agreement, including the definition of Acquired Assets as "all of the Equity Interests that any Seller owns in Sunnova Solstice Holdings, LLC . . . and all of the properties, rights, interests, and other assets held by Sellers as of the Closing."  *Id.* at 9.  In other words, any party reviewing the publicly-filed Bidding Procedures Motion was on express notice that the Debtors intended to sell the equity interest in Solstice Holdings—the entity that indirectly owns the Owner Affiliates and the Relevant Systems.  And a sophisticated party like Enterprise, which had spent over $30 million purchasing ITCs generated

---

[8]   *Affidavit Re: of Ryan Vyskocil Regarding Notice of Chapter 11 Bankruptcy Case, Order Granting Complex Chapter 11 Bankruptcy Case Treatment, and Notice of Revised Chapter 11 Bankruptcy Case* [Docket No. 564].

[9]   Prior to August 14, 2025, no attorney representing Enterprise had filed a notice of appearance or an application to appear *pro hac vice*.

[10]   *Emergency Motion Debtors' Emergency Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the WholeCo Stalking Horse Agreement and Expense Reimbursement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Authorizing the Assumption and Assignment of Assumed Executory Contracts and Unexpired Leases, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 113] (the "Bidding Procedures Motion").

by the Relevant Systems, plainly would be on notice that there was now an even higher likelihood of recapture.  Once again, Enterprise did nothing.

20.     On June 20, 2025, the Debtors filed the WholeCo Stalking Horse Agreement and proposed form of the Sale Order.[11]   The WholeCo Stalking Horse Agreement included a description of the Acquired Assets that mirrored the Bidding Procedures Motion, making clear it included "all of the Equity Interests that any Seller owns in Sunnova Solstice Holdings, LLC." WholeCo Stalking Horse Agreement § 1.1.  Enterprise's inaction continued.

21.     That the Debtors' filings to this point were enough to put interested parties on notice is evidenced by the fact that, around this time, the Debtors received an inquiry from Advantage Capital Management Corporation ("Advantage"), a third party that brokered the sale of the Purchased ITCs, about the possibility of recapture.   On July 1, 2025, Advantage's counsel at Orrick, Herrington & Sutcliffe LLP ("Orrick") reached out to the Debtors' counsel, noting that Advantage was "thinking about how to avoid recapture in the bankruptcy scenario."  Ex. 4 at 7. After a follow-up inquiry on July 16, 2025, the Debtors responded that they had asked the lenders to TEP Holdings to enter into an agreement relating to Solar Systems owned by SAP IV, but they had not confirmed whether they were willing to do so.[12]  To the Debtors' knowledge, Advantage did not respond, or make any further inquiries, for nearly **two weeks**, until July 29, 2025—just two days prior to the Sale Hearing, as described below.[13]

---

[11]   *Notice of Filing of WholeCo Stalking Horse Agreement and Proposed Sale Order* [Docket No. 238].

[12]   *Id.*

[13]   *Id.*

22.     On July 11, 2025, the Debtors filed a redacted version of the schedules to the WholeCo Stalking Horse Agreement (the "APA Schedules").[14]  The publicly-filed version of the APA Schedules disclosed yet more information, which, again, would put any interested party on notice that there was a significant possibility that the proposed transaction would trigger recapture. For example, Schedule 3.5(a) sets forth the "Equity Interests of Acquired Entities," listing 183 "Acquired Entities."  APA Schedules, Sch. 3.5(a).  Schedule 3.8 identifies 28 "Sellers," ***all of which are non-Debtors*** (directly contradicting Enterprise's claim that "the Debtors failed to disclose that the sale transaction calls for the sale of assets owned by non-debtors" (Mot. ¶ 1)).[15] *Id.*, Sch. 3.8.  The APA Schedules expressly listed Solstice Holdings and multiple of the Owners Affiliates as "Acquired Entities" and Solstice Borrower and AP6 Warehouse as "Sellers."  *Id.*, Schs. 3.5(a), 3.8.  Nevertheless, Enterprise continued to stay silent and sit on its hands.

23.     The same day, on July 11, 2025, the Court held a hearing on the Bidding Procedures Motion,[16] after which it entered the Bidding Procedures Order.[17]  Enterprise did not object to the

---

[14]   *Notice of Filing of Schedules to WholeCo Stalking Horse Agreement* [Docket No. 404].

[15]   At various points in its Motion, Enterprise claims that the Sale Transaction will "include a sale of ***the Projects*** owned by non-debtor affiliates." Mot. ¶ 16 (emphasis added.).  While it is true as a technical matter that a small number of Relevant Systems—the 39 Relevant Systems owned by AP6 Warehouse—are actually being sold, ownership of the vast majority of Relevant Systems—the 2,565 Relevant Systems owned by the other Owner Affiliates—will not change as part of the Sale Transaction.  Instead, as was fully disclosed in the APA Schedules at least as early as July 11, 2025, the indirect equity interests in the entities that *hold* those Relevant Systems is being sold.

[16]   *Amended Agenda for Hearing on 7/11/2025* [Docket No. 412].

[17]   *Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Wholeco Stalking Horse Agreement and Expense Reimbursement, (V) Approving the ServiceCo Stalking Horse Agreement, (VI) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VII) Authorizing the Assumption and Assignment of Assumed Executory Contracts and Unexpired Leases, (VIII) Authorizing the Sale of Assets, and (IX) Granting Related Relief* [Docket No. 419] (the "Bidding Procedures Order").

Bidding Procedures, file a reservation of rights, or appear at the hearing.  Nor, for that matter, did Advantage.

24.     Approximately a week later, on July 17, 2025, the Debtors served Enterprise and with the Sale and Auction Notice (as defined in the Bidding Procedures Motion).[18]  The next day, the Debtors filed affidavits of publication of the Sale and Auction Notice as required under the Bidding Procedures Order.[19]  The Sale and Auction Notice included, in bold font, the July 24, 2025 deadline to object to the Sale Transaction and the consequences of failing to do so:

> **CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION**
> **ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE TRANSACTION OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT(S).**

25.     The objection deadline of July 24, 2025 came and went.  Although ***fourteen*** parties filed objections, ***two*** parties filed reservations of rights, and ***nine*** parties sent the Debtors comments or informal objections, Enterprise (and Advantage) filed nothing.

26.     Five days later, on July 29, 2025, the Debtors filed the Successful Bidder Notice,[20] identifying the Purchaser as the successful bidder and noting that the Debtors intended to seek approval of the WholeCo Stalking Horse Agreement at the Sale Hearing scheduled for July 31, 2025.

27.     That same day, Advantage's counsel finally reached back out to the Debtors' counsel, sending three emails in quick succession asking for "any update" after going silent since

---

[18]  *See Affidavit of Service* filed substantially contemporaneously herewith regarding service of, among other things, the Sale and Auction Notice (the "Sale and Auction Notice Affidavit").

[19]  *E.g.*, *Affidavit Re: Publication of Notice of Sale Transaction, Auction, and Related Dates and Deadlines (San Juan Daily Star)* [Docket No. 455].

[20]  *Notice of (I) Conclusion of the Auction, (II) Designation of the Successful Bidder, and (III) Filing of Amendment to WholeCo Stalking Horse Purchase Agreement* [Docket No. 560].

July 16, 2025.  Ex. 4 at 5.  In response, the Debtors advised Advantage that "[t]he bankruptcy auction process finished yesterday, and a bid for the sale of the company was accepted.  Pending approval of the sale, Sunnova will no longer own the ITCs."  *Id.* at 4.  When Advantage asked what company was being sold, the Debtors responded that "[t]he sale was for most of the assets/entities owned by Sunnova (including TEP Holdings)," and was structured as "a mix of assets and equity."  *Id.* at 2–3.

28.     Two days later, on July 31, 2025, the Court held the Sale Hearing.[21]  Numerous parties in interest appeared and made comments on the record regarding the Sale Transaction. The Debtors' declarant in support of the Sale Transaction was subject to extensive cross-examination, and the Sale Hearing ultimately lasted for several hours.[22]  The same day, the Court entered the Sale Order.[23]

29.     Nevertheless, despite being on notice of the filing of a chapter 11 petition by TEP Developer, the entity that sold $30 million of Purchased ITCs to Enterprise less than nine months prior to the Petition Date;[24] despite being on notice of the Bidding Procedures Motion, the Bidding Procedures Order, the WholeCo Stalking Horse Agreement, and the APA Schedules, all of which expressly disclosed that the sale transaction envisioned non-Debtor entities selling the very same

---

[21]  *Agenda for Hearing on 7/31/2025* [Docket No. 589].

[22]  *PDF with attached Audio File* [Docket Nos. 595, 596, 597, 598].

[23]  *Order (I) Authorizing the Sale of Certain of the Debtors' Assets to the Stalking Horse Bidder Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 599] (the "Sale Order").

[24]  Although TEP Developer has not owned the Relevant Systems for some time, it is clear from Advantage's communications described above that the owner of the Relevant Systems was known or knowable.  In any event, it is simply inconceivable that a sophisticated financial counterparty that purchased over $30 million ITCs subject to potential recapture would fail to inquire in any way after receiving notice that the seller of those ITCs filed for bankruptcy less than a year after the sale.

Owner Affiliates that owned the Solar Systems that gave rise to its ITCs; and despite receiving the Sale and Auction Notice and the Successful Bidder Notice, which notified Enterprise of the date of the Sale Hearing and warned Enterprise that failure to object would mean Enterprise would be "forever barred from asserting any objection to such sale," ***Enterprise still did nothing***.  Enterprise did not pick up the phone or send an email to the Debtors or its counsel to ask any questions about the sale transaction or the sale process.  Enterprise did not file an objection or a reservation of rights.  And neither Enterprise nor its counsel appeared at (or, as far as the Debtors can tell, attended) the Sale Hearing.[25]

30. However, five days after the Sale Hearing, Enterprise filed two proofs of claim, one each against Debtors TEP Developer and Sunnova Energy Corporation (the "Proofs of Claim").[26] The Proofs of Claim, which expressly state that the basis of Enterprise's claim is the "recapture of tax credits sold,"[27] fatally undermine its assertion that it believed that the Sale Transaction would not result in recapture, or that it lacked sufficient information to determine that there was at least a *possibility* that the Sale Transaction could result in recapture, such that it should have investigated further and filed an objection (or at a very minimum, a reservation of rights) before the Sale Hearing.  ***This is because absolutely nothing had changed in the mix of information available to Enterprise since the Debtors filed the APA Schedules nearly a month earlier—yet Enterprise***

---

[25] For what it is worth, the record is arguably even worse for Advantage, whose counsel was expressly on notice that there was a potential for recapture that had not been resolved as of July 16, 2025, and expressly recognized that recapture remained a possibility as of July 29, 2025, two days before the Sale Hearing, when they were told by the Debtors what the APA Schedules had already made clear, *i.e.*, that the "sale was a mix of assets and equity," and that the stock of the regarded tax owner of the Owner Affiliate that owned the majority of the Relevant Systems was "being acquired by Buyer."  Ex. 4 at 2–3.  Yet they, too, failed to object, reserve rights, or even appear at the Sale Hearing.

[26] Exs. 5, 6 (Proofs of Claim Nos. 888 & 984, respectively).

[27] Ex. 5 at 2; Ex. 6 at 2.

***now recognized there was a risk of recapture.*** Plainly, other than its own neglect, there was nothing stopping Enterprise from recognizing that same risk ***before*** the Sale Hearing and raising the issue through an objection.

31.     Notably, at this point on August 5, 2025, the Debtors had never had a single communication with Enterprise concerning these chapter 11 cases; and, to the extent they are even relevant, the Debtors' communications with Advantage prior to the Sale Hearing were such that Advantage should have been (and, based on the tone and tenor of its counsel's emails, *was*) even more concerned about the potential for recapture than it had been before speaking with the Debtors. Nevertheless, in its Motion, Enterprise alleges that the Debtors made "assurances," and that, "prior to August 11, 2025, the Debtors led [Enterprise] to believe that the Sale Transaction would ***NOT*** involve the sale of any of the [Relevant Systems] and would ***NOT*** result in a recapture of the [Purchased ITCs]." Mot. ¶ 16 (emphasis in original). Tellingly, Enterprise ignores the history described above and does not explain *how* the Debtors actually "led" Enterprise to believe anything, and, notwithstanding the heavy burden it bears on this Motion, Enterprise does not identify a single communication between Enterprise and anyone else that forms the basis for this allegation. That is likely because it is simply not true: for the avoidance of doubt, neither the Debtors nor the Debtors' counsel ***ever*** told Enterprise or Advantage that the Sale Transaction would not result in a recapture of the Purchased ITCs. This is typical and makes great sense— debtors are not in the business of, and do not as a matter of course, give tax advice to third parties, and when they do give directions, they ***always*** counsel that those parties to seek the advice of their advisors.[28]

---

[28]  *See, e.g.*, Disclosure Statement at 3 (advising in bold, all caps font, that "[t]he Debtors urge each Holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement"); *id.* at 109 (advising in bold, all caps font that the summary of federal income tax consequences of the Plan is "not a substitute for careful tax planning and advice based upon the

32.     Six days after Enterprise filed the Proofs of Claim, on August 11, 2025, the Debtors and Advantage met via teleconference to discuss analysis performed in connection with closing diligence for the Sale Transaction that confirmed that the Purchased ITCs would likely be recaptured upon consummation of the Sale Transaction.  Later that day, the Debtors, Advantage, Enterprise, the Purchaser, and SunStrong met via teleconference to discuss potential solutions for the likely recapture of the Purchased ITCs.  Although potential alternative structures for the Sale Transaction were discussed, the Debtors and the Purchaser determined that none of the proposals was actionable under the circumstances.

33.     Three days later, on August 15, 2025, Enterprise filed this Motion.  The circumstances supporting the Court's ruling in favor of the Sale Transaction have not changed since it entered the Sale Order.

## Objection

## I.      Enterprise Fails to Show Cause for Reconsideration.

34.     Reconsideration is an "extraordinary remedy that should be used sparingly." *Templet v. HydroChem, Inc.,* 367 F.3d 473, 479 (5th Cir. 2004) (citations omitted). Reconsideration "is only appropriate in select and narrow instances."  *In re Rusch*, 2010 WL 5394789, at *1 (Bankr. D.N.J. Dec. 28, 2010) (citing *Stivala Invs., Inc. v. Atl. Nat'l Trust LLC*, 394 B.R. 778, 780 (Bankr. M.D. Pa. 2008)); *see also In re Longhorn Pacing & Oilfield Servs., Inc.*, 648 B.R. 300, 306 (Bankr. S.D. Tex. 2023) (citing Rule 59(e)'s "narrow purpose"); *In re Pride Companies, L.P.*, 285 B.R. 366, 369 n.1 (Bankr. N.D. Tex. 2002) (citing the "narrow dictates of Rule 60").  This high standard is even more stringent in bankruptcy proceedings, where

---

individual circumstances pertaining to a holder" and "[a]ll holders are urged to consult their own tax advisors").  Similar language appears nearly universally in documents filed in complex chapter 11 cases like the Debtors'.

the Federal Rules of Civil Procedure are incorporated through the Bankruptcy Rules, which "shall be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every case and proceeding."  Fed. R. Bankr. Pro. 1001.

35.     Enterprise has failed to show any extraordinary circumstance justifying reconsideration of, or relief from, the Sale Order.  Accordingly, the Motion should be denied.

**A.     Enterprise Fails to Meet the Requirements for Relief Under Bankruptcy Rule 9023 and Rule 59(e)**.

36.     Rule 59, incorporated by Bankruptcy Rule 9023, does not enumerate the grounds for altering or amending a judgment.  Rather, "Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Longhorn*, 648 B.R. at 306 (citations and quotations omitted).  Thus, a Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that ***could have been*** offered or raised before the entry of judgment." *Templet*, 367 F.3d at 478–79 (emphasis supplied).

37.     Bankruptcy Rule 9023 is only satisfied when there is (i) an intervening change in controlling law, (ii) new evidence not previously available, or (iii) a need to correct a clear or manifest error of law or fact or to prevent manifest injustice.  *In re SAL ATX LLC*, 660 B.R. 795, 813 (Bankr. W.D. Tex. 2024) (citing *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012)).  Movants bear a "heavy burden" in proving that reconsideration is warranted.  *De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd.*, 2016 WL 4769346, at *2 (Bankr. N.D. Tex. Mar. 1, 2016) (denying motion to reconsider because "Defendants have not met their heavy burden").

38.     When considering a Rule 59(e) motion to reconsider premised on new evidence or manifest error of fact, a court may not grant such a motion unless the movant establishes: "(1) the facts discovered are of such a nature that they would probably change the outcome; (2) the alleged facts are actually newly discovered and could not have been discovered earlier by proper diligence;

and (3) the facts are not merely cumulative or impeaching." *Infusion Res., Inc. v. Minimed, Inc.*, 351 F.3d 688, 696–97 (5th Cir. 2003) (citing *English v. Mattson*, 214 F.2d 406, 409 (5th Cir. 1954)).  In other words, Enterprise must show that it could not have made the allegedly critical discovery earlier through proper diligence.  *Molina v. Equistar Chems. LP*, 261 F. App'x 729, 734 (5th Cir. 2008) (denying Rule 59(e) relief without considering the effect of the newly discovered evidence because movant "completely failed to demonstrate why he could not have pursued this 'critical' discovery earlier in the litigation by proper diligence").

39.     Enterprise has not come close to carrying its heavy burden here.  First, Enterprise cannot possibly show that "the alleged facts are actually newly discovered and could not have been discovered earlier by proper diligence."  *Infusion Res., Inc.*, 351 F.3d at 696–97.  As described above, Enterprise was on extensive and constant notice of the bankruptcy filing and bankruptcy proceedings of its counterparty under the TCPA, including the proposed sale of some or substantially all of its assets.  Upon the filing of the Bidding Procedures Motion, and again upon the filing of the WholeCo Stalking Horse Agreement, Enterprise was on notice that TEP Developer and its affiliates proposed to sell their assets.  Indeed, Enterprise was on ***express*** notice that the entities that owned the Relevant Systems were themselves going to be sold.  APA Schedules, Sch. 3.5(a).  Enterprise and its counsel were also served with the Auction and Sale Notice one week ***before*** the deadline to object to the Sale Hearing and two weeks before the Sale Hearing.  *See* Sale and Auction Notice Affidavit.  Despite this extensive notice, Enterprise appears to have performed no diligence whatsoever—it failed to engage in any outreach to the Debtors, take discovery of the sale documents, or appear and ask questions during the Bidding Procedures Hearing or the Sale Hearing.  Nor does Enterprise argue in its Motion, much less prove, that it could not have done so. This failure is fatal to the Motion.  *See Rollins v. Home Depot USA*, 8 F.4th 393, 396–97 (5th Cir.

2021) (affirming denial of Rule 59(e) motion where, among other things, party failed to monitor the docket); *Two-Way Media LLC v. AT&T, Inc.*, 782 F.3d 1311, 1317 (Fed. Cir. 2015) (affirming district court finding that it was "inexcusable for . . . counsel to . . . at minimum . . . monitor the docket").

40.     Second, Enterprise cannot show that discovery of the potential recapture of the Purchased ITCs, if raised to the Court at or prior to the Sale Hearing, would have changed the outcome.  The Court carefully evaluated the proposed Sale transaction with the aid of extensive testimony, made extensive findings regarding all aspects of the Sale Transaction and concluded it was a sound exercise of the Debtors' business judgment.  Tr. of Sale Hr'g at 90:15–23 ("THE COURT:  So in terms of the elements of 363, I think that the debtor's business judgment has been completely validated by the evidence and by the facts of the case, both at this hearing and at the various other hearings . . . . It's further validated by the position of the Unsecured Creditors Committee, which at the prior hearing, was very much a wait-and-see attitude to see whether, in fact, this was a value-maximizing transaction."); Sale Order ¶¶ Y–Z, CC; *see, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).  And for good reason:  the Sale Transaction was the result of weeks of marketing, a multi-day auction process, and round-the-clock negotiations, leading to the highest and best transaction available to the Debtors, supported by the Debtors' key stakeholders (including the Official Committee of Unsecured Creditors).  Nothing in Enterprise's Motion, even if timely raised and accepted as true, would have changed the fact that there is no alternative to the Sale Transaction for maximizing the value of the Debtors' assets, to the general benefit of the Debtors' stakeholders.

41.     Indeed, as set forth in further detail below (*infra*, Section II), declining to approve the Sale Transaction at the Sale Hearing (or vacating the Sale Order on reconsideration) would

lead to a liquidation that would have grave consequences not only for the Debtors' existing creditors, but for Enterprise as well, as it would almost certainly face the same risk of recapture as it will once the Sale Transaction is closed. *See* Tr. of Sale Hr'g 100:7–13 ("I think the evidence is uncontroverted, and this—this is not changed from day one in this case, that the debtor is facing significant liquidity issues. That the—the sale is—addresses the issue that if—if there wasn't a— if the liquidity issues were not addressed quickly, the situation would be getting worse, not better."). Accordingly, Enterprise cannot meet its burden of showing that its purported "newly discovered evidence" would have changed the outcome at the Sale Hearing, even if that evidence was newly discovered in the first place (and it was not).

42.     Third, when ruling on a Rule 59(e) motion, courts in the Fifth Circuit must consider "the likelihood that the non-moving party will suffer unfair prejudice if the case is reopened." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (citation omitted). The Debtors and their stakeholders would suffer substantial prejudice from Enterprise's inexcusable delay. While Enterprise sat on its hands and failed to conduct reasonable—or any—diligence, the Debtors expended significant resources pursuing a sale process, running an auction for the Sale Transaction, and preparing for and attending the Sale Hearing. The Debtors and their advisors then spent two more weeks working to close the Sale Transaction—incurring significant administrative expenses in the process—before Enterprise finally brought its Motion.

43.     Finally, Enterprise challenges the section 363(m) protections provided to the Purchaser. However, the Sale Order neither expands nor modifies section 363(m), it simply provides that the Purchaser is entitled to the protections thereunder. *See* Sale Order ¶¶ JJ ("The Purchaser is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby."), KK ("The Purchaser is . . . entitled to all of

the protections afforded under section 363(m) of the Bankruptcy Code."), 32 ("The Purchaser is a good-faith purchaser of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m)."); *see also* 11 U.S.C. § 363(m) (providing protections to a purchaser of debtor assets under section 363(b)). Accordingly, Enterprise's request for additional language providing relief from section 363(m) protections would be superfluous. Indeed, numerous provisions of the Sale Order already make clear that the protections of section 363 apply only "[t]o the extent that a Debtor owns the Acquired Assets contemplated to be sold under the APA."[29] Accordingly, no additional revisions need to be made to the Sale Order even if Enterprise had a valid issue. In any event, as described above, the terms of the Sale Transaction—including the sale of assets by non-Debtor affiliates—were readily apparent from the Debtors' public filings beginning six weeks before the Sale Hearing. Enterprise's assertion that it was unaware of any sale of non-Debtor assets is therefore not credible and irrelevant.

**B.    Enterprise Fails to Meet the Requirements for Relief Under Bankruptcy Rule 9024 and Rule 60**.

44.    Enterprise also moves for relief under Rule 60 of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 9024. This branch of the Motion fails for all the reasons set forth above, as well as at least three others:

45.    First, Enterprise did not have the ability to seek relief under Rule 60(b) at the time it filed its Motion. Although the Motion purports to seek relief under Rule 59(e) or Rule 60(b) in the alternative, it is well established that "the Federal Rules of Civil Procedure do not provide for

---

[29]    *E.g.*, Sale Order ¶¶ X, LL, MM, NN, 11, 26; *see also Notice of Filing of Revised Proposed order (I) Authorizing the Sale of Certain of the Debtors' Assets to the Stalking Horse Bidder Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 581-2] (reflecting changes made to this effect in redline).

a 'Motion for Reconsideration,'" and therefore "such motions may properly be considered *either* a Rule 59(e) motion to alter or amend judgment *or* a Rule 60(b) motion for relief from judgment." *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir.1998) (emphasis added); *see also Shepherd v. International Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004) (quoting *Hamilton Plaintiffs*).  "If a motion for reconsideration is filed within 14 days of the judgment or order of which the other party complains, it is considered a Rule 59(e) motion; otherwise, it is treated as a Rule 60(b) motion." *CARBO Ceramics, Inc., v. Bd. Tax Assessors for Wilkinson Cnty., GA* (*In re CARBO Ceramics, Inc.*), No. 20-31973, 2024 WL 505159, at *1 (Bankr. S.D. Tex. Feb. 8, 2024) (citing *Shepherd*, 372 F.3d at 328 n.1); *see also NF Clean v. Kakal (In re Kakal)*, No. 17-35014, 2019 WL 1868626, at *1 (Bankr. S.D. Tex. Apr. 25, 2019) (same).  Here, because Enterprise filed the Motion within 14 days of the Sale Order, the Motion must be considered under the rubric of Rule 59(e), not Rule 60(b).[30]

46.     Second, the burden of seeking relief under Rule 60(b) is at least as high, if not higher, than that of Rule 59(e).  The Fifth Circuit has "consistently held that the relief under Rule 60(b) is considered an extraordinary remedy . . . [and that] [t]he desire for a judicial process that is predictable mandates caution in reopening judgments." *In re Pettle*, 410 F.3d 189, 191 (5th Cir. 2005) (citations and quotations omitted).  A movant "must establish that it qualifies for Rule 60(b) relief by 'clear and convincing evidence.'" *In re South*, 647 B.R. 535, 538 (Bankr. E.D. Tex. 2023) (citation omitted).  And to obtain relief under Rule 60(b)(6), the "movant must show the initial judgment to have been manifestly unjust." *Edward H. Bohlin Co., Inc. v. Banning Co., Inc*., 6 F.3d

---

[30]   Even if Enterprise is entitled to seek Rule 60(b) relief in the alternative (it is not), because Rule 60(b) carries with it an even higher burden than Rule 59(e), Enterprise cannot possibly carry its burden of showing cause for relief from the Sale Order, a fact Enterprise acknowledges.  Mot. ¶ 30 ("Rule 59(e) motions provide relief for the movant on grounds at least as broad as Rule 60 motions.").

350, 357 (5th Cir. 1993). Rule 60(b) does not offer a lifeline for parties seeking to escape the consequences of their own decisions—even those they come to regret. *In re Harbor Fin. Grp., Inc.*, 303 B.R. 124, 133 (Bankr. N.D. Tex. 2003) (holding that "relief because of 'mistake' under Rule 60(b)(1) is 'not available for a party who simply misunderstands the legal consequences of his deliberate acts'" (citation omitted)).

47.    Third, Enterprise has not come close to meeting its heavy burden under either of the provisions on which it relies under Rule 60(b). Rule 60(b) enumerates limited grounds for relieving a party or its legal representative from a final judgment, order, or proceeding, and Enterprise alleges that only two of those grounds are applicable here: (1) mistake, inadvertence, surprise, or excusable neglect (Rule 60(b)(1)); and (2) any other reason that justifies relief (Rule 60(b)(6)).

48.    With respect to Rule 60(b)(1), "[o]nce it is established that a party's neglect 'was at least a partial cause of its failure . . . ' the moving party then has the 'burden to convince the court that its neglect was excusable.'" *In re Perez*, 2012 WL 2576393, at *12–13 (Bankr. N.D. Tex. July 3, 2012) (citation omitted). The determination of what constitutes "excusable" neglect is ultimately an equitable one, taking into account all relevant circumstances, including "the danger of prejudice to the debtor, the length of delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).

49.    Here, Enterprise's claim that it lacked "a meaningful opportunity to object to and clarify the structure of and impact" of the Sale Transaction (Mot. ¶ 28) is objectively false: (i) Enterprise is a sophisticated financial institution that was familiar enough with ITCs to purchase

more than $30 million of them from TEP Developer; (ii) as set forth above, Enterprise was or should have been aware that the Debtors, including the seller under the TCPA and its indirect parent and affiliates, intended to sell substantially all their assets; and (iii) even cursory attention to the docket or the notices delivered to Enterprise would have revealed ample information to Enterprise regarding the Sale Transaction and Enterprise's opportunity to seek diligence, clarify its misunderstandings, and engage with the Debtors.  Having elected to forego even basic outreach and diligence, Enterprise's neglect is inexcusable, and condoning such neglect here risks significant prejudice to the Debtors, their estates, and their stakeholders.

50.     With respect to Rule 60(b)(6), relief under that provision is "mutually exclusive from relief available under sections (1)–(5)," and Enterprise cannot seek relief under both Rule 60(b)(1) and Rule 60(b)(6) based on the same facts.  *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 643 (5th Cir. 2005).  Rule 60(b)(6) is not a catch-all designed to pick up motions for reconsideration that otherwise fail the strict standards set forth in sections (1)–(5).  *Halliburton Energy Servs., Inc. v. NL Indus.*, 618 F. Supp. 2d 614, 652 (S.D. Tex. 2009) ("Because [movant] has not stated a ground for relief that is separate from the grounds relied on in seeking relief under the other subsections of Rule 60(b), it cannot obtain relief under Rule 60(b)(6)").  Rather, "[r]elief is available under Rule 60(b)(6) only where exceptional circumstances prevented the moving party from seeking redress through the usual channels."  *Atkinson v. Prudential Prop. Co.*, 43 F.3d 367, 373 (8th Cir. 1994) (internal quotation omitted).  And "[e]xceptional circumstances are not present every time a party is subject to potentially unfavorable consequences as a result of an adverse judgment properly arrived at."  *Id.* (internal quotation omitted).

51.     Here, Enterprise relies on precisely the same facts in support of its request for relief under Rule 60(b)(6) as it does in its requests under Rule 59(e) and Rule 60(b)(1), and all of its

requests fail for the same fundamental reason, namely, because the only "extraordinary circumstance" here is Enterprise's failure to perform basic diligence.   The Motion should be denied.

## II. Vacating the Sale Order Will Result in the Debtors' Liquidation to the Detriment of All Stakeholders, Including Enterprise.

52.      Enterprise requests that the Court reconsider and vacate the Sale Order without considering the implications of their requested outcome.   Abandoning the Sale Transaction now, however, would result in a materially worse outcome for all stakeholders.   As described above, in the Debtors' declaration in support of the Bidding Procedures Motion,[31] and in the Sale Declaration in support of the Sale Transaction,[32] the structure of the Sale Transaction was heavily negotiated and ultimately determined to provide the only path forward for the Purchaser, and likely any potential purchaser of the Debtors' and their affiliates' assets.[33]   The Debtors and their advisors engaged extensively with the Purchaser on alternative sale structures that might mitigate the risk

---

[31]   *Declaration of Bassam J. Latif in Support of Entry of Debtors' Emergency Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the WholeCo Stalking Horse Agreement and Expense Reimbursement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Authorizing the Assumption and Assignment of Assumed Executory Contracts and Unexpired Leases, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 403] (the "Bidding Procedures Declaration").

[32]   *Declaration of Bassam J. Latif in Support of Entry of an Order(I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, Encumbrances, and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 579] (the "Sale Declaration").   The Latif Declaration was admitted into evidence at the Sale Hearing without objection and Mr. Latif appeared and was subject to cross-examination regarding his testimony therein.

[33]   *See* Sale Declaration ¶ 13 ("As compared to the potential Sum-of-the-Parts Bid, the improved WholeCo Stalking Horse Bid provided greater value to all stakeholders, as well as significantly less execution risk and lower costs of execution."); ¶ 24 ("The Debtors, with the assistance of their advisors, have engaged in extensive discussions with the Purchaser, their advisors, various counterparties, and other critical stakeholders to ensure that the Purchaser is well-positioned to assume and operate the Debtors' business without significant disruption."); *id.* ¶ 25 ("I believe that entering into the WholeCo Stalking Horse Agreement . . . is critically necessary in light of the lesser alternatives presently available to the Debtors.");

of negative consequences of the Sale Transaction.[34]   The Debtors, their advisors, and the Purchaser, however, determined that each alternative structure would likely result in insurmountable tax implications for any purchaser.  The Debtors are certain (including based on conversations with the Purchaser) that the Purchaser, or any purchaser, could not justify the resulting tax implications on top of an already complicated sale, leaving the Debtors with only one option: liquidation.

53.   In a liquidation, and any sale or winddown transaction for that matter, a recapture for Enterprise would be triggered, and Enterprise would be in the same position or, likely, worse off.  Further, not only would Enterprise face the same recapture issues, but every stakeholder of the Debtors would face a materially worse outcome—the loss of more than $100 million of value for the estates, no certainty of any continued servicing of customers' Solar Systems, little-to-no recovery for stakeholders that have already lost millions (and, for some, billions) of dollars, and a prolonged process likely led by a chapter 7 trustee with no historical knowledge of this complex structure.

54.   The Debtors are tasked with maximizing value for *all* stakeholders.  While the Debtors are sympathetic to the implications Enterprise faces, the Sale Transaction is the only actionable path the Debtors have to provide any meaningful value to its stakeholders.  The Debtors, in their business judgment, have determined that the Sale Transaction provides the most value-maximizing transaction available under the circumstances.  The unwinding of the Sale Transaction will neither provide incremental benefit to Enterprise, nor any stakeholder.

---

[34]   *See* Bidding Procedures Declaration ¶ 14 ("[F]ollowing multiple rounds of extensive arm's-length negotiations over several weeks, the Debtors, utilizing their business judgment and in consultation with Moelis and their other advisors, entered into [the WholeCo Stalking Horse Agreement].").

Unwinding the Sale Transaction **_will_** put **_all_** stakeholders in a materially worse position, including Enterprise.  Accordingly, the Sale Order should not be vacated, and the Motion should be denied.

## **<u>Conclusion</u>**

55.      The Debtors respectfully request the Court deny the Motion and allow the Debtors to close the Sale Transaction and focus on progressing toward confirmation and consummation of the Plan.

Houston, Texas
August 18, 2025

/s/ *Jason G. Cohen*

| **BRACEWELL LLP** | **KIRKLAND & ELLIS LLP** |
|---|---|
| Jason G. Cohen (TX Bar No. 24050435) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Jonathan L. Lozano (TX Bar No. 24121570) | Anup Sathy, P.C. (admitted *pro hac vice*) |
| 711 Louisiana Street, Suite 2300 | 333 West Wolf Point Plaza |
| Houston, Texas 77002 | Chicago, Illinois 60654 |

**BRACEWELL LLP**
Jason G. Cohen (TX Bar No. 24050435)
Jonathan L. Lozano (TX Bar No. 24121570)
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:     (713) 223-2300
Facsimile:     (800) 404-3970
Email:          jason.cohen@bracewell.com
                jonathan.lozano@bracewell.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          anup.sathy@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
Ciara Foster (admitted *pro hac vice*)
Margaret Reiney (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          brian.schartz@kirkland.com
                ciara.foster@kirkland.com
                margaret.reiney@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Service**

I certify that on August 18, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason G. Cohen*
Jason G. Cohen